FILED 10 JUN '24 10:31 USDC-ORP

Derek Bluford
Plaintiff, In Pro se
3901 Klein Blvd.
Lompoc, CA 93436

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF OREGON
PORTLAND DIVISION

| | |
|---|---|
| Derek Bluford,<br>　　　　Plaintiff | Case No.: 3:22-cv-00811-SI |
| vs. | VERIFIED SECOND AMENDED<br>COMPLAINT |
| United States of America, et. al,<br>　　　　Defendants | JURY TRIAL DEMANDED |

## 1. INTRODUCTION

The Plaintiff, Derek Bluford, a non-violent offender who self-surrendered to the Federal Bureau of Prisons by walking in, is now wheelchair-bound, accompanied by a myriad of other medical conditions due to the Defendant's deliberate indifference towards his serious medical needs, medical negligence and other actions and inactions. The Plaintiff now brings this action under Bivens v. Six Unknown Agents of the Federal Bureau of Narcotics ("Bivens"), the Rehabilitation Act ("RA"), and the Federal Tort Claims Act ("FTCA"). Plaintiff's claims stem from the actions that initially took place at the Federal Correctional Institution Sheridan ("FCI Sheridan"), and continued while he was transferred while remaining under the custody and care of the Defendant.

The Plaintiff initially filed a Bivens case against David Prock, Jr. (Case No. 3:22-cv-00811-SI), however, then filed an amended complaint changing both the jurisdiction from Bivens to the FTCA and replacing Defendant David Prock, Jr. with the United States of America. Subsequently, the Plaintiff also filed a separate Bivens case (Case No. 3:22-cv-01005-SI) against Warden DeWayne

Hendrix and eleven other defendants in their individual and official capacities.

The Defendants, through the Oregon United States Attorney's Office, then moved the court to dismiss the Plaintiff's Bivens claims arguing that the Plaintiff did not exhaust his administrative remedies, that the Plaintiff failed to properly serve all Defendants, and that due to a recent United States Supreme Court ruling in Egbert v. Boule, that the Plaintiff's claims were now barred. The Plaintiff replied in opposition and the Court ruled that the Plaintiff would be extended Bivens and thus able to pursue his Bivens claims one and two against the BOP employees in their individual capacities.

Due to the number of complaints all stemming from conduct of the same Defendants while at FCI Sheridan, the Defendants then moved for a motion to consolidate. The Plaintiff submitted his own motion requesting that two additional cases (Case No. 3:23-00993-HZ and 2:24-cv-00509-JAT-ASB) be consolidated with the other two.

The Defendants additionally requested that the Plaintiff be ordered to file one amended complaint that includes the Bivens claims along with his FTCA and Rehabilitation Act claims. For those reasons, the Plaintiff now files this Verified Second Amended Complaint.

2. JURISDICTION

**A) Bivens**

Under Bivens v. Six Unknown Agents of the Federal Bureau of Narcotics, 403 U.S. 388 (1971), Plaintiffs may sue federal officials for the violation of certain constitutional rights. Plaintiff, Derek Bluford, is bringing this suit, in part, against federal officials.

The Defendant(s) are or were an employee of the United States Department of Justice ("DOJ"), BOP. Furthermore, the Defendant(s) were on active duty and

2

working while the events took place which have now resulted in this lawsuit. Therefore, this constitutes the Defendants acting under color of federal law.

**B) Rehabilitation Act ("RA")**

The Plaintiff is a qualified individual with a disability. He suffers from a physical and mental impairment that substantially limits one or more of the major life activities of an individual (there is a record of such impairment) and he is regarded as having such an impairment. BOP receives federal funding. The Plaintiff was excluded from and denied the benefits of services, programs and activities due to his disability and was not provided any reasonable accommodations for his disability despite his request(s).

**C) Federal Tort Claims Act ("FTCA")**

Under 28 U.S.C. §§1346(b), 1402(b), 2401(b), 2671-80, et seq., the Federal Tort Claims Act gives federal district courts exclusive jurisdiction over claims against the United States for "injury or loss of property, or personal injury, or death caused by the negligent or wrongful act(s) or omission(s)" of a federal employee "acting within the scope of his office or employment." Plaintiff brings this action against the United States for actions committed by BOP employee(s) who caused him injuries by their intentional, negligent and wrongful acts. Since the acts stated occurred while the Plaintiff resided at FCI Sheridan, which is located in Oregon, Oregon State Law applies.

3. Parties

Plaintiff:

Derek Bluford, 3901 Klein Blvd., Lompoc, CA 93436

At all times relevant hereto, Plaintiff Derek Bluford was under the custody and care of the Federal Bureau of Prisons.

Defendants:

United States of America, 950 Pennsylvania Ave., Washington, D.C. 20530

3

BOP Director, Michael Carvajal, 320 First N.W., Washington, D.C. 20534

At all times relevant hereto, Mr. Carvajal was the Director of the Federal Bureau of Prisons. As the BOP Director, this Defendant was responsible for the treatment and care of the Plaintiff. On information and belief, this Defendant had actual and constructive notice of the claims raised in this complaint. This Defendant knew that the Plaintiff was suffering and not only acted with deliberate indifference towards the Plaintiff's serious medical needs but failed to respond to the Plaintiff's request for help and inquire into the claims reported to him as argued within this complaint.

This Defendant had, and owed, a duty to Plaintiff. During the time frame of the claims brought within this complaint, the Defendant and Plaintiff had what courts have identified as a "Special Relationship", therefore giving the Defendant a heightened care of duty. Despite his duty, this Defendant knowingly acted adversely towards the Plaintiff by not only intentionally committing state torts against him, but participating in conduct that rose to the level of violating his constitutional rights.

BOP Western Regional Director, Melissa Rios-Marquez, 7338 Shoreline Drive, Stockton, CA 95219

At all times relevant hereto, Mrs. Rios-Marquez was the Western Regional Director of the Federal Bureau of Prisons. As the BOP Western Regional Director this Defendant was responsible for the treatment and care of the Plaintiff. On information and belief, this Defendant had actual and constructive notice of the claims raised in this complaint. This Defendant knew that the Plaintiff was suffering and not only acted with deliberate indifference towards the Plaintiff's serious medical needs, but failed to respond to the Plaintiff's request for help and inquire into the claims reported to her as argued within this complaint.

4

The Defendant had, and owed, a duty to the Plaintiff. During the time frame of the claims brought within this complaint, the Defendant and Plaintiff had what courts have identified as a "Special Relationship", therefore giving the Defendant a heightened care of duty. Despite her duty, this Defendant knowingly acted adversely towards the Plaintiff by not only intentionally committing state torts against him, but participating in conduct that rose to the level of violating his constitutional rights.

FCI Sheridan Warden, DeWayne Hendrix, 27072 SW Ballston Road, Sheridan, OR 97378

At all times relevant hereto, Mr. Hendrix was the Warden of Federal Correctional Institution Sheridan. As Warden, this Defendant was responsible for the treatment and care of the Plaintiff. On information and belief, this Defendant had actual and constructive notice of the claims raised in this complaint. This Defendant knew that the Plaintiff was suffering and not only acted with deliberate indifference towards the Plaintiff's serious medical needs, but failed to respond to the Plaintiff's request for help and inquire into the claims reported to him as argued within this complaint.

This Defendant had, and owed, a duty to the Plaintiff. During the time frame of the claims brought within this complaint, the Defendant and Plaintiff had what courts have identified as a "Special Relationship", therefore giving the Defendant a heightened care of duty. Despite his duty, this Defendant knowingly acted adversely towards the Plaintiff by not only intentionally committing state torts against him, but participating in conduct that rose to the level of violating his constitutional rights.

FCI Sheridan Associate Warden, Andrew Cooper, 27072 SW Ballston Road, Sheridan, OR 97378

At all times relevant hereto, Mr. Cooper was the Associate Warden of Federal

Correctional Institution Sheridan. As Associate Warden, this Defendant was responsible for the treatment and care of the Plaintiff. On information and belief, this Defendant had actual and constructive notice of the claims raised in this complaint. This Defendant knew that the Plaintiff was suffering and not only acted with deliberate indifference towards the Plaintiff's serious medical needs, but failed to respond to the Plaintiff's request for help and inquire into the claims reported to him as argued within this complaint. This Defendant had, and owed, a duty to the Plaintiff. During the time frame of the claims brought within this complaint, the Defendant and Plaintiff had what courts have identified as a "Special Relationship", therefore giving the Defendant a heightened care of duty. Despite his duty, this Defendant knowingly acted adversely towards the Plaintiff by not only intentionally committing state torts against him, but participating in conduct that rose to the level of violating his constitutional rights.

FCI Sheridan Case Manager, Patricia Ayala-Pena, 27072 SW Ballston Road, Sheridan, OR 97378

At all times relevant hereto, Mrs. Ayala-Pena was part of the Plaintiff's Unit Team serving as the Case Manager. As part of the Unit Team for the Plaintiff, she was directly responsible for him. On information and belief, this Defendant had actual and constructive notice of the claims raised in this complaint. This Defendant knew that the Plaintiff was suffering and not only acted with deliberate indifference towards the Plaintiff's serious medical needs but failed to respond to the Plaintiff's request for help and inquire into the claims reported to her as argued within this complaint.

This Defendant had, and owed, a duty to the Plaintiff. During the time frame of the claims brought within this complaint, the Defendant and Plaintiff had what courts have identified as a "Special Relationship", therefore giving the

6

Defendant a heightened care of duty. Despite her duty, this Defendant knowingly acted adversely towards the Plaintiff by not only intentionally committing state torts against him, but participating in conduct that rose to the level of violating his constitutional rights and constituting criminal acts.

FCI Correctional Counselor, Brent Cray, 27072 SW Ballston Road, Sheridan, OR 97378

At all times relevant hereto, Mr. Cray was part of the Plaintiff's Unit Team, serving as the Counselor. As part of the Unit Team for the Plaintiff he was directly responsible for him. On information and belief, this Defendant had actual and constructive notice of the claims raised in this complaint. The Defendant knew that the Plaintiff was suffering and not only acted with deliberate indifference towards the Plaintiff's serious medical needs, but failed to respond to the Plaintiff's request for help and inquire into the claims reported to him as argued within this complaint.

This Defendant had, and owed, a duty to the Plaintiff. During the time frame of the claims brought within this complaint, the Defendant and Plaintiff had what courts have identified as a "Special Relationship", therefore giving the Defendant a heightened care of duty. Despite his duty, this Defendant knowingly acted adversely towards the Plaintiff by not only intentionally committing state torts against him, but participating in conduct that rose to the level of violating his constitutional rights and constituting criminal acts.

FCI Sheridan Correctional Counselor, A. Rodriguez, 27072 SW Ballston Road, Sheridan, OR 97378

At all times relevant hereto, Mr. Rodriguez was a Correctional Counselor at FCI Sheridan. This Defendant was responsible for the treatment and care of the Plaintiff. On information and belief, this Defendant had actual and constructive notice of the claims raised in this complaint. The Defendant knew

7

that the Plaintiff was suffering and not only acted with deliberate indifference towards the Plaintiff's serious medical needs, but failed to respond to the Plaintiff's request for help and inquire into the claims reported to him as argued within this complaint.

This Defendant had, and owed, a duty to the Plaintiff. During the time frame of the claims brought within this complaint, the Defendant and Plaintiff had what courts have identified as a "Special Relationship", therefore giving the Defendant a heightened care of duty. Despite his duty, this Defendant knowingly acted adversely towards the Plaintiff by not only intentionally committing state torts against him, but participating in conduct that rose to the level of violating his constitutional rights, and constituting criminal acts.

FCI Unit Manager, Brian Sponselor, 27072 SW Ballston Road, Sheridan, OR 97378

At all times relevant hereto, Mr. Sponselor, was part of the Plaintiff's Unit Team, serving as the Unit Manager. As part of the Unit Team for the Plaintiff, he was directly responsible for him. On information and belief, this Defendant had actual and constructive notice of the claims raised in this complaint. The Defendant knew that the Plaintiff was suffering and not only acted with deliberate indifference towards the Plaintiff's serious medical needs but failed to respond to the Plaintiff's request for help and inquire into the claims reported to him as argued within this complaint.

This Defendant had, and owed, a duty to the Plaintiff. During the time frame of the claims brought within this complaint, the Defendant and Plaintiff had what courts have identified as a "Special Relationship", therefore giving the Defendant a heightened duty of care. Despite his duty, this Defendant knowingly acted adversely towards the Plaintiff by not only intentionally committing state torts against him, but participating in conduct that rose to the level of violating his constitutional rights.

8

FCI Sheridan Doctor, Andrew Grasley, 27072 SW Ballston Road, Sheridan, OR 97378

At all times relevant hereto, Dr. Grasley was the Clinical Director and Head Doctor who oversaw the medical department at FCI Sheridan. This Defendant was directly responsible for the medical treatment and care of the Plaintiff. On information and belief, this Defendant had actual and constructive notice of the claims raised in this complaint. The Defendant knew that the Plaintiff was suffering and not only acted with deliberate indifference towards the Plaintiff's serious medical needs but failed to respond to the Plaintiff's request for help and inquire into the claims reported to him as argued within this complaint.

This Defendant had, and owed, a duty to the Plaintiff. During the time frame of the claims brought within this complaint the Defendant and Plaintiff had what courts have identified as a "Special Relationship", therefore giving the Defendant a heightened care of duty. Despite his duty, this Defendant knowingly acted adversely towards the Plaintiff by not only intentionally committing state torts against him, but participating in conduct that rose to the level of violating his constitutional rights, and constituting criminal acts.

FCI Sheridan Psychologist, Doctor Cynthia Campagna, 27072 SW Ballston Road, Sheridan, OR 97378

At all times relevant hereto, Dr. Campagna was the Head Psychologist who oversaw the psychology department at FCI Sheridan. This Defendant was directly responsible for the treatment and mental health care of the Plaintiff. On information and belief, this Defendant had actual and constructive notice of the claims raised in this complaint. The Defendant knew that the Plaintiff was suffering and not only acted with deliberate indifference towards the Plaintiff's serious medical needs but failed to respond to the Plaintiff's request

for help, and inquire into the claims reported to her as argued within this complaint.

This Defendant had, and owed, a duty to the Plaintiff. During the time frame of the claims brought within this complaint, the Defendant and Plaintiff had what the courts have identified as a "Special Relationship", therefore giving the Defendant a heightened care of duty. Despite her duty, the Defendant knowingly acted adversely towards the Plaintiff by not only intentionally committing state torts against him, but participating in conduct that rose to the level of violating his constitutional rights.

FCI Sheridan Special Investigative Services Lieutenant, David Prock, Jr., 27072 SW Ballston Road, Sheridan, OR 97378

At all times relevant hereto, Mr. Prock was the Lieutenant of the Special Investigations Services department at FCI Sheridan. This Defendant was directly responsible for investigating claims of staff and resident misconduct. On information and belief, this Defendant had actual and constructive notice of the claims raised in this complaint. The Defendant knew that the Plaintiff was suffering and not only acted with deliberate indifference towards the Plaintiff's serious medical needs but failed to respond to the Plaintiff's request for help and inquire into the claims reported to him as argued within this complaint. This Defendant had, and owed, a duty to the Plaintiff. During the time frame of the claims brought within this complaint, the Defendant and Plaintiff had what courts have identified as a "Special Relationship", therefore giving the Defendant a heightened care of duty. Despite his duty, the Defendant knowingly acted adversely towards the Plaintiff by not only intentionally committing state torts against him, but participating in conduct that rose to the level of violating his constitutional rights and constituting criminal acts.

DOES 1-99

The Plaintiff alleges that unidentified DOES exist who directly participated

10

in the violations of the Plaintiff's constitutional rights and committed state torts against him. Plaintiff reserves the right to amend the complaint after discovery is completed so that Plaintiff can properly identify these Defendant(s).

4. Exhaustion of Administrative Remedies

Prior to filing these actions the Plaintiff pursued and fully exhausted all available administrative remedies that were available to him including, but not limited to, submitting several Department of Justice Standard Form 95 Claims which were all received by the Federal Bureau of Prisons, Western Regional Office, via the United States Postal Service Priority Mail.

5. Provisions

The Plaintiff requests that the following provisions be applied to the corresponding claims and causes of action, where appropriately identified.

**(a) Jailer-Prisoner "Special Relationship"**

The Ninth Circuit and State of Oregon Courts have long held that there is a "Special Relationship" between "jailer and prisoner" which imposes a heightened duty of care on the jailer to the prisoner. See Nordenstrom v. Corizon Health, Inc., No. 3:18-cv-01754-HZ, 2021 U.S. Dist. LEXIS 115139, 2021 WL 2546275, at *21 (D. Oregon, June 18, 2021). See also Giraldo v. California Department of Corrections, 168 Cal. App. 4th 231, 252-53, 85 Cal. Rptr. 3d 371 (2008).

The staff referenced in this complaint are employees of the Federal Bureau of Prisons (jailer) and the Plaintiff is a prisoner under their custody and care, therefore giving them [BOP] a heightened care of duty. In fact, the Plaintiff relies solely on the BOP for safekeeping, medical, protection, food, clothing and rehabilitation programming. See 18 U.S.C. §4042(a)(2) and (3), and BOP Program Statement (BOP's official policy) including, but not limited to, 6031.04, 5310.17, and 1210.25.

11

**(b) Law Enforcement Proviso**

Pursuant to the "law enforcement proviso" of 2860(h), Congress created an exception to the general prohibition on intentional torts under the FTCA for claims arising "out of assault, battery, false imprisonment, false arrest, abuse of process, or malicious prosecution," by an "investigative or law enforcement officer." See 28 U.S.C. §2860(h). See also Millbrook, 569 U.S. at 54-55.

Prison guards and staff are "law enforcement officers" for purposes of the proviso. In Bramwell v. U.S. Bureau of Prisons, 348 F.3d 804, 807 (9th Cir. 2003) ("The U.S. Supreme Court has specifically held that intentional misconduct by BOP officers gives rise to a cause of action under [the law enforcement proviso in] Section 2680(h).") (citing Carlson v. Green, 446 U.S. 14, 20, 100 S.Ct. 1468, 64 L. Ed. 2d 15 (1980)).

**(c) Defendant(s) Conduct Rose to the Level of Violating the United States Constitution**

All of the claims that the Plaintiff brings stem from the Defendant(s) by way of it's agency [BOP] and employee's actions against the Plaintiff for him engaging in protected activity. The protected activity that the Plaintiff was engaged in include, but is not limited to, freedom of speech (when the Plaintiff was trying to correct the unconstitutional conditions of confinement that he was being subjected to); Plaintiff being blocked in his attempts to seek redress from the court (due to him being denied medical care); and enduring such an extreme campaign of harassment that it included the Defendant(s) committing criminal acts.

This court, by way of the Honorable Michael Simon, has held that "the discretionary function exception" [in FTCA actions] does not apply when the alleged conduct rises to the level of a constitutional violation. See Hill v. Le, 2021

12

U.S. Dist. LEXIS 183290, 2021 WL 4391706 (D. Oregon, Sept. 24, 2021).

**(d) Defendant(s) Conduct Rose to the Level of Violating the Oregon Constitution**

Article 1, Sections 8, 13 and 16 of the Oregon State Constitution states that inmates should not be subject to "unnecessary rigor," "cruel and unusual punishment," and will have the right to "medical care," and be free from "retaliation." All of these rights were violated consistently by the Defendant(s) which caused the Plaintiff to suffer damages medically, mentally, physically, economically and non-economically.

All of the claims that the Plaintiff brings stem from the Defendant(s) by way of it's agency [BOP] and employees' actions against the Plaintiff for him engaging in protected activity. The protected activity that the Plaintiff was engaged in includes, but is not limited to, freedom of speech (when the Plaintiff was trying to correct the unconstitutional conditions of confinement that he was being subjected to); the Plaintiff being blocked in his attempts to seek redress from the court (due to him being denied medical care); and enduring such an extreme campaign of harassment that it included the Defendant(s) committing criminal acts.

This court, by way of the Honorable Michael Simon, has held that "the discretionary function exception" [in FTCA actions] does not apply when the alleged conduct rises to the level of a constitutional violation. See Hill v. Le, 2021 U.S. Dist. LEXIS 183290, 2021 WL 4391706 (D. Oregon, Sept. 24, 2021).

**(e) Discretionary Function**

The Ninth Circuit has long held that carelessness voids the "discretionary function exception". See Keller v. United States, 771 F.3d 1021. The court held that "carelessness would not be covered by the discretionary function exception as it involves no choice or judgment grounded in public policy consideration."

See also <u>Padilla v. United States</u>, 2012 U.S. Dist. LEXIS 195217, 2012 WL 12882367 at *6 (C.D. Cal. 2012); <u>Palay</u>, 349 F.3d at 432.

BIVENS CLAIM 1

STATEMENT OF FACTS

15

Due to the known worldwide Coronavirus ("Covid-19") pandemic, the rapid number of deaths and serious illnesses that occurred as a result of the virus prompted Congress and the Department of Justice to enact the CARES ACT to expand the authority of the Federal Bureau of Prisons ("BOP") to send non-violent and medically vulnerable inmates to home confinement. (See 3/2020 and 7/2020 memo to BOP to decrease prison population.) By all intents and purposes, Covid-19 was known to be a serious virus that was causing deaths. BOP Director Michael Carvajal ("Director Carvajal"), BOP Western Regional Director Melissa Rios-Marquez ("WR Director Rios"), FCI Sheridan Warden DeWayne Hendrix ("Warden Hendrix"), FCI Sheridan Associate Warden Andrew Cooper ("AW Cooper"), FCI Sheridan Unit Manager Brian Sponselor ("UM Sponselor"), FCI Sheridan Case Manager Patricia Ayala-Pena ("Case Manager Ayala"), FCI Sheridan Correctional Counselor Brent Cray ("Counselor Cray"), FCI Correctional Counselor A. Rodriguez ("Counselor Rodriguez"), FCI Sheridan Head Doctor Andrew Grasley ("Dr. Grasley"), FCI Head Psychologist Cynthia Campagna ("Dr. Campagna") and FCI Sheridan Special Investigations Services Lieutenant David Prock, Jr. ("SIS Prock"), were all aware of this. Not only had they received directives from the Attorney General's Office but they had discussed these measures within their own agency. As residents of FCI Sheridan started to apply for compassionate release (from 2020-2022) due to the inadequate medical care and high risk that they faced, the Defendants denied their request. The Defendants knew that the courts would depend on the information that they provided to help evaluate whether to grant a Defendants (prisoners) motion for compassionate release or not. Instead of providing the courts with correct information, which would have resulted in courts granting more releases and thus lowering the inmate population (and thus the likelihood of infection), the Defendants (Director Carvajal, WR Director Rios, Warden Hendrix, AW Cooper, Dr. Grasley and SIS Prock) decided

16

to report and publish false and misleading information regarding the true number of infected inmates, those that had recovered and transferred in or out of the institution as found by a recent investigation conducted by the Department of Justice, Office of Inspector General ("OIG"). See DOJ Inspector General Capstone Review of BOP Response to Covid-19, March 2023 report. As verified by the Plaintiff and internal reports, FCI Sheridan was simply not testing inmates for Covid-19, therefore allowing them to not report the number of truly infected inmates.

Furthermore, the Defendants (Carvajal, Rios-Marquez, Hendrix and Cooper) refused to stop inmate transfers or implement safe Covid-19 screening procedures or precautions. New inmates were being mixed with the general population inmates (where the Plaintiff was housed) while staff (Defendants Hendrix, Cooper, Cray, Sponselor, Ayala-Pena, Rodriguez, DOES 1-99) were not wearing PPE gear nor enforcing others to, which ultimately led to the Plaintiff contracting Covid-19. The Plaintiff suffered serious injury due to the Defendant's (all) not only individually, but collectively, creating a dangerous and unnecessary risk for wanton infliction of pain, death and serious illness which is exactly what led to the Plaintiff's suffering.

Regarding the Defendant's knowledge of the risk of death and/or serious illness of Covid-19 from 2020, the Defendants were all aware of this not only due to having over 300 inmates under their custody and care die as a result of Covid-19 but also some of their colleagues. Even medical professionals within the BOP and local governments advised and discussed the evolving virus with the Defendants and urged them to create alternative plans to mitigate the further risk and spread of Covid-19. Yet, the Defendants still implemented no measurable actions to help reduce the risk and spread of the virus.

In July of 2021, even the Plaintiff and his attorney started informing the

17

Defendants (including, but not limited to, Director Carvajal, WR Director Rios, Warden Hendrix, AW Cooper, Case Manager Ayala, Counselor Cray, and DOES 1-99) via writing and conversations of some of the specific risks and concerns regarding their deliberate indifference and wanton misconduct that was taking place by them and their colleagues, therefore increasing the risk for death or serious illness for the Plaintiff. Yet, their request and concerns were ignored, laughed at, and met with insults and threats by some of the Defendants. Other Defendants chose not to respond at all.

District Courts around the nation have identified FCI Sheridan apart from the other BOP institutions as to having an environment which increased the risk for it's residents to contract Covid-19. See United States v. Sharma, Case No. 15-00051, 2020 U.S. Dist. LEXIS 217215, 2020 WL 6802404 at *4 (E.D. Cal., Nov. 19, 2020) ("Last year, this court joined the latter group and held that conditions at FCI Sheridan were risky enough to show the circumstances were extraordinary and compelling."); Stirling v. Cooper, No. 20-712, D. Or. Jan. 8, 2021 ("Reports filed in litigation about the conditions at FCI Sheridan also cast doubt on the effectiveness of the prison's response to Covid-19."); United States v. Meron, Case No. 2:18-cr-0209-KJM, 2020 U.S. Dist. LEXIS 161711 (describing conditions at FCI Sheridan that are increasing the risk of Covid-19); United States v. Morris, No. 99-0174, 2020 WL 4344945 at *3 (W.D. Wash. June 22, 2020); United States v. Etzel, No. 17-0001, 466 F.Supp.3d 1135, 1139 (D. Or. 2020). In addition, the Oregon USAO even argued in Stirling v. Hendrix that inmates should utilize compassionate release to avoid the harsh conditions at FCI Sheridan.

Finally, the Oregon District Court ordered that an inspection of FCI Sheridan take place due to ongoing litigation and concerns that the court had regarding the unconstitutional conditions of confinement (See Exhibit ___1A___ - Amended

18

Complaint for Declaratory and Injunctive Relief and Petition For Writ of Habeas Corpus) by the Oregon Federal Public Defender's OFfice, Oregon United States Attorney's Office, Infectious Disease Control consultants, and others. Their report concluded that the residents of FCI Sheridan were not only "experiencing widespread distress and harm" due to the unconstitutional conditions of confinement and the "inhumane" conditions, but that the "inmates did not have access to these [medical care] services." (See Exhibit __1A__).

In the beginning of August 2021, FCI Sheridan employee(s) and inmate(s) tested positive for Covid-19. By September 2021, FCI Sheridan was experiencing yet another Covid-19 outbreak. Warden Hendrix and AW Cooper were aware of this and had instituted a modified operations schedule for the institution. (See Exhibit __1__). In this memo, a directive was issued to all staff informing them that they "must" wear "mandatory masks." Yet, staff (DOES 1-99) including the Defendants (Counselor Cray, Counselor Rodriguez, Case Manager Ayala-Pena, Dr. Grasley, Dr. Campagna) refused to wear them, including Warden Hendrix and AW Cooper who issued the notice themselves, as observed by the Plaintiff.

Around this time, FCI Sheridan 2A Housing Unit had inmates showing signs of Covid-19. This was observed by the Plaintiff, Derek Bluford, who in turn continued to notify staff including, but not limited to, Warden Hendrix (see Exhibit __2__), AW Cooper, Director Carvajal and WR Director Rios.

Due to the Plaintiff's medically documented heart conditions (see Exhibit __3__) and other health concerns, he also immediately notified the Unit 2 staff by speaking with them and sending them "Inmate Request to Staff" forms, both electronically and through the institution mail to Counselor Cray, Case Manager Ayala and 2A Housing Unit Officers (DOES 1-99) (see Exhibit __4__).

The Plaintiff's requests were not responded to and ignored by staff. Furthermore, Counselor Cray warned the Plaintiff again about "trying to cause trouble"

19

for FCI Sheridan by complaining about Covid-19. Counselor Cray informed the Plaintiff that "this whole thing is being blown out of proportion" and that "it's nothing serious" as he has "had the China Virus" and was now "perfectly fine." The Plaintiff had previously tried to file "Request For Administrative Remedies" regarding Covid-19 concerns and misconduct. However, it was rejected by Counselor Cray and, in return, the Plaintiff was threatened by Counselor Cray and informed that if he continued with his complaints, which focused on FCI Sheridan staff (DOES 1-99) and the Defendants breaking BOP and Center For Disease Control ("CDC") Covid-19 guidelines and procedures and criminal activities, that "there would be hell to pay" and that he [the Plaintiff] would receive an Incident Report. If the Plaintiff received an Incident Report he would lose Good Conduct Time and thus be confined under the BOP for longer. The Plaintiff then sent "Sensitive Complaints" and letters to upper BOP management (Director Carvajal, WR Director Rios, Warden Hendrix, AW Cooper, and SIS David Prock). Some were not responded to while others were rejected (see Exhibit __5__ ). Plaintiff also informed the Special Investigative Services of the threats that he was receiving from Counselor Cray both electronically and by sending them an Inmate Request To Staff form via institutional mail. The Plaintiff again explained his concerns over staff conduct increasing the risk for him getting infected with Covid-19, why he was trying to pursue an Administrative Remedy, the criminal activity, and the threats and denial that he was receiving from the Defendants.

The Plaintiff then continued to reach out to other FCI Sheridan departments, such as Medical and Health Services, warning them about the Covid-19 cases and people infected with the virus in his housing unit (see Exhibit __6__ ).

On September 7, 2021, the medical staff visited all of the FCI Sheridan Housing Units and tested a few random inmates. Their test results for inmates in the 2A

20

Housing Unit came back positive. Despite the Plaintiff's medical request which stated that he had Covid-19 symptoms and was requesting medical assistance, he was not tested for Covid-19 nor provided any medical aid. The Plaintiff was informed by the medical staff that the institution did not have enough Covid-19 tests for all inmates and that temperature checks were being utilized. The Plaintiff then requested a temperature check and was still denied while being informed that the tests were being taken at random. The Plaintiff then reiterated his medical concerns and cited known Covid-19 symptoms to the Defendants and staff (DOES 1-99). Yet still, the Plaintiff received no medical care or test.

It's important to note that the Department of Health and Human Services ("DHHS") reported that bOP was consistently declining additional Covid-19 drugs. They stated "We have reached out multiple times to BOP asking them why they do not want their allocations offered by HHS. They consistently say they have enough to meet demand/their demand is low." DHHS wrote this to Congress on May 4, 2022. Concerned, frustrated and seeking medical care, the Plaintiff then wrote Dr. Grasley and informed him that he was not feeling well citing numerous Covid-19 symptoms, and fear over what could happen due to the Plaintiff's medical history which he informed Dr. Grasley increased his risk for Covid-19 death or serious illness (see Exhibit __7__).

Over the next few days, the Plaintiff continued to contact the medical department, Dr. Grasley, Warden Hendrix, AW Cooper, Counselor Cray, Case Manager Ayala, and once again wrote to Director Carvajal and WR Director Rios for help (see Exhibit(s) __8__). All of the Plaintiff's efforts had no success. The The Plaintiff even reached out to Dr. Campagna citing anxiety and stress due to his growing fear of dying at FCI Sheridan and asking for her assistance in getting medical help due to his chronic pain. Again, all of his requests went

unanswered.

On September 9, 2021, the Plaintiff's roommate, Charles Topps, was removed from the 2A Housing Unit for testing positive for Covid-19. Despite the Plaintiff's roommate testing positive and the two of them spending 23 hours, 45 minutes in the room together each day (due to the modified operations), medical still refused to test or provide medical aid to the Plaintiff even though his condition had worsened. Instead, the Defendants placed a notice on the Plaintiff's room door stating that he was "Not Showing Signs of Illness" which was obviously false, reckless, and wantonly exposing/risking others. (See Exhibit 9 ).

On September 13, 2021, Plaintiff was found barely responsive by staff. An emergency respiratory encounter was performed and the Plaintiff was taken to the Salem Emergency Hospital via a third-party ambulance (see Exhibit 10 ). The Plaintiff was then tested for Covid-19 by the Defendants as they waited for the ambulance and then tested again for Covid-19 upon arriving at the hospital. Both tests confirmed the Plaintiff had Covid-19.

Since then, the Plaintiff has not recovered from Covid-19. The Defendants themselves have diagnosed the Plaintiff as to having "Post Covid-19 symptoms" (see Exhibit 11 ).

The Plaintiff was a Petitioner in Stirling v. Salazar/Hendrix, Case No. 3:20-cv-00712-SB, District of Oregon, and had asked Warden Hendrix even before joining the suit as a Petitioner, to stop transfers of inmates coming into FCI Sheridan as it was increasing the risk for the Plaintiff to get infected with the serious virus (Covid-19) and potentially die. Warden Hendrix refused. The Plaintiff explained precautions were not being taken to abate the increased risk of exposure to the deadly virus. Staff were not wearing PPE nor even providing effective or consistent supplies to the Plaintiff to keep himself safe

22

from the virus. The Plaintiff and his counsel then reached out to Director Carvajal and Western Regional Director Rios-Marquez requesting the same action and informing them of his increased risk of infection and increased risk for death or serious injury. Yet, they both failed to respond or take reasonable steps to abate the risk or investigate the Plaintiff's claims.

The Plaintiff was originally informed that he was "revived," however, since then has been told that he only passed out. The Plaintiff recalls that upon regaining consciousness that he was connected to an AED/Defibrillator. Staff also discussed in front of the Plaintiff potential liability, stating they they needed "to be careful," regarding "what was written down" as Counselor Cray had informed them earlier to stress the matter. The staff then stated that they would "wait and enter the medical information later and after speaking with others."

Despite the Plaintiff consistently contacting the Defendant regarding his serious medical need, asking them for help and medical care, he received no medical care at all. In fact, his requests were only met with threats and deliberate indifference towards his serious medical needs by the Defendants. The Defendants (Director Carvajal, WR Director Rios, Warden Hendrix, AW Cooper, Case Manager Ayala, Counselor Cray, Counselor Rodriguez, Dr. Grasley, Dr. Campagna, and SIS Prock) all knew that the Plaintiff was at an increased risk for death or serious illness if infected with Covid-19, as the Plaintiff and/or his counsel informed them of this information. Yet they still chose not to take reasonable actions to abate it.

As of today, the Plaintiff has now been diagnosed by the BOP's neurologist as "wheelchair-bound" and suffers from over a dozen other verified medical complications as diagnosed by the Defendants themselves.

BOP and the FCI Sheridan defendants knew that their response to the Covid-19

23

pandemic was inadequate. Not only were their practices leading to more deaths and serious illnesses, but continuous Covid-19 outbreaks, with each outbreak growing with more victims and longer durations. The Defendants established a custom of not wearing masks or other PPE gear and not enforcing this mandatory protective measure with their colleagues or inmates. The Defendants would constantly observe each other, their colleagues (DOES 1-99) and inmates not wearing masks or other PPE gear. Furthermore, the Defendant's all knew that social distancing was impossible at FCI Sheridan. Despite all of this, the Defendants chose not to act reasonably and take measures to abate the risk of introduction and spread of the Covid-19 virus which ultimately caused the Plaintiff to suffer great damages including, but not limited to, becoming wheelchair bound, mentally and physically impaired, and developing over a dozen other medical complications as diagnosed and verified by the Defendants themselves. The Defendants (Director Carvajal, WR Director Rios-Marquez, Warden Hendrix and AW Cooper) recklessly continued on with inmate transfers despite knowing it could carry a significant risk of spreading Covid-19. The Defendants (all) knew that containing a Covid-19 outbreak would be difficult due to its tight quarters, antiquated design, and poor ventilation.

Despite this, the Defendants (all) placed transferred inmates into the same housing unit of the Plaintiff at times, allowing air to flow in and out of the same cells, allowed newly transferred inmates to use the same showers, computers, phones and same tables of the other inmates, all while not wearing PPE nor providing sanitation supplies and vaccines. Despite the Defendants (all) being aware of limited Covid-19 tests and vaccinations, they were refusing these supplies offered to them by the government.

In an effort to discourage inmates of complaining about Covid-19 and keeping their outbreaks contained, the Defendants (all) would place sick (infected with Covid-19) in the SHU and then inform the remaining inmates that those

24

24a

inmate(s) went to the SHU.

Finally, prison staff were not regularly tested for Covid-19 and this contributed to inmates being infected and suffering through a serious illness and/or death. Staff (all Defendants and DOES 1-99) would travel in between housing units wearing the same clothing that they were when interacting with infected inmates and then came into contact with non-infected inmates cells and housing units, thus spreading the virus.

BIVENS CLAIM 1

DELIBERATE INDIFFERENCE

Deliberate Indifference

The U.S. Supreme Court explained what deliberate indifference means in its 1994 decision in Farmer v. Brennan. In Farmer, the Supreme Court held that an official acts with deliberate indifference when he or she "knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." 511 U.S. 825, 114 S.Ct. 1970 (1994), Id at 847.

Officials deliberate indifference can be proven through circumstantial evidence. The Supreme Court said "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a fact finder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." See Farmer, 511 U.S. at 842; see also Vance v. Peters, 97 F.3d 987, 992 (7th Cir. 1996); Spruce v. Sargent, 149 F.3d 783, 785-86 (8th Cir. 1998).

Deliberate indifference can also be found if the Defendants had actual knowledge that there were deficiencies in their medical care system in which created or caused an injury to the Plaintiff due to not receiving medical care. See Bass v. Wallenstein, 769 F.2d 1173, 1184-86 (7th Cir. 1985) (holding administrators deliberately indifferent based on their knowledge of deficiencies in medical care system); Alsina-Ortiz v. LaBoy, 400 F.3d 77, 81-82 (1st Cir. 2005) (holding high-level officials deliberately indifferent if they "knew of a continuing pattern of culpable failures of health care procedures and practices for inmates to receive care).

Director Carvajal's deliberate indifference towards the Plaintiff's serious medical needs

BOP Director Michael Carvajal was well aware of the extremely risky environment that he and his co-defendants had created at FCI Sheridan, thus increasing the

26

risk for Covid-19 infection. Not only had prisoners under his custody and care died as a result of Covid-19 but many of his own staff. In addition to this, litigation (including, but not limited to, Stirling v. Hendrix, Case No. 3:20-cv-00712-SB, District of Oregon, etc.), letters from Senators, letters from Congress members, letters from counsel (including the Plaintiff's), inmate complaints (including the Plaintiff's), internal BOP staff complaints, news & media outlets, and even the United States Senate Judiciary Committee was consistently pressuring Director Carvajal to do something to mitigate the risk and spread of the dangerous virus. See Beers-Capitol v. Whetzel, 256 F.3d at 132 (actual knowledge may be proven by circumstantial evidence if an excessive risk to inmates health or safety was so obvious that an official must have known about it). For example, Chair of the Senate Judiciary Committee, Dick Durbin, told Director Carvajal "Last March, Senator Grassley and I, along with a bipartisan group of 12 additional Senators, wrote to you and to the Attorney General, William Barr, to express serious concerns about the health and well being of prison staff and inmates ... It didn't take a degree or Dr. Fauci's resume to realize that our prisons were particularly vulnerable because of so many people gathered in such a limited space." See U.S. Senate Committee on the Judiciary, April 15, 2021.

Regarding FCI Sheridan Defendants not following BOP Covid-19 policies and CDC Covid-19 guidelines, not only had the Plaintiff and his attorney informed Director Carvajal of the specific violations and risk that were taking place, but so did local politicians. For example, Senators Padilla and Feinstein sent a letter to Director Carvajal asking why the lack of Covid-19 precautions yet never received a meaningful response apart from Director Carvajal stating that the BOP "takes these allegations seriously," in which Padilla replied stating "We communicated to you months ago that we understand [BOP precautions and

27

Covid-19 policies] aren't being followed." Yet again, Director Carvajal failed to respond or take action to abate the known serious risk. Director Carvajal was well aware of BOP's inadequate responses to Covid-19.

Apart from the above, no clearer argument can be made that Director Carvajal was aware of the Plaintiff's substantial risk and serious medical need than due to the fact that the Plaintiff himself and his attorney wrote to Director Carvajal informing him of the concerns regarding the conduct of the FCI Sheridan Defendants, the Plaintiff's substantial risk of death or serious illness if infected, and pleaded with him to do something to stop this cruel and unusual punishment. Yet, Director Carvajal acted with deliberate indifference towards the Plaintiff's serious medical needs by taking no reasonable measures to abate the risk. Courts have found that this amounts to deliberate indifference. See LaFaut v. Smith, 834 F.2d 389, 392-94 (4th Cir. 1987) (holding that official was the "responsible official in charge" and had been "fully advised" of the problem and therefore, due to taking no measurable action, that it constituted deliberate indifference); see also Ginest v. Board of County Comm'rs of Carbon County, 333 F.Supp.2d 1190, 1198 (D. Wyo. 2004) (finding officials have a duty to investigate information suggesting a risk of injury).

Director Carvajal was aware of the serious risk yet failed to even implement practices to ensure infected inmates were separated from non-infected inmates. Courts have found that this violates the Eighth Amendment. See Helling v. McKinney, 509 U.S. 25, 33, 113 S.Ct. 2475 (1993) (citing cases condemning the failure to separate prisoners with contagious diseases from others).

The Plaintiff again wrote Director Carvajal when he had believed that he had contracted the virus pleading with him to get medical care, informing him of his denied/delayed medical care request which exacerbated his symptoms, pain and suffering, the breakdown and complete failure of FCI Sheridan's medical

28

department, the limited Covid-19 tests available at FCI Sheridan and his increased risk for death or serious illness due to his medical conditions, citing Covid-19 symptoms. Yet again, Director Carvajal failed to respond or take action to abate the Plaintiff's serious risk.

Courts have also found that high-level officials acted with deliberate indifference due to their subordinates failure to get medical care for sick prisoners if they "knew of a continuing pattern of culpable failures." See Alsina-Ortiz v. LaBoy, 400 F.3d 77, 81-82 (1st Cir. 2005); see also Villant v. Dep't of Corrections of City of New York, 786 F.3d 516-519 (2nd Cir. 1986); Hill v. Marshall, 962 F.2d 1209, 1214 (6th Cir. 1992) (Supervisors failure to review and respond to inmate medical complaints despite knowledge of a breakdown in services constituted deliberate indifference); Fisher v. Koehler, 692 F.Supp. at 1562 (deliberate indifference found based on city government's "institutional failure" even though warden and commissioner were sincere and competent). Director Carvajal was well aware of the pattern of culpable failures by his agency. Not only were hundreds of inmates dying due to inadequate medical care, but litigation was mounting regarding these issues and he was consistently being warned and advised by local governments of the risk and BOP's lack of appropriate response. Yet, Carvajal blamed inadequate staffing which, in itself, courts have still found constitutes deliberate indifference. See Cabrales v. County of Los Angeles, 864 F.2d 1454, 1460-61 (9th Cir. 1988) and Anderson v. City of Atlanta, 788 F.2d at 685-89.

Director Carvajal was also aware of the BOP's Patient Care Program, Primary Care Provider Team (PCPT), as it was updated to meet the required Community Standard of Care for inmates. Despite this being developed and provided as part of the BOP Program Statement (BOP's Official Policy), Director Carvajal failed to implement the program. BOP medical staff consistently filed reports to their

29

supervisors [BOP] and with the Office of Inspector General ("OIG"), who ultimately did an audit on the BOP health care provided to inmates and stated "... we found that BOP did not have a reliable, consistent process in place to evaluate either the timeliness of inmate healthcare or the quality of that care." (See Exhibit 11A). This report was received by the BOP as were other complaints and findings by BOP staff and other agencies reviews and complaints. Even BOP unions were complaining to Director Carvajal and stating publicly that staff shortages and BOP operations "put a lot of normal health procedures for inmates on backlog." Finally, BOP medical staff even submitted complaints to the BOP and OIG stating that the medical practices are leading to severe problems and that "THIS IS UNACCEPTABLE. DANGEROUS. Literally a powder keg awaiting an explosion." (See Exhibit 11A). Yet still, Director Carvajal took no reasonable measures to abate the serious risk. See Hope v. Pelzer, 240 F.3d 975, 978-79 (11th Cir. 2001) (holding reports from government demonstrated that officials were aware of substantial risk of serious harm); Tafoya v. Salazar, 516 F.3d 912-916 (10th Cir. 2008) ("The official's knowledge of the risk need not be knowledge of a substantial risk to a particular inmate, or knowledge of the particular manner in which injury might occur.").

Despite Director Carvajal knowing that there were system failures and deficiencies within the BOP medical system, he still acted with deliberate indifference to abate the Plaintiff's serious medical needs and make accommodations to provide him medical care for his serious medical needs. Courts have found that this too serves as deliberate indifference. See Bass v. Wallenstein, 769 F.2d 1173, 1184-86 (7th Cir. 1985) (holding administrators could be held deliberately indifferent based on their knowledge of deficiencies in medical care system). Director Carvajal and the Plaintiff had what the Ninth Circuit and Oregon Courts have long held to constitute a "special relationship" (jailed-prisoner), there-

30

fore, heightening the duty on the jailer to provide care for. and avoid foreseeable risk towards the Plaintiff. Yet, despite his duty, Director Carvajal ignored and disregarded the safety, healthcare, and life of the Plaintiff which ultimately caused the Plaintiff to suffer great damages including, but not limited to, becoming wheelchair-bound, becoming mentally and physically impaired, and developing over a dozen other medical complications as diagnosed and verified by the Defendants themselves. It was very foreseeable that the Plaintiff most likely would contract the Covid-19 virus due to the recklessness and deliberately indifferent conduct by Director Carvajal and his co-defendants towards the Plaintiff's serious medical needs and unconstitutional conditions of confinement.

The Plaintiff raised his complaint to Director Carvajal regarding inmate transfers taking place and notified him that it was increasing his risk to get infected with what was known to the world as a deadly virus. The Plaintiff further explained that he was at an increased risk for death or serious illness. The Defendant failed to take action to stop the transfers or report to their colleagues the request to stop transfers. Seeing that transfers were still continuing, the Plaintiff requested that at least precautions be taken to protect his health with PPE. Yet, the Defendant and his co-defendants refused to wear them at times which ultimately led to the Plaintiff contracting Covid-19 and suffering great injuries.

WR Director Rios deliberate indifference towards the Plaintiff's serious medical needs

Western Regional Director Mrs. Rios-Marquez was well aware of the extremely risky environment that she and her co-defendants had created at FCI Sheridan, thus increasing the risk for Covid-19 infection for the Plaintiff. Not only had prisoners under her region's custody and care died as a result of Covid-19 but

31

many of her own staff. In addition to this, litigation (including, but not limited to, Stirling v. Hendrix, etc.) and local government and medical offices were asking her and her superiors to do something to mitigate the risk and spread of the dangerous virus.

Apart from the above, no clearer argument can be made that WR Director Rios was aware of the Plaintiff's substantial risk and serious medical need than due to the fact that the Plaintiff himself and his attorney wrote WR Director Rios informing her of the concerns regarding the reckless conduct of the FCI Sheridan Defendants, the complete breakdown and failure of the FCI Sheridan medical department, the Plaintiff's substantial risk for death or serious illness if infected, the limited amount of Covid-19 tests, and pleaded with her to do something to stop the cruel and unusual punishment. Yet, WR Director Rios acted with deliberate indifference towards the Plaintiff's serious medical needs by taking no reasonable measures to abate the risk. Courts have found that this amounts to deliberate indifference. See LaFaut v. Smith (holding that official was the "responsible official in charge" and had been "fully advised" of the problem, and therefore due to taking no reasonable actions, that it constituted deliberate indifference); see also Ginest v. Board of County of Comm'rs of Carbon County (finding officials have a duty to investigate information suggesting a risk of injury).

In addition to the written correspondence that WR Director Rios received regarding the Plaintiff not receiving medical care, the Plaintiff also spoke with WR Director Rios in person regarding this matter, yet she still failed to act to abate his risk of continued substantial risk and failed to get him medical care. WR Director Rios was aware of the serious risk yet failed to even implement practices to ensure infected inmates were separated from non-infected inmates. Courts have found that this violates the Eighth Amendment. See Helling v.

32

McKinney (citing cases condemning the failure to separate prisoners with contagious diseases from others).

The Plaintiff again wrote WR Director Rios when he had believed that he had contracted the virus, pleading with to get medical care, informing her of his denied/delayed medical request which was exacerbating his symptoms, pain and suffering, the breakdown and complete failure of FCI Sheridan's medical department, the limited Covid-19 tests available at FCI Sheridan, and his increased risk for death or serious illness due to his medical conditions, citing Covid-19 symptoms. Yet again, WR Director Rios failed to respond or take action to abate the Plaintiff's risk.

Courts have found that high-level officials act with deliberate indifference due to their subordinates failure to get medical care for sick prisoners if they "knew of a continuing pattern of culpable failures." See Alsina-Ortiz v. LaBoy; Villant v. Dep't of Corrections of City of New York; Hill v. Marshall; Fisher v. Koehler. WR Director Rios was well aware of the pattern of culpable failures by her agency. Not only were hundreds of inmates dying due to inadequate medical care, but litigation was mounting regarding these issues and she and her superiors were consistently being warned and advised by local government and medical offices of the risk and BOP's lack of adequate response. WR Director Rios was also aware of the BOP's Patient Care Program, Primary Care Provider Team ("PCPT") as it was updated to meet the required community standard of care for inmates. Despite this being developed and provided as part of the BOP Program Statement (BOP's Official Policy), WR Director Rios failed to implement the program. BOP medical staff consistently filed and submitted complaints to their supervisors [BOP] and with the Office of Inspector General ("OIG") who ultimately did an audit on the BOP's health care provided to inmates and stated "... we found that BOP did not have a reliable, consistent process in place to evaluate either the timeliness of inmate healthcare

33

or the quality of that care." (See Exhibit ||A ). This report was received by the BOP as were complaints and findings by BOP staff and other agency reviews and complaints. Even BOP unions were complaining to WR Director Rios and her superiors and stating publicly that staff shortages and BOP operations "put a lot of normal health procedures for inmates on backlog." Finally, BOP medical staff even submitted complaints to BOP and OIG stating that the medical practices are leading to severe problems and that "THIS IS UNACCEPTABLE. DANGEROUS. Literally a powder keg awaiting an explosion." (See Exhibit ||A ). Yet still, WR Director Rios took no reasonable measures to abate these known risks which ultimately caused the Plaintiff lifelong injuries. See Hope v. Pelzer (holding reports from government demonstrated that officials were aware of substantial risk of serious harm); see also Tafoya v. Salazar ("The official's knowledge of the risk need not be knowledge of a substantial risk to a particular inmate, or knowledge of the particular manner in which injury might occur"); Beers-Capitol v. Whetzel (actual knowledge may be proven by circumstantial evidence if an excessive risk to inmates' health or safety was so obvious that an official must have known about it).

Despite WR Director Rios knowing that there were system failures and deficiencies within the FCI Sheridan medical system, she still acted with deliberate indifference to abate the Plaintiff's serious medical needs and make accommodations to provide him medical care for his serious medical needs. Courts have found that this too serves as deliberate indifference. See Bass v. Wallenstein (holding administrators could be held deliberately indifferent based on their knowledge of deficiencies in medical care system).

WR Director Rios and the Plaintiff had what the Ninth Circuit and Oregon Courts have long held to constitute a "special relationship" (jailer-prisoner), therefore, heightening the duty on the jailer to provide care for, and avoid foreseeable risk towards, the Plaintiff. Yet, despite her duty, WR Director Rios

34

ignored and disregarded the safety, healthcare, and life of the Plaintiff which ultimately caused the Plaintiff to suffer great damages including, but not limited to, becoming wheelchair-bound, becoming mentally and physically impaired, and developing over a dozen other medical complications as diagnosed and verified by the Defendants themselves. It was very foreseeable that the Plaintiff would most likely contract the Covid-19 virus due to the recklessness and deliberately indifferent conduct by WR Director Rios and her co-defendants towards the Plaintiff.

The Plaintiff raised his complaint to WR Director Rios regarding inmate transfers taking place and notified her that it was increasing his risk to get infected with what was known to the world as a deadly virus. The Plaintiff further explained that he was at an increased risk for death or serious illness. The Defendant failed to take actions to stop the transfers or report to their colleagues the request to stop transfers. Seeing that transfers were still continuing, the Plaintiff requested that at least precautions be taken to protect his health with PPE. Yet, the Defendant and her co-defendants refused to wear them at times which ultimately led to the Plaintiff contracting Covid-19 and suffering great injuries.

<u>Warden Hendrix's deliberate indifference towards the Plaintiff's serious medical needs</u>

Warden Hendrix was well aware of the extremely risky environment that he and his co-defendants had created at FCI Sheridan, thus increasing the risk for Covid-19 infection. Not only had prisoners under his custody and care died as a result of Covid-19, but many of his colleagues. In addition to this, litigation (including, but not limited to, <u>Stirling v. Hendrix</u>), letters from local politicians, letters from counsel (including the Plaintiff's), inmate complaints (including the Plaintiff's), internal BOP staff complaints and concerns, news & media, and even local government and medical offices were consistently

informing Warden Hendrix of the concerns and risk associated with Covid-19 and urging him to take reasonable measures to abate it. See Beers-Capitol v. Whetzel, 256 F.3d at 132 (actual knowledge may be proven by circumstantial evidence if an excessive risk to inmate health or safety was so obvious that an official must have known about it).

Apart from the above, no clearer argument can be made that Warden Hendrix was aware of the Plaintiff's substantial risk and serious medical need than due to the fact that the Plaintiff himself and his attorney wrote and spoke with Warden Hendrix, informing him of the concerns regarding the conduct of his own and of the FCI Sheridan Defendants, the complete breakdown and failure of the medical department, the Plaintiff's substantial risk of death or serious illness if infected, and pleaded with him to do something to stop this cruel and unusual punishment. Yet, Warden Hendrix acted with deliberate indifference towards the Plaintiff's serious medical needs by taking no reasonable measures to abate the risk. Courts have found that this amounts to deliberate indifference. See LaFaut v. Smith, 834 F.2d 389, 392-94 (4th Cir. 1987) (holding that official was the "responsible official in charge" and had been "fully advised" of the problem, and therefore, due to taking no reasonable measures, that is constituted deliberate indifference); see also Genest v. Board of County Comm'rs of Carbon County, 333 F.Supp.2d 1190, 1198 (D. Wyo. 2004) (finding officials have a duty to investigate information suggesting a risk of injury).

Warden Hendrix was aware of the serious risk yet failed to even implement practices to ensure infected inmates were separated from non-infected inmates. Courts have found that this violates the Eighth Amendment. See Helling v. McKinney, 509 U.S. 25, 33, 113 S.Ct. 2475 (1993) (citing cases condemning the failure to separate prisoners with contagious diseases from others). See also Tafoya v. Salazar, 516 F.3d 912, 916 (10th Cir. 2008) ("The official's know-

ledge of the risk need not be knowledge of a substantial risk to a particular inmate, or knowledge of the particular manner in which injury might occur."). The Plaintiff again wrote and spoke with Warden Hendrix when he had believed that he had contracted the virus, pleading with him to get medical care, informing him of his denied/delayed medical request which exacerbated his symptoms, pain and suffering, the limited Covid-19 tests, and his increased risk for death or serious illness due to his medical conditions, citing Covid-19 symptoms. Yet again, Warden Hendrix failed to respond or take action to abate the Plaintiff's serious risk for death or serious illness.

Courts have found that high-level officials acted with deliberate indifference due to their subordinates failure to get medical care for sick prisoners if they "knew of a continuing pattern of culpable failures." See Alsina-Ortiz v. LaBoy, 400 F.3d 77, 81-82 (1st Cir. 2005); see also Villant v. Dep't of Corrections of City of New York, 786 F.3d 516-519 (2nd Cir. 1986); Hill v. Marshall, 962 F.2d 1209, 1214 (6th Cir. 1992) (Supervisors failure to review and respond to inmate medical complaints despite knowledge of a breakdown in services constituted deliberate indifference); Fisher v. Koehler, 692 F.Supp. at 1562 (deliberate indifference found based on government's "institutional failure" even though warden and commissioner were sincere and competent). Warden Hendrix was well aware of the pattern of culpable failures at FCI Sheridan. Not only was litigation mounting, but numerous Covid-19 outbreaks continued at FCI Sheridan, emergency transports to local hospitals increased, and communications from concerned family members and attorneys (including the Plaintiff's) kept informing him of such. Warden Hendrix blamed inadequate staffing which, in itself, courts have still found constitute deliberate indifference. See Cabrales v. County of Los Angeles, 864 F.2d 1454, 1460-61 (9th Cir. 1988), and Anderson v. City of Atlanta, 788 F.2d at 685-89.

Warden Hendrix was also aware of the BOP's Patient Care Program, Primary Care

37

Provider Team ("PCPT"), as it was updated to meet the required community standard of care for inmates. Despite this being developed and provided as part of the BOP Program Statement (BOP's Official Policy), Warden Hendrix failed to implement the program. BOP medical staff consistently filed reports to their supervisors [BOP] and with the Office of Inspector General ("OIG"), who ultimately did an audit on the BOP health care provided to inmates and stated "... we found that BOP did not have a reliable, consistent process in place to evaluate either the timeliness of inmate healthcare or the quality of that care." (See Exhibit  11 A ). This report was consistent with the practices that Warden Hendrix implemented and managed at FCI Sheridan. Even BOP unions were complaining and publicly stating that staff shortages and BOP operations "put a lot of normal health procedures for inmates on backlog." (See Exhibit  11 A ). Finally, BOP medical staff even submitted complaints to the BOP and OIG stating that the medical practices are leading to severe problems and that "THIS IS UNACCEPTABLE. DANGEROUS. Literally a powder keg awaiting an explosion." (See Exhibit  11 A ). See Hope v. Pelzer, 240 F.3d 975, 978-79 (11th Cir. 2001) (holding report(s) from government demonstrated that officials were aware of the substantial risk of serious harm to inmates). Yet still, Warden Hendrix took no reasonable measures to abate the risk.

Despite Warden Hendrix knowing that there were system failures and deficiencies within the FCI Sheridan medical system, he still acted with deliberate indifference to abate the Plaintiff's serious medical needs and make accommodations to provide him medical care for his serious medical needs. Courts have found that this too serves as deliberate indifference. See Bass v. Wallenstein, 769 F.2d 1173, 1184-86 (7th Cir. 1985) (holding administrators could be held deliberately indifferent based on their knowledge of deficiencies in medical care system). Not only had the Plaintiff informed Warden Hendrix of the lack of medical, but so had other inmates at FCI Sheridan. In addition to

38

this, Warden Hendrix was in litigation directly resulting from the inadequate medical care of FCI Sheridan. Yet, he still failed to take reasonable measures to correct the knowingly failing medical care system or provide alternative medical care options for inmates (including the Plaintiff).

Warden Hendrix and the Plaintiff had what the Ninth Circuit and Oregon Courts have long held to constitute a "special relationship" (jailer-prisoner), there- fore, heightening the duty of the jailer to provide care for and avoid foresee- able risk towards the Plaintiff. Yet, despite his duty, Warden Hendrix ignored and disregarded the safety, healthcare, and life of the Plaintiff which ulti- mately caused the Plaintiff to suffer great damages including, but not limited to, becoming wheelchair-bound, mentally and physically impaired and develop- ing over a dozen other medical complications as diagnosed and verified by the Defendants themselves. It was very foreseeable that the Plaintiff would most likely contract the Covid-19 virus due to the recklessness and deliberately indifferent conduct by Warden Hendrix and his co-defendants towards the Plain- tiff's serious medical needs and unconstitutional conditions of confinement. Warden Hendrix created a custom at FCI Sheridan by not wearing his mask or PPE gear and not enforcing his staff to abide by the "rules" of wearing the alleg- edly "mandatory" safety equipment that would scientifically reduce the chances of death or serious illness for the Plaintiff. Warden Hendrix was aware that social distancing was impossible within the Plaintiff's housing unit and at the institution in general. Yet, he required all inmates to eat together in their housing units and stay within those crowded units day in and day out. See Waggy v. Spokane County Washington, 594 F.3d 707, 713 (9th Cir. 2012) (holding that plaintiff's "must ... demonstrate that his deprivation resulted from an official policy or custom established by a ... policy maker possessed with final authority to establish that policy). As the Warden of FCI Sheridan he possessed the authority to establish policy. Warden Hendrix failed to train,

supervise and discipline his subordinates for their conduct (not wearing mask or PPE gear), which in turn increased the risk for the Plaintiff to get infected with Covid-19 and ultimately suffer great damages. Courts have found that this, too, meets the deliberate indifference test. See Forrest v. Estate of Roman, 2019 U.S. App. LEXIS 20486 at *21. See also Riggs v. Sisolak, et al., 2023 U.S. Dist. LEXIS 65369, Case No. 3:22-cv-00465-MMD-CSD, Jan. 3, 2023 (court held that since Defendants (i) sometimes did not wear mask, (ii) personally observed C/O's "not complying with the mask mandate," and (iii) learned that inmates were forced to eat/live/be in a "crowded" chow hall where social distancing was impossible, that taken together these allegations were sufficient to plead Defendant(s) "Acted with indifference to the risks posed by Covid-19." See Martinez, 2022 U.S. Dist. LEXIS 7304, 2022 WL 126054 at *6. The Plaintiff raised his complaint to Warden Hendrix regarding inmate transfers taking place and notified him that it was increasing his risk to get infected with what was known to the world as a deadly virus. The Plaintiff further explained that he was at an increased risk for death or serious illness. The Defendant failed to take action to stop the transfers or report to his colleagues the request to stop transfers. Seeing that transfers were still continuing, the Plaintiff requested that at least precautions be taken to protect his health with PPE. Yet, the Defendant and his co-defendants refused to wear them at times which ultimately led to the Plaintiff contracting Covid-19 and suffering great injuries.

FCI Sheridan Associate Warden Cooper's deliberate indifference towards Plaintiff's serious medical need

AW Cooper was well aware of the extremely risky environment that he and his co-defendants had created at FCI Sheridan thus increasing the risk for Covid-19 infection. Not only had prisoners under his custody and care died as a result of Covid-19, but many of his colleagues. In addition to this, litigation

40

(including, but not limited to, Stirling v. Hendrix), letters from local politicians, letters from counsel (including the Plaintiff's), inmate complaints (including the Plaintiff's), internal BOP staff complaints and concerns, news and media, and even local government and medical officers were consistently informing AW Cooper and his superiors of the concerns and risk associated with Covid-19 and urging them to take reasonable measures to abate it. See Beers-Capitol v. Whetzel (actual knowledge may be proven by circumstantial evidence if an excessive risk to inmates health and safety was so obvious that an official must have known about it). AW Cooper knew that the measures, practices and operations that he consistently implemented was inadequate as deaths, serious illnesses and Covid-19 outbreaks only continued to grow time after time over the course of three years (2020-2022).

Apart from the above, no clearer argument can be made that AW Cooper was aware of the Plaintiff's substantial risk and serious medical need than due to the fact that the Plaintiff himself and/or his attorney wrote to and spoke with Warden Hendrix and AW Cooper informing them of the concerns regarding the conduct of his own and of the FCI Sheridan Defendants, the complete breakdown and failure of the FCI Sheridan medical department, the Plaintiff's substantial risk of death or serious illness if infected, and pleaded with him to do something to stop the cruel and unusual punishment. Yet, AW Cooper acted with deliberate indifference towards the Plaintiff's serious medical needs by taking no reasonable measures to abate the risk. Courts have found that this amounts to deliberate indifference. See LaFaut v. Smith (holding that official was the "responsible official in charge" and had been "fully advised" of the problem and therefore, due to taking no action, that it constituted deliberate indifference); see also Genes v. Board of County Comm'rs of Carbon County (finding officials have a duty to investigate information suggesting a risk

41

of injury).

AW Cooper was aware of the serious risk, yet failed to even implement practices to ensure infected inmates were separated from non-infected inmates. Courts have found that this violates the Eighth Amendment. See Helling v. McKinney (citing cases condemning the failure to separate prisoners with contagious diseases from others); see also Tafoya v. Salazar ("The officials' knowledge of the risk need not be knowledge of a substantial risk to a particular inmate or knowledge of the particular manner in which injury might occur.").

The Plaintiff again wrote AW Cooper when he had believed that he had contracted the virus, pleading with him to get medical care, informing him of his denied/delayed medical request which exacerbated his symptoms, pain and suffering, the limited amount of Covid-19 tests, and his increased risk for death or serious illness due to his medical condition, citing Covid-19 symptoms. Yet again, AW Cooper failed to respond or take action to abate the Plaintiff's risk for death or serious illness.

Courts have found that high-level officials acted with deliberate indifference due to their subordinates failure to get medical care for sick prisoners if they "knew of a continuing pattern of culpable failures." See Alsina-Ortiza v. LaBoy; Villant v. Dep't of Corrections of City of New York; Hill v. Marshall (Supervisors failure to review and respond to inmate medical complaints despite knowledge of a breakdown in services constituted deliberate indifference); Fisher v. Koehler (deliberate indifference found based on government's "institutional failure" even though warden and commissioner were sincere and competent). AW Cooper was well aware of the pattern of culpable failures at FCI Sheridan. Not only was litigation mounting regarding FCI Sheridan's failure and inadequate response to Covid-19 and inadequate medical care, but numerous Covid-19 outbreaks continued to occur, emergency transports to local hospitals increased, and communications from concerned family members and attorneys

(including the Plaintiff's) kept informing him of such. AW Cooper blamed inadequate staffing which, in itself, courts have still found constitutes deliberate indifference. See Cabrales v. County of Los Angeles and Anderson v. City of Atlanta.

AW Cooper was also aware of the BOP's Patient Care Program, Primary Care Provider Team ("PCPT"), as it was updated to meet the required community standard of care for inmates. Despite this being developed and provided as part of the BOP Program Statement (BOP's Official Policy), AW Cooper failed to implement the program. BOP medical staff consistently filed reports to their supervisors [BOP] and with the Office of Inspector General ("OIG"), who ultimately did an audit on the BOP health care provided to inmates and stated " ... we found that BOP did not have a reliable, consistent process in place to evaluate either the timeliness of inmate healthcare or the quality of that care." (See Exhibit ||A ). This report was consistent with the practices that AW Cooper implemented and managed at FCI Sheridan. Even BOP unions were complaining and publicly stating that staff shortages and BOP operations "put a lot of normal health procedures for inmates on backlog." (See Exhibit ||A ). Finally, BOP medical staff even submitted complaints to the BOP and OIG stating that the medical operations are leading to severe problems and that "THIS IS UNACCEPTABLE. DANGEROUS. Literally a powder keg awaiting an explosion. (See Exhibit ||A ). See Hope v. pelzer (holding report(s) from government were sufficient to show that they were aware of the substantial risk of serious harm to inmates). Yet still, AW Cooper took no reasonable measure to abate the risk. Despite AW Cooper knowing that there were system failures and deficiencies within the FCI Sheridan medical system and institution, he still acted with deliberate indifference to abate the Plaintiff's serious medical needs and make accommodations to provide him medical care for his serious medical needs. Courts have found that this too serves as deliberate indifference. See Bass v.

43

Wallenstein (holding administrators could be held deliberately indifferent based on their knowledge of deficiencies in medical care system). Not only had the Plaintiff informed AW Cooper of the lack of medical, but so had other inmates of FCI Sheridan. In addition to this, AW Cooper was involved in the litigation directly resulting from the inadequate medical care at FCI Sheridan. Yet, he still failed to take reasonable measures to correct the knowingly failing medical care system or provide alternative medical care options to inmates (including the Plaintiff).

AW Cooper and the Plaintiff had what the Ninth Circuit and Oregon Courts have long held to constitute a "special relationship" (jailer-prisoner), therefore, heightening the duty of the jailed to provide care for, and avoid foreseeable risk towards, the Plaintiff. Yet, despite his duty, AW Cooper ignored and disregarded the safety, healthcare, and life of the Plaintiff which ultimately caused the Plaintiff to suffer great damages including, but not limited to, becoming wheelchair-bound, mentally and physically impaired, and developing over a dozen other medical complications as diagnosed and verified by the Defendant's themselves. It was very foreseeable that the Plaintiff would most likely contract the Covid-19 virus due to the recklessness and deliberately indifferent conduct by AW Cooper and his co-defendants towards the Plaintiff. AW Cooper created a custom at FCI Sheridan by not wearing his mask or PPE gear and not enforcing his staff to abide by the "rules" of wearing the allegedly "mandatory" safety equipment that would scientifically reduce the chances of death or serious illness for the Plaintiff. AW Cooper was aware that social distancing was impossible with the Plaintiff's housing unit and at the institution in general. Yet, he required all inmates to eat together in their housing units and stay within those crowded units day in and day out. See Waggy v. Spokane County, Washington, 594 F.3d 707, 713 (9th Cir. 2010) (proving liabil-

44

bility for an action or policy of deliberate indifference, a Plaintiff "must ... demonstrate that his deprivation resulted from an official policy or custom established by a ... policy maker possessed with final authority to establish policy.")

As the Associate Warden of FCI Sheridan, AW Cooper possessed the authority to establish policy. AW Cooper failed to train, supervised and discipline his subordinates for their conduct (not wearing mask or PPE gear), which in turn increased the risk for the Plaintiff to get infected with Covid-19 and ultimately suffer great damages. Courts have found that this too meets the deliberate indifference test. See Forrest and Estate of Roman, 2019 U.S. App. LEXIS 20486 at *21; see also Riggs v. Sisolak (court held that since the Defendants (i) sometimes did not wear mask, (ii) personally observed C/Os "not complying with the mask mandate," and (iii) learned that inmates were forced to eat/live/ be in a "crowded" chow hall where social distancing was impossible, that taken these allegations together they were sufficient to plead that the Defendant "acted with indifference to the risks posed by Covid-19." See Martinez, 2022 U.S. Dist. LEXIS 7304, 2022 WL 126054 at *6.

The Plaintiff raised his complaint to AW Cooper regarding inmate transfers taking place and notified him that it was increasing his risk to get infected with what was known to the world as a deadly virus. The Plaintiff further explained that he was at an increased risk for death or serious illness. The Defendant failed to take action to stop the transfers or report to his colleagues the request to stop transfers. Seeing that transfers were still continuing, the Plaintiff requested that at least precautions be taken to protect his health with PPE. Yet, the Defendant and his co-defendants refused to wear them at times which ultimately led to the Plaintiff contracting Covid-19 and suffering great injuries.

<u>CM Ayala's deliberate indifference towards the Plaintiff's serious medical need</u>

CM Ayala was well aware of the extremely risky environment that she and her co-defendants had created at FCI Sheridan, thus increasing the risk for Covid-19 infection. Not only had prisoners at her facility suffered great illnesses, but some had died as well. In addition to this, litigation (including, but not limited to, <u>Stirling v. Hendrix</u>), letters from counsel (including the Plaintiff's), inmate complaints (including the Plaintiff's), internal BOP staff complaints and concerns, news & media, and even local government and medical offices were consistently informing CM Ayala and her superiors of the concerns and risk associated with Covid-19 and urging them to take reasonable measures to abate it. See <u>Beers-Capitol v. Whetzel</u>, 256 F.3d at 132 (actual knowledge may be proven by circumstantial evidence if an excessive risk to inmates health or safety was so obvious that an official must have known about it).

Apart from the above, no clearer argument can be made of that CM Ayala was aware of the Plaintiff's substantial risk and serious medical need than due to the fact that the Plaintiff himself wrote and spoke with CM Ayala informing her of his concerns regarding her and her colleagues conduct that was increasing the risk for him getting infected and thus potentially suffering from a serious illness or death, and that he was at an increased risk for substantial harm due to his medical conditions. The Plaintiff pleaded with CM Ayala to do something to stop this cruel and unusual punishment. Yet, CM Ayala acted with deliberate indifference towards the Plaintiff's serious medical needs by taking no reasonable measures to abate the risk. CM Ayala was fully advised of the Plaintiff's medical conditions and increased risk. Furthermore, she was fully aware that not only her actions, but her colleagues and operations within the housing unit was increasing the risk for the Plaintiff to get infected with Covid-19 and thus suffer from death or serious illness. See <u>Lafaut v. Smith</u>

46

(holding that official was the "responsible official in charge" and had been "fully advised" of the problem and, therefore, due to taking no reasonable action that it constituted deliberate indifference); see also Genest v. Board of County Comm'rs of Carbon County (finding officials have a duty to investigate information suggesting a risk of injury).

CM Ayala was aware of the serious risk yet failed to even enforce practices to ensure infected inmates were separated from non-infected inmates. Courts have found that this violates the Eighth Amendment. See Helling v. McKinney (citing cases condemning the failure to separate prisoners with contagious diseases from others).

The Plaintiff again wrote and spoke with CM Ayala when he had believed that he had contracted the virus pleading with her to get medical care for him as he was in agonizing pain due to the prolonged/denied/delayed medical request which exacerbated his symptoms, pain and suffering, the complete breakdown and failure of the medical department, the limited amount of Covid-19 tests, and his increased risk for death or serious illness, due to his medical conditions, citing Covid-19 symptoms. Yet again, CM Ayala failed to respond reasonably and only referenced the Plaintiff's prior complaints and difficulties that he had caused her and her colleagues by complaining and trying to file grievances against them. See Alsina-Ortiz v. LaBoy (holding guard who knew of prisoner's "prolonged, manifest, agonizing pain" and did nothing to get care for him could be deliberately indifferent); see also Delany v. DeTella, 25 F.3d 679, 686 (7th Cir. 2001) (deliberate indifference established where defendants did nothing after inmate filed a grievance and requested medical attention).

CM Ayala knew that FCI Sheridan's medical department had operational issues and was failing, informing the Plaintiff that that "is not her job, nor her concern." Yet, despite knowing this, CM Ayala still failed to take reasonable

47

to get the Plaintiff medical care, knowing that he was at an increased risk for death or serious illness. See Hill v. Marshall (supervisors failure to review and respond to inmate medical complaints, despite knowledge of a breakdown in services, constituted deliberate indifference); Bass v. Wallenstein (holding administrators could be held deliberately indifferent based on their knowledge of deficiencies in the medical care system). Not only had the Plaintiff informed CM Ayala of the non-existent medical care, but so had other inmates. Yet, CM Ayala still failed to take reasonable measures to correct the knowingly failing system and operations within the Plaintiff's housing unit or arrange for him to get medical care.

CM Ayala and the Plaintiff had what the Ninth Circuit and Oregon Courts have long held to constitute a "special relationship" (jailer-prisoner), therefore heightening the duty of the jailer to provide care for, and avoid foreseeable risk towards, the Plaintiff. Yet, despite her duty, CM Ayala ignored and disregarded the safety, healthcare, and life of the Plaintiff in a form of retaliation due to his complaints and for his attorney contacting her and her colleagues which ultimately caused the Plaintiff to suffer great damages including, but not limited to, becoming wheelchair-bound, mentally and physically impaired. and developing over a dozen other medical complications as diagnosed and verified by the Defendants themselves. It was very foreseeable that the Plaintiff would contract the Covid-19 virus due to the recklessness and deliberately indifferent conduct by CM Ayala and her co-defendants towards the Plaintiff.

CM Ayala created a custom in the Plaintiff's housing unit at FCI Sheridan of not wearing her mask or PPE gear and not enforcing inmates or her colleagues to wear their mask, despite the mask being "mandatory." CM Ayala knew that wearing a mask and PPE gear would significantly reduce the chances of death or serious illness for the Plaintiff yet still failed to act reasonably to take even the

48

simplest steps to help reduce these chances by wearing protective gear and enforcing rules. See Waggy v. Spokane County, Washington (proving liability for an action or policy of deliberate indifference, a Plaintiff "must ... demonstrate that his deprivation resulted from an official policy or custom established by a ... policy maker possesses with final authority to establish policy.") CM Ayala served as the Case Manager for the unit in which the Plaintiff was housed. The Plaintiff notified CM Ayala of her and her colleagues failure to wear masks or other PPE even as the Plaintiff observed CM Ayala talking with inmates and colleagues (neither wearing a mask) numerous times and complained to her asking that she abide by and enforce the rules. Yet, CM Ayala took insult to the Plaintiff's request, ignored him, and failed to act reasonably. Courts have found that this too meets the deliberate indifference test. See Riggs v. Sisolak, et al., 2023 U.S. Dist. LEXIS 65369, Case No. 3:22-cv-00465-MMD-CSD, Jan. 3, 2023 (court held that since the Defendants (i) sometimes did not wear a mask, (ii) personally observed C/Os "not complying with the mask mandate," and (iii) learned that inmates were forced to eat/live/be in a "crowded" chow hall where social distancing was impossible, that taken these allegations together, were sufficient to plead that the Defendant "acted with indifference to the risks posed by Covid-19." See Martinez, 2022 U.S. Dist. LEXIS 7304, WL 126054 at *6.

CM Ayala was directly responsible for the Plaintiff and other inmates in the unit. She knew that her supervisors and her colleagues failed to respond adequately to Covid-19 and that social distancing was not possible given the operations that she and her colleagues had instituted within the Plaintiff's housing unit and institution. Despite being informed by the Plaintiff of the substantial risk that he faced, once he believed that he had contracted Covid-19 and was experiencing severe symptoms, CM Ayala decided to take no action due to

49

the Plaintiff complaining previously about her and other staff's conduct (increasing the risk for Covid-19 infection and illegal activities from staff). Due to this, the Plaintiff suffered great damages.

The Plaintiff raised his complaint to CM Ayala  regarding inmate transfers taking place and notified her that it was increasing his risk to get infected with what was known to the world as a deadly virus. The Plaintiff further explained that he was at an increased risk for death or serious illness. The Defendant failed to take action to stop the transfers or report to her colleagues the request to stop transfers. Seeing that transfers were still continuing, the Plaintiff requested that at least precautions be taken to protect his health with PPE. Yet, the Defendant and her co-defendants refused to wear them at times which ultimately led to the Plaintiff contracting Covid-19 and suffering great injuries.

Counselor Cray's deliberate indifference towards the Plaintiff's serious medical needs

Counselor Cray was well aware of the extremely risky environment that he and his co-defendants had created at FCI Sheridan thus increasing the risk for Covid-19 infection. Not only had prisoners at his facility suffered great illnesses but some had died as well, In addition to this, litigation (including, but not limited to, Stirling v. Hendrix), letters from counsel (including the Plaintiff's), inmate complaints (including the Plaintiff's), internal BOP staff complaints and concerns, news & media, and even local government and medical offices were consistently informing Counselor Cray and his superiors of the concerns and risk associated with Covid-19 and urging them to take reasonable measures to abate it. See Beers-Capitol v. Whetzel, 256 F.3d at 132 (actual knowledge may be proven by circumstantial evidence if an excessive risk to inmates health or safety was so obvious that an official must have known about

50

it).

Apart from the above, no clearer argument can be made of that Counselor Cray was aware of the Plaintiff's substantial risk and serious medical need than due to the fact that the Plaintiff himself and his attorney wrote and spoke with Counselor Cray, informing him of the concerns regarding his and his colleagues conduct that was increasing risk of the Plaintiff getting infected and thus potentially suffering from a serious illness or death, and that he was at an increased risk for substantial harm due to his medical conditions. The Plaintiff pleaded with Counselor Cray to do something to stop the cruel and unusual punishment, Yet, Counselor Cray acted with deliberate indifference towards the Plaintiff's serious medical needs by taking no reasonable measures to abate the risk. Counselor Cray continued to engage in reckless behavior by not wearing a mask, nor other PPE equipment, nor reporting misconduct (not wearing mask or PPE gear and criminal activity) by him and his colleagues. Counselor Cray was directly responsible for the Plaintiff. Counselor Cray was fully advised of the Plaintiff's medical conditions and increased risk. Furthermore, he was fully aware that not only his actions, but his colleagues and operations within the housing unit was increasing the risk for the Plaintiff to get infected with Covid-19 and thus suffer from death or serious illness. See LaFaut v. Smith (holding that official was the "responsible official in charge" and had been "fully advised" of the problem and therefore, due to taking no reasonable action, it constituted deliberate indifference); see also Genest v. Board of County Comm'rs of Carbon County (finding officials have a duty to investigate information suggesting a risk of injury).

Counselor Cray was aware of the serious risk yet failed to even enforce practices to ensure infected inmates were separated from non-infected inmates. Courts have found that this violates the Eighth Amendment. See Helling v. McKinney (citing cases condemning the failure to separate prisoners with con-

51

foreseeable risk towards the Plaintiff. Yet, despite his duty, Counselor Cray ignored and disregarded the safety, healthcare, and life of the Plaintiff in a form of retaliation due to his complaints and his attorney contacting him and his colleagues which ultimately caused the Plaintiff to suffer great damages, including, but not limited to, becoming wheelchair-bound, mentally and physically impaired, and developing over a dozen other medical complications as diagnosed and verified by the Defendants themselves. It was very foreseeable that the Plaintiff would contract the Covid-19 virus due to the recklessness and deliberate indifference conduct by Counselor Cray and his co-defendants towards the Plaintiff's serious medical needs and unconstitutional conditions of

confinement.

Counselor Cray created a custom in the Plaintiff's housing unit at FCI Sheridan, of not wearing mask or PPE gear, and not enforcing inmates or his colleagues to wear their mask, despite mask being "mandatory." Counselor Cray knew that wearing mask and PPE gear would significantly reduce the chances of death or serious illness for the Plaintiff, yet still failed to act reasonably to take even the simplest steps to help reduce these chances by wearing protective gear and enforcing rules. See Waggy v. Spokane County Washington (proving liability for an action or policy of deliberate indifference, a Plaintiff "must... demonstrate that his deprivation resulted from an official policy or custom established by a... policymaker possessed with the final authority to establish policy."). Counselor Cray served as the Counselor from the unit in which the Plaintiff was housed. The Plaintiff notified Counselor Cray of him and his colleagues failures to wear mask or other PPE, as the Plaintiff observed Counselor Cray talking with inmates and colleagues (neither wearing mask) numerous times, and complained to him asking that he and others abide by and enforce the rules. Yet, Counselor Cray took insult to the Plaintiff's request, and failed to act reasonably. Courts have found that this too meets the deliberate indifference test. See Riggs v. Sisolak (Court held that since the Defendants (i) sometimes did not wear mask, (ii) personally observed C/Os "not complying with the mask mandate," and (iii) learned that inmates were forced to eat/live/be in a "crowded" chow hall, where social distancing was impossible, that taken these allegations together, were sufficient to plead that the Defendant "acted with indifference to the risks posed by Covid-19.") See Martinez, 2022 U.S. Dist. LEXIS 7304, 2022 WL 126054, at *6.

Instead, Counselor Cray threatened the Plaintiff on several occasions, telling him that he would get a "Incident Report," and that there "would be hell to pay," if he continued on with his complaints and unfounded medical request. The Plaintiff also informed Counselor Cray that he was aware of his and his colleagues criminal activity, regarding smuggling items into the prison and running/allowing gambling operations to take place (by inmates) in exchange for kickbacks. Counselor Cray only increased his threats and hostility towards the Plaintiff, informing the Plaintiff that he would inform the inmates that he worked with the Federal Bureau of Investigations, and even went as far as printing out articles regarding the Plaintiff's cooperation, his book, and picture showing the Plaintiff that he was not bluffing. In addition, Counselor Cray and Counselor Rodriguez would intentionally cough towards the Plaintiff, and make jokes about the Plaintiff contracting Covid-19. The Plaintiff believes that Counselor Rodriguez's hostility came from him [the Plaintiff] reporting Counselor Rodriguez's criminal activity (smuggling drugs, health products, cell phones, and other items) to Counselor Cray. The Plaintiff later learned that Counselor Cray did not report this, and that he was involved in this criminal activity, as well as falsifying federal documents, and informing inmates of incoming inmates who were sex offenders, despite knowing that they would then be harmed. The Plaintiff, is not a sex offender, however, still took concern over this reckless behavior.

Counselor Cray was directly responsible for the Plaintiff, and other inmates in the unit. Counselor Cray knew that his co-defendants and colleagues failed to respond adequately to Covid-19, and that social distancing was not possible given the operations that he and his colleagues had instituted within the Plaintiff's housing unit and institution. Despite being informed by the Plaintiff of the substantial risk that he faced, then again once he believed that he contracted Covid-19, and was experiencing severe and exacerbating symptoms, Counselor Cray decided to take no action due to the Plaintiff's prior complaints. It was not until the Plaintiff was found barely responsive by Counselor Cray, an emergency respiratory event was performed, and the Plaintiff was rushed to the emergency hospital that Counselor Cray acted. Upon returning, Counselor Cray informed the Plaintiff that he should be grateful that he even called medical to save his "sorry ass," after all of his complaints. Because of Counselor Cray's deliberate indifference towards the Plaintiff's serious medical needs, he suffered great damages.

The Plaintiff raised his complaint to __Cray_____ regarding inmate transfers place, and notified them that it was increasing his risk to get infected with what was known to the world as a deadly virus. The Plaintiff further explained that he was at an increased risk for death or serious illness. The Defendant failed to take action to stop the transfers, or report to colleagues the request to stop transfers, despite knowing the serious risk for illness or death. Seeing that transfers were still continuing, the Plaintiff requested that at least precautions be taken to protect his health with PPE, and other measures. Yet, the Defendant and their co-defendants refused to wear them at times, and often mocked the Plaintiff, which ultimately lead and contributed to the Plaintiff contracting Covid-19, being revived, and taken to the Salem Emergency Hospital.

Dr. Grasley's deliberate indifference towards the Plaintiff's serious medical needs

Dr. Grasley was well aware of the extremely risky environment that he and his co-defendants had created at FCI Sheridan, thus increasing the risk for Covid-19 infection. Not only had prisoners under his care died as a result of Covid-19, but many of his colleagues. In addition to this, litigation (including but not limited to Stirling v. Hendrix, and other claims filed against Dr. Grasley and his medical department), letters and calls from concerned family members (including the Plaintiff's), letters and calls from counsel (including the Plaintiff's), inmate complaints (including the Plaintiff's), and internal BOP staff complaints, news & media, and even local government and medical offices were consistently informing Dr. Grasley and his co-defendants of the concerns and risk associated with Covid-19, and urging him to take reasonable measures to abate it. See Beers-Capitol v. Whetzel (actual knowledge may be proven by circumstantial evidence, if an excessive risk to inmates health and safety was so obvious that an official must have known about it). Dr. Grasley knew that the measures, practices and operations that he consistently implemented and managed as the Clinical Director and head doctor for FCI Sheridan was inadequate, as deaths, serious illnesses, and Covid-19 outbreaks only continued to grow time after time, over the course of three years (2020-2022).

Apart from the above, no clearer argument can be made that Dr. Grasley was aware of the Plaintiff's substantial risk and serious medical need than due to the fact that the Plaintiff himself wrote and notified Dr. Grasley on numerous occasions, informing him of his substantial risk for death or serious illness due to all of the deliberate indifference and reckless conduct taking place by him and his colleagues. Yet, Dr. Grasley acted with deliberate indifference towards the Plaintiff's serious medical needs by taking no reasonable measures to abate the risk. Courts have found that this amounts to deliberate indifference. See LaFaut v. Smith (holding official was the "responsible official in charge" and had been "fully advised" of the problem, and therefore due to taking no action, that it constituted deliberate indifference); See also Genes v. Board of County Comm'rs of Carbon County (finding officials have a duty to investigate information suggesting a risk of injury).

Dr. Grasley was aware of the serious risk, yet failed to even implement practices to ensure that infected inmates were separated from non-infected inmates. Courts have found that this violates the Eighth Amendment. See Helling v. McKinney (citing cases condemning the failure to separate prisoners with contagious diseases from others).

The Plaintiff again wrote Dr. Garsley /loss of smell, loss of taste/ when he had believed that he had contracted with virus, and pleaded with him to get medical care, informing him of his denied/delayed medical request, his severe and chronic pain - vomiting nonstop, severe aches and pain, high fever, dizziness, extreme nausea, the complete breakdown and failure of the medical department, the limited amount Covid-19 test, and his increased risk for death or serious illness due to his medical conditions, citing Covid-19 symptoms. The Plaintiff sent dozens of request through the institutional and electronic mail, passing some request through medical personnel, and even had housing unit staff (corrections officers) call Dr. Grasley. See McElliot v. Foley, 182 F.3d 1248, 1256-57 (11th Cir. 1999)(holding repeated delays in doctor seeing a patient with constant severe pain could constitute deliberate indifference). Yet again, Dr. Grasley failed to respond or take action to abate the Plaintiff's serious risk.

Courts have found that high-level officials acted with deliberate indifference due to their subordinates failure to get medical care for sick prisoners if they "knew of a continuing pattern of culpable failures." See Alsina-Ortiza v. LaBoy; See also Villant v. Dep't of Correction of City of New York; Hill v. Marshall (Supervisors failure to review and respond to inmate medical complaints despite knowledge of a breakdown in services constituted deliberate indifference); Fisher v. Koehler (deliberate indifference found based on governments "institutional failure" even though warden and commissioner were sincere and competent). Dr. Grasely was well aware of the pattern of culpable failures at FCI Sheridan within the medical department, as he was the head clinical director and head doctor. Furthermore, not only was litigation mounting regarding FCI Sheridan's failure and inadequate medical care, but numerous Covid-19 outbreaks continued to occur, emergency transports to local hospitals increased, and communications from concerned family members and attorneys (including the Plaintiff's) kept informing him on such. Dr. Grasley blamed inadequate staffing, which in itself, courts have still found constitute deliberate indifference. See Cabreales v. County of Los Angeles and Anderson v. City of Atlanta.

Dr. Grasley was also aware of the BOP's Patient Care Program, Primary Care Provider Team ("PCPT"), as it was updated to meet the required community standard of care for inmates. Despite this being developed and provided as part of the BOP Program Statement (BOP's Official Policy), Dr. Grasley failed to implement the program as the Clinical Director and head doctor. BOP medical staff consistently filed reports and complained to their supervisors regarding staff shortages and the concerns they had on the impact of care being provided to inmates (including the Plaintiff). Ultimately, BOP medical staff reported complaints to the Office of Inspector General ("OIG"), who ultimately did an audit on the BOP health care provided to inmates and stated "...we found that BOP did not have a reliable, consistent process in place to evaluate either the timeliness of

inmate healthcare or the quality of that care." (See Exhibit ||A This report was consistent with the practices that Dr. Grasley implemented and managed at FCI Sheridan. Even BOP unions were complaining, and publicly stating that staff shortages and BOP operations "put a lot of normal procedures for inmates on backlog." (See Exhibit ||A Finally, BOP medical staff submitted a complaint to OIG stating that the medical operations are leading to severe problems and that "THIS IS UNACCEPTABLE. DANGEROUS. Literally a powder keg awaiting an explosion (See Exhibit ||A See Hope v. Pelzer (holding report(s) from government were sufficient to show that they were aware of the substantial risk of serious harm to inmates). Yet still, Dr. Grasley took no reasonable measures to abate the risk.

Despite Dr. Grasley knowing that there were system failures and deficiencies within the FCI Sheridan medical system, and institution, he still acted with deliberate indifference to abate the Plaintiff's serious medical needs, and make accommodations to provide him medical care for his serious medical needs. Courts have found that this too serves as deliberate indifference. See Bass v. Wallenstein (holding administrators could be held deliberately indifferent based on their knowledge of deficiencies in medical care system). Not only had the Plaintiff informed Dr. Grasley and raised complaints to him about the lack of medical care, but so had other inmates at FCI Sheridan. In addition to this, Dr. Grasley was involved in litigation directly resulting from the inadequate medical care at FCI Sheridan. Yet, he still failed to take reasonable measures to correct the knowingly failing medical care system, or provide alternative medical care options to inmates (including the Plaintiff).

Dr. Grasley and the Plaintiff had what the Ninth Circuit and Oregon Courts have long held to constitute a "special relationship" (jailer-prisoner), therefore heightening the duty of the jailer to provide care for, and avoid foreseeable risk towards the Plaintiff. Yet, despite his duty, Dr. Grasley ignored and disregarded the safety, healthcare, and life of the Plaintiff, which ultimately caused the Plaintiff to suffer great damages, including but limited to becoming wheelchair bound, mentally and physically impaired, and developing over a dozen other medical complications, as diagnosed and verified by the Defendant's themselves. It was foreseeable that the Plaintiff would most likely contract the Covid-19 virus, due to the reckless and deliberately indifferent conduct by Dr. Grasley and his co-defendants towards the Plaintiff.

The Plaintiff raised his complaint to ___Dr. Grasley___ regarding inmate transfers place, and notified them that it was increasing his risk to get infected with what was known to the world as a deadly virus. The Plaintiff further explained that he was at an increased risk for death or serious illness. The Defendant failed to take action to stop the transfers, or report to colleagues the request to stop transfers, despite knowing the serious risk for illness or death. Seeing that transfers were still continuing, the Plaintiff requested that at least precautions be taken to protect his health with PPE, and other measures. Yet, the Defendant and their co-defendants refused to wear them at times, and often mocked the Plaintiff, which ultimately lead and contributed to the Plaintiff contracting Covid-19, being revived, and taken to the Salem Emergency Hospital.

Dr. Campagna's deliberate indifference towards the Plaintiff's serious medical needs

Dr. Campagna was well aware of the extremely risky environment that she and her co-defendants had created at FCI Sheridan, thus increasing the risk for Coivd-19 infection. Not only had prisoners at her institution suffered great illnesses, but some had died. In addition to this, litigation (including but not limited to Stirling v. Hendrix), letters from counsel (including the Plaintiff's), inmate complaints (including the Plaintiff's), internal BOP staff complaints and concerns, and even local government and medical offices were consistently informing Dr. Campagna and her superiors of the concerns and risk associated with Covid-19, and urging them to take reasonable measures to abate it. See Beers-Capitol v. Whetzel (actual knowledge may be proven by circumstantial evidence, if an excessive risk to inmate health or safety was so obvious that an official must have known about it).

Apart from the above, no clearer argument can be made of that Dr. Campagna was aware of the Plaintiff's substantial risk and serious medical need than due to the fact that the Plaintiff himself wrote and spoke to Dr. Campagna, informing her of the concerns he had regarding her and her colleagues conduct, that was increasing the risk for him getting infected and thus potentially suffering from a serious illness or death, and that he was at an increased risk for substantial harm due to his medical conditions. The Plaintiff pleaded with Dr. Campagna to do something to stop this cruel and unusual punishment, and requested on numerous times to be seen by her for the anxiety and stress that he was experiencing due to his constant fear of death. Yet, Dr. Campagna acted with deliberate indifference towards the Plaintiff's serious medical needs by taking no reasonable measures to abate the risk. Dr. Campagna continued to engage in reckless behavior by not wearing mask nor PPE equipment, nor reporting misconduct (not wearing mask or PPE gear) by her colleagues. Dr. Campagna was directly responsible for the Plaintiff's mental health, safety and wellbeing. Dr. Campagna was fully advised of the Plaintiffs medical conditions, and increased risk. Furthermore, she was fully aware that not only her actions, but her colleagues and operations within the institution was increasing the risk for the Plaintiff to get infected with Covid-19, and thus increasing his odds of suffering from serious illness or death. See LaFaut v. Smith (holding that official was the "responsible official in charge" and had been "fully advised" of the problem, and therefore due to taking no reasonable action, that it constituted deliberate indifference); See also Genest v. Board of County Comm'rs of Carbon County (finding officials have a duty to investigate information suggesting a risk of injury).

The Plaintiff again wrote to Dr. Campagna when he had believed that he had contracted the virus, pleading with her to get medical care for him as he was in agonizing pain due to the prolonged/denied/delayed medical request, the complete breakdown and failure of the medical departments, the limited amount Covid-19 test, and his increased risk for death or serious illness, due to his medical condition, citing Covid-19 symptoms. Yet again, Dr. Campagna failed to respond. See Alsina-Ortiz v. LaBoy (holding guard who knew of prisoner's "prolonged, manifest, agonizing pain" and did nothing to get care for him could satisfy the deliberate indifference).

Dr. Campagna knew that FCI Sheridan's medical department had operational issues and was failing, and even told the Plaintiff and other inmates that there were not enough Covid-19 test for everyone, and that the medical department was short on staff. Yet, despite knowing this, Dr. Campagna still failed to take reasonable action to get the Plaintiff medical care, knowing that he was at an increased risk for death or serious illness. See Hill v. Marshall (Supervisors failure to review and respond to inmate medical complaints, despite knowledge of breakdown in services constituted deliberate indifference); See also Bass v. Wallenstein (holding administrators could be held deliberately indifferent based on their knowledge of deficiencies in medical care system).

Dr. Campagna and the Plaintiff had what the Ninth Circuit and Oregon Courts have long held to constituted as a "special relationship," (jailer-prisoner), therefore, heightening the duty on the jailer to provide care for, and avoid foreseeable risk towards the Plaintiff. Yet, despite her duty, Dr. Campagna ignored and disregarded the safety, healthcare, and life of the Plaintiff, which ultimately caused the Plaintiff to suffer great damages, including but not limited to becoming wheelchair bound, mentally and physically impaired, and developing over a dozen other medical complications, as diagnosed and verified by the Defendant's themselves. It was very foreseeable that the Plaintiff could suffer the damages in which he did, as Dr. Campagna and her co-defendants actions were reckless and showed a pattern of deliberate indifference towards his serious medical need.

Dr. Campagna was directly responsible for the Plaintiff. She knew that her supervisors and colleagues failed to respond adequately to Covid-19, and that social distancing was not possible given the operations that she and her colleagues had instituted within the institution. Despite being informed by the Plaintiff of the substantial risk that he had faced, then once again once he believed that he had contracted the Covid-19 virus, and was experiencing severe symptoms and chronic pain, Dr.

58

Campagna decided to take no action. Instead, Dr. Campagna decided to participate in reckless conduct by not wearing her mask, or other PPE gear and participate in retaliation by cutting off all mental health services to the Plaintiff.

The Plaintiff raised his complaint to Dr. Campagna regarding inmate transfers place, and notified them that it was increasing his risk to get infected with what was known to the world as a deadly virus. The Plaintiff further explained that he was at an increased risk for death or serious illness. The Defendant failed to take action to stop the transfers, or report to colleagues the request to stop transfers, despite knowing the serious risk for illness or death. Seeing that transfers were still continuing, the Plaintiff requested that at least precautions be taken to protect his health with PPE, and other measures. Yet, the Defendant and their co-defendants refused to wear them at times, and often mocked the Plaintiff, which ultimately lead and contributed to the Plaintiff contracting Covid-19, being revived, and taken to the Salem Emergency Hospital.

SIS Prock's deliberate indifference towards the Plaintiff's serious medical needs

SIS Prock was well aware of the extremely risky environment that he and his co-defendants had created at FCI Sheridan, thus increasing the risk for Covid-19 infection. Not only had prisoners at his institution died and suffered serious illnesses as a result of Covid-19, but so had some of his colleagues. In addition to this, litigation (including but not limited to Stirling v. Hendrix), letters from local politicians, letters from counsel (including the Plaintiff's), inmate complaints (including the Plaintiff's), internal BOP staff complaints and concerns, and even local government and medical offices were consistently informing SIS Prock and his superiors of the concerns and risk associated with Covid-19, and urging them to take reasonable measures to abate it. See Beers-Capitol v. Whetzel (actual knowledge may be proven by circumstantial evidence, if an excessive risk to inmates health and safety was so obvious that an official must have known about it). SIS Prock knew that the measures, practices and operations that FCI Sheridan implemented was inadequate, as deaths, serious illnesses, and Covid-19 outbreaks only continued to occur and grow, time after time, over the course of three years (2020-2022).

Apart from the above, no clearer argument can be made that SIS Prock was aware of the Plaintiff's substantial risk, serious medical needs and threats and challenges that he faced getting medical and grieving these issues than due to the fact that the Plaintiff himself wrote to the Special Investigative Services department at FCI Sheridan, where SIS Prock served as a Lieutenant. The Plaintiff submitted numerous complaints regarding staff misconduct, including but not limited to staff not wearing mask or PPE gear, staff (DOES 1-99) and SIS Prock's co-defendants intentionally coughing towards/at the Plaintiff and making jokes, criminal activity (Counselor Cray and Counselor Rodriguez smuggling illegal drugs, health supplements, cell phones and other items into the prison; Counselor Cray managing a gambling operation for inmates in exchange for kickbacks; Counselor Cray informing inmates of other inmates who had sex crimes; Counselor Cray allowing a specific inmate involved in the smuggling and gambling operation to make numerous unmonitored phone calls from his office), and other concerns including the lack of medical care. The Plaintiff explained in his complaints, the he was being retaliated against by staff, refused grievances, and threatened. Yet, no action or response ever happened.

The Plaintiff's last messages to SIS Prock was that he believed that he had contracted the Covid-19 virus, and needed immediate medical care as he was suffering extreme pain and suffering, and more importantly that he was at an increased risk for death or serious illness, due to his medical conditions. Yet still, SIS Prock failed to ever respond to the Plaintiff, or get him medical care, despite the Plaintiff's consistent request. The Plaintiff later learned that SIS Prock and his colleagues informed Counselor Cray of all the Plaintiff's sensitive complaints against him, in which caused Counselor Cray and other Defendants (Counselor Rodriguez) to further their campaign of harassment against him.

Despite SIS Prock knowing that FCI Sheridan's medical department had operational issues and was failing, he failed to take reasonable action to get the Plaintiff medical care, knowing that he was at an increased risk for death or serious illness. See Hill v. Marshall (Supervisors failure to review and respond to inmate medical complaints, despite knowledge of breakdown in services constituted deliberate indifference); See also Bass v. Wallenstein (holding administrators could be held deliberately indifferent based on their knowledge of deficiencies in medical care system).

SIS Prock and the Plaintiff had what the Ninth Circuit and Oregon Courts have long held to constitute as a "special relationship" (jailer-prisoner), therefore heightening the duty on the jailer to provide care for, and avoid foreseeable risk towards the Plaintiff. Yet, despite his duty, SIS Prock ignored and disregarded the safety, healthcare, and life of the Plaintiff, which ultimately caused the Plaintiff to suffer great damages, including but not limited to becoming wheelchair bound, becoming mentally and physically impaired, and developing over a dozen other medical complications, as diagnosed and verified by the Defendants themselves. It was very foreseeable that the Plaintiff would suffer the damages in which he did, as SIS Prock and his co-defendants actions were reckless and showed a pattern of deliberate indifference towards his serious medical needs.

The Plaintiff raised his complaint to __Prock__ regarding inmate transfers place, and notified them that it was increasing his risk to get infected with what was known to the world as a deadly virus. The Plaintiff further explained that he was at an increased risk for death or serious illness. The Defendant failed to take action to stop the transfers, or report to colleagues the request to stop transfers, despite knowing the serious risk for illness or death. Seeing that transfers were still continuing, the Plaintiff requested that at least precautions be taken to protect his health with PPE, and other measures. Yet, the Defendant and their co-defendants refused to wear them at times, and often mocked the Plaintiff, which ultimately lead and contributed to the Plaintiff contracting Covid-19, being revived, and taken to the Salem Emergency Hospital.

62

**BIVENS CLAIM 2**

**STATEMENT OF FACTS**

On or about September 14th, 2021, the Plaintiff returned to FCI Sheridan, from the Salem Emergency Hospital. Upon the Plaintiff being discharged from the hospital, the doctor prescribed the Plaintiff treatment in the form of medication, and that he follow the CDC Covid-19 recommended home remedies. To address the Plaintiff's severe and extreme vomiting that he was suffering from, the doctor specifically prescribed the Plaintiff Meclizine (Antivert) 25 MG.

Upon returning to FCI Sheridan, the Plaintiff was still infected with Covid-19 and continued to suffer from extreme and chronic pain, consistently throwing up, and eduring other medical complications (fever, chills, sore throat, muscle pain, loss of smell and taste). In addition, the Plaintiff could not bear weight in his legs and began losing his ability to walk, which was compounded by a combination of falls he suffered due to not being provided Rehabilitation Act accomodations, and the Defendant's intentionally denying him medical care. These events continued while the Plaintiff was at FCI Sheridan from September 2021 - August 2022.

The Plaintiff immediately began requesting his prescribed medication from Dr. Andrew Grasley and medical staff, upon his return to FCI Sheridan, by not only sending Inmate Request to Staff forms to them and having staff call, but by speaking with medical staff who appeared to take vitals of the inmates. The Plaintiff even requested assistance from the Defendant's (Cray, Rodriguez, Cooper, Hendrix, Ayala-Pena, Campagna) to get his medications, and informed them of the severe and chronic pain that he was in. Despite all of the Plaintiff's efforts to receive his prescribed medication to help alleviate his vomiting and severe/chronic pain, it was never given to him, ever.

It wasn't until five days after the Plaintiff returned to the institution, that he received a medication (Acetaminophen), which was not even the prescribed medication from the Salem Hospital doctor. For several days  the Plaintiff had to suffer through chronic and severe pain while enduring the effects of what was known by the Defendants to be a serious medical condition (Covid-19). Yet despite the Defendant's knownledge of this, they failed to provide not only the prescribed

63

treatment to the Plaintiff, but also failed to provide him with follow up care.

Originally, the Plaintiff was scheduled for a medical exam and follow up with Dr. Grasley one week after he returned from the emergency hospital. However, not only would weeks pass without the Plaintiff being seen by Dr. Grasley, despite the doctor knowing that the Plaintiff was suffering from a serious medical condition (Covid-19) and losing his ability to walk, but months. Dr. Grasley in fact not only interfaced with, but denied his own prescribed treatment. It wasn't until 11/4/2021 when the Plaintiff was even seen by medical staff who informed him that Dr. Grasley was unable to see him. This visit only occurred due to the United States Attorney's Office reaching out in response to a motion for reduction in sentence and compassionate release being filed on the Plaintiff's behalf, citing inadequate medical care, unconstitutional conditions of confinement and other factors.

Not even basic necessities such as water were consistently available or provided to the Plaintiff. In fact, if the Plaintiff needed water, he had to wheel himself out of the gym, up a ramp to the main floor, and then get water out of an often-empty sports jug, as staff failed to refill the jug. The nearest staff were hundreds of feet away from the Plaintiff's makeshift bed, and were not available to him when he sought additional medical care or was in pain. There were no emergency buttons nor any other method to notify staff in case of an emergency.

FCI Sheridan medical records show that on 9/14/2021, "Tylenol" and "Zofran" were prescribed to the Plaintiff by the Defendants. However, Plaintiff never received these medications. Medical records show that the Plaintiff was prescribed five medications from 9/13/2021 to 1/4/2022. The Plaintiff was advised by medical staff that he needed physical therapy due to him gradually losing feeling in his legs. The Plaintiff never received any of the medications nor physical therapy as prescribed by the Defendant's themselves, despite remaining at the insti-

tution for nearly another year and consistently requesting his prescribed treatment. The Plaintiff continuously informed the Defendants (Carvajal, Rios-Marquez, Hendrix, Cooper, Cray, Ayala-Pena, Grasley, Rodriguez, Campagna, Prock, Does 1-99) of their and their colleagues absence of replied or assistance to his serious medical needs' prescribed treatment and the severe and chronic pain that he was suffering from.

Due to the institution being on a modified operations schedule and the Plaintiff being wheelchair-bound, he consistently spoke with and wrote to staff, including, but not limited to Dr. Grasley, Dr. Campagna, Unit Staff (Mr. Cray, Mrs. Ayala-Pena), Counselor Mr. Rodriguez, Warden Hendrix, Associate Warden Cooper, and pill line staff requesting his medications and other prescribed treatment. The Defendants not only indivudally, but collectively failed to reasonably respond to the Plaintiff's serious medical needs and were frustrated with the Plaintiff due to him pursuing legal action against them. The Plaintiff then again informed the Western Regional Director, Mrs. Melissa Rios-Marquez, and BOP Director Michael Carvajal explaining these issues, his serious medical needs, and updating them regarding recent developments. Despite all of the Plaintiff's and his attorney's efforts to get care, the Defendants intentionally and deliberately failed to respond to his serious medical needs, which resulted in the Plaintiff suffering serious injuries including further unnecessary severe and chronic plain and losing his ability to walk.

Out of retaliation and in an effort to shield his colleagues and his own liability, Mr. Cray informed the Plaintiff that he had taken steps with the medical department to block the chance of his motion being granted, since he was "trying to pursue suing the institution after they saved his life." By this time Mr. Cray had received and become aware of notices of legal action against him and the institution for their deliberate indifference, wanton misconduct, and reckless disregard for the Plaintiff's serious medical needs and safety. Upon information and belief Mr. Cray worked in cahoots with Dr. Grasley, Dr. Campagna

65

and others to block medical services to the Plaintiff and falsify the Plaintiff's records, including, but not limited to: medical, programming and team meetings. Mr. Cray then disclosed to inmates that the Plaintiff has cooperated with the Federal Bureau of Investigations, which caused the Plaintiff to have been removed from the general population and placed in the Special Housing Unit (SHU) on 1/25/2022.

From January 2022 through August 2022 the Defendants (all) refused to provide or allow the Plaintiff access to medical or mental health services within BOP policy, despite knowing that he had numerous current and active medical needs. The Plaintiff's medical records show that he was actively suffering from: pain in unspecified limbs, shortness of breath, extreme nausea/vomiting, and Covid-19 symptoms. The Plaintiff originally weighed 184 pounds upon self-surrendering to the Defendants at FCI Sheridan. Due to the Defendants placing the Plaintiff in the Special Housing Unit and blocking all medications and medical care to him, he went on to throw up over 50 pounds over several months without any care. Upon being transferred, the Plaintiff was examined by medical and weighed 133 pounds, despite rising just under 6 feet, 2 inches. Nearly a 30% loss of body-weight. The Plaintiff consistently requested and pleaded with the Defendants (Carvajal, Rios-Marquez, Hendrix, Grasley, Campagna, Cray, Ayala-Pena, Prock and Rodriguez) for help yet they ignored his requests.

When the Plaintiff sought help from Counselor Rodriguez he informed the Plaintiff that he hoped that he would die back there [in the SHU], and that he knew that the Plaintiff tried reporting him to Mr. Cray regarding him helping out other inmates. This was in regards to the Plaintiff reporting illegal activities to Mr. Cray, who the Plaintiff later learned was involved in the same criminal activity (smuggling items into prison for prisoners, managing inmate gambling, etc.). Mr. Rodriguez made it clear to the Plaintiff that he would not be helping him get any medical care.

The Defendant's own policy required that individuals in the SHU be moved every 21 days due to known adverse mental health consequences of being confined consistently in the same room. Futhermore, the Defendant's own policy required that individuals in the SHU be consistently interviewed by mental health services every 30 days. The Plaintiff was never moved, nor interviewed by mental health services in accordance with the Defendant's own policy, which lead to him not only attempting to commit suicide, but upon being transferred and examined by a mental health specialist, being diagnosed with a "Severe/Major Depressive Disorder," and requiring three separate mental health prescriptions to even function at a low level. The Plaintiff informed Cray that he and his co-defendants would not get away with their malicious actions, and that he would make sure that psychology and medical were held accountable, as they have abandoned him. Mr. Cray then reported that psychology had made reports that they were seeing him, so good luck with that claim.

Despite the Plaintiff informing Rios-Marquez and submitting sensitive complaint(s) to her along with letters informing her of the retaliation and deliberate indifference to his serious medical need, and not receiving care, she continuously failed to take action to reasonably abate his risk and get him care. In addition, the Plaintiff's attorney was even writing to the Defendants (Carvajal, Rios-Marquez, Hendrix, and calling Cray and others several times), yet this only caused the Defendants to continue acting with deliberate indifference and increasing their hostile actions actions towards the Plaintiff and his serious medical needs. Ultimately this caused the Plaintiff great damages including, but not limited to, him going on to throw up nearly 30% of his bodyweight, developing serious mental health disorders, becoming wheelchair bound, and unnecessarily suffering from severe and chronic pain, due to being restricted from medical services.

The Defendants even blocked all of the Plaintiff's attorney's attempts to communicate with the Plaintiff. For eight months, the Defendants refused to app-

rove any of the Plaintiff's attorney's requests for Attorney-Client calls and visits. It wasn't until the Plaintiff was transferred that he finally had access to his former counsel. (See Exhibit  12  ). The Defendants were trying to derail the Plaintiff's pursuit of legal claims against them at all costs.

The Plaintiff was initially scheduled in 2021 to be taken out of the institution and examined by an outside neurologist. Despite this, the Defendants cancelled the Plaintiff's scheduled appointment for non-medical reasons. The Defendants cited on the Plaintiff's medical records that his appointment was cancelled due to "not enough staff" available to drive him to the scheduled appointment (see Exhibit  13  ). However, the Plaintiff was informed by Mr. Cray that staff were not going to come in on their day off to take him, because he didn't believe that the Plaintiff needed the care. The Plaintiff suffered several head injuries from 9/2021 - 8/2022. From falling off of a bunk bed, due to being forced into a two-person cell (that was not Rehabilitation Act compliant) with another wheelchair-bound inmate, to several falls that he had in the shower due to not being provided a shower chair/bench, the Plaintiff suffered numerous unnecessary injuries and ultimately lost his ability to walk.

The BOP has recently become known for not providing adequate medical care for person(s) in its custody who require off-site medical care. For example, the Office of Inspector General ("OIG") conducted an audit on the healthcare provided to inmates and concluded in their report that, "We found that the BOP did not have a reliable, consistent process in place to evaluate either the timeliness of inmate healthcare of quality of that care," and "Further, we found that BOP faced challenges in transporting inmates to off-site appointments which resulted in a frequent need to reschedule appointments that counld delay an inmate's healthcare."

Finally the report found that "BOP also did not have a process in place to monitor how long an inmate waited to receive care after a cancelled appointment.

Because BOP did not have systems to measure or track any of these issues, we believe it is difficult for the BOP to determine whether inmates are receiving care within the required community standard." See Office of Inspector General Office, Audit of the Federal Bureau of Prisons Comprehensive Medical Services Awarded to the Massachusetts Medical School (March 2022).

Similar to the findings of the OIG, even BOP Unions and staff were informing the Defendants of the issues with their medical care. For example, BOP Union President, Charles Jones said, "Those [staff] shortages put a lot of normal health procedures for inmates on backlog. This has caused significant issues of scheduling many outside medical trips each day which is carried out by correctional services." See Forbes Magazine, Federal Bureau of Prisons' Medical Care Falls Short of Its Own Policy, April 19, 2022, Walter Palvo. In the same article, it highlights the BOP's medical staff also raised concerns regarding BOP inmate healthcare, not only to the DIrector and Western Regional Director, but to the OIG, citing delayed medical care and medications leaving hundreds of inmates decompensating daily.

The United States Judiciary Committee told the BOP in a public hearing "It is deeply upsetting that families are mourning the loss of their loved ones because they were not afforded the proper medical care they deserved while incarcerated." See NPR, Law makers push for federal prison oversight after reports of inadequate medical, By Meg Anderson, December 12, 2023.

Lastly, even district courts throughout the nation have found that the BOP has not been living up to its constitutional obligation to provide adequate medical care. See United States v. Burr, 2022 U.S. Dist. LEXIS 216371, Case No. 1:15-cr-362-1, Dec 1, 2022 ("While it is a positive that the procedure is finally scheduled for later this year, that is worth little weight since the BOP already cancelled Mr. Burr's endoscopy once and may do so again," and "The evidence is overwhelming that the BOP is not providing medical care in the most effective

69

manner..."); See also <u>United States v. Ranes, Case No 3:06-cr-00041, D. Alaska, Nov. 22, 2022</u> ("In the two years since the Court previously heard Mr. Ranes' health continues to deteriorate, and troublingly, the BOP has yet to provide app- ropriate medical treatment."); <u>United States v. English No. 2:19-cr-20164, 2022 U.S. Dist. LEXIS 230553, E.D. Mich., Dec 22, 2022</u> ("In sum, BOP's mismanagement of English's serious health conditions, even if they are not yet life threatening, presents extraordinary and compelling reasons for release."); <u>United States v. Derentz, 608 F. Supp. 3d 189, 193 (E.D. Pa 2022)</u> ("BOP's repeated delays in arr- anging for care to protect [the defendant's] vision, constitute an extraordinary and compelling reason for release.")

Despite the Plaintiff's specialist appointment scheduled to take place in March of 2022 and it being missed due to staff shortages, the Defendants went on to never take the Plaintiff to the neurologist, despite his constant requests and worsening condition. The Plaintiff consistently informed Dr. Grasley, Warden Hendrix, Director Carvajal and Western Regional Director Rios-Marquez, Cooper, Campagna, Ayala-Pena, Rodriguez, and Prock of his worsening condition, and pleaded for help. The Defendants informed the Plaintiff that that was not their duty, while others suggested that the Plaintiff "make-up" with Mr. Cray, while the remaining Defendants did not even respond. From January 2022 - August 2022, the Defendants would conduct weekly walkthroughs in the SHU and the Plaintiff would consistently inform them that he was being denied medical care, mental health care, and needed his medications and care. Warden Hendrix would consistently deflect the issues that the Plaintiff would raise to him, often saying that he has "people" to deal with that stuff, and that the Plaintiff needed to contact them. The Warden rejected the opportunity to correct issues, despite him being the CEO of the institution. The Plaintiff informed Warden Hendrix that he was not being allowed to file grievances, and that he was not being allowed daily recreation like all of the other inmates, and again, Warden Hendrix

70

deflected, informing the Plaintiff to file a complaint with his Unit Team, despite the Plaintiff stressing to him that certain complaints were consistently being rejected, lost, and never returned.

On 4/25/2022, Dr. Grasley was on the 300 range of SHU, where the Plaintiff was housed. The Plaintiff called out to Dr. Grasley in a panic and asked for help, citing all of his issues, in which Dr. Grasley refused to seek out and inquire more. Dr. Grasley responded to the Plaintiff, by shouting from several doors down that "You're fine."

From January 2022, through August 2022. the Plaintiff's health seriously deteriorated, and his serious medical needs went without care, despite the Defendant's knowledge of the known risk to the Plaintiff's medical  and mental health needs. The Plaintiff's health not only seriously deteriorated during this time, but was compounded by the intentionally denied medical care by the Defendants. These included a plumbing break flooding the Plaintiff's room with feces for several days in June of 2022, causing his eye to become infected and ultimately losing partial vision in his left eye, the Plaintiff becoming wheelchair-bound due to the Defendants denying him medical care, to the damages that the Plaintiff incurred due to known psychological impairments due to Defendant's retaliation (keeping the Plaintiff in the SHU, not allowing Plaintiff to leave his room, not allowing the Plaintiff to ever go out to recreation, and cutting off all medical services), to him being assaulted and battered by an inmate at the direction of the Defendants, and throwing up over 50 pounds, the Defendant's actions were malicious, and clearly constituted deliberate indifference towards the Plaintiff's serious medical needs, which resulted in great damages.

To date, due to Defendant's action, and continued deliberate indifference towards the Plaintiff's serious medical needs, the Plaintiff has been diagnosed by the Defendant's themselves as to suffering from three mental health disorders (Severe/Major Depressive Disorder, Post Traumatic Stress Disorder and Anxiety Disorder), become wheelchair-bound, lost vision in his left eye, suffered a torn

71

rotator cuff, disorder of eyelid (cyst on eyelid), Astigmatism, Unspecified disorder of eye and adnexa, hypertension, hemorrhoids (due to showering on the floor for over a year, and getting cuts and infections on his buttocks due to having to slide across broken tiles on the shower floor), Polyosteoarthritis, cervical disc disorder, unspecified disorder of synovium and tendon (multiple sites), disorder of kidney and ureter, localized swelling, mass or lump, dizziness, Post Covid-19, nausea, osteoarthritis, and other ill-defined heart diseases (See Exhibit __14__). This is all due to the Defendant's continued deliberate indifference towards the Plaintiff's serious medical needs. The Plaintiff originally self-surrendered to the BOP by walking in, while in good health. Today, the Plaintiff has become wheelchair-bound, suffers from a myriad of medical complications, all due to the Defendant's actions.

Deliberate Indifference

Director Carvajal's deliberate indifference towards the Plaintiff's serious medical needs
Upon the Plaintiff returning to FCI Sheridan on 9/14/2021, and updating his family, counsel at the time (Cyrus Zal), and the Oregon Federal Defender, Lisa Hay, it was decided that the Plaintiff should follow up with the Defendant's, including BOP Director Michael Carvajal, to update them on the medical emergency that took place.

The Plaintiff then sent legal correspondence to Director Carvajal notifying him of the medical emergency, and requested immediate action regarding FCI Sheridan's continued deliberate indifference toward his serious medical need as he was still infected with Covid-19 and suffering from not receiving follow up medical care, not receiving his prescribed medications, not being provided wheelchair accommodations for showering or housing, all while losing his ability to walk, which was another serious medical need. See Taylor v. Plousis, ("a medical condition which threatens a Plaintiff's ability to walk, even on a non-permanent basis, falls within the ambit of a 'serious medical need.'"); See also Kaufman v. Carter, ("inability to walk, even temporarily, constitutes a serious medical need."); Jones v. Simek, (finding prison and doctor deliberately indifferent due to waiting 6 months to take prisoner to neurologist).

Even district court's throughout the nation were aware of the dangerous and risky environment at FCI Sheridan. See United States v. Sharma, supra ("Last year, this court joined the latter group and held that conditions at FCI Sheridan were risky enough to show the circumstances were extraordinary and compelling."); See also Stirling v. Hendrix, supra ("Report filed in litigation about the conditions at FCI Sheridan also cast doubt on the effectiveness of the prisons response to Covid-19.").

Yet again, the Plaintiff's request went unanswered by Director Carvajal. This conduct by Director Carvajal is consistent with the findings of the United States Senate Permanent Investigation Subcommittee, who subpoenaed Director Carvajal to report to them on August 1, 2022, to investigate similar matters, as Senators were receiving numerous reports of Carvajal failing to respond to serious medical needs, corruption, and sexual abuse of person(s) under his custody and care. At this public hearing, Ranking Senator Ron Johnson expressed to Director Carvajal "It's almost willful ignorance, and that's what I find disturbing." while caricaturing Carvajal's response to the BOP crises as "Don't want to know what's happening below me." The Subcommittee found that Carvajal had received reports, letters, and was cc'd on e-mails, but had intentionally ignored issues [inadequate medical care, corruption, suicides, legal matters, abuse, etc]. When it comes to the Plaintiff's matter, it's clear that Director Carvajal continued these acts of bad faith, and willful ignorance as not only had the Plaintiff contacted Carvajal on several occasion's, but so had his counsel.

There could be no clearer argument that Carvajal was aware if the Plaintiff's serious medical needs, risk and unconstitutional conditions of confinement, yet still acted with deliberate indifference towards the Plaintiff, than due to the fact that the Plaintiff spoke with Carvajal in person on April 6, 2022, and gave him a letter fully detailing his medical issues [specialty appointments cancelled, no medications, significant weight loss, heart pains that he was suffering through, shortness of breath, extreme vomiting and weight loss, and severe/chronic pain that he was in], medical concerns [losing his ability to walk, being blocked from medical and mental health care services], ongoing litigation [Stirling v. Hendrix], retaliation, threats, and pleaded with him for help. See also Jett v. Penner, 439 F.3d 1091, 1098 (9th Cir. 2006) (holding prison officals "are liable for deliberate indifference when they knowingly fail to respond to an inmate's request for help.") Yet, Director Carvajal failed to act reasonably or at all for that matter, to abate the Plaintiff's cruel and unusual punishment, blocked medical care, or to cure the unconstitutional conditions of confinement he was suffering from, despite being the official in charge of the BOP and fully advised of the risk and continuing problems. See LaFaut v. Smith, supra (holding that official was the "responsible official in charge" and been "fully advised" of the problem, and therefore due to taking no measurable action, that it constituted deliberate indifference); see also Ginest v. Board of County Comm'rs of Carbon County, supra (finding officials have a duty to investigate information suggesting a risk of injury).

Director Carvajal and the Plaintiff had what the Ninth Circuit and Oregon Courts have long held to constitute a "special relationship" (jailer-prisoner), therefore, heightening the duty on the jailer to provide care for, and avoid foreseeable risk towards the Plaintiff. Yet, despite this duty, Director Carvajal ignored and disregarded the safety, healthcare, and life of the Plaintiff again, despite knowing that his [Director Carvajal's] first absence of action to the Plaintiff's request for medical care for his serious medical need, resulted in him [the Plaintiff] being revived and rushed to the emergency hospital, which ultimately caused the Plaintiff significant injuries.

73

It was very foreseeable that the Plaintiff would continue to not receive adequate medical care for his serious medical needs, and be further subjected to unconstitutional conditions of confinement, as Director Carvajal had created a culture of mismanagement, abuse, corruption, and was consistently failing to reasonably address and cure staff shortages. Carvajal repeatedly failed to take measurable action to abate the serious medical and safety risk to the Plaintiff, or correct constitutional violations, as found by BOP internal reports, U.S. Senate Committee public hearings, litigation, and complaints from both people under his care and custody, and his own staff. Even BOP Unions were complaining to Director Carvajal about staff shortages, and the subsequent effects on normal health care procedures for inmates, and the breakdown in health care services. Carvajal knew that he and his co-defendants had created and managed a pattern of failures and inadequate medical care services for inmates as it was consistently being brought to his attention by several sources (U.S. Senate Judiciary Committee hearings, OIG audits on BOP Inmate Healthcare, litigation, internal reports and complaints, and the Plaintiff and his counsel informing him). See Alsina-Ortiz v. LaBoy, supra (holding high-level officials deliberately indifferent because they "knew of a continuing pattern of culpable failures of health care procedures and practices for inmates to receive care); see also Villant v. Dep't of Correction of City of New York, supra; Hill v. Marshall, supra (Supervisors failure to review and respond to inmate medical complaints despite knowledge of a breakdown in services constituted deliberate indifference); Fisher v. Koehler, supra (deliberate indifference found based on city governments "institutional failure").

Due to the culture that Carvajal and his co-defendants not only created, but managed, retaliation and corruption was, and continues to run rampant within the BOP. Complaints against staff tend to be disregarded, and in return met with extreme hostility and abuse. The Inspector General found that BOP has too few internal investigative staff, resulting in a "substantial backlog of unresolved employee misconduct cases." and that BOP didn't even know "whether the number of staff it represents as necessary to manage its institutions safely and effectively is accurate." See DOJ, Limited-Scope Review of the Federal Bureau of Prisons' Strategies to Identify, Communicate, and Remedy Operational Issues, Rpt No 23-065 (May 4, 2023).

The Government Accounting Office ("GAO"), even placed BOP on its "high risk" list of "government operations with vulnerabilities to fraud, abuse, mismanagement, or in need of transformation." See GAO, Efforts Made To Achieve Progress Need to Be Maintained and Expanded To Fully Address All Areas (April 20, 2023).

BOP Director Carvajal, knew of the serious risk for the Plaintiff while he was housed in the SHU from January 2022 - August 2022. Not only had the Plaintiff informed Director Carvajal in person on 4/6/2022, but so had government agencies with longstanding change request for unsafe practices within the SHU. Yet Carvajal never changed or improved these dangerous conditions or practices, that increased the likelihood for death or serious injury for person(s) held in the SHU. GAO stated that "while the BOP was previously called out for the practices of SHU placement of prisoners, little has changed." and criticized BOP for its "slow progress towards taking action on longstanding recommendation, partly because the Bureau hasn't established rules or time frames for doing so." The GAO report concluded, that "The management of federal prisons, including use of restrictive housing, requires immediate attention." See GAO, Federal Bureau Prisons Haven't Addressed Longstanding Concerns About Overuse of Solitary Confinement, Feb 6. 2024. The Plaintiff and his counsel informed Director Carvajal countless times, of the Plaintiff's growing health concerns, threats, and retaliation that was taking place, yet again, Director Carvajal failed to respond, which resulted in the Plaintiff suffering great damages as diagnosed and verified by the Defendant's themselves.

The Plaintiff's complaints, and attempts in seeking redress from the courts only caused him further injuries, due to the retaliation, which Director Carvajal was aware of. The Plaintiff pleaded with Carvajal for help, and informed him that nothing was getting done, nor even being investigated. The Plaintiff's claims were consistent with the agency's [BOP] annual Office of Internal Affairs Report, which showed that 14,361 cases in the most recent three-year period, involved alleged misconduct by 17, 907 employees. At that rate, even for an agency that employs 37,000 people, it would take seven years to collect a misconduct allegation for every one of them. On September 29, 2022, the new BOP Director Collette Peters acknowledged that "...it's not safe for the people that we're entrusted to protect." when it came to discussing the staff shortages and employee misconduct backlogs. Director Carvajal failed to hire, train, and address longstanding issues of retaliation, corruption, and abuse of the person(s) in it's care and custody, include the Plaintiff.

Due to Director Carvajal not only creating and managing a hostile environment for prisoners under his custody and care, who sought out  the court's and Office of Internal Affairs support in getting relief, but by directly choosing not to respond to the Plaintiff's serious risk, nor take any reasonable action to investigate the Plaintiff's request for help, he [the Plaintiff] suffered great injuries. After Director Carvajal visited the Plaintiff in the SHU, his staff turned around and directed an inmate to harm him, in return for relief to go home earlier, in which was actually then provided to that inmate. The Plaintiff suffered a torn rotator cuff due to being pinned against the desk by the inmate, while Defendant Cray ridiculed the Plaintiff and commanded him to stop his complaints. The Plaintiff then went on to suffer from further from the denied medical care, and ultimately vomited over 50 pounds of his body weight, and had numerous medical conditions develop and become compounded due to the Defendants intentionally blocking medical care service to him.

74

Western Regional Director Melissa Rios-Marquez's deliberate indifference towards the Plaintiff's serious medical needs

Upon the Plaintiff returning to FCI Sheridan on 9/14/2021, and updating his family, counsel at the time (Cyrus Zal), and the Oregon Federal Defender, Lisa Hay, it was decided that the Plaintiff should follow up with the Defendant's, including the Rios-Marquez, to update them on the medical emergency that took place.

The Plaintiff then sent legal correspondence to Rios-Marquez, notifying her of the medical emergency, and requested immediate action, regarding FCI Sheridan's continued deliberate indifference towards his serious medical needs as he was still infected with Covid-19 and suffering from not receiving follow up medical care, not receiving his prescribed medications, not being provided wheelchair accommodations for showering or housing, all while losing his ability to walk, which was another serious medical need. See Taylor v. Plousis, supra ("a medical condition which threatens a Plaintiff's ability to talk, even on a non-permanent basis, falls within the ambit of a 'serious medical need.'"); See also Kaufman v. Carter, supra ("inability to walk, even temporarily, constitutes a serious medical need.); Jones v. Simek, supra (finding prison officials and doctor deliberately indifference due to waiting 6 months to take prisoner to neurologist.). Yet again, his request went unanswered.

This conduct by Rios-Marquez is consistent with the findings of numerous district courts throughout the nation, the U.S. Senate Judiciary Committee, and the Attorney General, regarding BOP's Executive Management failing to respond to the crisis within their agency. These reputable judges, government agencies and senators found that the BOP Executive Management had created a culture of turning a blind eye towards corruption, the abuse of inmates, and that due to staff shortages and known BOP internal deficiencies, continues to fail at providing adequate medical care services, for person(s) in it's custody and care. When it comes to the Plaintiff's matter, it's clear that Rios-Marquez continued these acts of bad faith, and willful ignorance as not only had the Plaintiff contacted her in regards to these matters, but so had his attorney.

Even district court's throughout the nation were aware of the dangerous and risky environment at FCI Sheridan. See United States v. Sharma, supra ("Last year, this court joined the latter group and held that conditions at FCI Sheridan were risky enough to show the circumstances were extraordinary and compelling."); See also Stirling v. Hendrix, supra ("Reports filed in litigation about the conditions at FCI Sheridan also cast doubt on the effectiveness of the prisons response to Covid-19.").

There could be no clearer argument that Rios-Marquez was not only aware of the substantial risk that the Plaintiff faced, but had acted with deliberate indifference towards the Plaintiff's serious medical needs, than due to the fact the Plaintiff spoke with Rios-Marquez in person, and informed her of his continued delayed medical specialty appointments, missing medications, retaliation and challenges which were continuing to result serious injury to him. Yet, Rios-Marquez failed to act reasonably or at all for that matter, to abate the Plaintiff's cruel and unusual punishment, and absent medical care, despite her acknowledging that for the Plaintiff to have waited more than six months for specialty appointments being concerning. See Jett v. Penner, infra (holding prison officials "are liable for deliberate indifference when they knowingly fail to respond to an inmate's request for help."). Rio-Marquez was the official in charge and could have taken immediate action, but failed to, despite being fully advised of her subordinates deliberate indifference towards the Plaintiffs serious medical needs and her institutions within the Western Region failing to provide medical care to person(s) in it's custody, and the serious harm and injuries as a result, that were taken place. The Plaintiff and his attorney made clear to Rios-Marquez all of the medical failures, and risk of injury to the Plaintiff. Yet, Rios-Marquez refused to take action. See LaFaut v. Smith, supra (holding that official was the "responsible official in charge" and had been "fully advised" of the problem, and therefore due to taking no measurable action, that it constituted deliberate indifference); See also Ginest v. Board of County Comm'rs of Carbon County, supra (finding officials have a duty to investigate information suggesting a risk of injury).

Rios-Marquez was directly responsible for the management of FCI Sheridan. Rios-Marquez consistently failed to properly protect the person(s) entrusted to her care and custody. Rio-Marquez created and managed a culture of careless disregard for prisoners, which led to many Covid-19 deaths, serious injuries, all while protecting criminals wearing badges who were taking advantage of the person(s) in it's custody sexually, physically, and in totality.

Numerous district courts have consistently found that the prisons in which Rios-Marquez supervises in her region, are filled with corruption, abuse, and are subjecting prisoners to cruel and unusual punishment. One district court ruled that Lompoc could not meet any constitutional conditions required by law, and ordered BOP to release a certain class of inmates (See Torres v. Milusinic et al., 2:20-cv-04450-CBM-PVCx, C.D. Cal). Another district court ordered an inspection of FCI Sheridan, and the report submitted to the court found that inmates were being subjected to "inhumane conditions" that were "resulting in widespread distress and harm." (See Stirling v. Hendrix, supra). Lastly, and most recently, another district court took control

over FCI Dublin, which was deemed publicly the "rape club." (See United States v. Jones, No 23-212, N.D. Cal, 11/21/2023; United States v. Nunley, No 23-213, N.D. Cal, 9/5/2023). The consistent factor amongst these concerns, is that they are all managed by Rios-Marquez.

Dozens of Rio-Marquez's employees have been arrested, including numerous Wardens, Correctional Officers, and others. These recent events of justice are not due to Rios-Marquez taking action, but rare occasions when the Court is able to intervene, and federal law enforcement agents are able to collect enough evidence to arrest and prosecute. Just between 2020 and 2022 there were over two dozen employees under Rios-Marquez supervision, that were arrested and/or convicted of crimes. See Prison Legal News, With "Fox In Charge Of The Henhouse," Almost All Misconduct Accusations Against BOP Staff Result In No Discipline, By Benjamin Tschirhart, March 2023.

The Plaintiff, and his counsel consistently notified Rios-Marquez of the issues, risk, and threats that the Plaintiff faced from 6/2021 through 9/2023. Yet, at every opportunity to respond, Rios-Marquez failed to take reasonable action to abate the risk, and pain that the Plaintiff was suffering from. The Plaintiff even spoke to Rios-Marquez in person, regarding his delayed medical trips to specialist and asked for her help. Yet, she failed to respond.

Rios-Marquez, and the Plaintiff have what the Ninth Circuit and Oregon Courts have long held to constitute a "special relationship" (jailer-prisoner), therefore, heightening the duty on the jailer to provide care for, and avoid foreseeable risk towards the Plaintiff. Yet, despite this duty, Rios-Marquez ignored and disregarded the safety, healthcare, and life of the Plaintiff again, despite knowing that her first absence of action for the Plaintiff's request for medical care for his serious medical need, resulted in him being rushed to the emergency hospital, which ultimately caused the Plaintiff significant damages.

It was very foreseeable that the Plaintiff most likely would continue to not receive adequate medical care for his serious medical needs, and be further subjected to unconstitutional conditions of confinement, as Rios-Marquez and her co-defendants created a culture of mismanagement, abuse, corruption, and repeatedly failed to meaningfully address staff shortages. Rios-Marquez repeatedly failed to take measurable action to abate the risk and correct these constitutional violations, as found by BOP internal reports, U.S. Senate Judiciary Committee public hearings, litigation, and complaints from both people under her custody and care, and her own staff. Even BOP Unions were complaining to Rio-Marquez, about staff shortages and the subsequent effects on normal health care procedures for inmates, and the breakdown in health care services. See Alsina-Ortiz v. LaBoy, supra (holding high-level officials deliberately indifference because they "knew of a continuing pattern of culpable failures of health care procedures and practices for inmates to receive care"); See also Villant v. Dep't of Correction of City of New York, supra; Hill v. Marshall, supra (Supervisors failure to review and respond to inmate medical complaints despite knowledge of a breakdown in services constituted deliberate indifference); Fisher v. Koehler, supra (deliberate indifference found based on city governments "institutional failure"). In addition, the Plaintiff actually told Rio-Marquez that he would not receive care if she didn't intervene. Yet, she still failed to take action.

Due to the culture that Rios-Marquez and her co-defendants not only created, but managed retaliation and corruption was, and continues to run rampant within the BOP. Especially at the Western Region institutions, which are managed by Rios-Marquez. Complaints are consistently disregarded, and in return met with extreme hostility and abuse. The Inspector General found that BOP has too few internal investigate staff, resulting in a "substantial backlog of unresolved employee misconduct cases," and that the BOP didn't even know "whether the number of staff it represents as necessary to manage its institutions safely and effectively is accurate." See DOJ, OIG, Limited-Scope Review of the Federal Bureau of Prisons' Strategies to Identify, Communicate, and Remedy Operational Issues, Rpt. No 23-065 (May 4, 2023).

The Government Accounting Office ("GAO"), even placed BOP on its "high risk" list of "government operations with vulnerabilities to fraud, abuse, and mismanagement, or in need of transformation." See GAO, Efforts Made To Achieve Progress Need To Be Maintained and Expanded To Fully Address All Areas (April 20, 2023).

Rios-Marquez knew of the serious risk for the Plaintiff while he was housed in the SHU from January 2022 - August 2022. The Plaintiff informed her of the retaliation, blocked medical care, threats, abuse, and his worsening medical condition, as each day he continued to throw up, lose significant weight, and still was not afforded medical care. In addition, government reports were consistently sent and reviewed by Rios-Marquez and her colleagues, regarding these very same issues. GAO found that "while BOP was previously called out for the practices of SHU placement of prisoners, little has changed." and criticized BOP for its "slow progress towards taking action on longstanding recommendations, partly because the Bureau hasn't established rules or time frames for doing so." The GAO report concluded, that "The management of federal prisons, including use of restrictive housing, requires immediate attention." See GAO, Federal Bureau of Prisons haven't Addressed Longstanding Concerns About Overuse of Solitary Confinement, Feb 6, 2024.

The Plaintiff informed Rios-Marquez of his growing serious health concerns, risk, threats, abuse and retaliation that was taking

place between 6/2021 - 8-2022, yet again, Rios-Marquez failed to respond. Even despite the Plaintiff's, and his attorney's numerous communications with Rios-Marquez, she still ignored and failed to reasonably respond, which resulted in the Plaintiff suffering great damages, as diagnosed and verified by the defendant's themselves.

The Plaintiff's complaints, and attempts in seeking redress from the courts only caused him further injuries, due to the retaliation, which Rios-Marquez was aware of. The Plaintiff pleaded with Rios-Marquez for help, and informed her that nothing was being done, nor even investigated. This was consistent with the agency's [BOP] annual Office of Internal Affairs Repot, which showed that 14,361 cases in the most recent three-ear period, involved misconduct by 17,907 employees. At that rate, even for an agency that employs 37,000 people, it would take seven years to collect a misconduct allegation for every one of them. Despite this knowledge, Rios-Marquez consistently failed to hire, train and address the growing concern of retaliation, corruption and abuse of person(s) in it's care and custody, including the Plaintiff's.

Warden Hendrix's deliberate indifference towards the Plaintiff's serious medical needs

Upon the Plaintiff returning to FCI Sheridan on 9/14/2021, and updating his family, counsel at the time (Cyrus Zal), and the Oregon Federal Defender, Lisa Hay, it was decided that the Plaintiff should follow up with the Defendant's, including Warden DeWayne Hendrix, to update them on the medical emergency that took place.

The Plaintiff then sent legal correspondence to Warden Hendrix, notifying him of the medical emergency, and requested immediate action regarding FCI Sheridan's continued deliberate indifference toward his serious medical need (not receiving follow up medical care, not receiving his prescribed medications, no wheelchair accommodations for showering or housing, etc), and that changes to the FCI Sheridan operations take place, due to the risky and dangerous environment. Yet again, his request went unanswered.

Even district court's throughout the nation were aware of the dangerous and risky environment at FCI Sheridan that Hendrix created and managed. See United States v. Sharma, supra ("Last year, this court joined the latter group and held that conditions at FCI Sheridan were risky enough to show the circumstances were extraordinary and compelling."); See also Stirling v. Hendrix, supra ("Reports filed in litigation about the conditions at FCI Sheridan also cast doubt on the effectiveness of the prisons response to Covid-19.").

There could be no clearer argument that Hendrix was not only aware of the risky environment that he created and managed, but that he acted with deliberate indifference towards the Plaintiff's serious medical needs, than due to the fact that the Plaintiff spoke with Hendrix on numerous occasions from 6/2021 - 8/2021, regarding the denied medical care, missed specialty appointments, retaliation, losing his ability to walk, and the threats and abuse that he was enduring. In addition, the Plaintiff and his counsel sent countless written communications to Hendrix as well. Yet all of these efforts, yielded no response from Hendrix except frustration. See Jett v. Penner, infra (holding prison officials "are liable for deliberate indifference when they knowingly fail to respond to an inmate's request for help.").

The Plaintiff informed Hendrix from January 2022 - August 2022, that he was losing a troubling amount of weight, throwing up daily, not being given his medications, suffering from an untreated eye infection, shortness of breath which was generally causing him to pass out, not being allowed the one hour access to daily recreation for months, losing feeling in his legs, and having mental health issues. Yet, Hendrix responded countless times by deflecting and telling the Plaintiff to raise his complaints with others, and to file a grievance, despite the Plaintiff informing him that he was being blocked from filing specific grievances, while others were being rejected, lost, and never returned to him. The Plaintiff informed Hendrix that policies were intentionally not being followed by the medical department, Special Investigation Services department, the Plaintiff's assigned Unit Team, and that the Plaintiff felt that he was in danger. Yet Hendrix, consistently ignored and deflected, saying that those were not his issues, and not his responsibility. See Watson v. Samuels, 2017 U.S. Dist. LEXIS 143383, No. 1:15-cv-116-BL (Aug. 3, 2017)("Plaintiff attempted to discuss the allegation with Warden Batts personally when he visited Plaintiff in the SHU. Warden refused to take action saying 'it was the responsibility of others'. In this Batts [Warden] exhibited deliberate indifference. He was the told but didn't want to know. BOP Policy refers to the Warden as the CEO. Chief Executive Officer. Warden Batts has 'grand' discretion being the warden at FCI Big Springs, in exercising his duties in the daily activities of the prison and therefore functional liability attaches to this warden. One of those duties is to ensure 'all' policies, rules, and procedures are followed by those subjected to his 'grand' authority staff and inmates... In a nutshell Batts as gate keeper in the key leadership role failed to perform proper 'over-sight' over his staff and to see that they complied with all policies and laws.").

On information and belief, Hendrix refused to take action or help the Plaintiff due to him assisting the Oregon Federal Defender bring to light the unconstitutional conditions of confinement at his institution, and getting numerous inmates to join the Stirling v. Hendrix case. FCI Sheridan was facing staff shortages and overcrowding. Despite this, Warden Hendrix kept bringing more inmates, despite knowing that he could not properly care for them, and that it increased the risk for infection for the Plaintiff, and was resulting in overcrowding, even further depleted inadequate medical care, increased violence, and abuse.

Warden Hendrix and the Plaintiff had what the Ninth Circuit and Oregon Courts have long held to constitute a "special relationship" (jailer prisoner), therefore, heightening the duty on the jailer to provide care for, and avoid foreseeable risk towards the Plaintiff. Yet, despite this duty, Hendrix ignored and disregarded the safety, healthcare, and life of the Plaintiff again, despite knowing that his [Hendrix] first absence of action to the Plaintiff's request for medical care for his serious medical need, resulted in him being revived and rushed to the emergency hospital, which ultimately caused the Plaintiff significant damages.

It was very foreseeable that the Plaintiff would continue to not receive adequate medical care for his serious medical needs, and be further subjected to unconstitutional conditions of confinement. Warden Hendrix and his co-defendants created and managed a culture of mismanagement, abuse, corruption, and consistently failed to meaningfully address staff shortages. Hendrix repeatedly failed to take measurable action to abate the serious medical risk, or correct the constitutional violations, as raised in litigation, complaints, and BOP internal reports. Hendrix was aware of the serious risk to the Plaintiff, not only due to the active litigation that he was personally in (See Stirling v. Hendrix), regarding these very matters at FCI Sheridan [lack of medical care and unconstitutional conditions of confinement], but due to the Plaintiff and his attorney informing him countless times. In addition, not only was the Plaintiff notifying Hendrix of his medical complaints and deterioration of health, but Hendrix was witnessing the Plaintiff's worsening physical condition as he visited the Plaintiff during his occasional rounds.

At every opportunity to abate the Plaintiff's serious risk, Hendrix failed to act reasonably or to even investigate such claims, despite the known repercussions that it could-and-did have on the Plaintiff. Apart from the Plaintiff and his attorney informing Hendrix of the Plaintiff's suffering, and inadequate medical care, Hendrix was also informed of these same concerns by health infection specialist, court ordered inspections, and the Oregon Federal Defenders Office. It is without question, that Hendrix was fully advised of the serious risk to the Plaintiff, and FCI Sheridan's failure of providing adequate medical care. See Alsina-Ortiz v. LaBoy, supra (holding high-level officials deliberately indifferent because they "knew of a continuing pattern of culpable failures of health care procedures and practices for inmate to receive care); See also Villant v. Dep't of Correction of City of New York, supra; Hill v. Marshall, supra (Supervisors failure to review and respond to inmate medical complaints despite knowledge of a breakdown in services constituted deliberate indifference); Fisher v. Koehler, supra (deliberate indifference found based on city governments "institutional failure").

FCI Sheridan's particularly increased pattern of culpable failures have been highlighted in litigation, and BOP internal reports. Inadequate medical care, retaliation and corruption was running rampant within the institution. The Plaintiff's complaints against staff were being rejected, and in return the staff then notified the individuals that the Plaintiff had submitted a complaint on, and often gave them the original complaint that the Plaintiff had attempted to file, which resulted in the Plaintiff enduring extreme hostility and abuse. Nothing was being investigated or followed up with. Even the Inspector General found that the BOP has too few internal investigative staff, resulting in a "substantial backlog of unresolved employee misconduct cases." and that BOP didn't even know "whether the number of staff it represents as necessary to manage its institutions safely and effectively is accurate." See OIG, Limited-Scope Review of the Federal Bureau of Prisons' Strategies to Identify, Communicate, and Remedy Operational Issues, Rpt. No 23-065 (May 4, 2023).

The Government Accounting Office ("GAO"), even placed BOP on it's "high risk" list of "government operations with vulnerabilities to fraud, abuse, and mismanagement, or in need of transformation." See GAO, Efforts Made To Achieve Progress Need To Be Maintained and Expanded To Fully Address All Areas (April 20, 2023). Even one of the Defendants in this suit has been removed from FCI Sheridan for corruption, in which the Plaintiff tried reporting.

Hendrix knew of the serious risk for the Plaintiff while he was housed in the SHU from January 2022 - August 2022. The Plaintiff informed him of the retaliation, blocked medical care, threats, abuse and his worsening medical condition, as each day he continued to throw up, lose significant weight, and still was not afforded medical care. In addition, ongoing litigation in which Hendrix was personally the Defendant in, highlighted and notified him of the known mental implications of subjecting the Plaintiff and others to severe lockdowns. Despite this, Hendrix still failed to abate the Plaintiff's unconstitutional confinement in the SHU. Hendrix was aware of the need for inmates to receive daily recreation, and had created a policy, allowing prisoners confined in the SHU to be released once per day, for one hour from their cells. The remaining 23 hours is spent confined in their cell. The Plaintiff was not allotted this. For eight months the Plaintiff had to remain in his cell, and was not allowed out to recreation, attorney calls/visits, or even visits from his family. Hendrix and his co-defendants said that they were not going to carry the Plaintiff up the stairs, as FCI Sheridan, was not complaint with the Rehabilitation Act, nor Americans with Disabilities Act. Even simple room changes every 21 days were required, as Hendrix knew of the mental health implications it could have on prisoners confined in the SHU. Yet, for the Plaintiff, he remained in his cell for 24 hours per day, for 8 months. See Allen v. Sakai, 48 F.3d 1082, 1088 (9th Cir. 1995)(holding prison officials deliberately indifferent due having a policy of five hours per week of recreation, which evidenced knowing of risk of depriving prisoners of exercise).

This is consistent with what GAO found the BOP SHU practices, stating "while BOP was previously called out for the practices of SHU placement of prisoners, little has changed." and criticized BOP for its "slow progress towards taking action on longstanding recommendations, partly because the Bureau hasn't established rules or time frames for doing so." The GAP report concluded that "The management of federal prisons, including use of restrictive housing, requires immediate attention." See, GAO, Federal Bureau of Prisons Hasn't Addressed Longstanding Concerns About Overuse of Solitary Confinement, Feb 6, 2024.

The Plaintiff's complaints, and attempts in seeking redress from the courts only caused him further damages, due to the

retaliation, which Hendrix was aware of. The Plaintiff pleaded with Hendrix for help, and informed him that nothing was being done, nor investigated.

Associate Warden Cooper's deliberate indifference towards the Plaintiff's serious medical needs

Upon the Plaintiff returning to FCI Sheridan on 9/14/2021, and updating his family, counsel at the time (Cyrus Zal), and the Oregon Federal Defender, Lisa Hay, it was decided that the Plaintiff should follow up with the Defendant's, including AW Andrew Cooper, to update them on the medical emergency that took place.

The Plaintiff then sent legal correspondence to AW Cooper, notifying him of the medical emergency, and requested immediate action regarding FCI Sheridan's continued deliberate indifference toward his serious medical need (not receiving follow up medical care, not receiving his prescribed medications, no wheelchair accommodations for showering or housing, etc), and that changes to the FCI Sheridan operations take place, due to the risky and dangerous environment. Yet again, his request went unanswered.

Even district court's throughout the nation were aware of the dangerous and risky environment at FCI Sheridan that AW Cooper created and managed. See United States v. Sharma, supra ("Last year, this court joined the latter group and held that conditions at FCI Sheridan were risky enough to show the circumstances were extraordinary and compelling."); See also Stirling v. Hendrix, supra ("Reports filed in litigation about the conditions at FCI Sheridan also cast doubt on the effectiveness of the prisons response to Covid-19.").

There could be no clearer argument that AW Cooper was not only aware of the risky environment that he created and managed, but that he acted with deliberate indifference towards the Plaintiff's serious medical needs, than due to the fact that the Plaintiff spoke with AW Cooper on numerous occasions from 6/2021 - 8/2021, regarding the denied medical care, missed specialty appointments, retaliation, losing his ability to walk, and the threats and abuse that he was enduring. In addition, the Plaintiff and his counsel sent countless written communications to AW Cooper as well. Yet all of these efforts, yielded no response from AW Cooper except frustration. See Jett v. Penner, infra (holding prison officials "are liable for deliberate indifference when they knowingly fail to respond to an inmate's request for help.").

The Plaintiff informed AW Cooper from January 2022 - August 2022, that he was losing a troubling amount of weight, throwing up daily, not being given his medications, suffering from an untreated eye infection, shortness of breath which was generally causing him to pass out, not being allowed the one hour access to daily recreation for months, losing feeling in his legs, and having mental health issues. Yet, AW Cooper responded countless times by deflecting and telling the Plaintiff to raise his complaints with others, and to file a grievance, despite the Plaintiff informing him that he was being blocked from filing specific grievances, while others were being rejected, lost, and never returned to him. The Plaintiff informed AW Cooper that policies were intentionally not being followed by the medical department, Special Investigation Services department, the Plaintiff's assigned Unit Team, and that the Plaintiff felt that he was in danger. Yet AW Cooper, consistently ignored and deflected, saying that those were not his issues, and not his responsibility. See Watson v. Samuels, 2017 U.S. Dist. LEXIS 143383, No. 1:15-cv-116-BL (Aug. 3, 2017)("Plaintiff attempted to discuss the allegation with Warden Batts personally when he visited Plaintiff in the SHU. Warden refused to take action saying 'it was the responsibility of others'. In this Batts [Warden] exhibited deliberate indifference. He was the told but didn't want to know. BOP Policy refers to the Associate Warden as the CEO Warden Batts has 'grand' discretion being the warden at FCI Big Springs, in exercising his duties in the daily activities of the prison and therefore functional liability attaches to this warden. One of those duties is to ensure 'all' policies, rules, and procedures are followed by those subjected to his 'grand' authority staff and inmates... In a nutshell Batts as gate keeper in the key leadership role failed to perform proper 'over-sight' over his staff and to see that they complied with all policies and laws.").

On information and belief, Cooper refused to take action or help the Plaintiff due to him assisting the Oregon Federal Defender bring to light the unconstitutional conditions of confinement at his institution, and getting numerous inmates to join the Stirling v. Hendrix case. FCI Sheridan was facing staff shortages and overcrowding. Despite this, Cooper kept bringing more inmates, despite knowing that he could not properly care for them, and that it increased the risk for infection for the Plaintiff, and was resulting in overcrowding, even further depleted inadequate medical care, increased violence, and abuse.

Cooper and the Plaintiff had what the Ninth Circuit and Oregon Courts have long held to constitute a "special relationship" (jailer prisoner), therefore, heightening the duty on the jailer to provide care for, and avoid foreseeable risk towards the Plaintiff. Yet, despite this duty, Hendrix ignored and disregarded the safety, healthcare, and life of the Plaintiff again, despite knowing that his [Hendrix] first absence of action to the Plaintiff's request for medical care for his serious medical need, resulted in him being revived and rushed to the emergency hospital, which ultimately caused the Plaintiff significant damages.

81

It was very foreseeable that the Plaintiff would continue to not receive adequate medical care for his serious medical needs, and be further subjected to unconstitutional conditions of confinement. Cooper and his co-defendants created and managed a culture of mismanagement, abuse, corruption, and consistently failed to meaningfully address staff shortages. Cooper repeatedly failed to take measurable action to abate the serious medical risk, or correct the constitutional violations, as raised in litigation, complaints, and BOP internal reports. Cooper was aware of the serious risk to the Plaintiff, not only due to the active litigation that he was personally in (See Stirling v. Cooper), regarding these very matters at FCI Sheridan [lack of medical care and unconstitutional conditions of confinement], but due to the Plaintiff and his attorney informing him countless times. In addition, not only was the Plaintiff notifying Cooper of his medical complaints and deterioration of health, but Cooper was witnessing the Plaintiff's worsening physical condition as he visited the Plaintiff during his occasional rounds.

At every opportunity to abate the Plaintiff's serious risk, Cooper failed to act reasonably or to even investigate such claims, despite the known repercussions that it could-and-did have on the Plaintiff. Apart from the Plaintiff and his attorney informing Cooper of the Plaintiff's suffering, and inadequate medical care, Cooper was also informed of these same concerns by health infection specialist, court ordered inspections, and the Oregon Federal Defenders Office. It is without question, that Cooper was fully advised of the serious risk to the Plaintiff, and FCI Sheridan's failure of providing adequate medical care. See Alsina-Ortiz v. LaBoy, supra (holding high-level officials deliberately indifferent because they "knew of a continuing pattern of culpable failures of health care procedures and practices for inmate to receive care); See also Villant v. Dep't of Correction of City of New York, supra; Hill v. Marshall, supra (Supervisors failure to review and respond to inmate medical complaints despite knowledge of a breakdown in services constituted deliberate indifference); Fisher v. Koehler, supra (deliberate indifference found based on city governments "institutional failure").

FCI Sheridan's particularly increased pattern of culpable failures have been highlighted in litigation, and BOP internal reports. Inadequate medical care, retaliation and corruption was running rampant within the institution. The Plaintiff's complaints against staff were being rejected, and in return the staff then notified the individuals that the Plaintiff had submitted a complaint on, and often gave them the original complaint that the Plaintiff had attempted to file, which resulted in the Plaintiff enduring extreme hostility and abuse. Nothing was being investigated or followed up with. Even the Inspector General found that the BOP has too few internal investigative staff, resulting in a "substantial backlog of unresolved employee misconduct cases." and that BOP didn't even know "whether the number of staff it represents as necessary to manage its institutions safely and effectively is accurate." See OIG, Limited-Scope Review of the Federal Bureau of Prisons' Strategies to Identify, Communicate, and Remedy Operational Issues, Rpt. No 23-065 (May 4, 2023).

The Government Accounting Office ("GAO"), even placed BOP on it's "high risk" list of "government operations with vulnerabilities to fraud, abuse, and mismanagement, or in need of transformation." See GAO, Efforts Made To Achieve Progress Need To Be Maintained and Expanded To Fully Address All Areas (April 20, 2023). Even one of the Defendants in this suit has been removed from FCI Sheridan for corruption, in which the Plaintiff tried reporting.

Cooper knew of the serious risk for the Plaintiff while he was housed in the SHU from January 2022 - August 2022. The Plaintiff informed him of the retaliation, blocked medical care, threats, abuse and his worsening medical condition, as each day he continued to throw up, lose significant weight, and still was not afforded medical care. In addition, ongoing litigation in which Cooper was personally the Defendant in, highlighted and notified him of the known mental implications of subjecting the Plaintiff and others to severe lockdowns. Despite this, Cooper still failed to abate the Plaintiff's unconstitutional confinement in the SHU. Cooper was aware of the need for inmates to receive daily recreation, and had created a policy, allowing prisoners confined in the SHU to be released once per day, for one hour from their cells. The remaining 23 hours is spent confined in their cell. The Plaintiff was not allotted this. For eight months the Plaintiff had to remain in his cell, and was not allowed out to recreation, attorney calls/visits, or even visits from his family. Even simple room changes every 21 days were required, as Cooper knew of the mental health implications it could have on prisoners confined in the SHU. Yet, for the Plaintiff, he remained in his cell for 24 hours per day, for 8 months. See Allen v. Sakai, 48 F.3d 1082, 1088 (9th Cir. 1995)(holding prison officials deliberately indifferent due having a policy of five hours per week of recreation, which evidenced knowing of risk of depriving prisoners of exercise).

This is consistent with what GAO found the BOP SHU practices, stating "while BOP was previously called out for the practices of SHU placement of prisoners, little has changed." and criticized BOP for its "slow progress towards taking action on longstanding recommendations, partly because the Bureau hasn't established rules or time frames for doing so." The GAP report concluded that "The management of federal prisons, including use of restrictive housing, requires immediate attention." See, GAO, Federal Bureau of Prisons Hasn't Addressed Longstanding Concerns About Overuse of Solitary Confinement, Feb 6, 2024.

The Plaintiff's complaints, and attempts in seeking redress from the courts only caused him further damages, due to the retaliation, which Cooper was aware of. The Plaintiff pleaded with Cooper for help, and informed him that nothing was being

done, nor investigated.

_Sponselor_ 's deliberate indifference towards the Plaintiff's serious medical needs

Upon the Plaintiff returning to FCI Sheridan on 9/14/2021, and updating his family, counsel at the time (Cyrus Zal), and the Oregon Federal Defender, Lisa Hay, it was decided that the Plaintiff should follow up with the Defendant's including _Sponselor_, to update them on the medical emergency that took place, due to them not responding to the Plaintiff's request for help for his serious medical need.

The Plaintiff then sent legal correspondence to _Sponselor_, notifying him  of the medical emergency, and requested immediate action, regarding FCI Sheridan's continued deliberate indifference towards his serious medical needs, as he was still infected with Covid-19 (a known serious medical condition), and suffering from not receiving follow up medical care, not receiving his prescribed medications, all while losing his ability to walk, which restricted him to a wheelchair full-time, and was also another "serious medical need." See Taylor v. Plousis, ("a medical condition which threatens a Plaintiff's ability to walk, even on a non-permanent basis, falls within the ambit of a 'serious medical need.'"); See also Kaufman v. Carter, ("inability to walk, even temporarily, constitutes a serious medical need"); Jones v. Simek, (finding prison doctor and officials deliberately indifferent due to waiting 6 months to take prisoner to neurologist). Despite the Plaintiff notifying _Sponselor_ of all of this, he  still failed to respond or take action to get the Plaintiff medical care, or abate the risk of his further injury and unnecessary pain.

This conduct by _Sponselor_ is consistent with the findings of numerous district courts throughout the nation, the Office of The Inspector General audits on BOP Inmate Healthcare, and complaints raised by both prisoners of BOP and it's staff. These reputable Judges and government agencies found that the BOP has been consistently failing to provide adequate medical care to person(s) in it's custody, particularly when prisoners require off-site third party medical care services.

When it comes to the Plaintiff's matter, it's clear that _Sponselor_ continued these acts of deliberate indifference towards the Plaintiff's serious medical needs, as the Plaintiff brought these claims and complaints to _Sponselor_ stressing his severe and chronic pain, absent medical care, and risk of injury, yet despite this, _Sponselor_ failed to take steps to reasonable abate the Plaintiff's suffering, or investigate the further risk he faced. See Jett v. Penner, 439 F.3d 1091, 1098 (9th Cir. 2006)(Prison officials "are liable for deliberate indifference when they knowingly fail to respond to an inmate's request for help.").

The Defendant's (all) were not only individually, but collectively deliberately indifferent to the Plaintiff's serious medical needs and risk. _Sponselor_ along with his  co-defendants consistently failed to wear PPE, or take precautions with transfers, and placed new inmates (sometimes infected with Covid-19 in his housing unit), thus increasing the risk for the Plaintiff to not only be exposed to the deadly virus, but actually get infected, in which he ultimately was.

Even district courts throughout the nation were aware of the extra dangerous and risky environment that FCI Sheridan had created and managed. See United States v. Sharma, ("Last year, this court joined the latter group and held that conditions at FCI Sheridan were risky enough to show the circumstances were extraordinary and compelling."); See also Stirling v. Hendrix, ("Records filed in litigation about the conditions at FCI Sheridan also cast doubt on the effectiveness of the prisons response to Covid-19."). numerous times between 11/2021 - 8/2022

There could be no clearer argument that _Sponselor_ was not only aware of the substantial risk that the Plaintiff faced, but had acted with deliberate indifference towards the Plaintiff's serious medical needs, than due to the fact that the Plaintiff spoke with _Sponselor_ in person, and informed him  of the continued delayed and denied medical care, missing medications, retaliation and medical complications that were resulting in consistent severe and chronic pain. See Jett v. Penner, (holding prison officials "are liable for deliberate indifference when they knowingly fail to respond to an inmate's request for help."). Yet, _Sponselor_ failed to act reasonably or at all for that matter, to abate the Plaintiff's serious medical needs, and pain. See Lancaster v. Monroe County, 116 F.3d at 1425 (clearly established that "an official acts with deliberate indifference when he knows that an inmate is in need of medical care, but he fails or refuses to obtain medical treatment for the inmate.").

The Plaintiff explained to _Sponselor_ that he had lost his ability to walk, was consistently throwing up daily, thus losing drastic weight, was suffering from an eye infection and cyst on his eyelid, was having shortness of breath, heart/chest pains, along with having numerous mental health issues, due to his prolonged isolation in the SHU, and intentionally being blocked from daily recreation. The Plaintiff was forced to stay in his room for nearly 8 months. All of these represented serious medical (1/2022 - 5/2022)

needs. See Cottell v. Igbinosa, (finding that heart and chest pains are a serious medical need); Mata v. Saiz, (recognizing severe chest pain as a serious medical need), Lavender v. Lampert, ("the existence of chronic and substantial pain itself demonstrates a serious medical need"); Piper v. Rasheed, ("There is no dispute in this case that the Plaintiff has a serious medical need. The cyst in his lower right eyelid caused him extreme pain and discomfort, as well as vision loss."); Richardson v. Nassau County, (evidence of an eye infection that needs a diagnosis is significant in showing seriousness); McGuckin v. Smith, (the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment supports a finding of seriousness); Wellman v. Faulkner, (holding mental health disorders as serious medical need).

As an employee of FCI Sheridan, _Sponselor_ was an official in charge, and could have taken immediate action, but failed to, despite being fully advised of the grossly delayed and denied medical care, and knowing that the Plaintiff was in consistent severe and chronic pain. See LaFaut v. Smith, (holding that official was the "responsible official in charge" and had been "fully advised" of the problem, and therefore due to taking no measurable action, that it constituted deliberate indifference); See also Ginest v. Board of County Comm'rs of Carbon County, (finding officials have a duty to investigate information suggestion a risk of injury).

agency's

_Sponselor_ and the Plaintiff have what the Ninth Circuit and Oregon Courts have long held to constitute a "special relationship" (jailer-prisoner), therefore, heightening the duty on the jailer to provide care for, and avoid foreseeable risk towards the Plaintiff. Yet, despite this duty, _Sponselor_ ignored and disregarded the safety, healthcare, and life of the Plaintiff, despite knowing that his first absence of action for the Plaintiff's request for medical care for his serious medical need, resulted in him being rushed to the emergency hospital, which ultimately caused the Plaintiff significant injuries.

It was very foreseeable that the Plaintiff would continue to not receive adequate medical care for his serious medical needs, and be further subjected to unconstitutional conditions of confinement, as _Sponselor_, and his co-defendants had created a culture of mismanagement, abuse, corruption, and repeatedly failed to meaningfully address staff shortages, provide adequate medical care, and act with reckless disregard for the health and safety of the Plaintiff. _Sponselor_ failed to take measurable action to abate the risk of serious injury to the Plaintiff, or correct the unconstitutional conditions of confinement, as found by BOP internal reports and complaints, U.S. Senate Judiciary Committee public hearings, litigation, and complaints from the people in it's care, including the Plaintiff. The medical department was extremely short on staff, and even the available medical staff members were being pulled to work custody and manage housing units. All person(s) at FCI Sheridan knew that the medical department was failing, inadequate, [and so cursory that it was resulting in widespread distress and harm]. See Hill v. Marshal, (supervisors failure to review and respond to inmate medical complaints despite knowledge of a breakdown in services constituted deliberate indifference); See also Fisher v. Koehler, supra (deliberate indifference found based on city governments "institutional failure").

_Sponselor_ knew of the serious risk for the Plaintiff while he was housed in the SHU from January 2022 - August 2022. The Plaintiff informed him of the retaliation, blocked medical care, having heart pains and irregular heart rate, being threatened, abused, and his worsening medical condition, as each day he continued to throw up, lose significant weight, and still was not afforded medical care. The Plaintiff pleaded for help, however, _Sponselor_ failed to respond, investigate or take any action to get the Plaintiff care, and abate the severe and chronic pain that he was suffering from. See Smith v. Michigan, 256 F. Supp. 2d 704, 710-11 (E.D. Mich. 2003)( prisoner's complaint of lack of medical care could support officials liability); See also Merritt v. Hawk, 153 F. Supp. 2d 1216, 1227-28 (D. Colo. 2001) (plaintiff's allegation that he had informed various prison officials about his problems were sufficient to plead their personal involvement).

_Sponselor's_ ignorance and willful denial to assist the Plaintiff ultimately took a heavy toll on the Plaintiff's mental health. The Plaintiff attempted suicide by hanging unsuccessfully, and despite passing out, and regaining conscious due to the loud banging on the door, was told to stop "fooling around" before he was "pepper sprayed." The Plaintiff received no follow up medical care, no sessions with psychology, nor was even placed on suicide watch. Ultimately, the Plaintiff was diagnosed with mental health disorders upon being transferred.

The Plaintiff was being denied medical care and strategically kept in the SHU. See Tomarkin v. Ward, 534 F. Supp. 1224, 1235 (S.D.N.Y. 1982)(denial of medical care in solitary confinement constituted deliberate indifference).

The Plaintiff was scheduled back in 2021 to be seen by a neurologist in March of 2022. Despite this, the Defendant's cancelled his appointment due to staff shortages. The plaintiff could no longer walk, and needed specialty medical care, as evidence by the doctors prescribing him treatment in the form of seeing a specialist (neurologist). The Defendant's knowingly cancelled the Plaintiff's specialty appointment, yet failed to take him to the neurologist after that, despite him remaining at the institution for another 6 months. Not only did the Plaintiff never see the specialist, the Defendant's cut off all of his medications, and follow up medical care, despite his worsening condition, and knowing that he had several current/active medical conditions, as evidenced by their own medical records.

85

In Estelle v. Gamble, infra, the U.S. Supreme Court recognized that prisoners must rely on prison officials to treat their medical needs, and broadened the scope of the Eighth Amendment to include inadequate medical care given to prisoners. Id at 103. The Plaintiff has relied on the Defendant's not only individually, but collectively to provide him care, medical treatment, Rehabilitation Act accommodations, and to take him to his medical specialty appointments, as prescribed by their own doctors. However, ___Spcnselor___ not only individually failed to reasonably respond to the Plaintiff's pleas for help, medical care, and accommodations, but willfully ignored the Plaintiff's claims of retaliation in the form of being blocked from medical care, and it's subsequent unnecessary severe and chronic pain that it was causing him.

Despite all of the Plaintiff's and his counsels attempts to not only prevent the Plaintiff from getting infected with Covid-19, but then to receive adequate medical care, they were all consistently denied or not provided. Delays in necessary treatment and pain constitute irreparable harm. See Porretti v. Dzurenda, infra ("the deprivation of [a prisoner's] constitutional right to medical care is sufficient to establish irreparable harm")(quoting Edmo v. Corizon, Inc., infra); Rodd v. Bonta, infra.

The Ninth Circuit Court of Appeals recently ruled that "Delaying treatment is an established example of deliberate indifference to a serious medical need in violation of the Eighth Amendment. See Stanard v. Dy. All of the Defendant's were aware that the Plaintiff was being denied and delayed medical care, yet they not only individually, but collectively failed to respond to his pleas for help, or abate the serious risk to his medical health, due to being frustrated with him for pursuing legal action against them and their colleagues.

It is without question that the Plaintiff's prescribed treatment for numerous medical conditions, including several serious medical needs, went grossly delayed time after time, due to transportation issues, staff shortages, retaliation, and other non-medical reasons. Eighth Amendment violations have consistently been found when "inmates wait months for appointments to specialty clinics." See Inmates of Occoquan v. Barry, infra; Hoptowit v. Ray, infra (the Constitution requires that such referrals to outside care be "reasonably speedy"). Furthermore, the Plaintiff's medical care was not allowed to be denied and delayed for non-medical reasons. See Dunn v. Dunn, 219 F. Supp. 3d 1100, 1126 (M.D. Ala. 2016)(explaining denial of necessary treatment for non-medical reasons is intentional deprivation).

Furthermore, interfering with prescribed treatment has consistently been found to represent deliberate indifference towards a serious medical need. See Pederson v. Corizon Health, Inc., infra, and Colwell v. Bannister, infra.

86

_Rodriguez_ 's deliberate indifference towards the Plaintiff's serious medical needs

Upon the Plaintiff returning to FCI Sheridan on 9/14/2021, and updating his family, counsel at the time (Cyrus Zal), and the Oregon Federal Defender, Lisa Hay, it was decided that the Plaintiff should follow up with the Defendant's including _Rodriguez_ , to update them on the medical emergency that took place, due to them not responding to the Plaintiff's request for help for his serious medical need.

The Plaintiff then sent legal correspondence to _Rodriguez_ , notifying him/ of the medical emergency, and requested immediate action, regarding FCI Sheridan's continued deliberate indifference towards his serious medical needs, as he was still infected with Covid-19 (a known serious medical condition), and suffering from not receiving follow up medical care, not receiving his prescribed medications, all while losing his ability to walk, which restricted him to a wheelchair full-time, and was also another "serious medical need." See Taylor v. Plousis, ("a medical condition which threatens a Plaintiff's ability to walk, even on a non-permanent basis, falls within the ambit of a 'serious medical need.'"); See also Kaufman v. Carter, ("inability to walk, even temporarily, constitutes a serious medical need"); Jones v. Simek, (finding prison doctor and officials deliberately indifferent due to waiting 6 months to take prisoner to neurologist). Despite the Plaintiff notifying _Rodriguez_ of all of this, he' still failed to respond or take action to get the Plaintiff medical care, or abate the risk of his further injury and unnecessary pain.

This conduct by _Rodriguez_ is consistent with the findings of numerous district courts throughout the nation, the Office of The Inspector General audits on BOP Inmate Healthcare, and complaints raised by both prisoners of BOP and it's staff. These reputable Judges and government agencies found that the BOP has been consistently failing to provide adequate medical care to person(s) in it's custody, particularly when prisoners require off-site third party medical care services.

When it comes to the Plaintiff's matter, it's clear that _Rodriguez_ continued these acts of deliberate indifference towards the Plaintiff's serious medical needs, as the Plaintiff brought these claims and complaints to _Rodriguez_ stressing his severe and chronic pain, absent medical care, and risk of injury, yet despite this, _Rodriguez_ failed to take steps to reasonable abate the Plaintiff's suffering, or investigate the further risk he faced. See Jett v. Penner, 439 F.3d 1091, 1098 (9th Cir. 2006)(Prison officials "are liable for deliberate indifference when they knowingly fail to respond to an inmate's request for help.").

The Defendant's (all) were not only individually, but collectively deliberately indifferent to the Plaintiff's serious medical needs and risk. _Rodriguez_ along with his co-defendants consistently failed to wear PPE, or take precautions with transfers, and placed new inmates (sometimes infected with Covid-19 in his housing unit), thus increasing the risk for the Plaintiff to not only be exposed to the deadly virus, but actually get infected, in which he ultimately was.

Even district courts throughout the nation were aware of the extra dangerous and risky environment that FCI Sheridan had created and managed. See United States v. Sharma, ("Last year, this court joined the latter group and held that conditions at FCI Sheridan were risky enough to show the circumstances were extraordinary and compelling."); See also Stirling v. Hendrix, ("Records filed in litigation about the conditions at FCI Sheridan also cast doubt on the effectiveness of the prisons response to Covid-19.").

There could be no clearer argument that _Rodriguez_ was not only aware of the substantial risk that the Plaintiff faced, but had acted with deliberate indifference towards the Plaintiff's serious medical needs, than due to the fact that the Plaintiff spoke with _Rodriguez_ in person, and informed him/ of the continued delayed and denied medical care, missing medications, retaliation and medical complications that were resulting in consistent severe and chronic pain. See Jett v. Penner, (holding prison officials "are liable for deliberate indifference when they knowingly fail to respond to an inmate's request for help."). Yet, _Rodriguez_ failed to act reasonably or at all for that matter, to abate the Plaintiff's serious medical needs, and pain. See Lancaster v. Monroe County, 116 F.3d at 1425 (clearly established that "an official acts with deliberate indifference when he knows that an inmate is in need of medical care, but he fails or refuses to obtain medical treatment for the inmate.").

The Plaintiff explained to _Rodriguez_ that he had lost his ability to walk, was consistently throwing up daily, thus losing drastic weight, was suffering from an eye infection and cyst on his eyelid, was having shortness of breath, heart/chest pains, along with having numerous mental health issues, due to his prolonged isolation in the SHU, and intentionally being blocked from daily recreation. The Plaintiff was forced to stay in his room for nearly 8 months (1/2022 - 8/2022). All of these represented

serious medical needs. See Cottell v. Igbinosa, (finding that heart and chest pains are a serious medical need); Mata v. Saiz, (recognizing severe chest pain as a serious medical need), Lavender v. Lampert, ("the existence of chronic and substantial pain itself demonstrates a serious medical need"); Piper v. Rasheed, ("There is no dispute in this case that the Plaintiff has a serious medical need. The cyst in his lower right eyelid caused him extreme pain and discomfort, as well as vision loss."); Richardson v. Nassau County, (evidence of an eye infection that needs a diagnosis is significant in showing seriousness); McGuckin v. Smith, (the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment supports a finding of seriousness); Wellman v. Faulkner, (holding mental health disorders as serious medical need).

As an employee of FCI Sheridan, _Rodriguez_ was an official in charge, and could have taken immediate action, but failed to, despite being fully advised of the grossly delayed and denied medical care, and knowing that the Plaintiff was in consistent severe and chronic pain. See LaFaut v. Smith, (holding that official was the "responsible official in charge" and had been "fully advised" of the problem, and therefore due to taking no measurable action, that it constituted deliberate indifference); See also Ginest v. Board of County Comm'rs of Carbon County, (finding officials have a duty to investigate information suggestion a risk of injury).

_Rodriguez_ and the Plaintiff have what the Ninth Circuit and Oregon Courts have long held to constitute a "special relationship" (jailer-prisoner), therefore, heightening the duty on the jailer to provide care for, and avoid foreseeable risk towards the Plaintiff. Yet, despite this duty, _Rodriguez_ ignored and disregarded the safety, healthcare, and life of the Plaintiff again, despite knowing that his first absence of action for the Plaintiff's request for medical care for his serious medical need, resulted in him being rushed to the emergency hospital, which ultimately caused the Plaintiff significant injuries.

It was very foreseeable that the Plaintiff would continue to not receive adequate medical care for his serious medical needs, and be further subjected to unconstitutional conditions of confinement, as _Rodriguez_, and his co-defendants had created a culture of mismanagement, abuse, corruption, and repeatedly failed to meaningfully address staff shortages, provide adequate medical care, and act with reckless disregard for the health and safety of the Plaintiff. _Rodriguez_ failed to take measurable action to abate the risk of serious injury to the Plaintiff, or correct the unconstitutional conditions of confinement, as found by BOP internal reports and complaints, U.S. Senate Judiciary Committee public hearings, litigation, and complaints from the people in it's care, including the Plaintiff. The medical department was extremely short on staff, and even the available medical staff members were being pulled to work custody and manage housing units. All person(s) at FCI Sheridan knew that the medical department was failing, inadequate, [and so cursory that it was resulting in widespread distress and harm]. See Hill v. Marshal, (supervisors failure to review and respond to inmate medical complaints despite knowledge of a breakdown in services constituted deliberate indifference); See also Fisher v. Koehler, supra (deliberate indifference found based on city governments "institutional failure").

_Rodriguez_ knew of the serious risk for the Plaintiff while he was housed in the SHU from January 2022 - August 2022. The Plaintiff informed him of the retaliation, blocked medical care, having heart pains and irregular heart rate, being threatened, abused, and his worsening medical condition, as each day he continued to throw up, lose significant weight, and still was not afforded medical care. The Plaintiff pleaded for help, however, _Rodriguez_ failed to respond, investigate or take any action to get the Plaintiff care, and abate the severe and chronic pain that he was suffering from. See Smith v. Michigan, 256 F. Supp. 2d 704, 710-11 (E.D. Mich. 2003)( prisoner's complaint of lack of medical care could support officials liability); See also Merritt v. Hawk, 153 F. Supp. 2d 1216, 1227-28 (D. Colo. 2001) (plaintiff's allegation that he had informed various prison officials about his problems were sufficient to plead their personal involvement).

_Rodriguez_ ignorance and willful denial to assist the Plaintiff ultimately took a heavy toll on the Plaintiff's mental health. The Plaintiff attempted suicide by hanging unsuccessfully, and despite passing out, and regaining conscious due to the loud banging on the door, was told to stop "fooling around," before he was "pepper sprayed." The Plaintiff received no follow up medical care, no sessions with psychology, nor was even placed on suicide watch. Ultimately, the Plaintiff was diagnosed with mental health disorders upon being transferred. Further contributing to this was Rodriguez's malicious, evil and criminal acts towards the Plaintiff. The Plaintiff was being denied medical care and strategically kept in the SHU. See Tomarkin v. Ward, 534 F. Supp. 1224, 1235 (S.D.N.Y. 1982)(denial of medical care in solitary confinement constituted deliberate indifference).

The Plaintiff was scheduled back in 2021 to be seen by a neurologist in March of 2022. Despite this, the Defendant's cancelled his appointment due to staff shortages. The plaintiff could no longer walk, and needed specialty medical care, as evidence by the doctors prescribing him treatment in the form of seeing a specialist (neurologist). The Defendant's knowingly cancelled the Plaintiff's specialty appointment, yet failed to take him to the neurologist after that, despite him remaining at the institution for another 6 months. Not only did the Plaintiff never see the specialist, the Defendant's cut off all of his medications, and follow up medical care, despite his worsening condition, and knowing that he had several current/active medical conditions, as evidenced by their own medical records.

In Estelle v. Gamble, infra, the U.S. Supreme Court recognized that prisoners must rely on prison officials to treat their medical needs, and broadened the scope of the Eighth Amendment to include inadequate medical care given to prisoners. Id at 103. The Plaintiff has relied on the Defendant's not only individually, but collectively to provide him care, medical treatment, Rehabilitation Act accommodations, and to take him to his medical specialty appointments, as prescribed by their own doctors. However, _Rodriguez_ not only individually failed to reasonably respond to the Plaintiff's pleas for help, medical care, and accommodations, but willfully ignored the Plaintiff's claims of retaliation in the form of being blocked from medical care, and it's subsequent unnecessary severe and chronic pain that it was causing him.

Despite all of the Plaintiff's and his counsels attempts to not only prevent the Plaintiff from getting infected with Covid-19, but then to receive adequate medical care, they were all consistently denied or not provided. Delays in necessary treatment and pain constitute irreparable harm. See Porretti v. Dzurenda, infra ("the deprivation of [a prisoner's] constitutional right to medical care is sufficient to establish irreparable harm")(quoting Edmo v. Corizon, Inc., infra); Rodd v. Bonta, infra.

89

The Ninth Circuit Court of Appeals recently ruled that "Delaying treatment is an established example of deliberate indifference to a serious medical need in violation of the Eighth Amendment. See Stanard v. Dy. All of the Defendant's were aware that the Plaintiff was being denied and delayed medical care, yet they not only individually, but collectively failed to respond to his pleas for help, or abate the serious risk to his medical health, due to being frustrated with him for pursuing legal action against them and their colleagues.

It is without question that the Plaintiff's prescribed treatment for numerous medical conditions, including several serious medical needs, went grossly delayed time after time, due to transportation issues, staff shortages, retaliation, and other non-medical reasons. Eighth Amendment violations have consistently been found when "inmates wait months for appointments to specialty clinics." See Inmates of Occoquan v. Barry, infra; Hoptowit v. Ray, infra (the Constitution requires that such referrals to outside care be "reasonably speedy"). Furthermore, the Plaintiff's medical care was not allowed to be denied and delayed for non-medical reasons. See Dunn v. Dunn, 219 F. Supp. 3d 1100, 1126 (M.D. Ala. 2016)(explaining denial of necessary treatment for non-medical reasons is intentional deprivation).

Furthermore, interfering with prescribed treatment has consistently been found to represent deliberate indifference towards a serious medical need. See Pederson v. Corizon Health, Inc., infra, and Colwell v. Bannister, infra.

_Rodriguez_ was deliberately indifferent to the Plaintiff's serious medical needs, due to the Plaintiff him for criminal activity. _Rodriguez_ was smuggling drugs, cell phones and managing a gambling ring with Cray within FCI Sheridan. _Rodriguez_ consistently threatened and harassed the Plaintiff throughout 9/2021 - 9/2022. From destroying some of the Plaintiff's legal documents and grievances, to managing a campaign of harassment against the Plaintiff, _Rodriguez_ action's were, and always have been malicious and evil. _Rodriguez_ actions against the Plaintiff not only violated constitutional rights, but constituted criminal activity as well.

While the Plaintiff was in the SHU, _Rodriguez_ informed the Plaintiff's that he hoped that he would die back there [in the SHU], and that he and Cray made sure that no one was coming to help him. _Rodriguez_ informed the Plaintiff that he would not be getting any medical help, and that he would rot away in the SHU. See Tomarkin v. Ward, 534 F. Supp 1224, 1235 (S.D.N.Y 1982)(denial of medical care in solitary confinement constituted deliberate indifference). _Rodriguez_ actions caused significant mental anguish within the Plaintiff.

The Ninth Circuit Court of Appeals recently ruled that "Delaying treatment is an established example of deliberate indifference to a serious medical need in violation of the Eighth Amendment. See Stanard v. Dy. All of the Defendant's were aware that the Plaintiff was being denied and delayed medical care, yet they not only individually, but collectively failed to respond to his pleas for help, or abate the serious risk to his medical health, due to being frustrated with him for pursuing legal action against them and their colleagues.

It is without question that the Plaintiff's prescribed treatment for numerous medical conditions, including several serious medical needs, went grossly delayed time after time, due to transportation issues, staff shortages, retaliation, and other non-medical reasons. Eighth Amendment violations have consistently been found when "inmates wait months for appointments to specialty clinics." See Inmates of Occoquan v. Barry, infra; Hoptowit v. Ray, infra (the Constitution requires that such referrals to outside care be "reasonably speedy"). Furthermore, the Plaintiff's medical care was not allowed to be denied and delayed for non-medical reasons. See Dunn v. Dunn, 219 F. Supp. 3d 1100, 1126 (M.D. Ala. 2016)(explaining denial of necessary treatment for non-medical reasons is intentional deprivation).

Furthermore, interfering with prescribed treatment has consistently been found to represent deliberate indifference towards a serious medical need. See Pederson v. Corizon Health, Inc., infra, and Colwell v. Bannister, infra.

Dr. Grasley 's deliberate indifference towards the Plaintiff's serious medical needs

Upon the Plaintiff returning to FCI Sheridan on 9/14/2021, and updating his family, counsel at the time (Cyrus Zal), and the Oregon Federal Defender, Lisa Hay, it was decided that the Plaintiff should follow up with the Defendant's including Dr. Grasley , to update them on the medical emergency that took place, due to them not responding to the Plaintiff's request for help for his serious medical need.

The Plaintiff then sent legal correspondence to Dr. Grasley , notifying him ᵣ of the medical emergency, and requested immediate action, regarding FCI Sheridan's continued deliberate indifference towards his serious medical needs, as he was still infected with Covid-19 (a known serious medical condition), and suffering from not receiving follow up medical care, not receiving his prescribed medications, all while losing his ability to walk, which restricted him to a wheelchair full-time, and was also another "serious medical need." See Taylor v. Plousis, ("a medical condition which threatens a Plaintiff's ability to walk, even on a non-permanent basis, falls within the ambit of a 'serious medical need.'"); See also Kaufman v. Carter, ("inability to walk, even temporarily, constitutes a serious medical need"); Jones v. Simek, (finding prison doctor and officials deliberately indifferent due to waiting 6 months to take prisoner to neurologist). Despite the Plaintiff notifying Dr. Grasley of all of this, he ᵢ still failed to respond or take action to get the Plaintiff medical care, or abate the risk of his further injury and unnecessary pain.

This conduct by Dr. Grasley is consistent with the findings of numerous district courts throughout the nation, the Office of The Inspector General audits on BOP Inmate Healthcare, and complaints raised by both prisoners of BOP and it's staff. These reputable Judges and government agencies found that the BOP has been consistently failing to provide adequate medical care to person(s) in it's custody, particularly when prisoners require off-site third party medical care services.

When it comes to the Plaintiff's matter, it's clear that Dr. Grasley continued these acts of deliberate indifference towards the Plaintiff's serious medical needs, as the Plaintiff brought these claims and complaints to Dr. Grasley stressing his severe and chronic pain, absent medical care, and risk of injury, yet despite this, Dr. Grasley failed to take steps to reasonable abate the Plaintiff's suffering, or investigate the further risk he faced. See Jett v. Penner, 439 F.3d 1091, 1098 (9th Cir. 2006)(Prison officials "are liable for deliberate indifference when they knowingly fail to respond to an inmate's request for help.").

The Defendant's (all) were not only individually, but collectively deliberately indifferent to the Plaintiff's serious medical needs and risk. Dr. Grasley along with his co-defendants consistently failed to wear PPE, or take precautions with transfers, and placed new inmates (sometimes infected with Covid-19 in his housing unit), thus increasing the risk for the Plaintiff to not only be exposed to the deadly virus, but actually get infected, in which he ultimately was.

Even district courts throughout the nation were aware of the extra dangerous and risky environment that FCI Sheridan had created and managed. See United States v. Sharma, ("Last year, this court joined the latter group and held that conditions at FCI Sheridan were risky enough to show the circumstances were extraordinary and compelling."); See also Stirling v. Hendrix, ("Records filed in litigation about the conditions at FCI Sheridan also cast doubt on the effectiveness of the prisons response to Covid-19.").

There could be no clearer argument that Dr. Grasley was not only aware of the substantial risk that the Plaintiff faced, but had acted with deliberate indifference towards the Plaintiff's serious medical needs, than due to the fact that the Plaintiff spoke with Dr. Grasley in person, and informed him ᵢ of the continued delayed and denied medical care, missing medications, retaliation and medical complications that were resulting in consistent severe and chronic pain. See Jett v. Penner, (holding prison officials "are liable for deliberate indifference when they knowingly fail to respond to an inmate's request for help."). Yet, Dr. Grasley failed to act reasonably or at all for that matter, to abate the Plaintiff's serious medical needs, and pain. See Lancaster v. Monroe County, 116 F.3d at 1425 (clearly established that "an official acts with deliberate indifference when he knows that an inmate is in need of medical care, but he fails or refuses to obtain medical treatment for the inmate.").

The Plaintiff explained to Dr. Grasley that he had lost his ability to walk, was consistently throwing up daily, thus losing drastic weight, was suffering from an eye infection and cyst on his eyelid, was having shortness of breath, heart/chest pains, along with having numerous mental health issues, due to his prolonged isolation in the SHU, and intentionally being blocked from daily recreation. The Plaintiff was forced to stay in his room for nearly 8 months (1/2022 - 8/2022). All of these represented

serious medical needs. See Cottell v. Igbinosa, (finding that heart and chest pains are a serious medical need); Mata v. Saiz, (recognizing severe chest pain as a serious medical need), Lavender v. Lampert, ("the existence of chronic and substantial pain itself demonstrates a serious medical need"); Piper v. Rasheed, ("There is no dispute in this case that the Plaintiff has a serious medical need. The cyst in his lower right eyelid caused him extreme pain and discomfort, as well as vision loss."); Richardson v. Nassau County, (evidence of an eye infection that needs a diagnosis is significant in showing seriousness); McGuckin v. Smith, (the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment supports a finding of seriousness); Wellman v. Faulkner, (holding mental health disorders as serious medical need).

As an employee of FCI Sheridan, _Dr. Grasley_ was an official in charge, and could have taken immediate action, but failed to, despite being fully advised of the grossly delayed and denied medical care, and knowing that the Plaintiff was in consistent severe and chronic pain. See LaFaut v. Smith, (holding that official was the "responsible official in charge" and had been "fully advised" of the problem, and therefore due to taking no measurable action, that it constituted deliberate indifference); See also Ginest v. Board of County Comm'rs of Carbon County, (finding officials have a duty to investigate information suggestion a risk of injury).

_Dr. Grasley_ and the Plaintiff have what the Ninth Circuit and Oregon Courts have long held to constitute a "special relationship" (jailer-prisoner), therefore, heightening the duty on the jailer to provide care for, and avoid foreseeable risk towards the Plaintiff. Yet, despite this duty, _Dr. Grasley_ ignored and disregarded the safety, healthcare, and life of the Plaintiff again, despite knowing that (his) first absence of action for the Plaintiff's request for medical care for his serious medical need, resulted in him being rushed to the emergency hospital, which ultimately caused the Plaintiff significant injuries.

It was very foreseeable that the Plaintiff would continue to not receive adequate medical care for his serious medical needs, and be further subjected to unconstitutional conditions of confinement, as _Dr. Grasley_, and (his) co-defendants had created a culture of mismanagement, abuse, corruption, and repeatedly failed to meaningfully address staff shortages, provide adequate medical care, and act with reckless disregard for the health and safety of the Plaintiff. _Dr. Grasley_ failed to take measurable action to abate the risk of serious injury to the Plaintiff, or correct the unconstitutional conditions of confinement, as found by BOP internal reports and complaints, U.S. Senate Judiciary Committee public hearings, litigation, and complaints from the people in it's care, including the Plaintiff. The medical department was extremely short on staff, and even the available medical staff members were being pulled to work custody and manage housing units. All person(s) at FCI Sheridan knew that the medical department was failing, inadequate, [and so cursory that it was resulting in widespread distress and harm]. See Hill v. Marshal, (supervisors failure to review and respond to inmate medical complaints despite knowledge of a breakdown in services constituted deliberate indifference); See also Fisher v. Koehler, supra (deliberate indifference found based on city governments "institutional failure").

_Dr. Grasley_ knew of the serious risk for the Plaintiff while he was housed in the SHU from January 2022 - August 2022. The Plaintiff informed (him) of the retaliation, blocked medical care, having heart pains and irregular heart rate, being threatened, abused, and his worsening medical condition, as each day he continued to throw up, lose significant weight, and still was not afforded medical care. The Plaintiff pleaded for help, however, _Dr. Grasley_ failed to respond, investigate or take any action to get the Plaintiff care, and abate the severe and chronic pain that he was suffering from. See Smith v. Michigan, 256 F. Supp. 2d 704, 710-11 (E.D. Mich. 2003)( prisoner's complaint of lack of medical care could support officials liability); See also Merritt v. Hawk, 153 F. Supp. 2d 1216, 1227-28 (D. Colo. 2001) (plaintiff's allegation that he had informed various prison officials about his problems were sufficient to plead their personal involvement).

_Dr. Grasley_ ignorance and willful denial to assist the Plaintiff ultimately took a heavy toll on the Plaintiff's mental health. The Plaintiff attempted suicide by hanging unsuccessfully, and despite passing out, and regaining conscious due to the loud banging on the door, was told to stop "fooling around," before he was "pepper sprayed." The Plaintiff received no follow-up medical care, no sessions with psychology, nor was even placed on suicide watch. Ultimately, the Plaintiff was diagnosed with mental health disorders upon being transferred.

The Plaintiff was being denied medical care and strategically kept in the SHU. See Tomarkin v. Ward, 534 F. Supp. 1224, 1235 (S.D.N.Y. 1982)(denial of medical care in solitary confinement constituted deliberate indifference).

The Plaintiff was scheduled back in 2021 to be seen by a neurologist in March of 2022. Despite this, the Defendant's cancelled his appointment due to staff shortages. The plaintiff could no longer walk, and needed specialty medical care, as evidence by the doctors prescribing him treatment in the form of seeing a specialist (neurologist). The Defendant's knowingly cancelled the Plaintiff's specialty appointment, yet failed to take him to the neurologist after that, despite him remaining at the institution for another 6 months. Not only did the Plaintiff never see the specialist, the Defendant's cut off all of his medications, and follow up medical care, despite his worsening condition, and knowing that he had several current/active medical conditions, as evidenced by their own medical records.

92

In Estelle v. Gamble, infra, the U.S. Supreme Court recognized that prisoners must rely on prison officials to treat their medical needs, and broadened the scope of the Eighth Amendment to include inadequate medical care given to prisoners. Id at 103. The Plaintiff has relied on the Defendant's not only individually, but collectively to provide him care, medical treatment, Rehabilitation Act accommodations, and to take him to his medical specialty appointments, as prescribed by their own doctors. However, _Dr. Grasley_ not only individually failed to reasonably respond to the Plaintiff's pleas for help, medical care, and accommodations, but willfully ignored the Plaintiff's claims of retaliation in the form of being blocked from medical care, and it's subsequent unnecessary severe and chronic pain that it was causing him.

Despite all of the Plaintiff's and his counsels attempts to not only prevent the Plaintiff from getting infected with Covid-19, but then to receive adequate medical care, they were all consistently denied or not provided. Delays in necessary treatment and pain constitute irreparable harm. See Porretti v. Dzurenda, infra ("the deprivation of [a prisoner's] constitutional right to medical care is sufficient to establish irreparable harm")(quoting Edmo v. Corizon, Inc., infra); Rodd v. Bonta, infra.

The Ninth Circuit Court of Appeals recently ruled that "Delaying treatment is an established example of deliberate indifference to a serious medical need in violation of the Eighth Amendment. See Stanard v. Dy. All of the Defendant's were aware that the Plaintiff was being denied and delayed medical care, yet they not only individually, but collectively failed to respond to his pleas for help, or abate the serious risk to his medical health, due to being frustrated with him for pursuing legal action against them and their colleagues.

_Dr. Grasley_ knew that the Plaintiff's specialty medical appointment was cancelled due to staff shortages, yet he failed to take action to get the Plaintiff the medical care, in which he initially prescribed. _Dr. Grasley_ knew that the Plaintiff's prescribed treatment was unnecessary delayed, thus causing him further harm and chronic pain. The Plaintiff informed _Dr. Grasley_ that he had not received any of his medications, was throwing up daily, and need of help. Yet, _Dr. Grasley_ failed to take action. See Wilhelm v. Rotman, 680 F.3d 1113, 1123 (9th Cir. 2012)(doctor's awareness of need for treatment followed by his unnecessary delay in implementing the prescribed treatment sufficient to plead deliberate indifference).

On 4/25/2022, while the Plaintiff was confined to the SHU, Dr. Grasley stopped by to check on another inmate. The Plaintiff yelled, calling Dr. Grasley's name, and pleading for help. Yet, the Dr. Grasley responded, by shouting "You're fine," to the Plaintiff, and not even bothering to come check on him or provide aid.

It is without question that the Plaintiff's prescribed treatment for numerous medical conditions, including several serious medical needs, went grossly delayed time after time, due to transportation issues, staff shortages, retaliation, and other non-medical reasons. Eighth Amendment violations have consistently been found when "inmates wait months for appointments to specialty clinics." See Inmates of Occoquan v. Barry, infra; Hoptowit v. Ray, infra (the Constitution requires that such referrals to outside care be "reasonably speedy"). Furthermore, the Plaintiff's medical care was not allowed to be denied and delayed for non-medical reasons. See Dunn v. Dunn, 219 F. Supp. 3d 1100, 1126 (M.D. Ala. 2016)(explaining denial of necessary treatment for non-medical reasons is intentional deprivation).

Furthermore, interfering with prescribed treatment has consistently been found to represent deliberate indifference towards a serious medical need. See Pederson v. Corizon Health, Inc., infra, and Colwell v. Bannister, infra.

_Dr. Grasley_ was deliberately indifferent to the Plaintiff's serious medical needs, due to the Plaintiff pursing legal claims against him. The Plaintiff sent countless written and electronic request to _Dr. Grasley_ asking him for medical help, yet, _Dr. Grasley_ failed to respond or take action. See Barry v. Ratelle, 985 F. Supp. 1235, 1239 (S.D. Cal. 1997) (holding prisoner's letters to prison medical doctor was sufficient to allege liability). _Dr. Grasley_ failed repeatedly to exam or see the Plaintiff for his serious medical needs. See McElligott v. Foley, 182 F.3d 1248, 1256-57 (holding repeated delays in doctors seeing patient with constant severe pain could satisfy the deliberate indifference requirement). _Dr. Grasley_ actions against the Plaintiff not only violated constitutional rights, but constituted criminal activity as well, as _Dr. Grasley_ falsified the medical records of the Plaintiff.

93

David Prock Jr's deliberate indifference towards the Plaintiff's serious medical needs

During the time that the Plaintiff was confined in the SHU (1/2022 - 8/2022) he then sent legal correspondence to _____Prock_____, and requested immediate action, regarding FCI Sheridan's continued deliberate indifference towards his serious medical needs. As he was suffering from not receiving follow up medical care, not receiving his prescribed medications, all while losing his ability to walk, which restricted him to a wheelchair full-time, and was also another "serious medical need." See Taylor v. Plousis, ("a medical condition which threatens a Plaintiff's ability to walk, even on a non-permanent basis, falls within the ambit of a 'serious medical need.'"); See also Kaufman v. Carter, ("inability to walk, even temporarily, constitutes a serious medical need"); Jones v. Simek, (finding prison doctor and officials deliberately indifferent due to waiting 6 months to take prisoner to neurologist). Despite the Plaintiff notifying _____Prock_____ of all of this, he/she still failed to respond or take action to get the Plaintiff medical care, or abate the risk of his further injury and unnecessary pain.

This conduct by _____Prock_____ is consistent with the findings of numerous district courts throughout the nation, the Office of The Inspector General audits on BOP Inmate Healthcare, and complaints raised by both prisoners of BOP and it's staff. These reputable Judges and government agencies found that the BOP has been consistently failing to provide adequate medical care to person(s) in it's custody, particularly when prisoners require off-site third party medical care services.

When it comes to the Plaintiff's matter, it's clear that _____Prock_____ continued these acts of deliberate indifference towards the Plaintiff's serious medical needs, as the Plaintiff brought these claims and complaints to _____Prock_____ stressing his severe and chronic pain, absent medical care, and risk of injury, yet despite this, _____Prock_____ failed to take steps to reasonable abate the Plaintiff's suffering, or investigate the further risk he faced. See Jett v. Penner, 439 F.3d 1091, 1098 (9th Cir. 2006)(Prison officials "are liable for deliberate indifference when they knowingly fail to respond to an inmate's request for help.").

The Defendant's (all) were not only individually, but collectively deliberately indifferent to the Plaintiff's serious medical needs and risk. _____Prock_____ along with his/ r co-defendants consistently failed to wear PPE, or take precautions with transfers, and placed new inmates (sometimes infected with Covid-19 in his housing unit), thus increasing the risk for the Plaintiff to not only be exposed to the deadly virus, but actually get infected, in which he ultimately was.

Even district courts throughout the nation were aware of the extra dangerous and risky environment that FCI Sheridan had created and managed. See United States v. Sharma, ("Last year, this court joined the latter group and held that conditions at FCI Sheridan were risky enough to show the circumstances were extraordinary and compelling."); See also Stirling v. Hendrix, ("Records filed in litigation about the conditions at FCI Sheridan also cast doubt on the effectiveness of the prisons response to Covid-19.").

There could be no clearer argument that Prock was not only aware of the substantial risk that the Plaintiff faced, but had acted with deliberate indifference towards the Plaintiff's serious medical needs, than due to the fact that the Plaintiff spoke with Prock in person, and informed him of the continued delayed and denied medical care, missing medications, retaliation and medical complications that were resulting in consistent severe and chronic pain. See Jett v. Penner, (holding prison officials "are liable for deliberate indifference when they knowingly fail to respond to an inmate's request for help."). Yet, Prock failed to act reasonably or at all for that matter, to abate the Plaintiff's serious medical needs, and pain. See Lancaster v. Monroe County, 116 F.3d at 1425 (clearly established that "an official acts with deliberate indifference when he knows that an inmate is in need of medical care, but he fails or refuses to obtain medical treatment for the inmate.").

The Plaintiff understood that Prock was not interested in helping the Plaintiff, due to him trying to file complaints against his co-defendants. Despite this, the Plaintiff pleaded with Prock for help still, due to the severe and chronic pain that he was experiencing. However, Prock was only interested in discussing the Plaintiff dropping his complaints, ceasing all further complaints, ceasing all communications with the Oregon Federal Defender's office, and the Plaintiff ceasing getting additional prisoners signed up for the legal action against FCI Sheridan for it's unconstitutional conditions of confinement.

The Plaintiff explained to Prock that he had lost his ability to walk, was consistently throwing up daily, thus losing drastic weight, was suffering from an eye infection and cyst on his eyelid, was having shortness of breath, heart/chest pains, along with having numerous mental health issues, due to his prolonged isolation in the SHU, and intentionally being blocked from daily recreation. The Plaintiff was forced to stay in his room for nearly 8 months (1/2022 - 8/2022). All of these represented serious medical

94

needs. See Cottell v. Igbinosa, (finding that heart and chest pains are a serious medical need); Mata v. Saiz, (recognizing severe chest pain as a serious medical need), Lavender v. Lampert, ("the existence of chronic and substantial pain itself demonstrates a serious medical need"); Piper v. Rasheed, ("There is no dispute in this case that the Plaintiff has a serious medical need. The cyst in his lower right eyelid caused him extreme pain and discomfort, as well as vision loss."); Richardson v. Nassau County, (evidence of an eye infection that needs a diagnosis is significant in showing seriousness); McGuckin v. Smith, (the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment supports a finding of seriousness); Wellman v. Faulkner, (holding mental health disorders as serious medical need).

As an employee of FCI Sheridan, Prock was an official in charge, and could have taken immediate action, but failed to, despite being fully advised of the grossly delayed and denied medical care, and knowing that the Plaintiff was in consistent severe and chronic pain. See LaFaut v. Smith, (holding that official was the "responsible official in charge" and had been "fully advised" of the problem, and therefore due to taking no measurable action, that it constituted deliberate indifference); See also Ginest v. Board of County Comm'rs of Carbon County, (finding officials have a duty to investigate information suggestion a risk of injury).

_____Prock_____ and the Plaintiff have what the Ninth Circuit and Oregon Courts have long held to constitute a "special relationship" (jailer-prisoner), therefore, heightening the duty on the jailer to provide care for, and avoid foreseeable risk towards the Plaintiff. Yet, despite this duty, _____Prock_____ ignored and disregarded the safety, healthcare, and life of the Plaintiff again, despite knowing that his first absence of action for the Plaintiff's request for medical care for his serious medical need, resulted in him being rushed to the emergency hospital, which ultimately caused the Plaintiff significant injuries.

It was very foreseeable that the Plaintiff would continue to not receive adequate medical care for his serious medical needs, and be further subjected to unconstitutional conditions of confinement, as _____Prock_____, and his co-defendants had created a culture of mismanagement, abuse, corruption, and repeatedly failed to meaningfully address staff shortages, provide adequate medical care, and act with reckless disregard for the health and safety of the Plaintiff. _____Prock_____ failed to take measurable action to abate the risk of serious injury to the Plaintiff, or correct the unconstitutional conditions of confinement, as found by BOP internal reports and complaints, U.S. Senate Judiciary Committee public hearings, litigation, and complaints from the people in it's care, including the Plaintiff. The medical department was extremely short on staff, and even the available medical staff members were being pulled to work custody and manage housing units. All person(s) at FCI Sheridan knew that the medical department was failing, inadequate, [and so cursory that it was resulting in widespread distress and harm]. See Hill v. Marshal, (supervisors failure to review and respond to inmate medical complaints despite knowledge of a breakdown in services constituted deliberate indifference); See also Fisher v. Koehler, supra (deliberate indifference found based on city governments "institutional failure").

_____Prock_____ knew of the serious risk for the Plaintiff while he was housed in the SHU from January 2022 - August 2022. The Plaintiff informed him of the retaliation, blocked medical care, having heart pains and irregular heart rate, being threatened, abused, and his worsening medical condition, as each day he continued to throw up, lose significant weight, and still was not afforded medical care. The Plaintiff pleaded for help, however, _____Prock_____ failed to respond, investigate or take any action to get the Plaintiff care, and abate the severe and chronic pain that he was suffering from. See Smith v. Michigan, 256 F. Supp. 2d 704, 710-11 (E.D. Mich. 2003)( prisoner's complaint of lack of medical care could support officials liability); See also Merritt v. Hawk, 153 F. Supp. 2d 1216, 1227-28 (D. Colo. 2001) (plaintiff's allegation that he had informed various prison officials about his problems were sufficient to plead their personal involvement).

_____Prock_____ ignorance and willful denial to assist the Plaintiff ultimately took a heavy toll on the Plaintiff's mental health. The Plaintiff attempted suicide by hanging unsuccessfully, and despite passing out, and regaining conscious due to the loud banging on the door, was told to stop "fooling around" before he was "pepper sprayed." The Plaintiff received no follow up medical care, no sessions with psychology, nor was even placed on suicide watch. Ultimately, the Plaintiff was diagnosed with mental health disorders upon being transferred.

The Plaintiff was being denied medical care and strategically kept in the SHU. See Tomarkin v. Ward, 534 F. Supp. 1224, 1235 (S.D.N.Y. 1982)(denial of medical care in solitary confinement constituted deliberate indifference).

The Plaintiff was scheduled back in 2021 to be seen by a neurologist in March of 2022. Despite this, the Defendant's cancelled his appointment due to staff shortages. The plaintiff could no longer walk, and needed specialty medical care, as evidence by the doctors prescribing him treatment in the form of seeing a specialist (neurologist). The Defendant's knowingly cancelled the Plaintiff's specialty appointment, yet failed to take him to the neurologist after that, despite him remaining at the institution for another 6 months. Not only did the Plaintiff never see the specialist, the Defendant's cut off all of his medications, and follow up medical care, despite his worsening condition, and knowing that he had several current/active medical conditions, as evidenced by their own medical records.

In Estelle v. Gamble, infra, the U.S. Supreme Court recognized that prisoners must rely on prison officials to treat their medical needs, and broadened the scope of the Eighth Amendment to include inadequate medical care given to prisoners. Id at 103. The Plaintiff has relied on the Defendant's not only individually, but collectively to provide him care, medical treatment, Rehabilitation Act accommodations, and to take him to his medical specialty appointments, as prescribed by their own doctors. However, _Prock_ not only individually failed to reasonably respond to the Plaintiff's pleas for help, medical care, and accommodations, but willfully ignored the Plaintiff's claims of retaliation in the form of being blocked from medical care, and it's subsequent unnecessary severe and chronic pain that it was causing him.

Despite all of the Plaintiff's and his counsels attempts to not only prevent the Plaintiff from getting infected with Covid-19, but then to receive adequate medical care, they were all consistently denied or not provided. Delays in necessary treatment and pain constitute irreparable harm. See Porretti v. Dzurenda, infra ("the deprivation of [a prisoner's] constitutional right to medical care is sufficient to establish irreparable harm")(quoting Edmo v. Corizon, Inc., infra); Rodd v. Bonta, infra.

The Ninth Circuit Court of Appeals recently ruled that "Delaying treatment is an established example of deliberate indifference to a serious medical need in violation of the Eighth Amendment. See Stanard v. Dy. All of the Defendant's were aware that the Plaintiff was being denied and delayed medical care, yet they not only individually, but collectively failed to respond to his pleas for help, or abate the serious risk to his medical health, due to being frustrated with him for pursuing legal action against them and their colleagues.

It is without question that the Plaintiff's prescribed treatment for numerous medical conditions, including several serious medical needs, went grossly delayed time after time, due to transportation issues, staff shortages, retaliation, and other non-medical reasons. Eighth Amendment violations have consistently been found when "inmates wait months for appointments to specialty clinics." See Inmates of Occoquan v. Barry, infra; Hoptowit v. Ray, infra (the Constitution requires that such referrals to outside care be "reasonably speedy"). Furthermore, the Plaintiff's medical care was not allowed to be denied and delayed for non-medical reasons. See Dunn v. Dunn, 219 F. Supp. 3d 1100, 1126 (M.D. Ala. 2016)(explaining denial of necessary treatment for non-medical reasons is intentional deprivation).

Furthermore, interfering with prescribed treatment has consistently been found to represent deliberate indifference towards a serious medical need. See Pederson v. Corizon Health, Inc., infra, and Colwell v. Bannister, infra.

<u>Dr. Campagna</u> 's deliberate indifference towards the Plaintiff's serious medical needs

Upon the Plaintiff returning to FCI Sheridan on 9/14/2021, and updating his family, counsel at the time (Cyrus Zal), and the Oregon Federal Defender, Lisa Hay, it was decided that the Plaintiff should follow up with the Defendant's including <u>Dr. Campagna</u>, to update them on the medical emergency that took place, due to them not responding to the Plaintiff's request for help for his serious medical need.

The Plaintiff then sent legal correspondence to <u>Dr. Campagna</u>, notifying h  /her of the medical emergency, and requested immediate action, regarding FCI Sheridan's continued deliberate indifference towards his serious medical needs, as he was still infected with Covid-19 (a known serious medical condition), and suffering from not receiving follow up medical care, not receiving his prescribed medications, all while losing his ability to walk, which restricted him to a wheelchair full-time, and was also another "serious medical need." See Taylor v. Plousis, ("a medical condition which threatens a Plaintiff's ability to walk, even on a non-permanent basis, falls within the ambit of a 'serious medical need.'"); See also Kaufman v. Carter, ("inability to walk, even temporarily, constitutes a serious medical need"); Jones v. Simek, (finding prison doctor and officials deliberately indifferent due to waiting 6 months to take prisoner to neurologist). Despite the Plaintiff notifying <u>Dr. Campagna</u> of all of this, he/she still failed to respond or take action to get the Plaintiff medical care, or abate the risk of his further injury and unnecessary pain.

This conduct by <u>Dr. Campagna</u> is consistent with the findings of numerous district courts throughout the nation, the Office of The Inspector General audits on BOP Inmate Healthcare, and complaints raised by both prisoners of BOP and it's staff. These reputable Judges and government agencies found that the BOP has been consistently failing to provide adequate medical care to person(s) in it's custody, particularly when prisoners require off-site third party medical care services.

When it comes to the Plaintiff's matter, it's clear that <u>Dr. Campagna</u> continued these acts of deliberate indifference towards the Plaintiff's serious medical needs, as the Plaintiff brought these claims and complaints to <u>Dr. Campagna</u> stressing his severe and chronic pain, absent medical care, and risk of injury, yet despite this, <u>Dr. Campagna</u> failed to take steps to reasonable abate the Plaintiff's suffering, or investigate the further risk he faced. See Jett v. Penner, 439 F.3d 1091, 1098 (9th Cir. 2006)(Prison officials "are liable for deliberate indifference when they knowingly fail to respond to an inmate's request for help.").

The Plaintiff kept informing Dr. Campagna of the blocked mental health services and/or breakdown in the policy for consistent care. Yet, she refused to respond or take steps to fix it. See <u>Coleman v. Schwarzenegger</u>, 2008 WL 3430820 (E.D. Cal. 2009) (breakdown in mental health services). The Plaintiff informed Dr. Campagna of his mental health concerns yet she still failed to respond. See <u>McCreary v. Fed. Bureau of Prisons</u>, 2020 U.S. Dist. LEXIS 15310, civil case no. 1:17-cv-01011, Jan. 29, 2020 (holding Defendants had actual knowledge of concerns surrounding the prisoner's mental health but that due to failing to respond or address such concerns, showed deliberate indifference.) Id. at 98.

The Defendant's (all) were not only individually, but collectively deliberately indifferent to the Plaintiff's serious medical needs and risk. _Dr. Campagna_ along with (her) co-defendants consistently failed to wear PPE, or take precautions with transfers, and placed new inmates (sometimes infected with Covid-19 in his housing unit), thus increasing the risk for the Plaintiff to not only be exposed to the deadly virus, but actually get infected, in which he ultimately was.

Even district courts throughout the nation were aware of the extra dangerous and risky environment that FCI Sheridan had created and managed. See United States v. Sharma, ("Last year, this court joined the latter group and held that conditions at FCI Sheridan were risky enough to show the circumstances were extraordinary and compelling."); See also Stirling v. Hendrix, ("Records filed in litigation about the conditions at FCI Sheridan also cast doubt on the effectiveness of the prisons response to Covid-19."). numerous times between 6/2021 - 8/2022

There could be no clearer argument that _Dr. Campagna_ was not only aware of the substantial risk that the Plaintiff faced, but had acted with deliberate indifference towards the Plaintiff's serious medical needs, than due to the fact that the Plaintiff spoke with _Dr. Campagna_ in person, and informed (her) of the continued delayed and denied medical care, missing medications, retaliation and medical complications that were resulting in consistent severe and chronic pain. See Jett v. Penner, (holding prison officials "are liable for deliberate indifference when they knowingly fail to respond to an inmate's request for help."). Yet, _Dr. Campagna_ failed to act reasonably or at all for that matter, to abate the Plaintiff's serious medical needs, and pain. See Lancaster v. Monroe County, 116 F.3d at 1425 (clearly established that "an official acts with deliberate indifference when he knows that an inmate is in need of medical care, but he fails or refuses to obtain medical treatment for the inmate.").

The Plaintiff explained to _Dr. Campagna_ that he had lost his ability to walk, was consistently throwing up daily, thus losing drastic weight, was suffering from an eye infection and cyst on his eyelid, was having shortness of breath, heart/chest pains, along with having numerous mental health issues, due to his prolonged isolation in the SHU, and intentionally being blocked from daily recreation. The Plaintiff was forced to stay in his room for nearly 8 months, All of these represented serious medical

(1/2022 - 8/2022)

needs. See Cottell v. Igbinosa, (finding that heart and chest pains are a serious medical need); Mata v. Saiz, (recognizing severe chest pain as a serious medical need), Lavender v. Lampert, ("the existence of chronic and substantial pain itself demonstrates a serious medical need"); Piper v. Rasheed, ("There is no dispute in this case that the Plaintiff has a serious medical need. The cyst in his lower right eyelid caused him extreme pain and discomfort, as well as vision loss."); Richardson v. Nassau County, (evidence of an eye infection that needs a diagnosis is significant in showing seriousness); McGuckin v. Smith, (the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment supports a finding of seriousness); Wellman v. Faulkner, (holding mental health disorders as serious medical need).

As an employee of FCI Sheridan, _Dr. Campagna_ was an official in charge, and could have taken immediate action, but failed to, despite being fully advised of the grossly delayed and denied medical care, and knowing that the Plaintiff was in consistent severe and chronic pain. See LaFaut v. Smith, (holding that official was the "responsible official in charge" and had been "fully advised" of the problem, and therefore due to taking no measurable action, that it constituted deliberate indifference); See also Ginest v. Board of County Comm'rs of Carbon County, (finding officials have a duty to investigate information suggestion a risk of injury).

_Dr. Campagna_ and the Plaintiff have what the Ninth Circuit and Oregon Courts have long held to constitute a "special relationship" (jailer-prisoner), therefore, heightening the duty on the jailer to provide care for, and avoid foreseeable risk towards the Plaintiff. Yet, despite this duty, _Dr. Campagna_ ignored and disregarded the safety, healthcare, and life of the Plaintiff again, despite knowing that I/her first absence of action for the Plaintiff's request for medical care for his serious medical need, resulted in him being rushed to the emergency hospital, which ultimately caused the Plaintiff significant injuries.

It was very foreseeable that the Plaintiff would continue to not receive adequate medical care for his serious medical needs, and be further subjected to unconstitutional conditions of confinement, as _Dr. Campagna_, and I/her co-defendants had created a culture of mismanagement, abuse, corruption, and repeatedly failed to meaningfully address staff shortages, provide adequate medical care, and act with reckless disregard for the health and safety of the Plaintiff. _Dr. Campagna_ failed to take measurable action to abate the risk of serious injury to the Plaintiff, or correct the unconstitutional conditions of confinement, as found by BOP internal reports and complaints, U.S. Senate Judiciary Committee public hearings, litigation, and complaints from the people in it's care, including the Plaintiff. The medical department was extremely short on staff, and even the available medical staff members were being pulled to work custody and manage housing units. All person(s) at FCI Sheridan knew that the medical department was failing, inadequate, [and so cursory that it was resulting in widespread distress and harm]. See Hill v. Marshal, (supervisors failure to review and respond to inmate medical complaints despite knowledge of a breakdown in services constituted deliberate indifference); See also Fisher v. Koehler, supra (deliberate indifference found based on city governments "institutional failure").

_Dr. Campagna_ knew of the serious risk for the Plaintiff while he was housed in the SHU from January 2022 - August 2022. The Plaintiff informed I/her of the retaliation, blocked medical care, having heart pains and irregular heart rate, being threatened, abused, and his worsening medical condition, as each day he continued to throw up, lose significant weight, and still was not afforded medical care. The Plaintiff pleaded for help, however, _Dr. Campagna_ failed to respond, investigate or take any action to get the Plaintiff care, and abate the severe and chronic pain that he was suffering from. See Smith v. Michigan, 256 F. Supp. 2d 704, 710-11 (E.D. Mich. 2003)( prisoner's complaint of lack of medical care could support officials liability); See also Merritt v. Hawk, 153 F. Supp. 2d 1216, 1227-28 (D. Colo. 2001) (plaintiff's allegation that he had informed various prison officials about his problems were sufficient to plead their personal involvement).

_Dr. Campagna's_ ignorance and willful denial to assist the Plaintiff ultimately took a heavy toll on the Plaintiff's mental health. The Plaintiff attempted suicide by hanging unsuccessfully, and despite passing out, and regaining conscious due to the loud banging on the door, was told to stop "fooling around, before he was pepper sprayed." The Plaintiff received no follow up medical care, no sessions with psychology, nor was even placed on suicide watch. Ultimately, the Plaintiff was diagnosed with ı mental health disorders upon being transferred.

The Plaintiff was being denied medical care and strategically kept in the SHU. See Tomarkin v. Ward, 534 F. Supp. 1224, 1235 (S.D.N.Y. 1982)(denial of medical care in solitary confinement constituted deliberate indifference).

The Plaintiff was scheduled back in 2021 to be seen by a neurologist in March of 2022. Despite this, the Defendant's cancelled his appointment due to staff shortages. The plaintiff could no longer walk, and needed specialty medical care, as evidence by the doctors prescribing him treatment in the form of seeing a specialist (neurologist). The Defendant's knowingly cancelled the Plaintiff's specialty appointment, yet failed to take him to the neurologist after that, despite him remaining at the institution for another 6 months. Not only did the Plaintiff never see the specialist, the Defendant's cut off all of his medications, and follow up medical care, despite his worsening condition, and knowing that he had several current/active medical conditions, as evidenced by their own medical records.

In Estelle v. Gamble, infra, the U.S. Supreme Court recognized that prisoners must rely on prison officials to treat their medical needs, and broadened the scope of the Eighth Amendment to include inadequate medical care given to prisoners. Id at 103. The Plaintiff has relied on the Defendant's not only individually, but collectively to provide him care, medical treatment, Rehabilitation Act accommodations, and to take him to his medical specialty appointments, as prescribed by their own doctors. However, Dr. Campagna not only individually failed to reasonably respond to the Plaintiff's pleas for help, medical care, and accommodations, but willfully ignored the Plaintiff's claims of retaliation in the form of being blocked from medical care, and it's subsequent unnecessary severe and chronic pain that it was causing him.

Despite all of the Plaintiff's and his counsels attempts to not only prevent the Plaintiff from getting infected with Covid-19, but then to receive adequate medical care, they were all consistently denied or not provided. Delays in necessary treatment and pain constitute irreparable harm. See Porretti v. Dzurenda, infra ("the deprivation of [a prisoner's] constitutional right to medical care is sufficient to establish irreparable harm")(quoting Edmo v. Corizon, Inc., infra); Rodd v. Bonta, infra.

The Ninth Circuit Court of Appeals recently ruled that "Delaying treatment is an established example of deliberate indifference to a serious medical need in violation of the Eighth Amendment. See Stanard v. Dy. All of the Defendant's were aware that the Plaintiff was being denied and delayed medical care, yet they not only individually, but collectively failed to respond to his pleas for help, or abate the serious risk to his medical health, due to being frustrated with him for pursuing legal action against them and their colleagues.

It is without question that the Plaintiff's prescribed treatment for numerous medical conditions, including several serious medical needs, went grossly delayed time after time, due to transportation issues, staff shortages, retaliation, and other non-medical reasons. Eighth Amendment violations have consistently been found when "inmates wait months for appointments to specialty clinics." See Inmates of Occoquan v. Barry, infra; Hoptowit v. Ray, infra (the Constitution requires that such referrals to outside care be "reasonably speedy"). Furthermore, the Plaintiff's medical care was not allowed to be denied and delayed for non-medical reasons. See Dunn v. Dunn, 219 F. Supp. 3d 1100, 1126 (M.D. Ala. 2016)(explaining denial of necessary treatment for non-medical reasons is intentional deprivation).

Furthermore, interfering with prescribed treatment has consistently been found to represent deliberate indifference towards a serious medical need. See Pederson v. Corizon Health, Inc., infra, and Colwell v. Bannister, infra.

_Ayala-Pena_'s deliberate indifference towards the Plaintiff's serious medical needs

Upon the Plaintiff returning to FCI Sheridan on 9/14/2021, and updating his family, counsel at the time (Cyrus Zal), and the Oregon Federal Defender, Lisa Hay, it was decided that the Plaintiff should follow up with the Defendant's including _Ayala-Pena_, to update them on the medical emergency that took place, due to them not responding to the Plaintiff's request for help for his serious medical need.

The Plaintiff then sent legal correspondence to _Ayala-Pena_, notifying /her of the medical emergency, and requested immediate action, regarding FCI Sheridan's continued deliberate indifference towards his serious medical needs, as he was still infected with Covid-19 (a known serious medical condition), and suffering from not receiving follow up medical care, not receiving his prescribed medications, all while losing his ability to walk, which restricted him to a wheelchair full-time, and was also another "serious medical need." See Taylor v. Plousis, ("a medical condition which threatens a Plaintiff's ability to walk, even on a non-permanent basis, falls within the ambit of a 'serious medical need.'"); See also Kaufman v. Carter, ("inability to walk, even temporarily, constitutes a serious medical need"); Jones v. Simek, (finding prison doctor and officials deliberately indifferent due to waiting 6 months to take prisoner to neurologist). Despite the Plaintiff notifying _Ayala-Pena_ of all of this, /she still failed to respond or take action to get the Plaintiff medical care, or abate the risk of his further injury and unnecessary pain.

This conduct by _Ayala-Pena_ is consistent with the findings of numerous district courts throughout the nation, the Office of The Inspector General audits on BOP Inmate Healthcare, and complaints raised by both prisoners of BOP and it's staff. These reputable Judges and government agencies found that the BOP has been consistently failing to provide adequate medical care to person(s) in it's custody, particularly when prisoners require off-site third party medical care services.

When it comes to the Plaintiff's matter, it's clear that _Ayala-Pena_ continued these acts of deliberate indifference towards the Plaintiff's serious medical needs, as the Plaintiff brought these claims and complaints to _Ayala-Pena_ stressing his severe and chronic pain, absent medical care, and risk of injury, yet despite this, _Ayala-Pena_ failed to take steps to reasonable abate the Plaintiff's suffering, or investigate the further risk he faced. See Jett v. Penner, 439 F.3d 1091, 1098 (9th Cir. 2006)(Prison officials "are liable for deliberate indifference when they knowingly fail to respond to an inmate's request for help.").

The Defendant's (all) were not only individually, but collectively deliberately indifferent to the Plaintiff's serious medical needs and risk. _Ayala-Pena_ along with her co-defendants consistently failed to wear PPE, or take precautions with transfers, and placed new inmates (sometimes infected with Covid-19 in his housing unit), thus increasing the risk for the Plaintiff to not only be exposed to the deadly virus, but actually get infected, in which he ultimately was.

Even district courts throughout the nation were aware of the extra dangerous and risky environment that FCI Sheridan had created and managed. See United States v. Sharma, ("Last year, this court joined the latter group and held that conditions at FCI Sheridan were risky enough to show the circumstances were extraordinary and compelling."); See also Stirling v. Hendrix, ("Records filed in litigation about the conditions at FCI Sheridan also cast doubt on the effectiveness of the prisons response to Covid-19.").

numerous times between 6/2021 - 8/2022

There could be no clearer argument that _Ayala-Pena_ was not only aware of the substantial risk that the Plaintiff faced, but had acted with deliberate indifference towards the Plaintiff's serious medical needs, than due to the fact that the Plaintiff spoke with _Ayala-Pena_ in person, and informed. /her of the continued delayed and denied medical care, missing medications, retaliation and medical complications that were resulting in consistent severe and chronic pain. See Jett v. Penner, (holding prison officials "are liable for deliberate indifference when they knowingly fail to respond to an inmate's request for help."). Yet, _Ayala-Pena_ failed to act reasonably or at all for that matter, to abate the Plaintiff's serious medical needs, and pain. See Lancaster v. Monroe County, 116 F.3d at 1425 (clearly established that "an official acts with deliberate indifference when he knows that an inmate is in need of medical care, but he fails or refuses to obtain medical treatment for the inmate.").

The Plaintiff explained to _Ayala-Pena_ that he had lost his ability to walk, was consistently throwing up daily, thus losing drastic weight, was suffering from an eye infection and cyst on his eyelid, was having shortness of breath, heart/chest pains, along with having numerous mental health issues, due to his prolonged isolation in the SHU, and intentionally being blocked from daily recreation. The Plaintiff was forced to stay in his room for nearly 8 months, All of these represented serious medical (1/2022 - 8/2022)

needs. See Cottell v. Igbinosa, (finding that heart and chest pains are a serious medical need); Mata v. Saiz, (recognizing severe chest pain as a serious medical need), Lavender v. Lampert, ("the existence of chronic and substantial pain itself demonstrates a serious medical need"); Piper v. Rasheed, ("There is no dispute in this case that the Plaintiff has a serious medical need. The cyst in his lower right eyelid caused him extreme pain and discomfort, as well as vision loss."); Richardson v. Nassau County, (evidence of an eye infection that needs a diagnosis is significant in showing seriousness); McGuckin v. Smith, (the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment supports a finding of seriousness); Wellman v. Faulkner, (holding mental health disorders as serious medical need).

As an employee of FCI Sheridan, _Ayala - Pena_____ was an official in charge, and could have taken immediate action, but failed to, despite being fully advised of the grossly delayed and denied medical care, and knowing that the Plaintiff was in consistent severe and chronic pain. See LaFaut v. Smith, (holding that official was the "responsible official in charge" and had been "fully advised" of the problem, and therefore due to taking no measurable action, that it constituted deliberate indifference); See also Ginest v. Board of County Comm'rs of Carbon County, (finding officials have a duty to investigate information suggestion a risk of injury).

_Ayala - Pena_____ and the Plaintiff have what the Ninth Circuit and Oregon Courts have long held to constitute a "special relationship" (jailer-prisoner), therefore, heightening the duty on the jailer to provide care for, and avoid foreseeable risk towards the Plaintiff. Yet, despite this duty, _Ayala - Pena_____ ignored and disregarded the safety, healthcare, and life of the Plaintiff again, despite knowing that    /her first absence of action for the Plaintiff's request for medical care for his serious medical need, resulted in him being rushed to the emergency hospital, which ultimately caused the Plaintiff significant injuries.

It was very foreseeable that the Plaintiff would continue to not receive adequate medical care for his serious medical needs, and be further subjected to unconstitutional conditions of confinement, as _Ayala - Pena_____, and his/her co-defendants had created a culture of mismanagement, abuse, corruption, and repeatedly failed to meaningfully address staff shortages, provide adequate medical care, and act with reckless disregard for the health and safety of the Plaintiff. _Ayala - Pena_ failed to take measurable action to abate the risk of serious injury to the Plaintiff, or correct the unconstitutional conditions of confinement, as found by BOP internal reports and complaints, U.S. Senate Judiciary Committee public hearings, litigation, and complaints from the people in it's care, including the Plaintiff. The medical department was extremely short on staff, and even the available medical staff members were being pulled to work custody and manage housing units. All person(s) at FCI Sheridan knew that the medical department was failing, inadequate, [and so cursory that it was resulting in widespread distress and harm]. See Hill v. Marshal, (supervisors failure to review and respond to inmate medical complaints despite knowledge of a breakdown in services constituted deliberate indifference); See also Fisher v. Koehler, supra (deliberate indifference found based on city governments "institutional failure").

_Ayala - Pena_____ knew of the serious risk for the Plaintiff while he was housed in the SHU from January 2022 - August 2022. The Plaintiff informed    i/her of the retaliation, blocked medical care, having heart pains and irregular heart rate, being threatened, abused, and his worsening medical condition, as each day he continued to throw up, lose significant weight, and still was not afforded medical care. The Plaintiff pleaded for help, however, _Ayala - Pena_ failed to respond, investigate or take any action to get the Plaintiff care, and abate the severe and chronic pain that he was suffering from. See Smith v. Michigan, 256 F. Supp. 2d 704, 710-11 (E.D. Mich. 2003)( prisoner's complaint of lack of medical care could support officials liability); See also Merritt v. Hawk, 153 F. Supp. 2d 1216, 1227-28 (D. Colo. 2001) (plaintiff's allegation that he had informed various prison officials about his problems were sufficient to plead their personal involvement).

_Ayala - Pena's_____ ignorance and willful denial to assist the Plaintiff ultimately took a heavy toll on the Plaintiff's mental health. The Plaintiff attempted suicide by hanging unsuccessfully, and despite passing out, and regaining conscious due to the loud banging on the door, was told to stop "fooling around," before he was "pepper sprayed." The Plaintiff received no follow up medical care, no sessions with psychology, nor was even placed on suicide watch. Ultimately, the Plaintiff was diagnosed with mental health disorders upon being transferred. Further contributing to this was Ayala-Pena's Falsification of documents as they regarded the Plaintiff. From team meeting reports, classification, programming, and other documents. The Plaintiff was being denied medical care and strategically kept in the SHU. See Tomarkin v. Ward, 534 F. Supp. 1224, 1235 (S.D.N.Y. 1982)(denial of medical care in solitary confinement constituted deliberate indifference).

The Plaintiff was scheduled back in 2021 to be seen by a neurologist in March of 2022. Despite this, the Defendant's cancelled his appointment due to staff shortages. The plaintiff could no longer walk, and needed specialty medical care, as evidence by the doctors prescribing him treatment in the form of seeing a specialist (neurologist). The Defendant's knowingly cancelled the Plaintiff's specialty appointment, yet failed to take him to the neurologist after that, despite him remaining at the institution for another 6 months. Not only did the Plaintiff never see the specialist, the Defendant's cut off all of his medications, and follow up medical care, despite his worsening condition, and knowing that he had several current/active medical conditions, as evidenced by their own medical records.

102

In Estelle v. Gamble, infra, the U.S. Supreme Court recognized that prisoners must rely on prison officials to treat their medical needs, and broadened the scope of the Eighth Amendment to include inadequate medical care given to prisoners. Id at 103. The Plaintiff has relied on the Defendant's not only individually, but collectively to provide him care, medical treatment, Rehabilitation Act accommodations, and to take him to his medical specialty appointments, as prescribed by their own doctors. However, Ayala - Pena not only individually failed to reasonably respond to the Plaintiff's pleas for help, medical care, and accommodations, but willfully ignored the Plaintiff's claims of retaliation in the form of being blocked from medical care, and it's subsequent unnecessary severe and chronic pain that it was causing him.

Despite all of the Plaintiff's and his counsels attempts to not only prevent the Plaintiff from getting infected with Covid-19, but then to receive adequate medical care, they were all consistently denied or not provided. Delays in necessary treatment and pain constitute irreparable harm. See Porretti v. Dzurenda, infra ("the deprivation of [a prisoner's] constitutional right to medical care is sufficient to establish irreparable harm")(quoting Edmo v. Corizon, Inc., infra); Rodd v. Bonta, infra.

The Ninth Circuit Court of Appeals recently ruled that "Delaying treatment is an established example of deliberate indifference to a serious medical need in violation of the Eighth Amendment. See Stanard v. Dy. All of the Defendant's were aware that the Plaintiff was being denied and delayed medical care, yet they not only individually, but collectively failed to respond to his pleas for help, or abate the serious risk to his medical health, due to being frustrated with him for pursuing legal action against them and their colleagues. Ayala - Pena even confiscated some of the Plaintiff's legal documents, & legal books, attorney communications, and complaints about her with Defendant Gray, and said that they were contaminated. It is without question that the Plaintiff's prescribed treatment for numerous medical conditions, including several serious medical needs, went grossly delayed time after time, due to transportation issues, staff shortages, retaliation, and other non-medical reasons. Eighth Amendment violations have consistently been found when "inmates wait months for appointments to specialty clinics." See Inmates of Occoquan v. Barry, infra; Hoptowit v. Ray, infra (the Constitution requires that such referrals to outside care be "reasonably speedy"). Furthermore, the Plaintiff's medical care was not allowed to be denied and delayed for non-medical reasons. See Dunn v. Dunn, 219 F. Supp. 3d 1100, 1126 (M.D. Ala. 2016)(explaining denial of necessary treatment for non-medical reasons is intentional deprivation).

Furthermore, interfering with prescribed treatment has consistently been found to represent deliberate indifference towards a serious medical need. See Pederson v. Corizon Health, Inc., infra, and Colwell v. Bannister, infra.

103

Brent Cray's deliberate indifference towards the Plaintiff's serious medical needs

Upon the Plaintiff returning to FCI Sheridan on 9/14/2021, and updating his family, counsel at the time (Cyrus Zal), and the Oregon Federal Defender, Lisa Hay, it was decided that the Plaintiff should follow up with the Defendant's including ___Cray___, to update them on the medical emergency that took place, due to them not responding to the Plaintiff's request for help for his serious medical need.

The Plaintiff then sent legal correspondence to ___Cray___, notifying him of the medical emergency, and requested immediate action, regarding FCI Sheridan's continued deliberate indifference towards his serious medical needs, as he was still infected with Covid-19 (a known serious medical condition), and suffering from not receiving follow up medical care, not receiving his prescribed medications, all while losing his ability to walk, which restricted him to a wheelchair full-time, and was also another "serious medical need." See Taylor v. Plousis, ("a medical condition which threatens a Plaintiff's ability to walk, even on a non-permanent basis, falls within the ambit of a 'serious medical need.'"); See also Kaufman v. Carter, ("inability to walk, even temporarily, constitutes a serious medical need"); Jones v. Simek, (finding prison doctor and officials deliberately indifferent due to waiting 6 months to take prisoner to neurologist). Despite the Plaintiff notifying ___Cray___ of all of this, he still failed to respond or take action to get the Plaintiff medical care, or abate the risk of his further injury and unnecessary pain. In fact, Cray often ridiculed and belittled the Plaintiff when he would complain or ask for help with his pain and inability to walk. See Mullen v. Smith, 738 F.2d 317, 318 - 319 (3rd Cir. 1984) (prisoner was subjected to ridicule and derision in response to complaints of pain and inability to walk, thus satisfying the deliberate indifference requirement).

This conduct by ___Cray___ is consistent with the findings of numerous district courts throughout the nation, the Office of The Inspector General audits on BOP Inmate Healthcare, and complaints raised by both prisoners of BOP and it's staff. These reputable Judges and government agencies found that the BOP has been consistently failing to provide adequate medical care to person(s) in it's custody, particularly when prisoners require off-site third party medical care services.

When it comes to the Plaintiff's matter, it's clear that ___Cray___ continued these acts of deliberate indifference towards the Plaintiff's serious medical needs, as the Plaintiff brought these claims and complaints to ___Cray___ stressing his severe and chronic pain, absent medical care, and risk of injury, yet despite this, ___Cray___ failed to take steps to reasonable abate the Plaintiff's suffering, or investigate the further risk he faced. See Jett v. Penner, 439 F.3d 1091, 1098 (9th Cir. 2006)(Prison officials "are liable for deliberate indifference when they knowingly fail to respond to an inmate's request for help.").

The Defendant's (all) were not only individually, but collectively deliberately indifferent to the Plaintiff's serious medical needs and risk. ___Cray___ along with his co-defendants consistently failed to wear PPE, or take precautions with transfers, and placed new inmates (sometimes infected with Covid-19 in his housing unit), thus increasing the risk for the Plaintiff to not only be exposed to the deadly virus, but actually get infected, in which he ultimately was.

Even district courts throughout the nation were aware of the extra dangerous and risky environment that FCI Sheridan had created and managed. See United States v. Sharma, ("Last year, this court joined the latter group and held that conditions at FCI Sheridan were risky enough to show the circumstances were extraordinary and compelling."); See also Stirling v. Hendrix, ("Records filed in litigation about the conditions at FCI Sheridan also cast doubt on the effectiveness of the prisons response to Covid-19.").

There could be no clearer argument that ___Cray___ was not only aware of the substantial risk that the Plaintiff faced, but had acted with deliberate indifference towards the Plaintiff's serious medical needs, than due to the fact that the Plaintiff spoke with ___Cray___ in person, and informed him, of the continued delayed and denied medical care, missing medications, retaliation and medical complications that were resulting in consistent severe and chronic pain. See Jett v. Penner, (holding prison officials "are liable for deliberate indifference when they knowingly fail to respond to an inmate's request for help."). Yet, ___Cray___ failed to act reasonably or at all for that matter, to abate the Plaintiff's serious medical needs, and pain. See Lancaster v. Monroe County, 116 F.3d at 1425 (clearly established that "an official acts with deliberate indifference when he knows that an inmate is in need of medical care, but he fails or refuses to obtain medical treatment for the inmate.").

The Plaintiff explained to ___Cray___ that he had lost his ability to walk, was consistently throwing up daily, thus losing drastic weight, was suffering from an eye infection and cyst on his eyelid, was having shortness of breath, heart/chest pains, along with having numerous mental health issues, due to his prolonged isolation in the SHU, and intentionally being blocked from daily recreation. The Plaintiff was forced to stay in his room for nearly 8 months. All of these represented serious medical (1/2022 - 8/2022)

needs. See Cottell v. Igbinosa, (finding that heart and chest pains are a serious medical need); Mata v. Saiz, (recognizing severe chest pain as a serious medical need), Lavender v. Lampert, ("the existence of chronic and substantial pain itself demonstrates a serious medical need"); Piper v. Rasheed, ("There is no dispute in this case that the Plaintiff has a serious medical need. The cyst in his lower right eyelid caused him extreme pain and discomfort, as well as vision loss."); Richardson v. Nassau County, (evidence of an eye infection that needs a diagnosis is significant in showing seriousness); McGuckin v. Smith, (the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment supports a finding of seriousness); Wellman v. Faulkner, (holding mental health disorders as serious medical need).

As an employee of FCI Sheridan, _____Cray_____ was an official in charge, and could have taken immediate action, but failed to, despite being fully advised of the grossly delayed and denied medical care, and knowing that the Plaintiff was in consistent severe and chronic pain. See LaFaut v. Smith, (holding that official was the "responsible official in charge" and had been "fully advised" of the problem, and therefore due to taking no measurable action, that it constituted deliberate indifference); See also Ginest v. Board of County Comm'rs of Carbon County, (finding officials have a duty to investigate information suggestion a risk of injury).

_____Cray_____ and the Plaintiff have what the Ninth Circuit and Oregon Courts have long held to constitute a "special relationship" (jailer-prisoner), therefore, heightening the duty on the jailer to provide care for, and avoid foreseeable risk towards the Plaintiff. Yet, despite this duty, _____Cray_____ ignored and disregarded the safety, healthcare, and life of the Plaintiff again, despite knowing that his first absence of action for the Plaintiff's request for medical care for his serious medical need, resulted in him being rushed to the emergency hospital, which ultimately caused the Plaintiff significant injuries. him [Cray] finding the Plaintiff barely responsive, and)

It was very foreseeable that the Plaintiff would continue to not receive adequate medical care for his serious medical needs, and be further subjected to unconstitutional conditions of confinement, as _____Cray_____, and his co-defendants had created a culture of mismanagement, abuse, corruption, and repeatedly failed to meaningfully address staff shortages, provide adequate medical care, and act with reckless disregard for the health and safety of the Plaintiff. _____Cray_____ failed to take measurable action to abate the risk of serious injury to the Plaintiff, or correct the unconstitutional conditions of confinement, as found by BOP internal reports and complaints, U.S. Senate Judiciary Committee public hearings, litigation, and complaints from the people in it's care, including the Plaintiff. The medical department was extremely short on staff, and even the available medical staff members were being pulled to work custody and manage housing units. All person(s) at FCI Sheridan knew that the medical department was failing, inadequate, [and so cursory that it was resulting in widespread distress and harm]. See Hill v. Marshal, (supervisors failure to review and respond to inmate medical complaints despite knowledge of a breakdown in services constituted deliberate indifference); See also Fisher v. Koehler, supra (deliberate indifference found based on city governments "institutional failure").

_____Cray_____ knew of the serious risk for the Plaintiff while he was housed in the SHU from January 2022 - August 2022. The Plaintiff informed him of the retaliation, blocked medical care, having heart pains and irregular heart rate, being threatened, abused, and his worsening medical condition, as each day he continued to throw up, lose significant weight, and still was not afforded medical care. The Plaintiff pleaded for help, however, _____Cray_____ failed to respond, investigate or take any action to get the Plaintiff care, and abate the severe and chronic pain that he was suffering from. See Smith v. Michigan, 256 F. Supp. 2d 704, 710-11 (E.D. Mich. 2003)( prisoner's complaint of lack of medical care could support officials liability); See also Merritt v. Hawk, 153 F. Supp. 2d 1216, 1227-28 (D. Colo. 2001) (plaintiff's allegation that he had informed various prison officials about his problems were sufficient to plead their personal involvement).

_____Cray's_____ ignorance and willful denial to assist the Plaintiff ultimately took a heavy toll on the Plaintiff's mental health. The Plaintiff attempted suicide by hanging unsuccessfully, and despite passing out, and regaining conscious due to the loud banging on the door, was told to stop "fooling around," before he was pepper sprayed." The Plaintiff received no follow up medical care, no sessions with psychology, nor was even placed on suicide watch. Ultimately, the Plaintiff was diagnosed with mental health disorders upon being transferred. Further contributing to this was Crays malicious, evil, and criminal acts towards the Plaintiff.

The Plaintiff was being denied medical care and strategically kept in the SHU. See Tomarkin v. Ward, 534 F. Supp. 1224, 1235 (S.D.N.Y. 1982)(denial of medical care in solitary confinement constituted deliberate indifference).

The Plaintiff was scheduled back in 2021 to be seen by a neurologist in March of 2022. Despite this, the Defendant's cancelled his appointment due to staff shortages. The plaintiff could no longer walk, and needed specialty medical care, as evidence by the doctors prescribing him treatment in the form of seeing a specialist (neurologist). The Defendant's knowingly cancelled the Plaintiff's specialty appointment, yet failed to take him to the neurologist after that, despite him remaining at the institution for another 6 months. Not only did the Plaintiff never see the specialist, the Defendant's cut off all of his medications, and follow up medical care, despite his worsening condition, and knowing that he had several current/active medical conditions, as evidenced by their own medical records.

In Estelle v. Gamble, infra, the U.S. Supreme Court recognized that prisoners must rely on prison officials to treat their medical needs, and broadened the scope of the Eighth Amendment to include inadequate medical care given to prisoners. Id at 103. The Plaintiff has relied on the Defendant's not only individually, but collectively to provide him care, medical treatment, Rehabilitation Act accommodations, and to take him to his medical specialty appointments, as prescribed by their own doctors. However, _____Cray_____ not only individually failed to reasonably respond to the Plaintiff's pleas for help, medical care, and accommodations, but willfully ignored the Plaintiff's claims of retaliation in the form of being blocked from medical care, and it's subsequent unnecessary severe and chronic pain that it was causing him.

Despite all of the Plaintiff's and his counsels attempts to not only prevent the Plaintiff from getting infected with Covid-19, but then to receive adequate medical care, they were all consistently denied or not provided. Delays in necessary treatment and pain constitute irreparable harm. See Porretti v. Dzurenda, infra ("the deprivation of [a prisoner's] constitutional right to medical care is sufficient to establish irreparable harm")(quoting Edmo v. Corizon, Inc., infra); Rodd v. Bonta, infra.

The Ninth Circuit Court of Appeals recently ruled that "Delaying treatment is an established example of deliberate indifference to a serious medical need in violation of the Eighth Amendment. See Stanard v. Dy. All of the Defendant's were aware that the Plaintiff was being denied and delayed medical care, yet they not only individually, but collectively failed to respond to his pleas for help, or abate the serious risk to his medical health, due to being frustrated with him for pursuing legal action against them and their colleagues. Cray even confiscated some of the Plaintiff's legal documents, legal books, attorney communications, and complaints about him and Ayala-Pena, and said that they were contaminated. It is without question that the Plaintiff's prescribed treatment for numerous medical conditions, including several serious medical needs, went grossly delayed time after time, due to transportation issues, staff shortages, retaliation, and other non-medical reasons. Eighth Amendment violations have consistently been found when "inmates wait months for appointments to specialty clinics." See Inmates of Occoquan v. Barry, infra; Hoptowit v. Ray, infra (the Constitution requires that such referrals to outside care be "reasonably speedy"). Furthermore, the Plaintiff's medical care was not allowed to be denied and delayed for non-medical reasons. See Dunn v. Dunn, 219 F. Supp. 3d 1100, 1126 (M.D. Ala. 2016)(explaining denial of necessary treatment for non-medical reasons is intentional deprivation).

Furthermore, interfering with prescribed treatment has consistently been found to represent deliberate indifference towards a serious medical need. See Pederson v. Corizon Health, Inc., infra, and Colwell v. Bannister, infra.

_____Cray_____ was deliberately indifferent to the Plaintiff's serious medical needs, due to the Plaintiff pursuing legal claims against him. _____Cray_____ consistently threatened the Plaintiff throughout 6/2021 - 9/2022. From threatening to disclose the Plaintiff's prior relationship with the government, to then actually doing it, which resulted in the Plaintiff getting battered and extorted, to managing a campaign of harassment against the Plaintiff, _____Cray's_____ action's were, and always have been malicious and evil. See Benefield v. McDowell, 241 F.3d 1267, 1271 (10th cir. 2001)("Labeling an inmate as a snitch satisfies the Farmer standard, and constitutes deliberate indifference to the safety of that inmate.").

_____Cray's_____ actions against the Plaintiff not only violated constitutional rights, but constituted criminal activity as well. _____Cray_____'s hostility towards the Plaintiff was due to the Plaintiff bringing to light criminal acts by _____Cray_____ and his co-defendants, and the Plaintiff attempting to get to the correct institution.

While the Plaintiff was in the SHU, _____Cray_____ directed the Plaintiff's roommate to harm him, in return for going home, having his disciplinary action dropped, along with no criminal referral being made, as the Plaintiff's roommate had swung at federal officers, and received a write up. This battery that took place, then caused the Plaintiff to suffer what doctors believed to be a torn rotator cuff. In addition, it caused significant fear and mental anguish within the Plaintiff. The Plaintiff was forced to continue living on with his assaulter, until he (the roommate) went home.

_____Cray_____ informed the Plaintiff that he would not be getting any medical help, and that he would rot away in the SHU. See Tomarkin v. Ward, 534 F. Supp 1224, 1235 (S.D.N.Y 1982)(denial of medical care in solitary confinement constituted deliberate indifference).

Federal Tort Claims Act ("FTCA")

Statement of Facts

In September of 2021, FCI Sheridan was experiencing yet another Covid-19 outbreak. The Plaintiff by this point had attempted to file complaints regarding FCI Sheridan staff not following Center for Disease Control("CDC") guidelines, nor BOP Covid-19 rules and regulations, and in return was threatened by staff (including but not limted to Correctional Counselor Brent Cray) for exercising his freedom of speech right, by filing administrative remedies and seeking the court for redress. The Plaintiff was further threatened by Mr. Cray that he "has made a lot of friends during his nearly 20 years in the BOP and could make life hard" for the Plaintiff.

Despite the Plaintiff trying to file administrative remedies for his health and safety, extreme prejudice was taken against him by staff. The Plaintiff was simply concerned of contracting Covid-19 due to his heart conditions, and was only trying to avoid unnecessary risk and injury.

On 9/13/2021, BOP staff found the Plaintiff barely responsive, and an emergency respiratory encounter was performed, he was revived, and then taken to the Salem Emergency Hospital, via a third party emergency ambulance.

Upon the Plaintiff returning to FCI Sheridan, him and his counsel continued filing and pursuing administrative remedies against the BOP and FCI Sheridan staff for their actions. This was met with numerous adverse actions by FCI Sheridan staff which include, but are not limited to, Mr. Cray informing inmates that the PLaintiff had cooperated with the FBI, not allowing the Plaintiff Rehabilitation Act ("RA") accommodations, blocking him from medical health services, and finally, starting a campaign of harrassment against him.

In December 2021, and until January 2022, the Plaintiff was being extorted for cooperating with the government. The inmates had told the Plaintiff that Mr. Cray informed them of this information. This is consistent with Cray's threats to the Plaintiff, and his other actions (informing inmates of others who were there for certain types of crimes, i.e. sex crimes).

In January of 2022, the Plaintiff's wife called FCI Sheridan and spoke with a Lieutenant Taylor, and requested that staff check on her husband. See Exhibit 15 - Plaintiff's

109

wife's phone records).

Lt. Taylor then called the Plaintiff to his office to speak with him regarding his wife's concern. However, the main extorter, inmate Milton Carter, went to the Plaintiff to the office and informed him that he had "only 1 minute to be in there." The Plaintiff then returned to his housing unit. Later in the evening the extorters were infuriated and had a meeting in the Plaintiff's cell, and there they assaulted and battered him.

On 1/25/2022, the Plaintiff then received an extortion letter demanding that he have his wife Zelle $10,000.00 to the extorter's agent, Aaron Mitchell. The Plaintiff knew that he could not do this and surrendered to Mr. Cray. He informed Mr. Cray that he had won, and that he needed to leave for his safety and security. The Plaintiff then got emotional and voiced his frustration in front of the housing unit building to Mr. Cray, who laughed and then taunted the Plaintiff before sending him to the Lieutenants office.

At the Lieutenants office, the Plaintiff spoke with Lt. Cerone, who informed the Plaintiff that "once I read this letter" that he could "not unread it." and if after reading it determined that there was a threat, that he would be forced to place the Plaintiff in the Special Housing Unit ("SHU") for his own safety, pending a threat assessment. After reading the letter, Lt. Cerone determined that there was a threat, and ordered the Plaintiff to the SHU. (See Exhibit _16_ - Plaintiff's Administrative Detention Order).

Upon the Plaintiff reporting to Lt. Cerone that Mr. Cray was the one who put the Plaintiff in danger by informing inmates of his cooperation with the FBI, Counselor Rodriguez stepped into the office (as he was in the adjoining office listening) and took the extortion letter, and informed Lt.Cerone that he would take it from there and write up the report/order for him. When the Plaintiff stated that he wanted to file a complaint against Mr. Cray for disclosing the information, Mr. Rodriguez became frustrated and infuriated with the Plaintiff, and told him that he would not let the Plaintiff try and cause trouble for Mr. Cray. The Plaintiff knew that Mr. Rodriguez did not like him, due to the Plaintiff previously reporting him to Mr. Cray for illegal activities, and criminal activity with other inamtes.

110

The Plaintiff was then handcuffed and taken to the SHU. Upon arriving at the SHU, he was stripped searched, and all items were confiscated and logged on an Inmate Intake Property Form. No letter was on the Plaintiff's person. See Exhibit __17__ - Copy of the Plaintiff's Property Intake Form.

From there, the Plaintiff was taken to his cell, where he had to be picked up and carried down several stairs by staff, as the SHU housing unit is not compliant with the Rehabilitation Act ("RA"). The Plaintiff is wheelchair-bound, and could not go down the steps. Plaintiff was informed by Mr. Cray that due to his complaints against FCI Sheridan staff, that he spoke with SIS, and that they were going to intentionally delay his (the Plaintiff's) investigation so thathe would have to suffer the conditions of the SHU for the maximum time possible. Mr. Cray went on saying that his allegations against him would go nowhere, and that all evidence would disappear. Furthermore, the Plaintiff was informed that he would continue to be cut off from mental health and now medical services as they beleived that he was trying to make sure that there is a record of his injuries and complaints. As always, these threats materialzied, and the Plaintiff was not provided medical care, nor his medications or prescribed treatment, from Januaray 2022 until he left FCI Sheridan in August of 2022.

On January 28th, 2022, the Plaintiff sent "Litigation Hold" notices to SIS, Warden Hendrix, and AW Cooper, requesting that all video surviellance from the incident date (1/25/21) be perserved, and that all video surviellance and staff round/sign in sheets for the SHU be perserved, until the Plaintiff was transferred, as it would be most likely used in litigation. Lastly, the Plaintiff requested that his e-mails and video footage for the month be saved.

David Prock Jr., is a FCI Sheridan, Special Investigations Services Lieutenant. Mr. Prock opened, managed and closed the investigation (Case: SHE-22-0073), regarding the Plaintiff.Specifically, on 4/13/2022, Mr. Porck requested that the Plaintiff be brought to him for an interview regarding the then active investigation. By this point, the Plaintiff's investigation had been extended twice, bringing it to the mandatory review for action timeline. Inmates who came to the SHU after the PLaintiff for actual disciplinary reasons, including but not limited to committing new crimes, assaulting and

battering others, bringing in/ geting caught with drugs, and escapes had their investigations/cases adjudicated before the Plaintiff's, despite the PLaintiff's investigation/case occurring first.

During the Plaintiff's interview with Mr. Prock, the Plaintiff immediately noticed that Mr. Prock was very dismissive, inattentive and condescending. Mr. Prock seemed to be only interested in discussing the Plaintiff dropping and stopping his complaints against Mr. Cray, SIS, and deterring the Plaintiff from communicating with the Oregon Federal Defender's Office, regarding FCI Sheridan issues. Nevertheless, the Plaintiff tried to walk Mr. Prock through the incident(s) that took place in the month of December and January 2022. The Plaintiff explained that Mr. Prock could easily pull up his emails from Trulincs to verify that he sent an email to his wife requesting that money be sent to an individual named Aaron Mitchel, and also that Mr. Prock could pull up the housing unit security footage covering the computer area, which would show the main extorter, Milton Carter reviewing the Plaintiff's email with the Plaintiff before directing him to send it off. Mr. Milton Carter demanded that the Plaintiff send $200.00 via Zelle to his agent Aaron Mitchell.

Upon the Plaintiff's wife receiving the email, she complied and sent the money. See Exhibit 18 - Zelle Payment Receipt.

Finally, when discussing his cooperation with Mr. Prock, the Plaintiff did confirm that he did assist the government in some their investigation into numerous current and former politicians, however, that things did not work out.

After the Plaintiff's interview concluded with Mr. Prock, the Plaintiff was later informed on 4/25/2022, that his SIS Case was "closed" and that the "threat was verified." and that he (the Plaintiff) would be transferred to a low security BOP institution. The BOP and FCI Sheridan administrative process then began to transfer the Plaintiff to another BOP institution.

As the next few days and weeks began to pass, the Plaintiff wanted to attempt again to make sure that his complaints were logged (as many of them were being returned untouched,

112

unresponded to, and ripped/destroyed) with the executive staff (Warden Associate Warden, Lieutenants, Regional Office, Headquarters, etc.) as the Plaintiff had been vociing his concerns to them on walkthroughs, submitting complaints, letters, etc., but he wasn't getting anywhere or reponses. The Plaintiff's room was constantly searched, and all of his draft complaints and letters to counsel were taken from him since they involved BOP staff. These items were never returned.

On 5/15/2022, Mr. Cray stopped by the Plaintiff's room, and when the Plaintiff tried to give him a grievance regarding Mr. Prock, he refused to accept it, after asking who it was pertaining to.

On 5/18/2022, Mr. Cray stopeed by the Plaintiff's room again, and yet again, refused to accept the grievance from the Plaintiff regarding Mr. Prock. Mr. Cray then informed the Plaintiff that "the last thing that you want to do right now is piss us off. Especially Prock. We have all of your paperwork on our desk right now. Do you want to go to another Medium Security Prison? We can find a reason to write you up, and guess who gets to decide your punishment?". The PLaintiff then submitted the grievance through the FCI Sheridan institutional mail.

On 5/21/2022, just days after the Plaintiff tried submitting his complaint against Mr. Prock numerous times, Mr. Prock directly retaliated against the Plaintiff, by creating a false federal document (Incident Report) in which he knew would cause adverse actions against the Plaintiff. See Exhibit  19  - Copy of Incident Report. Mr. Prock took this extreme act all due to the Plaintiff exercising his right to freedom of speech by filing a complaint, and seeking redress from the court.

Mr. Prock's actions were malicious and evil, and for the sole purpose of causing the Plaintiff harm and unnecessary rigor. The Incident Report was not even issued within the BOP policy. In fact, it violated several policies of the BOP. See BOP Program Statement(s) 541.1, 541.5, and 541.7, along with the General Section 3. Principles, subsection (d) which prohibits retaliation against inmates and outlines the policies and procedures for issuing Disciplinary Incident Reports. Additionally, when the fake "hearing" took place, the PLaintiff was not allowed to present evidence, request evideence, allwed witnesses,

113

or anything. The Plaintiff was simply instructed to sign the hearing report, and that he if refused to sign, that he would receive another Incident Report for failing to follow staff directives.  The Chair of the UDC was Mr. Cray. The individual who started the entire matter, which was also against BOP policy.

Despite Mr. Prock closing the Plaintiff's SIS Case on 4/25/2022, he falsified a federal document claiming that he had "just became aware that" the Plaintiff's "Case had closed." nearly 26 days later, after HE closed the case. Mr. Prock falsified this report to meet the BOP policy that Incident Reports must be written and issued within 24 hours. In addition, the "Incident Date" listed on the Incident Report is recorded as 4/11/2022, which is nearly 40 days before the Incident Report was issued, and not even the day that the Plaintiff met with Mr. Prock, which was 4/13/2022.

In Mr. Procks fabricated Incident Report, he claims that he didn't find any evidence to support the Plaintiff's allegations, and that "evidence found" supported the claims that the Plaintiff's statements were fictitious. Mr. Prock does not mention or reference what the "evidence found" was that supposedly supported his claims as required by BOP policy 541.5, as there is none to support or even hint that the PLaintiff's claims were fictitious. Furthermore, inmates are to be informed of all evidence against them when an Iñcident Report is issued. Again, the Plaintiff was not afforded the opportunity which violated his due process rights.

Mr. Prock even states that the Plaintiff "lied" as to stating that he met with a Lt. Tyler, because Lt. Tyler doesn't exist, when in fact, the Plaintiff had met with a Lt. Taylor. The Plaintiff obviously confused the lieutenants name as he only met with the lieutenant for less than one minute and was asked the lieutenants name by Mr. Prock months later (due to the retaliatory intentional pushbacks of the Plaintiff's investigation, so that he would spend more time in the SHU).

The entire Incident Report is obviously false, as the honest and respectable lieutenants Cerone and Taylor clearly provide opposing and conflicting statements with those found in Mr. Procks frabicated Incident Report. Lt. Cerone states that he remembers the Plaintiff coming to his office with a document/letter (extortion letter). See Exhibit 30

- Lt. Cerone's response to the Plaintiff's Inmates Request To Staff Form.

Lt. Taylor, whom the Plaintiff thought was named Lt. Tyler confirms that he called the Plaintiff up to his office to address concerns that he had received from the Plaintiff's wwife. See Exhibit __21__ - Lt. Taylor's response to Plaintiff's Inamte Request To Staff Form.

Mr. Prock and/or Mr. Rodriguez, obviously removed, deleted, or intentionally looked over all supporting evidence of the Plaintiff's claims, and was simply looking to cause harm to the Plaintiff, despite knowing that he was the victim of a crime. Mr. Prock even failed to look at the most apparent evidence, which was the video footage from the night the Plaintiff told him that he was forced to send an email, whiah would have shown the extorter reading the Plaintiff's email, and then directing him to send it off, and get off the computer immediately after. Again, "Litigation Hold" notices were sent to BOP and FCI Sheridan regarding them preserving this evidence.

Mr. Prock goes on in his Incident Report claiming that 1) the Plaintiff did not cooperate; and 2) the Plaintiff provided the government with fake "audio recordings." Mr. Prock states that he confirmed all of this through the Plaintiff's Presentencing Report. This is again false, and was used to cause the Plaintiff emotional distress and place him at risk, by this Incident Report being read to the Plaintiff in front of other inmates. The Plaintiff's Presentencing Report will show that Mr. Prock's statments are false, and incorrect. The Plaintiff cooperated with the FBI for nearly one year, traveling all over the United States to engage in meetings with current and former elected officials. The Plaintiff issued money to elected officals in exchange for contracts. This was all verified by the FBI and DOJ. Furthermore, the United States Attorney's Office, published the Plaintiff's Federal Bureau of Investigation Opening Source Document on Pacer, along with a Statement of Facts that show Mr. Procks statements are inaccurate and false. See Exhibit __22__ - FCI Source Opening Document for Plaintiff. The Plaintiff was simply a victim of a campaign of harassment, directed by Mr. Cray and Mr. Prock, who were retaliating against him for exercising his freedom of speech

right, and trying to seek redress from the court. The Plaintiff was assisting the Oregon Federal Defender's Office with discovery and information related to FCI Sheridan's conditions of confinement, helping additional inmates sign up for the petition, and holding the defendant's responsible for their cruel and unusual punishment. See Exhibit 23 - Copy of Inspection Report that took place at FCI Sheridan.

The Plaintiff was being punished for this, as it was voiced to him by numerous Defendant's in this suit, and others (DOES 1-99). In fact, the Plaintiff was not the only inmate being punished for this. See Exhibit 24 - Oregon Federal Defenders Emergency Motion Requesting Special Master Due To Numerous Reports of Retaliation.

Mr. Prock even went as far as allowing yet another inmate to commit crimes against the Plaintiff and his family. An inamte in the SHU came across the Plaintiff's family information (address, name, etc), and began writing the Plaintiff's family members pretending to be the Plaintiff and requesting that his family wire $75,000.00 to the inmate. See Exhibit 25 - Copies of the letters and envelopes mailed out to the Plaintiff's family, impersonating the Plaintiff.

The Plaintiff's counsel and family then immediately contacted FCI Sheridan staff, filed a police report and contacted the Oregon United States Attorney's Office. See Exhibit 26 - Copy of Folsom Police Department Report. The Plaintiff's counsel(Cyrus Zal) even mailed FCI Sheridan SIS a copy of the police report, letters, envelopes, and other pertinent information, in addition to the PLaintiff's wife mailing and contacting SIS Mr. Prock as well. Yet, Mr. Prock refused to take action, despite being required to under 18 U.S.C. 4042(a)(3), which require BOP staff "provide for the protection, instruction, and 'dicipline'of all persons..." Even BOP Policy 1350.01 "Criminal Matter Referrals" required Mr. Prock to investigate the matter, and to then make a criminal referral to the United States Attorney's Office. However, despite an inmate committing mail fraud, conspiracy to commit wire fruad, along with several other crimes, Mr. Prock excused it, due to the victim being the Plaintiff.

The Plaintiff was informed by Mr. Cray that again he should not expect help from Prock or anyone at the institution, since he has been helping Lisa Hay embarass them, and

trying to get them fired, and writing up staff. Mr. Cray further insinuated that the inmate who had been writing the Plaintiff's family, would be getting released soon, and may soon stop by the Plaintiff's home to pay them a visit. Mr. Cray could not have known about the Incident of the Plaintiff being impersonated, unless he was informed this by Mr. Prock.

After the Plaintiff was transferred, he continued to seek medical help both for his physical pains, and his mental health. Upon arriving at his new BOP institution, and being seen by medical and mental health services, he was diagnosed with mental health disorders, and prescribed numerous mental health medications. In addition, the Plaintiff now weighed 133 pounds. He had lost over 50 pounds from vomiting while FCI Sheridan, and being denied medical care, his medications, and help, despite all of his pleas for help.

Mr. Pock was informed of his errors with the evidence and documents provided in this complaint. Mr. Prock was further informed of the adverse actions that were taking place against the Plaintiff, for the Incident Report that he falsified against him. Yet. Mr. Prock took no action to correct his doings, which goes to show and support that Mr. Procks actions have and continue to be only to cause the Plaintiff harm in realiation for the Plaintiff exercising his protected rights.

Lastly, the Incident Report was challenged by the Plaintiff, however, the Chairman of the fake hearing was no other than Mr. Cray, who this whole thing started from. This again, was in violation of the BOP Policy, and done to further retaliate against the Plaintiff. Ultimately, Mr. Cray directed the Plaintiff to sign the disciplinary action or face further adverse actions. See Exhibit 27 - Copy of Hearing Result. The Plaintiff was not allowed a hearing, allowed to see evidence, call witnesses, or even allowed to contact his attorney. Mr. Cray had blocked all of the Plaintiff's attorneys attempts for 8 months to get in contact with his client. See Exhibit 12 - Declaration from attorney Cyrus Zal.

117

Causes of Action

~~sixth day by Mr. Prock and Mr. Cray to cause the Plaintiff great pain to physically and mentally.~~

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

The Ninth Circuit has specifically recognized IIED claims under the FTCA. See Sheehan v. United States, 896 F. 2d 1168, 1172 (9th Circ. 1990) ("We hold that a claim based on conduct constituting the tort of intentional infliction of emotional distress is not excluded as a matter of law from FTCA by 2680(h).").

Upon Mr. Prock discovering that the Plaintiff had filed a complaint against him, he decided to take immediate action to inflict severe emotional distress on the Plaintiff, by fabricating an Incident Report against the Plaintiff. Mr. Prock knew that his fabricated Incident Report would have severe adverse actions against the Plaintiff, including but not limited to the Plaintiff no longer being able to apply the two years that he earned off of his sentence, affecting the Plaintiff's Security, Custody and Pattern scores negatively, making the Plaintiff ineligible for certain family/children visiting events, and prolonging his opportunity to participate in Evidence Based Recidivism Reduction programs and opportunities.

Mr. Prock's actions were not only criminal, but malicious and evil, and for the intent of causing the Plaintiff to suffer. Mr. Prock's actions caused the Plaintiff great emotional distress, which resulted in actual psychological and physical injuries to the Plaintiff. Mr. Prock and Mr. Cray took extreme actions to block the Plaintiff from all medical services in retaliation and in an attempt to block the Plaintiff from having records to refer back to of their actions, all for him exercising his right to freedom of speech, assisting the Oregon Chief Federal Defender Lisa Hay, and seeking redress from the Court.

Mr. Prock intentionally subjected the Plaintiff to further means of cruel and unusual punishment. The Plaintiff suffered medical harm by the absence of medical care (severe and chronic pain from not receiving his medications and losing nearly 50 pounds from throwing up/nausea), and psychological harm as he was locked away in the SHU for 24 hours per day, 7 days per week, for nearly 8 months without being allowed out for daily recreation. The effects

of Mr. Prock and Mr. Crays actions damaged the Plaintiff to the point of causing him to be prescribed anti-depressants and being required to start seeing a psychologist. Mr. Prock's actions even caused the Plaintiff to unsuccessful attempt suicide. Despite the Plaintiff having a serious medical need and not being able to walk and having numerous active medical issues on his BOP Medical Health Records, and requesting psychology dozens of times, Mr. Cray and Mr. Prock blocked all of his access for nearly one year collectively. From January 2022 until September 2022, the Plaintiff wasn't provided any medical or psychology care until he was transferred and arrived at FCI Phoenix, at which time he was immediately prescribed numerous medications for pain, nausea, antidepressants and more, due from the effects of Mr. Prock and Mr. Cray's actions.

Mr. Prock and Mr. Cray's actions constituted an extraordinary transgression of the bounds of socially tolerable. As federal officers of the law, Mr. Prock and Mr. Cray are supposed to maintain law, order, and protection, yet abused their power and intentionally broke their employer's policy to cause the Plaintiff great harm by fabricating a federal document to further their retaliatory actions for the Plaintiff engaging in protected activity (exercising his freedom of speech right by filing grievances), all to protect their employer and colleagues.

Mr. Prock took extraordinary and illegal steps to not only block the Plaintiff from going home two years early and participating in rehabilitating programs and events but subjected him to the extreme conditions of confinement of the SHU, in which the Supreme Court has found causes great psychological issues to the point in some cases, of no return for inmates. Mr. Prock broke his duty of care by intentionally causing harm to the Plaintiff.

## NEGLIGENCE

The Defendant, by way of the BOP had a duty to investigate the extortion crime that took place against the Plaintiff by the Defendants employees/colleagues and inmates. The BOP is required to provide protection and discipline for its residents, even if that protection is against its employees (18 U.S.C. 4042(a)(3)). The Plaintiff relies on the Defendant to conform to a

standard of care, and provide safekeeping, medical, protection, and essentials, especially due to their Special Relationship. The Defendant breached that standard intentionally, to cause harm to the Plaintiff in retaliation. Furthermore, the Defendant, by way of Mr. Prock failed to review, collect and take into account the obvious evidence that confirmed the Plaintiffs complaint. The casual connection between the Defendant's conduct by turning around and issuing the Plaintiff an Incident Report in retaliation, outside of BOP policy, and the resulting injury are obvious. By the Defendant falsifying a federal document against the Plaintiff, he lost the two years he earned off his sentence to go home early to his family and suffered phycological harm (depression and anxiety) in which now he has to be medicated for and see a psychologist. Furthermore, the Defendant intentionally prolonged the stay of the Plaintiff in SHU, who is a non-violent offender, who was not even placed in the SHU for disciplinary reasons. While the average stay for an inmate in the SHU in BOP is 3.98 weeks, the Plaintiff was held in the SHU for nearly 30 weeks.

## ABUSE OF PROCESS

The Defendant, by way of Mr. Prock and Mr. Cray had an ulterior purpose beyond malice that was unrelated to the SHU and Disciplinary Process to cause harm to the Plaintiff, in retaliation for the Plaintiff writing them up in Administrative Remedy Complaints, and helping the local Chief Federal Public Defender highlight constitutional violations that were taking place at their institution.

The Defendant knowingly falsified a federal document, to cause great harm to the Plaintiff and make him be confined for an additional two years. Their willful act in the process was not proper nor regular conduct of which the proceeding was made for.

## FALSE IMPRISONMENT

The Defendant is confining the Plaintiff to the Bureau of Prisons custody for an additional two years, by his falsified Incident Report. The Defendant intended to confine the Plaintiff for a longer term not only in the Bureau of Prisons, but in the SHU while the Plaintiff

was housed at FCI Sheridan. The Defendant intentionally pushed back the Plaintiffs investigation, and then intentionally withheld his transfer to have him confined to the SHU in which the Defendant knew would cause adverse psychological effects to the Plaintiff. SEE EXHIBIT 28, Dr. Grassin Report provided to the Defendant. The Plaintiff was not even allowed to leave his room for daily recreation unlike the other inmates who were allowed to, and where in the SHU for disciplinary reasons. The Plaintiff was obviously aware of the confinement, and the imposition of restraint on the Plaintiffs freedom of movement was clear.

## WANTON MISCONDUCT

For Mr. Prock to falsify a federal document as a law enforcement officer was egregious. Mr. Prock's actions were intentional and of unreasonable character, and with complete disregard of the risk and harm that would follow to the Plaintiff from his malicious actions. Mr. Prock was in fact conscious of the indifference that his falsified Incident Report would have on the Plaintiff, yet still made a decision to continue on with his act(s) against the Plaintiff.

Mr. Prock had a duty to protect the Plaintiff, provide safekeeping, medical care, and other essentials, yet consciously breached that duty to retaliate against the Plaintiff. Mr. Prock and Mr. Cray's motives were to deter the Plaintiff from filing any more complaints, and no longer helping the Oregon Chief Federal Public Defender, Lisa Hay. Their actions lead to actual physical and mental harm to the Plaintiff in which he is now being medicated for and seen by a psychologist.

## GROSS NEGLIGENCE

Mr. Prock acted with reckless disregard to the safety and well being of the Plaintiff, all due to the Plaintiff exercising his constitutional rights. The Defendant could have easily pulled the Plaintiffs emails to verify that he was forced to send an email to his wife requesting that money be sent to Aaron Mitchell. Mr. Prock could have viewed the video footage at the time of the email being sent to see that the extorter was with the Plaintiff and reading his email before making him send it. Mr. Prock could have reviewed the Zelle receipt for the money sent Aaron

Mitchell to verify that extortion money was actually sent. Mr. Prock could have listened to the extorters phone calls to see that he coordinated with Aaron Mitchell to verify and set up the transaction to receive the extortion funds. Mr. Prock could have checked with the lieutenants to see if one of them had met with the Plaintiff due to receiving a call from his wife. Mr. Prock could have reviewed his employer's policy to see that his Incident Report violated several policies, yet he intentionally ignored them as his intent was malicious and evil and for the purpose of causing harm to the Plaintiff. Mr. Prock not only failed to investigate, he failed to keep the Plaintiff safe intentionally and negligently.

## ABUSE OF PROCESS

The Defendant is required to "provide.... discipline of all persons charged with or convicted of offenses against the United States." See 18 U.S.C. 4042(a)(3). Mr. Prock had clear evidence of Inmate Johnston, of FCI Sheridan impersonating the Plaintiff, to commit wire and mail fraud. The resident mailed a letter through the United States Postal Service, to the family of the Plaintiff requesting that $75,000 be wired to him. At minimum Inmate Johnston committed mail fraud, and conspiracy to commit wire fraud. The Defendant received a police report from the Law Offices of Cyrus Zal along with the offer to have the original envelopes and letters turned over to them. Yet refused to take action or respond in retaliation.

Even the police report clearly noted that the evidence showed that the Plaintiff did not write or send the letters requesting money be sent to the identified inmate. Yet, Mr. Prock and Mr. Cray refused to help the Plaintiff as further retaliation in their campaign of harassment. The Defendants abused the process and authority in which they were empowered with, and yet instead, informed and the Plaintiff that they were not going to help him due to his complaints, and that the resident was going to be released and then possibly go to the Plaintiffs residence.

## NEGLIGENCE

The Defendant, by way of Mr. Prock had a duty to investigate the crime that took place against the Plaintiff and his family, as inmate Johnston was a resident of FCI Sheridan, and

under his custody and care, in which he was required to discipline or make a prosecution referral to the United States Attorney's Office. See 18. U.S.C. 4042(a)(3).

The Defendant breached that duty and standard only in retaliation against the Plaintiff for him exercising his Constitutional Right. The Plaintiff was informed that he would not be provided aid, nor would the inmate be disciplined since he has attempted to continue on with his complaints.

The Defendants actions caused the Plaintiff to be injured physically and mentally. The Defendants action led to actual injuries in which the Plaintiff is now being medicated for and being seen by a psychologist.

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

The Defendant, by way of its employees (Mr. Prock and Mr. Hendrix) were mailed an appeal for the Incident Report issued to the Plaintiff. The Plaintiff attempted appealing his Incident Report numerous times, however his other forms had been immediately returned to him by Mr. Cray, and he was told to "let it go" and to "stop while he is ahead, or else things were going to get worse for him." These appeal packets included evidence showing and supporting the Plaintiffs claims. From phone records and BOP staff statements, to referencing prior litigation hold notices for footage/emails and the FBI's document confirming that the Plaintiff was a cooperator, the Defendant had all relevant information to know for a fact that his Incident Report was false.

The Defendant intended to inflict severe emotional distress on the Plaintiff by not correcting his actions. The Defendant made clear by way of its employees Mr. Cray and Mr. Prock that they were punishing the Plaintiff for "causing trouble" by filing his complaints and helping Chief Federal Public Defender Lisa Hay. Mr. Prock and Mr. Cray broke several BOP policies by issuing and adjudicating their purported Incident Report. These policy violations were raised in the appeals and later on in additional complaints.

The Defendants actions caused the plaintiff severe emotional distress. Not only by staff

124

informing more inmates of the Plaintiff telling on other inmates, but by disclosing that he had a relationship with the FBI when his Incident Report was issued and read, caused the Plaintiff severe emotional distress over his safety. Furthermore, the Plaintiff was caused severe emotional distress by knowing that he would no longer be able to lose two years off of his sentence, in which he had worked so hard for by completing Evidence Based Recidivism Reduction programs.

The Defendants actions transgressed the bounds of socially tolerable conduct. Their actions were malicious and evil, and for the intent of causing the Plaintiff extreme pain and suffering and causing him to deter from ever filing any more complaints or following up with his suits.

## NEGLIGENCE

The Defendant, by way of its employees had a duty requiring them to conform to a certain standard of care, including but not limited to those found under 18 U.S.C 4042(a)(3), and by the BOP policies, which state that the BOP is to provide safekeeping, protection, medical care, discipline and other essentials to the Plaintiff. Mr. Prock acted negligently and took no due diligence steps in effort to confirm the Plaintiffs complaints and crimes that took place against him. Mr. Prock at all times had access to material evidence that confirmed the Plaintiffs allegations and proved that the crimes took place against the Plaintiff, yet negligently ignored those pieces of evidence and later stated in his report that "no evidence existed" that supported the claims made by the Plaintiff.

Mr. Prock and Mr. Cray breached the standard of care and duty to investigate, discipline, provide safekeeping and protection to the Plaintiff as he was a resident at FCI Sheridan. At all times before issuing the Incident Report to the Plaintiff, and after the issuance of the Incident Report, Mr. Prock received indisputable evidence that showed that the Plaintiff was innocent, yet Mr. Prock negligently took no action to correct his mistakes which drastically effected the Plaintiff, nor did Mr. Prock try to prevent further harm from occurring to the Plaintiff stemming

from their (Mr. Prock and Mr. Cray's) own negligent acts.

The Plaintiffs physical injuries and psychological injuries are clear. From the Plaintiffs attempted suicide attempts to his ongoing antidepressants and psychologist appointments, the Defendants actions harmed the Plaintiff and caused actual damages.

## FALSE IMPRISONMENT

By Mr. Prock fabricating an Incident Report against the Plaintiff, he has caused the Plaintiff to lose two years off of his sentence, by making him ineligible to apply two years (12 months ETC and 12 months halfway house) off of his sentence for successfully participating in and completing Evidence Based Recidivism Reduction programs and activities. Mr. Prock and Mr. Cray also intentionally held the Plaintiff in the SHU for a prolonged amount of time in retaliation for him exercising his constitutional rights. The average inmates stay in the BOP SHU is 3.98 weeks. Yet, the Plaintiff was held in the SHU for nearly 30 weeks, as a non-violent inmate who was not even placed in the SHU for disciplinary reasons, but for protection due to Mr. Cray disclosing to inmates that he had assisted the Federal Bureau of Investigations.

The Plaintiff was warned that this harm would come and continue if he continued exercising his constitutional rights and assisting the Chief Federal Public Defender Lisa Hay. The Plaintiff was kept in the SHU and exclusively not allowed to go out to recreation like the other inmates. The Plaintiff spent 24 hours per day, for nearly 8 months in a cell, with maybe 5 exceptions when he was allowed to go to the laundry room and to meet with staff. The Plaintiff was blocked from all visits with his family as well, as he was informed that staff would not pick him up and carry him upstairs to the visiting area/video room.

These cruel actions were carried out by assertion of legal authority granted to Mr. Prock and Mr. Cray as BOP employees.

## ABUSE OF PROCESS

Mr. Prock and Mr. Cray are in charge of and the responsible party for the discipline of the Plaintiff under 18. U.S.C 4042(a)(3), since he was a resident at FCI Sheridan. Both Mr.

Prock and Mr. Cray took retaliatory actions against the Plaintiff for him engaging in protected activities (freedom of speech). Due to the Plaintiff exercising this right, Mr. Prock and Mr. Cray abused the process of discipline in which they were granted under the authority of the Bureau of Prisons. They had an ulterior motive to intentionally cause harm to the Plaintiff to stop him from engaging in further protected activities and deter him from following up with any of his claims which stemmed from protected activities.

Mr. Prock and Mr. Cray broke several of their own BOP policies to cause harm to the Plaintiff. The Plaintiffs incident stemmed from Mr. Cray disclosing to inmates that the Plaintiff assisted the Federal Bureau of Investigations. Yet, Mr. Cray was the Chairman to adjudicate the Plaintiffs innocence in the Incident Report hearing. The BOP policy clearly states that a staff member who is involved in the incident cannot be part of the process. Furthermore, both Mr. Prock and Mr. Cray confiscated legal material (complaints and drafted suits against them) from the Plaintiff prior to issuing him the falsified Incident Report. Incident Reports must be issued within 24 hours of the incident, however, Mr. Prock waited for several weeks until issuing his falsified federal document. Mr. Prock only did this once he learned that the Plaintiff had attempted to file a written complaint against him.

Both Mr. Prock and Mr. Cray's actions were not only criminal, but malicious and evil, with the sole intention of causing harm to the Plaintiff by abusing the process of discipline under the BOP. The Plaintiff has now suffered not only physical and mental health damages due to their extremities but lost two years off of his sentence in which he earned through successfully participating in Evidence Based Recidivism Reduction programs and activities.

## WANTON MISCONDUCT

Upon Mr. Prock receiving indisputable evidence which unequivocally cleared the Plaintiff of Mr. Prock's fabricated Incident Report, he continued to allow adverse actions to commence on the Plaintiff, which include the Plaintiff not being able to go home two years early for his successful participation in Evidence Based Recidivism Reduction programs and

activities. Not only did Mr.Prock know that he falsified an Incident Report, but later when confronted with evidence of his actions in which proved that his statements were false, still refused to take correction action.

Mr.Procks actions were and continued to be intentional and of unreasonable character, with complete disregard of the harm and damage that he has caused the Plaintiff as a result of his actions. Mr. Prock was and has always been conscious of the indifference that his falsified Incident Report would have and has had on the Plaintiff.

Mr.Prock had a duty to protect the Plaintiff, provide safekeeping, medical care, and other esstionals, yet consciously breached that duty to retlaiate against the Plaintiff.

Mr.Prock and Mr.Cray's motives were to harm and deter the Plaintiff from filing anymore complaints, no longer help the Oregon Federal Defenders Office, and dismiss/cease all administrative remdies, litigation, and complaints against FCI Sheridan and its staff. Their (Prock and Cray) actions lead to actual physical and mental damage to the Plaintiff in which he is now being medication for and seen by a psychologist.

## GROSS NEGLIGENCE

Upon Mr.Prock receiving indisputable evidence which unequivocally clears the Plaintiff of Mr.Procks fabricated and retaliatory Incident Report, Mr.Prock has breached his duty of care, and is intentionally causing harm to the Plaintiff by way of his falisfied federal document. The adverse actions have been made clear to Mr.Prock, yet he has taken no correction actions. As a law enforcement officer, he is intentionally causing harm to a victim.

## RELIEF

Wherefore, the Plaintiff prays and request that the court grant him the following damages:

1) Award the Plaintiff $30,000,000.00 for the loss of future income, mental and physical damages, pain and suffering, against the Defendants jointly and severally;

2) Award the Plaintiff all of his legal fees

3) Allow the Plaintiff the jury to consider punitive damages against the individuals sued in their individual capacities

4) Award the Plaintiff all future estimated medical expenses, loss of life/enjoyment, counseling and rehabilitation services cost

5) Award the Plaintiff any other such relief that the court find appropriate.

## VERIFICATION

Pursuant to U.S.C. 1746, I verify under the pentalty of perjury that the foregoing is true and correct.

Dated this 30th, of May 2024.

Respectfully Submitted,

Derek Bluford, Reg#77108-097
USP Lompoc
3901 Klein Blvd
Lompoc, CA 93436

# EXHIBIT 1A

Lisa Hay, OSB # 980628
Federal Public Defender
District of Oregon
101 SW Main Street, Suite 1700
Portland, Oregon 97204
Tel:    (503) 326-2123
Fax:    (503) 326-5524
Email: lisa_hay@fd.org

Attorney for Petitioner

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON

|  |  |
|---|---|
| **JOHN PHILIP STIRLING,** | **Case No. 3:20-cv-00712-SB** |
| Petitioner, | **AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND PETITION FOR WRIT OF HABEAS CORPUS** |
| v. | |
| **JOSIAS SALAZAR, Warden, FCI Sheridan,** | |
| Defendant-Respondent. | |

## INTRODUCTION

Whether through indifference or incompetence, the Federal Bureau of Prisons is endangering the lives of individuals entrusted to its care by failing to establish consistent and effective safeguards to protect them from the coronavirus and by subjecting them to conditions of confinement so harsh that mental and physical health are impaired. More than eighty federal inmates have died from COVID-19, thousands others have been sickened, yet the Bureau fails to follow the directives of the Attorney General and health authorities to de-densify its facilities in order to allow for safe distance between prisoners and lower staff-to-inmate ratios. Instead, since March 31, the Bureau has instituted increasingly draconian lockdown measures, confining pretrial detainees and convicted inmates in small cells for up to 23 hours per day, and at times up to 72 hours straight; triple-bunking some inmates in two-person cells; sharply curtailing contact with family and friends; cancelling educational and rehabilitative programs; eliminating or reducing needed medical care; and providing misinformation that frightens, destabilizes, and demoralizes, including quarantining inmates for transfer to home confinement, then revoking the transfers without explanation.

The Bureau increases the risk of infection for all inmates in a number of ways: by failing to test all current inmates for COVID-19; transporting inmates into and out of facilities without testing for COVID-19; allowing guards to enter without being tested and to wear the same gloves, masks and uniforms as they rotate through areas of the compound; and failing to provide sufficient cleaning materials needed to disinfect surfaces to avoid infection. While a national emergency like the pandemic justifies emergency measures, the Bureau's resort to a continuing lockdown, now more than 80 days running, and its inability to protect inmates from COVID-19 with or without the lockdown, results in custody that violates the laws and Constitution of the United States.

**PAGE 1.    AMENDED COMPLAINT**

Because no conditions of confinement would be constitutionally sufficient to protect Mr. Stirling from COVID-19 within the Federal Detention Center at Sheridan, Oregon, where he is housed, Mr. Stirling seeks a writ of habeas corpus under 28 U.S.C. § 2241 ordering his release from unlawful custody. While the petition is pending, Mr. Stirling seeks declaratory and injunctive relief in the form of orders (1) prohibiting the Warden from accepting further detainees to the Federal Detention Center in Sheridan, Oregon, where he is housed, until the Warden can demonstrate that adequate quarantining and testing of the new arrivals assures that they are not infected with the coronavirus; (2) prohibiting Mr. Stirling's transfer out of the Federal Detention Center to any other BOP facility until the Warden can demonstrate that sufficient measures exist to protect him from infection with the coronavirus during both transportation and at the new facility; (3) mandating specific cleaning and social distancing protocols be implemented; and (3) mandating enlargement of his custody to allow serve of his sentence in the community rather than within the Federal Detention Center, until or if the lockdown has been lifted and safe conditions restored. Mr. Stirling further seeks court-mandated fact-finding on the conditions at FCI Sheridan as an interim measure to inform the decision in this case.

## STATEMENT OF FACTS

### I.   Background

1.1    The novel coronavirus that causes COVID-19 has led to a global pandemic. As of June 29, 2020, more than 10 million people have been infected with the virus worldwide, and 504,936 have died.[1] A quarter of those deaths have occurred within the United States. The

---

[1] Johns Hopkins Medical Center, Coronavirus resource center, https://coronavirus.jhu.edu/ (last accessed June 29, 2020, 9:22 p.m.)

PAGE 2.    AMENDED COMPLAINT

devastating and rapid spread of the virus in the United States is evident in graphs that show the cumulative cases since the 50th day after the first case.[2]



1.2     The spread of the virus within prisons has been no less dramatic. There have been at least 75,000 people infected in U.S. prisons and jails, and at least 657 inmates and workers have died.[3] Since the first known COVID-related death of an inmate on March 29, 2020, at least 548 prisoners in state and federal custody have died of COVID.[4] The Bureau of Prisons acknowledges

_____

[2] *Id.* Because the epidemic began at different times in different countries, viewing each country's curve from the same starting point allows an easier comparison among countries. The starting point for this chart is the day on which the 50th case was confirmed in each country, with the trend lines following the number of days since that event.

[3] The New York Times, *Coronavirus in The U.S.: Latest Map and Case Count*, https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html#clusters (last accessed June 29, 2020).

[4] The Marshall Project, https://www.themarshallproject.org/2020/05/01/a-state-by-state-look-at-coronavirus-in-prisons (last accessed June 29, 2020).

**PAGE 3.     AMENDED COMPLAINT**

89 inmate deaths directly attributed to COVID-19, a figure that does not include either deaths at private federal prisons or deaths of inmates after they are discharged from prison.[5]

1.3    According to the Centers for Disease Control and Prevention, people who suffer from certain underlying medical conditions face an elevated risk of complications if they contract COVID-19. The conditions causing higher risk include chronic lung disease, moderate to severe asthma, serious heart conditions, chronic kidney disease, liver disease, diabetes, compromised immune systems, and severe obesity.[6] Those aged 65 and over are also at higher risk.

1.4    In order to slow the spread of the virus and to save lives, the CDC issued a series of guidelines recommending "social distancing" of at least six feet of distance between people, frequent hand-washing, use of alcohol-based disinfectants, and wearing of masks.[7] New reports indicate that remaining in proximity to others, in closed indoor spaces with limited air circulation, poses increased risk of coronavirus infection.[8]

---

[5] Death total from Bureau of Prisons website, https://www.bop.gov/coronavirus/ (last accessed June 29, 2020). The site acknowledges that private prisons are not included in the count. For an example of an unreported death of an inmate after discharge, see https://www.nytimes.com/2020/06/15/obituaries/alan-hurwitz-dead-coronavirus.html. The BOP did not issue a press release to report his death. *See* https://www.bop.gov/resources/press_releases.jsp

[6] Ctrs. for Disease Control & Prevention, Coronavirus Disease 2019 (COVID-19), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/index.html (last accessed June 19, 2020).

[7] Ctrs. for Disease Control & Prevention, Coronavirus Disease 2019 (COVID-19), https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html (last accessed June 19, 2020) ("[K]eeping space between you and others is one of the best tools we have to avoid being exposed to this virus and slowing its spread locally and across the country and world.")

[8] https://www.businessinsider.com/coronavirus-risk-higher-tight-indoor-spaces-with-little-air-flow-2020-5

**PAGE 4.    AMENDED COMPLAINT**

1.5     Specifically relating to prisons, the CDC has noted the increased risk factors for

spread of the coronavirus:

- Incarcerated/detained persons live, work, eat, study, and recreate within congregate environments, heightening the potential for COVID-19 to spread once introduced.

- There are many opportunities for COVID-19 to be introduced into a correctional or detention facility, including daily staff ingress and egress; transfer of incarcerated/detained persons between facilities and systems.

- Options for medical isolation of COVID-19 cases are limited and vary depending on the type and size of facility, as well as the current level of available capacity, which is partly based on medical isolation needs for other conditions.

- Adequate levels of custody and healthcare staffing must be maintained to ensure safe operation of the facility, and options to practice social distancing through work alternatives such as working from home or reduced/alternate schedules are limited for many staff roles.

- Because limited outside information is available to many incarcerated/detained persons, unease and misinformation regarding the potential for COVID-19 spread may be high, potentially creating security and morale challenges.

- The ability of incarcerated/detained persons to exercise disease prevention measures (e.g., frequent handwashing) may be limited and is determined by the supplies provided in the facility and by security considerations. Many facilities restrict access to soap and paper towels and prohibit alcohol-based hand sanitizer and many disinfectants.

- Incarcerated/detained persons and staff may have medical conditions that increase their risk of severe disease from COVID-19. [9]

---

[9] Ctrs. for Disease Control & Prevention, Coronavirus Disease 2019 (COVID-19), https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html (last accessed June 29, 2020)

**PAGE 5.     AMENDED COMPLAINT**

1.6     The CDC has issued guidance urging prison administrators to take action to prevent overcrowding of correctional and detention facilities.[10] According to CDC guidelines, only two measures are known to be effective in reducing the spread of this disease: (1) diligent "social or physical distancing," which involves keeping at least six feet of space between people to avoid transmission of the virus, and (2) vigilant hygiene practices, including frequently washing hands and regularly disinfecting surfaces. Physical distancing is a necessary predicate for hygiene practices to have any meaningful impact.[11]

1.7     As the spread of the coronavirus escalated, Congress passed the Coronavirus Aid, Relief, and Economic Security ("CARES") Act, which modified 18 U.S.C. § 3624(c) to enable the Bureau to allow greater use of home confinement and reduce crowding at prisons during the COVID-19 emergency.

1.8     As the spread of the coronavirus escalated, Attorney General Barr issued memoranda on March 26 and April 3, directing the Bureau of Prisons to decrease prison populations by transferring medically at-risk prisoners to home confinement.[12] The Attorney General

---

[10] Ctrs. for Disease Control and Prevention, *Interim Guidance on Management of Coronavirus* Disease *2019 (COVID-19) in* CORRECTIONAL AND DETENTION FACILITIES (CDC GUIDANCE) (Mar. 23, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html (last accessed June 29, 2020).

[11] https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/social-distancing.html

[12] Office of the Attorney General, Prioritization of Home Confinement as Appropriate in Response to COVID-19 Pandemic (Mar. 26, 2020), https://www.justice.gov/file/1262731/download. Office of the Attorney General, Increasing Use of Home Confinement as Institutions Most Affected by COVID-19 (Apr. 3, 2020), https://www.justice.gov/file/1266661/download.

**PAGE 6.     AMENDED COMPLAINT**

acknowledged that "emergency conditions are materially affecting the functioning of the Bureau of Prisons," and that due to the rapid spread of COVID-19, "time is of the essence." He directed the Bureau "to move vulnerable inmates out" of specific institutions suffering from infection and also out of facilities facing similarly serious problems.

1.9    As the spread of the coronavirus escalated, numerous public officials, doctors, and members of Congress issued increasingly urgent calls for the Bureau of Prisons to de-densify its facilities in order to allow adequate distance among incarcerated inmates. On March 23, 2020, a bipartisan group of fourteen U.S. Senators sent a letter to U.S. Attorney General Barr and BOP Director Carvajal to express their "serious concern for the health and wellbeing of federal prison staff and prisoners . . . especially those who are most vulnerable to infection."[13] The Senators wrote that they reviewed the BOP's COVID-19 Action Plan and noted that it did not include any measures to protect the most vulnerable staff and prisoners. The Senators urged the Department of Justice and the BOP to release to home confinement certain individuals who were elderly, ill, or incarcerated for non-violent offenses and were near release. Two hundred faculty members associated with Johns Hopkins School of Public Health expressed "urgent concern" about the spread of COVID-19 in prisons, jails, and juvenile detention centers.[14] The doctors detailed the

---

[13]
https://www.durbin.senate.gov/imo/media/doc/Letter.%20to%20DOJ%20and%20BOP%20on%2
0COVID-19%20and%20FSA%20provisions%20-
%20final%20bipartisan%20text%20with%20signature%20blocks.pdf

[14] https://bioethics.jhu.edu/wp-content/uploads/2019/10/Johns-Hopkins-faculty-letter-on-
COVID-19-jails-and-prisons.pdf.

PAGE 7.    AMENDED COMPLAINT

many reasons that crowded detention facilities would pose serious health risks for inmates and staff alike. [15]

1.10    Despite the calls to de-densify prisons by releasing the most vulnerable, the Bureau has not released large numbers of at-risk inmates. The Federal Correctional Institution at Sheridan, Oregon, for example, housed 1,787 inmates in its three facilities as of April 14, 2020.[16] Two and a half months later, the population had dropped by fewer than 170 inmates, to 1,619.[17]

1.11    Although the CDC warned that moving inmates among facilities could spread the coronavirus, the Bureau slowed but never halted inmate transportation.[18] On May 23, 2020, despite the exponential spread of the virus within federal prisons, the Bureau announced it would resume greater transportation of inmates.[19] The Bureau decided to transport newly-sentenced inmates to one of three "quarantine sites" – FCC Yazoo City, Missouri; FCC Victorville, California; and FTC Oklahoma City, Oklahoma. The proposed plan is to test inmates for coronavirus before they are moved to their designated Bureau facility.

---

[15] *See also* Declaration of Dr. Homer Venters, filed in *Fraihat v. ICE*, No. 19-cv-01546-JGB (C.D. Cal, Mar. 24, 2020), attached as Exhibit 2 (describing requirements for safety of detainees in federal immigration custody).

[16] Of those, 1,264 inmates and detainees were at the FCI or the detention center, and 523 were at the camp. Bureau of Prisons website, https://www.bop.gov/locations/institutions/she/ (accessed April 14, 2020).

[17] The camp population decreased to 456 inmates, while 1,163 inmates were in custody at the FCI & FDC. https://www.bop.gov/locations/institutions/she/ (accessed June 29, 2020)

[18] Bureau of Prisons website, https://www.bop.gov/coronavirus/covid19_status.jsp (last accessed June 19, 2020).

[19] Bureau of Prisons website, https://www.bop.gov/resources/news/pdfs/20200527_press_release_inmate_movement.pdf (last accessed June 19, 2020).

**PAGE 8.    AMENDED COMPLAINT**

1.12    Safe transportation of inmates would require a level of preparation, training, and staffing that the Bureau has not demonstrated in its response to COVID-19. As one medical expert opined when assessing safe transportation of immigration detainees, "transferring large numbers of detained people between facilities to cohort symptomatic and asymptomatic people will increase the spread of COVID-19 infection throughout geographic areas."[20]

## II.    Conditions for Sheridan Detainees

2.1    On March 31, 2020, the Bureau announced a 14-day lockdown of all inmates within federal prisons.[21] A press release explained that "for a 14-day period, inmates in every institution will be secured in their assigned cells/quarters to decrease the spread of the virus." The Bureau pledged to review the decision to confine inmates in cells after 14 days to determine if modified operations could be resumed.[22] On April 14, 2020, the Bureau extended the lockdown order, and it has never been lifted.[23]

2.2    Inmates at the Sheridan FDC report that, since the lockdown started, they have been held in cells for 23 hours per day, and sometimes for up to 72 hours straight, without release. As Petitioner John Stirling described on April 20, 2020 (ECF 1):

---

[20] Ex. 2, Declaration of Dr. Homer Venters, ¶ 18, filed in *Fraihat v. ICE*, No. 19-cv-01546-JGB (C.D. Cal, Mar. 24, 2020).

[21] Bureau of Prisons website, https://www.bop.gov/resources/news/pdfs/20200331_press_release_action_plan_5.pdf (last accessed June 19, 2020).

[22] *Id.*

[23] Bureau of Prisons website, https://www.bop.gov/resources/news/pdfs/20200414_press_release_action_plan_6.pdf

**PAGE 9.    AMENDED COMPLAINT**

We have illegally been under lockdown for 19 days. Cut off from phones, showers, email and quality food. 4 hours out in 14 days only.

No Phones. The BOP increased phone time from 300 to 500 minutes /month. But we are locked down and can not use it.

2.3     Other inmates at FDC Sheridan report that, for months, they have been given only one hour out of their cell, twice a day.[24] On weekends they are locked in from Friday until Monday. they have difficulty reaching family members by phone or email because, in the limited time they have out of their cell, the lines for the phones and computers are long.[25]

2.4     On May 25, an inmate reported that "management is allowing for approximately 70+ inmates to be released from their cells for 2 ½ hours per day. There are no social distancing measures being enforced and most all inmates are in very close proximity to each other during that 2 ½ hours. The facility has issued face masks but the staff are not enforcing the wearing of them and almost all inmates on the cell-block where I am housed do not wear them."[26]

2.5     During the lockdown, conditions have become less sanitary than before.[27] Inmates report they are out of toilet paper. Trash is not collected from cells while inmates are locked down. Inmates are permitted a shower only every three days. Laundry has been reduced to once per week. Inmates receive no or insufficient cleaning supplies.  As petitioner Stirling described, "Cleaning and masks is a joke. We have no bleach." (ECF 1, p. 9).

---

[24] Ex. 1, Declaration of Investigator Courtney Withycombe.

[25] *Id.*

[26] *Id.*

[27] *Id.*

PAGE 10.    AMENDED COMPLAINT

2.6     During the lockdown, the quality of food has deteriorated. Inmates report receiving "baloney sandwiches" day after day.[28]

2.7     Two weeks after the lockdown went into effect, one inmate at the Sheridan FDC committed suicide.[29] Inmates report that two other detainees engaged in acts of self-harm while locked in their cells, one reportedly slashing his neck.[30] Other inmates report they are stressed and feel poor physically due to cramped conditions, lack of fresh air, lack of exercise, and poor food. Some inmates reportedly contemplated or started hunger strikes.[31]

2.8     The Bureau does not acknowledge any COVID-19 cases at Sheridan, in any of the three facilities. According to the BOP website, 150 inmates at Sheridan have been tested so far for COVID-19, and none were positive. Twelve tests are pending.[32]

2.9     Inmates report being frightened of contracting the virus at Sheridan. As one inmate with underlying health issues wrote:

> I currently live in daily fear that if COVID-19 were to reach my unit at FCI Sheridan, it would be a certain death sentence for me. ....
>
> These people here refuse to help me. I've been very sick for the last 4 months and still have not helped me. I sent many paper requests concerning my lungs and only

---

[28] Ex. 1, Declaration of Investigator Courtney Withycombe.

[29] https://www.oregonlive.com/coronavirus/2020/04/ors-federal-public-defender-lockdown-at-federal-prison-to-avoid-spread-of-coronavirus-is-becoming-overwhelming-for-some-inmates.html

[30] Ex. 1, Declaration of Investigator Courtney Withycombe. For photos of lockdown food in a Texas prison, see The Marshall Project, *Ewww, What Is That,* (May 11, 2020) https://www.themarshallproject.org/2020/05/11/ewwwww-what-is-that

[31] *Id.*

[32] Bureau of Prisons website, https://www.bop.gov/coronavirus/ (last accessed June 29, 2020).

PAGE 11.    AMENDED COMPLAINT

> one response, that said I would be seen soon. That was over a month ago and still have not been seen. I've sent 7 electronic requests begging for help, and not one response! I've made them aware that I'm having trouble breathing, and that I've passed out because I can't breath[e] and still they won't help me.

2.10  Another inmate described seeing inmates with symptoms being taken away, and having the guards imply the cause was COVID-19:

> This morning an inmate who lives 10 feet from me in the next cube in the same over-crowded wing was taken out to the hospital for shortness of breath and coughing and we were told simply "don't touch his stuff if you want to live" by one of the correctional officers. A number of other inmates are getting cold symptoms the last couple of days. Everybody is afraid to report their symptoms because they do not want to be put into isolation with no access to contact their families at all, when they think they only have a cold. This is scary. I know that if I am exposed, I will very likely not survive or will have permanent damage. The quarantine area here is a joke does not provide protection at all, as the same staff walk through the quarantine area just as regularly as they walk through the non-quarantine areas.

2.11  Inmates receive misinformation, and clear statements by the Bureau are retracted or reversed with no explanation. One inmate was incorrectly told that, because he would be released to home confinement, he should not file a motion for compassionate release because the two could interfere with each other.[33] He asked his attorney to withdraw his compassionate release motion as a result.

2.12  Other inmates at Sheridan were told they were getting released, and they were sent into quarantine, only to learn later that they would not get released. Some had already alerted their families they were coming home. As one spouse writes:

> I want you to know what is happening there. I am truly bothered by my husband's stories of how those who are already in quarantine at the Sheridan Camp are being sent back to the general population after spending almost a month or so inside.

---

[33] Ex. 1, Declaration of Investigator Courtney Withycombe.

**PAGE 12.   AMENDED COMPLAINT**

> Another wife has shared with me that her husband was already in quarantine for twelve days, but was sent back for no apparent reason. Yesterday, May 26, he shared that two other men were kicked out of quarantine. Most of them were sent out because they found out they had no underlying conditions, one was sent back because the Probation Officer could no longer entertain another inmate. Another man was in quarantine for 30 days, but was sent back because they neglected to file his papers. I am not too sure what are the other reasons for these men being sent back to general population. It demoralizes the inmates who are all hoping to finally be reunited with their families.
>
> Many of them including my husband was called to sign documents for release. I also sent the documents of the designated visitor who will be picking him up, I waited for his Probation Officer to come and inspect our home, and my husband was able to finish all his Release Preparation Program (RPP) classes. But until this day, they have not been called to provide a release date or any update of some sort. My husband had the courage to approach his Case Manager to ask for an update, but he was told that he was not even on the list in the first place; it did not make sense. This discouraged him to keep moving forward. I, on the other hand, will continue fighting for my husband and for those who are significantly affected by how things are run in the camp.[34]

2.13    The harmful effect of misinformation has been noted at other BOP facilities as well. Nationally, inmates in minimum security facilities were reported to be "at the breaking point" from the lockdown, the lack of communication, and the fear and uncertainty from changing BOP policies.[35]

2.14    Communication with attorneys is also limited. Attorneys report that legal mail, which ordinarily should be opened in the inmate's presence, now is simply opened by prison guards on their own and delivered to the locked-in client.[36] Clients have severely limited time to

---

[34] Ex. 1, Declaration of Investigator Courtney Withycombe.

[35] Walter Pavlo, *Minimum Security Inmates Locked In Cells For Quarantine Are At Breaking Point,* Forbes (May 6, 2020) https://www.forbes.com/sites/walterpavlo/2020/05/06/minimum-security-inmates-locked-in-cells-for-quarantine-are-at-breaking-point/#247911441a66

[36] *Id.*

**PAGE 13.    AMENDED COMPLAINT**

use the attorney phone to make calls. As a result, accurate and current information on the conditions at Sheridan is difficult to obtain.

2.15    Inmates are worried that newly arriving inmates will bring the virus to them.  As Mr. Stirling wrote: "The prison keep putting 10 people that are from outside this prison in my unit under what the captain says is 'quarantine.'  Sheridan prison staff are endangering my life with new entries." (ECF 1, p. 2). He asked that they "keep new arrivals out. ... They bring 16 new prisoners from another prison in here." (ECF 1, p. 8).  He reported 10 new people arrived on April 16, 2020, and six more were expected. The new prisoners were "being quarantined" right in their unit. (ECF 1, p. 6-8).

## III.    Parties

3.1    Petitioner John Stirling is a 66-year old man who is detained at the Sheridan FDC.  After being sentenced on May 21, 2020, to 40 months of custody, he has not yet been designated to another facility for service of his sentence.  He fears that, as a newly-sentenced inmate, he will be transported out of Oregon to a quarantine facility, and may be exposed during the travel to inmates infected by the coronavirus. Mr. Stirling suffers from advanced diabetes and requires two injections of medication daily. An x-ray notes lung scarring, and medical reports include a tuberculosis diagnosis.  He falls within the category of individuals considered at high risk for serious complications if infected with the coronavirus.

3.2    Josias Salazar is the Warden of FCI Sheridan and is named in his official capacity as a custodian of Mr. Stirling.

## IV.    Jurisdiction and Venue

4.1    The Court has subject-matter jurisdiction over this Petition pursuant to 28 U.S.C. § 1331 (federal question), 5 U.S.C. §§ 702 & 706 of the Administrative Procedure Act, 28 U.S.C.

PAGE 14.    AMENDED COMPLAINT

§ 2241 (habeas corpus) and Article I, § 9, cl. 2 of the United States Constitution (Suspension Clause). In addition, the Court has jurisdiction to grant declaratory relief pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201.

4.2     Venue is proper in the District of Oregon pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to these claims occurred and continues to occur in this district. This Court has personal jurisdiction over Warden Salazar because at all times relevant to this action, he has been employed at FCI Sheridan in Sheridan, Oregon, and all the actions and omissions at issue occurred at Sheridan.

## V.     Statement of Law

**A.     In Light Of The Bureau's Decision To Use Severe Lockdown As The Alternative To De-Densifying Its Facilities, No Conditions Of Confinement At FCI Sheridan Would Meet Eighth Amendment And Due Process Requirements And Mr. Stirling's Writ of Habeas Corpus Should Be Granted.**

Under 28 U.S.C. § 2241, a person in custody in violation of the laws and Constitution of the United States is entitled to summary relief and disposition as "law and justice require" under 28 U.S.C. § 2243. The Government violates the Eighth Amendment if it confines a criminal detainee in unsafe conditions. *Helling v. McKinney*, 509 U.S. 25, 32 (1993). Punishment without full compliance with the Fifth and Sixth Amendments violates the right to due process of law. *See, e.g., Crawford v. Washington*, 541 U.S. 36, 68 (2004); *Apprendi v. New Jersey*, 530 U.S. 466, 476-77 (2000); *Gideon v. Wainwright*, 372 U.S. 335, 344- 45 (1963).

Mr. Stirling is unlawfully detained and should be granted summary habeas corpus relief because his detention violates the laws and Constitution of the United States. *See Boumediene v. Bush*, 549 U.S. 1328, 1330 (2007) ("the 'province' of the Great Writ, 'shaped to guarantee the most fundamental of all rights, is to provide an effective *and speedy* instrument by which

PAGE 15.    AMENDED COMPLAINT

judicial inquiry may be had into the legality of the detention of a person.'" (emphasis in *Boumediene*) (quoting *Carafas v. LaVallee*, 391 U.S. 234, 238 (1968)). Because Mr. Stirling challenges the fact of his confinement under the circumstances of the COVID pandemic and seeks release, habeas relief is proper. *See, e.g., Wilson v. Williams*, No. 20-3447, 2020 WL 3056217, at *5 (6th Cir. June 9, 2020) (petition under 2241 is proper vehicle for inmates challenging fact of confinement in light of COVID-19); *Martinez-Brooks v. Easter*, No. 3:20-CV-00569, 2020 WL 2405350, at *16 (D. Conn. May 12, 2020) ("Because Petitioners contend that the Eighth Amendment violation inheres in their incarceration at Danbury FCI and cannot be remedied unless they are removed from that setting, Petitioners are challenging the fact—or "existence"—of their confinement" and 2241 provides the proper vehicle for relief). A "hybrid" habeas petition may challenge both the conditions and execution of a sentence. *Muhammad v. Close,* 540 U.S. 749, 751 (2004) (noting "[s]ome cases are hybrids.")

> 1.    *The Bureau's Failure to Take Needed Steps to De-Densify The Prison and To Mitigate Transmission of COVID-19 Constitutes Deliberate Indifference to Mr. Stirling's Serious Medical Needs In Violation Of Due Process And The Eighth Amendment.*

The respondents are violating Mr. Stirling's Due Process and Eighth Amendment rights by continuing to incarcerate him in conditions that place him at substantial risk of serious harm from transmission of an infectious and deadly disease, especially considering his vulnerable medical condition. The Due Process Clause of the Fifth Amendment forbids the government from depriving a person of life, liberty, or property without due process of law. U.S. Const. amend. V. The protection applies to "all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent." *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001). Constitutional protections for individuals confined by the state, whether civilly or

**PAGE 16.    AMENDED COMPLAINT**

criminally, include the right to reasonable safety and medical care. *See Estelle v. Gamble*, 429 U.S. 97, 103 (1976); *see also Youngberg v. Romeo*, 457 U.S. 307, 315 (1982) ("[T]he right to personal security constitutes a 'historic liberty interest' protected substantively by the Due Process Clause." (citation omitted)).

"The rationale for this principle is simple enough: when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—e.g., food, clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause." *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 200 (1989). The State's duty to protect arises "from the limitation which it has imposed on [the detainee's] freedom to act on his own behalf." *Id.; see also Estelle*, 429 U.S. at 103 ("An inmate must rely on prison 28 authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met.").

Although sentenced as punishment to the custody of the BOP, Mr. Stirling retains his Eighth Amendment right to be free from cruel and unusual punishment. *See Wilhelm v. Rotman*, 680 F.3d 1113, 1122 (9th Cir. 2012). Given the decision of the Bureau to lock down every inmate rather than de-densify, and because that strategy nevertheless risks exposing Mr. Stirling to infection from the coronavirus, no conditions of confinement at Sheridan can meet constitutional requirements.

Under the Eighth Amendment, the Government must provide criminal detainees with basic human needs, including reasonable safety. *Helling v. McKinney*, 509 U.S. 25, 32 (1993). The Government violates the Eighth Amendment if it confines a criminal detainee in unsafe conditions. *See Helling*, 509 U.S. at 33. Moreover, the Government may not "ignore a condition of

**PAGE 17.   AMENDED COMPLAINT**

confinement that is sure or very likely to cause serious illness." *See Helling*, 509 U.S. at 32. "That the Eighth Amendment protects against future harm to inmates is not a novel proposition." *Helling*, 509 U.S. at 33. The Supreme Court stated clearly: "[T]he Eighth Amendment protects [prisoners] against sufficiently imminent dangers as well as current unnecessary and wanton infliction of pain and suffering[.]" *Helling*, 509 U.S. at 33. Indeed, the Court concluded that, where prisoners in punitive isolation were crowded into cells and some of them had infectious maladies, "the Eighth Amendment required a remedy, even though it was not alleged that the likely harm would occur immediately and even though the possible infection might not affect all of those exposed." *Helling*, 509 U.S. at 33.

The Ninth Circuit employs a two-part test in assessing whether prison officials have violated the Eighth Amendment by way of deliberate indifference to the medical needs of inmates: (1) the plaintiff must show "a serious medical need by demonstrating that failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain"; and (2) the defendants' "response to the need" must have been "deliberately indifferent." *Wilhelm*, 680 F.3d at 1122 (quoting *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006)). Government officials act with deliberate indifference when they "ignore a condition of confinement that is sure or very likely to cause serious illness and needless suffering the next week or month or year," even when "the complaining inmate shows no serious current symptoms." *Helling*, 509 U.S. at 33.

As *Helling* established, this Court need not "await a tragic event" at Sheridan to find that the respondents are maintaining unconstitutional conditions of confinement. *Id.* at 32-33. The tragic events are already unfolding in prisons around the country, as inmates are sickened and die

**PAGE 18.   AMENDED COMPLAINT**

in federal care. Mr. Stirling has a constitutional right to be free from conditions of confinement that "pose an unreasonable risk of serious damage to [his] future health." *Id.* at 35.

The threat of exposure to a deadly infectious disease such as COVID-19 and subsequent mistreatment due to lack of medical resources constitutes a serious risk to health, particularly for someone with unique vulnerability to COVID-19. *See Helling*, 509 U.S. at 34 (noting with approval Eighth Amendment claims based on exposure to serious contagious diseases); *Unknown Parties v. Johnson*, No. cv-15-00250, 2016 WL 8188563, at *15 (D. Ariz. Nov. 18, 2016), *aff'd sub nom, Doe v. Kelly*, 878 F.3d 710 (finding evidence of medical risks associated with . . .being exposed to communicable diseases" adequate to establish irreparable harm under the Eighth Amendment); *Castillo v. Barr*, ___ F.Supp. 3d ___, 2020 WL 1502864, at *5 (C.D. Cal. Mar. 27, 2020) (in civil detainment context, ruling that officials could not "be deliberately indifferent to the potential exposure of civil detainees to a serious, communicable disease on the ground that the complaining detainee shows no serious current symptoms, or ignore a condition of confinement that is more than very likely to cause a serious illness").

Mr. Stirling is entitled to protections from conditions of confinement that create a serious risk to health or safety, including through release from custody when necessary. *Brown v. Plata*, 563 U.S. 493, 531–32 (2011) (upholding lower court's order releasing people from state prison even though release was based on prospect of future harm caused by prison overcrowding); *see also Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (correctional official violates Eighth Amendment by consciously failing to prevent "a substantial risk of serious harm").

Mr. Stirling has demonstrated a "serious medical need" that is unmet by the BOP and that could result in significant injury. His age and his underlying condition of advanced diabetes indisputably place him within the category of high-risk individuals identified by the CDC as likely

**PAGE 19.   AMENDED COMPLAINT**

to experience greater harm if infected by the coronavirus. By locking him in a unit with inmates who have not been tested for the coronavirus and by maintaining a high population of inmates that ensures crowding around phones, in showers, and in common areas, when released from cells, the BOP places him at risk for exposure to a life-threatening disease. The deliberate indifference of BOP personnel is also evident in that they have resumed transportation of newly-sentenced inmates, regardless of health risk; they have failed to utilize authority to de-densify the Sheridan facility in order to allow distance between inmates; and they have failed to conduct adequate testing or to provide adequate cleaning materials to allow inmates to take precautions to remain safe. The writ should be granted. To the extent further evidence is needed, Mr. Stirling requests an evidentiary hearing.

> 2. *The Bureau's Continuing Extension Of The 14-Day Lockdown To Now Over 80 Days Violates Due Process And The Eighth Amendment.*

"The Constitution 'does not mandate comfortable prisons,' but neither does it permit inhumane ones, and ... 'the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment.' " *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (internal citations omitted). "A prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate violates the Eighth Amendment." *Id.* at 828.

Confining prisoners to small cells for long stretches of time; triple-bunking some inmates within those cells; providing inadequate nutrition as a result of sack food delivery; obstructing contact with family and the outside world; eliminating the ability to exercise; and creating unsanitary conditions in the time of a pandemic through limited showers and laundry, results in inhumane conditions. "When people are locked into cells alone, for most of the day, they quickly

**PAGE 20. AMENDED COMPLAINT**

experience psychological distress that manifests in self-harm and suicidality."[37] Moreover, these efforts to lock detained people into cells may worsen, not improve, Sheridan's infection control efforts, because the rapid response required for mental and physical health emergencies may bring contamination into units from influx of emergency staff.

Mr. Stirling asserts he has experienced physical and mental harm as a result of the continuing lockdown. The uncertainty of the length of the lockdown itself causes mental distress. Moreover, placing the full prison on lockdown subjects him to potential harm because, during the hour that inmates are released, they are more volatile in their competition for scarce phone and shower and resources. Because a continuing lockdown appears to be the Bureau's chosen response the pandemic, which shows no signs of abating, Mr. Stirling asserts the indefinite lockdown violates his rights to Due Process and under the Eighth Amendment. Release should be granted.

### 3. Request For Injunctive Relief

Individuals may sue to enjoin constitutional violations, either directly under the Constitution or under the Administrative Procedure Act. *See Sierra Club v. Trump*, 929 F.3d 670, 694 (9th Cir. 2019) ("Plaintiffs may bring their challenge through an equitable action to enjoin unconstitutional official conduct, or under the judicial review provisions of the Administrative Procedure Act (APA), 5 U.S.C. § 701 *et seq.*, as a challenge to a final agency decision that is alleged to violate the Constitution, or both."); *Farmer v. Brennan*, 511 U.S. 825, 846 (1994) ("If the court finds the Eighth Amendment's subjective and objective requirements satisfied" with regard to a federal prisoner, "it may grant appropriate injunctive relief.").

---

[37] Ex. 2, Declaration of Dr. Homer Venters, ¶ 10.

**PAGE 21.   AMENDED COMPLAINT**

Mr. Stirling requests a temporary restraining order and a permanent injunction to (1) prohibit the BOP from bringing new inmates into the FDC Sheridan until the warden has demonstrated adequate testing and safety protocols to ensure the coronavirus is not introduced through the arrivals; and (2) to prohibit his transportation out of the FDC Sheridan until the Warden can demonstrate the transportation, any place of quarantine, and the designated facility will be safe and not subject him to infection from the coronavirus.

Mr. Stirling is entitled to a temporary restraining order if he can show: (1) a likelihood of success on the merits; (2) that he is likely to suffer irreparable harm in the absence of relief; (3) the balance of equities tip in his favor; and (4) an injunction is in the public's interest. *See Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Under the Ninth Circuit's sliding scale approach, a stronger showing of one element may offset a weaker showing of another. *See Pimentel v. Dreyfus*, 670 F.3d 1096, 1105 (9th Cir. 2012). Accordingly, Mr. Stirling is entitled to a temporary restraining order if "serious questions going to the merits [are] raised and the balance of hardships tips sharply in [his] favor." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1132 (9th Cir. 2011).

Mr. Stirling has established that there is more than a mere likelihood of success on the merits. *See Winter*, 555 U.S. at 20. He has established that he is likely to suffer irreparable harm in the absence of relief because the deprivation of constitutional rights unquestionably constitutes irreparable injury. *See Hernandez v. Sessions,* 872 F.3d 976, 994 (9th Cir. 2017). The balance of the equities tip sharply in his favor. He faces irreparable harm to constitutional rights and health. Indeed, there is no harm to the Government when a court prevents the Government from engaging in unlawful practices. *See Rodriguez v. Robbins,* 715 F.3d 1127, 1145 (9th Cir. 2013).

PAGE 22.   AMENDED COMPLAINT

Finally, the injunctive relief sought here is in the public's best interest. The public has a critical interest in preventing the further spread of the coronavirus. An outbreak at FCI Sheridan would require use of hospital resources in the community and create stress for the medical infrastructure.

### 4.    Request For Interim Relief

To the extent the writ cannot be immediately granted, Mr. Stirling seeks an order of enlargement, under which his sentence could be served in the community until the conditions at Sheridan can be rendered safe. See *LaDuke v. Nelson*, 762 F.2d 1318, 1330-31 (9th Cir. 1985), *modified*, 796 F.2d 309  (9th Cir. 1986); *Martinez-Brooks v. Easter*, No. 3:20-CV-00569, 2020 WL 2405350, at *16 (D. Conn. May 12, 2020) (granting order of enlargement for certain inmates at FCI Danbury in light of pandemic).[38]

Further, as an interim measure, Mr. Stirling further seeks court-mandated fact-finding, under Court supervision, of the actual conditions at FCI Sheridan. Because access to information is restricted, Mr. Stirling experiences stress from his belief that inmates and staff are, in fact, infected by the coronavirus and that insufficient measures have been taken to protect the health and safety of inmates. Just as other courts have ordered inspections of federal facilities and frequent status reports, Mr. Stirling seeks court-ordered data collection here. *See, e.g., In re Coronavirus/COVID-19 Pandemic, Administrative Order* No. 2020-14 (EDNY Apr. 2, 2020) (Ex. 4) (requiring bi-monthly status updates regarding 1) protocols for screening & testing inmates, staff, and others enter or leaving each facility; 2) the number of inmates tested and the number of

---

[38] The attached declaration of Professor Judith Resnik as Exhibit 3 provides historical and legal analysis of the court's enlargement authority.

**PAGE 23.    AMENDED COMPLAINT**

positive tests; 3) the number of staff and other correctional workers testing positive; and 4) "[a]ll efforts undertaken to mitigate the spread of COVID-19"); *Gomes v. Department of Homeland Security*, Order, Case No. 20-cv-453, Dkt No. 123 at 56-61 (D.N.H. May 14, 2020) (Ex. 5) (ordering report concerning detailed issues related to testing and mitigation measures in local jail holding federal detainees); *Urdaneta v. Keeton*, Order, Case No. 20-cv-654, Dkt. No. 52 at 22  (Ex. 6) (D. Ariz. May 11, 2020) (soliciting proposed measures from parties to ensure adequate health standards in federal detention facility including placement in single-occupancy cell, meals delivered to cell; free, unlimited PPE, hygiene supplies, and disinfectant; requiring all staff to wear PPE; and requiring testing).

## CONCLUSION

For the foregoing reasons, the Court should grant the writ of habeas corpus and order release, and if further proceedings are needed, order injunctive and interim relief.

Respectfully submitted this 29th day of June, 2020.

*/s/ Lisa Hay*
Lisa Hay
Federal Public Defender

**PAGE 24.   AMENDED COMPLAINT**

# EXHIBIT 1

# FCI Sheridan
## Notification for the Inmate Population

### September 2, 2021

There are currently positive COVID cases from 5 of the 8 housing units within the FCI. Yamhill County COVID transmission is at the HIGHEST rate since the beginning of the pandemic. According to the BOP COVID-19 Modified Operations Matrix, FCI Sheridan is currently at Level 3 Operations, which requires full mitigation measures involving intense modifications to institution operations to reduce the transmission of COVID-19.

The following actions must be taken to reduce COVID-19 transmission:

- Mandatory mask wearing for staff and inmates;

- Maximizing physical distancing and inmate interaction between housing units;

- Continuous and effective testing and contact tracing;

- All inmate meals and medications are being delivered to the housing units;

- Outside Recreation remains closed;

- Inside Recreation houses inmates in isolation status due to COVID;

- Education is conducting GED testing only;

- Religious Services is suspending services in the Chapel;

- Visiting is restricted temporarily and will be re-evaluated every two weeks. It will resume with the appropriate reduction of risk;

- Enhanced unit sanitation;

- Cooperation among staff and inmates with these protective measures is essential to managing and reducing COVID-19 transmission.

X _____
A. Cooper
Associate Warden

# EXHIBIT 2

Original kept by inmate and copy sent institution mail

BP-A0148
JUNE 10

**INMATE REQUEST TO STAFF** CDFRM

**U.S. DEPARTMENT OF JUSTICE**                    **FEDERAL BUREAU OF PRISONS**

| TO:(Name and Title of Staff Member) | DATE: |
|---|---|
| Mr. Hendrix / Warden | 9-1-2021 |
| FROM: | REGISTER NO.: |
| Derek Bluford | 77108-097 |
| WORK ASSIGNMENT: | UNIT: |
| Education | 2A |

SUBJECT: (Briefly state your question or concern and the solution you are requesting.
Continue on back, if necessary.  Your failure to be specific may result in no action being
taken.  If necessary, you will be interviewed in order to successfully respond to your
request.

Mr. Hendrix,

I wanted to raise a sensitive matter to you, regarding your staff. I attempted to file a complaint regarding the BOP Covid-19 policies not being followed and was threatened in return by my Counselor, Mr. Cray. He informed me that there would be hell to play if I attempted to file the complaint again or through other means. Staff are knowingly and recklessly increasing our risk of exposure to Covid by not wearing mask in the housing unit, mixing quarantine inmates with nonequaratined inmates, and allowing inmates to mingle with 2B housing inmates. Covid is here. I am "high risk" due to my heart condition and would like to be moved and tested please. I am already not feeling well.

Respectfully
D R

(Do not write below this line)

DISPOSITION:

| Signature Staff Member | Date |
|---|---|
| | |

Record Copy - File; Copy - Inmate

PDF                          Prescribed by P5511

This form replaces BP-148.070 dated Oct 86
and BP-S148.070 APR 94

FILE IN SECTION 6 UNLESS APPROPRIATE FOR PRIVACY FOLDER     **SECTION 6**

# EXHIBIT 3



**KAISER FOUNDATION HOSPITALS**

SAC-HOSPITAL
2025 MORSE AVENUE
SACRAMENTO CA 95825-2115
Hospital Record

Bluford, Derek L
MRN: 110007498356, DOB: 3/23/1987, Sex: M
Adm: 3/31/2014, D/C: 3/31/2014

## Emergency Department Records

### Diagnosis

| Diagnosis | Comment | Added By | Time Added | Team Role | Provider Specialty |
|---|---|---|---|---|---|
| VIRAL SYNDROME | | Gill, Kanwal Singh (M.D.) | 3/31/2014  4:01 PM | Attending Provider | Emergency Medicine |

### ED Disposition

| ED Disposition | Condition | Comment |
|---|---|---|
| Discharge/Dismiss to Home | | |

## ED Nursing - ED NURSING

**ED Nursing signed by Ferrari, Anna M (R.N.) at 3/31/2014 1:14 PM**                    Version 1 of 1

| | | |
|---|---|---|
| Author: Ferrari, Anna M (R.N.)<br>Filed: 3/31/2014  1:14 PM<br>Editor: Ferrari, Anna M (R.N.) (REGISTERED NURSE) | Service: —<br>Status: Signed | Author Type: REGISTERED NURSE |

Brought in by medics from work, c/o chest pain, non rad x 2 days.  Pt has been dx with PVC'S.  Pta BP=116/78, hr=61, with some PVC'S noted.  Pt anxious had big meeting today

Electronically signed by Ferrari, Anna M (R.N.) on 3/31/2014  1:14 PM

**ED Nursing signed by Henson, Jessica Dee (R.N.) at 3/31/2014  1:31 PM**                    Version 1 of 1

| | | |
|---|---|---|
| Author: Henson, Jessica Dee (R.N.)<br>Filed: 3/31/2014  1:31 PM<br>Editor: Henson, Jessica Dee (R.N.) (REGISTERED NURSE) | Service: —<br>Status: Signed | Author Type: REGISTERED NURSE |

1329-1st contact with patient, report received from Anna F.  RN, patient sitting up in bed resting comfortably, complain of  Sudden onset of chest pain and palpations today, p/s history of palpations and chest pain and was dx with pvcs, pt denies complaints now, p/s palpations and chest pain relieved with no interventions, c/o dizziness only now, denies chest pain, sob, nausea, vomiting, diarrhea  or other complaints, skin pink, warm and dry, respitory rate even and unlabored, speaking full sentences, no guarding, no grimacing, MD Gill at bedside and  aware, will continue to monitor

Patient informed that personal belongings are the responsibility of the patient and not Kaiser Emergency Department as stated in patient signed consent.

Number of patient belongings bags (if applicable):

Verified by, if applicable (psychiatric and altered patients only):

Location of belongings bags (choose one item below if applicable).

In patient room YES

Sent home with family NO

In designated psychiatric location NO

Other:All belongings remain with patient

Generated on 10/11/21  7:01 AM



**KAISER FOUNDATION HOSPITALS**

SAC-HOSPITAL
2025 MORSE AVENUE
SACRAMENTO CA 95825-
2115
Hospital Record

Bluford, Derek L
MRN: 110007498356, DOB: 3/23/1987, Sex: M
Adm: 4/5/2014, D/C: 4/5/2014

---

## ED Provider Notes - ED PROVIDER

**ED Provider Notes signed by Clark, Oanh Yen Nguyen (D.O.) at 4/5/2014  3:33 PM**                    Version 1 of 1

| | | |
|---|---|---|
| Author: Clark, Oanh Yen Nguyen (D.O.) | Service: — | Author Type: PHYSICIAN (D.O.) |
| Filed: 4/5/2014  3:33 PM | Status: Signed | |
| Editor: Clark, Oanh Yen Nguyen (D.O.) (PHYSICIAN (D.O.)) | | |

CC:

Derek L Bluford is a 27 Y male here for triage chief complaint SYNCOPE

HPI:

He said he was sleeping when he woke up with shortness of breath that lasted for 10 minutes. He had dizziness at the time. He also had heart palpitation at that time. Now every resolved. He feels well now . He has been feeling intermitent chest pain and shortness of breath for 3-4 days. He actually had similar symptoms in the past. He was here a few days ago and workups were negative.

He denies chest pain today. He has no shortness of breath, dizziness, or palpitation at this time. No leg pain or swelling.

He said he works in the legal system and job is very stressful. He drinks 3 cups of coffee a day.
PMD: Patient  has a PCP.

PMH:

**Active Ambulatory Problems**
Diagnosis                                                                                   Date Noted
• ANXIETY DISORDER                                                              10/25/2005
• BRADYCARDIA                                                                       11/04/2011
• PALPITATIONS                                                                        11/30/2011

**No Additional Past Medical History**

MEDS:

No changes in medication status

ALLERGY:

Allergies: No known allergies

---

Generated on 10/11/21  7:01 AM

 **THE PERMANENTE MEDICAL GROUP**

FOL-IRON POINT
2155 IRON POINT ROAD
FOLSOM CA 95630-8707
Encounter Record

Bluford, Derek L
MRN: 110007498356, DOB: 3/23/1987, Sex: M
Visit date: 2/14/2018

## Progress Notes (continued)

**Progress Notes signed by Pearson, Ryan Dean (M.D.) at 2/14/2018 5:11 PM (continued)**        Version 1 of 1

Patient Active Problem List:
ANXIETY DISORDER
BRADYCARDIA
PALPITATIONS
*NEW MEMBER

Family History

| Problem | Relation | Age of Onset |
|---|---|---|
| • Coronary Artery Disease<br>*dx age 40s, deceased age 62 massive MI* | Father | |
| • Diabetes | Grandmother | |
| • Diabetes | Grandfather | |
| • Hypertension | None | |
| • Colon Cancer | None | |
| • Prostate Cancer | None | |

Past Surgical History:
 has no past surgical history on file.

No outpatient prescriptions have been marked as taking for the 2/14/18 encounter
(Office Visit) with Pearson, Ryan Dean (M.D.).

Physical Examination:
BP 113/76 | Pulse 70 | Temp 97.1 °F (36.2 °C) (Oral) | Ht 6' 1" | Wt 74.4 kg (164 lb) | SpO2 98% | BMI 21.64
kg/m²
Wt Readings from Last 3 Encounters:
02/14/18      74.4 kg (164 lb)
04/23/15      72.7 kg (160 lb 4.8 oz)
04/22/15      72.6 kg (160 lb)

General appearance -  vital signs reviewed and alert, well appearing, and in no distress
Mental status - alert, oriented to person, place, and time, normal mood, behavior, speech, dress, motor activity,
and thought processes
Left hand:  + swelling over middle finger PIP joint; minimal tender to palpation over ulnar aspect of PIP joint but
otherwise no TTP along middle finger; flexion at PIP is decreased (only 70 degrees) compared to other fingers
that can fully flex

Data Reviewed:
Xray - left middle finger appears unremarkable on my read

---RTC or call back if the symptoms worsen or fail to improve as expected and follow up.  Patient understands
that it is the patients responsiiblility to call for questions or follow-up appointments for all reasons including

Generated on 10/11/21  7:02 AM

# EXHIBIT 4

Orginal kept

BP-A148.055
SEP 98
**INMATE REQUEST TO STAFF**

**U.S. DEPARTMENT OF JUSTICE**
**FEDERAL BUREAU OF PRISONS**

| TO:(Name and Title of Staff Member) Medical | DATE: 9-8-2021 |
|---|---|
| FROM: Derek Buford | REGISTER NO.: 77108-097 |
| WORK ASSIGNMENT: Education | UNIT: 2A |

SUBJECT: (Briefly state your question or concern and the solution you are requesting.
Continue on back, if necessary.  Your failure to be specific may result in no action being
taken.  If necessary, you will be interviewed in order to successfully respond to your
request.

Hello.

I believe that I have covid. You guys removed some inmates yesterday for testing positive in our unit. I am having shortness of breath and I can not really taste or smell. Can I please be tested. I have heart issues and would like to avoid any serious risk. My roommate seems to be sick as well.

Respectfully
Derek Buford

(Do not write below this line)

DISPOSITION:

| Signature Staff Member | Date |
|---|---|
| | |

Record Copy - File; Copy - Inmate
(This form may be replicated via WP)

This form replaces BP-148.070 dated Oct 86
and BP-S148.070 APR 94

FILE IN SECTION 6 UNLESS APPROPRIATE FOR *PRIVACY FOLDER*

**SECTION 6**

Copy written out

BP-A0148
JUNE 10

**INMATE REQUEST TO STAFF** CDFRM

U.S. DEPARTMENT OF JUSTICE                    FEDERAL BUREAU OF PRISONS

| TO:(Name and Title of Staff Member) Unit 2 (Mr.Cray & Mrs.Ayala) | DATE: 9-8-2021 |
|---|---|
| FROM: Derek Bluford | REGISTER NO.: 77108-047 |
| WORK ASSIGNMENT: Education | UNIT: 2A |

SUBJECT: (Briefly state your question or concern and the solution you are requesting. Continue on back, if necessary. Your failure to be specific may result in no action being taken. If necessary, you will be interviewed in order to successfully respond to your request.

Mr.Cray / Mrs.Ayala,

I have covid-19 I believe. I need to be tested. I have heart issues and am high risk. Im not trying to upset you or get a write up, but I need help. There are numerous inmates in here who are also showing signs of covid. Im having shortness of breathe, loss of taste/smell, fever and night sweats. What is the plan to help us? We need medical help.

Respectfully
Derek Bluford

(Do not write below this line)

DISPOSITION:

| Signature Staff Member | Date |
|---|---|
| | |

Record Copy - File; Copy - Inmate

PDF                          Prescribed by P5511

This form replaces BP-148.070 dated Oct 86
and BP-S148.070 APR 94

FILE IN SECTION 6 UNLESS APPROPRIATE FOR Prescribed PYolder          **SECTION 6**

TRULINCS 77108097 - BLUFORD, DEREK - Unit: SHE-C-L

---------------------------------------------------------------------------------------------------------------------

FROM: 77108097 BLUFORD, DEREK
TO: Health Services
SUBJECT: ***Request to Staff*** BLUFORD, DEREK, Reg# 77108097, SHE-B-L
DATE: 09/11/2021 05:37 PM

To: Medical
Inmate Work Assignment: N/A

To Whom It May Concern,

I wanted to reach out and address my concern. Last week on the 9/7/2021 we were locked down for temperature checks. A few inmates had concerning temperatures which caused you to remove them from the Housing Unit 2A. Since then, more inmates have been removed due to covid. When are the remaining inmates going to be tested? My roommate was removed for covid, and my neighbor. I have been placed on quarantine, and yet still not tested. All of the symptoms show. You have people in here who need medical attention. What is the plan? Why is no action being taken?

Respectfully,

TRULINCS 77108097 - BLUFORD, DEREK - Unit: SHE-B-R

--------------------------------------------------------------------------------------------

FROM: 77108097 BLUFORD, DEREK
TO: Unit 2
SUBJECT: ***Request to Staff*** BLUFORD, DEREK, Reg# 77108097, SHE-B-L
DATE: 09/12/2021 05:27 PM

To:
Inmate Work Assignment: N/A

Hello,

On 9/7 we were locked down for temperature checks. Several inmates were removed for covid concerns and placed in the gym. This continued for two more days. Finally, my roommate was removed for Covid. Since then, no one has been tested in here and inmates continue to get sick. Most complain of loss of taste/smell, fever, and shortness of breath. Why are we not being tested. I have been placed on quaratine, yet, the sign says "I am not showing signs of illness" which is false. What is going on?

Respectfully,

# EXHIBIT 5

U.S. DEPARTMENT OF JUSTICE
Federal Bureau of Prisons

**REQUEST FOR AD̄MINISTRATIVE REMEDY**

*Type or use ball–point pen. If attachments are needed, submit four copies. Additional instructions on reverse.*

From: BLUFORD, Derek L.    77108-077    2A-213    FCI Sheridan
    LAST NAME, FIRST, MIDDLE INITIAL    REG. NO.    UNIT    INSTITUTION

Part A– INMATE REQUEST

Sensitive matter being filed with Warden and Regional in good faith effort before an "Emergency Motion for Injunctive Relief" is filed in federal court. Please see attached 3 Pages.

8-18-2021
    DATE

D—B
    SIGNATURE OF REQUESTER

Part B– RESPONSE



    DATE    WARDEN OR REGIONAL DIRECTOR

*If dissatisfied with this response, you may appeal to the Regional Director. Your appeal must be received in the Regional Office within 20 calendar days of the date of this response.*

ORIGINAL: RETURN TO INMATE    CASE NUMBER: _____

    CASE NUMBER: 1092503

Part C– RECEIPT

Return to: _____
    LAST NAME, FIRST, MIDDLE INITIAL    REG. NO.    UNIT    INSTITUTION

SUBJECT: _____

    DATE    RECIPIENT'S SIGNATURE (STAFF)

USP LVN    Printed on Recycled Paper

Federal Bureau of Prisons

Type or use ball-point pen. If attachments are needed, submit four copies. One copy of the completed BP-DIR-9 including any attachments must be submitted with this appeal.

From: Bluford, Derek, L          77108-097       2A        FCI Sheridan
      LAST NAME, FIRST, MIDDLE INITIAL      REG. NO.       UNIT         INSTITUTION

## Part A—REASON FOR APPEAL

Sensitive Complaint

This is a "Sensitive Complaint" being filed directly to the Regional Director, per policy. In my initial attempt to file this at the institution, I was told that I would be written up/issued an incident report. I was also informed that if I pursue this and staff found out, that there would be hell to pay.

Please find my complaint attached with 4 copies/sets prepared by my attorney.

9-11-2021                                    ___D___B___
DATE                                         SIGNATURE OF REQUESTER

## Part B—RESPONSE

_____                              _____
DATE                                         REGIONAL DIRECTOR

If dissatisfied with this response, you may appeal to the General Counsel. Your appeal must be received in the General Counsel's Office within 30 calendar days of the date of this response.

ORIGINAL: RETURN TO INMATE                   CASE NUMBER: _____

## Part C—RECEIPT
                                             CASE NUMBER: _____

Return to: _____
           LAST NAME, FIRST, MIDDLE INITIAL      REG. NO.       UNIT         INSTITUTION

SUBJECT: _____

# EXHIBIT 6

BP-A0148
JUNE 10

**INMATE REQUEST TO STAFF** CDFRM

**U.S. DEPARTMENT OF JUSTICE**                    **FEDERAL BUREAU OF PRISONS**

| TO:(Name and Title of Staff Member) Medical | DATE: 9-12-2021 |
|---|---|
| FROM: Derek Bluford | REGISTER NO.: 77108-097 |
| WORK ASSIGNMENT: Education | UNIT: 2A |

SUBJECT: (Briefly state your question or concern and the solution you are requesting. Continue on back, if necessary.  Your failure to be specific may result in no action being taken.  If necessary, you will be interviewed in order to successfully respond to your request.

I Need HELP!

I am having difficulty breathing, sweating, fever and I can not smell or taste. I am unable to eat and need help. I've been writing and emailing you all! Please help, I have heart issues.

Needing Help ASAP
D-B

(Do not write below this line)

DISPOSITION:

| Signature Staff Member | Date |
|---|---|
| | |

Record Copy - File; Copy - Inmate

PDF                          Prescribed by P5511

This form replaces BP-148.070 dated Oct 86
and BP-S148.070 APR 94

FILE IN SECTION 6 UNLESS APPROPRIATE FOR PRIVACY FOLDER          **SECTION 6**

TRULINCS 77108097 - BLUFORD, DEREK - Unit: SHE-B-R

----------------------------------------------------------------------------------------------------

FROM: 77108097 BLUFORD, DEREK
TO: Health Services
SUBJECT: ***Request to Staff*** BLUFORD, DEREK, Reg# 77108097, SHE-B-L
DATE: 09/11/2021 05:37 PM

To: Medical
Inmate Work Assignment: N/A

To Whom It May Concern,

I wanted to reach out and address my concern. Last week on the 9/7/2021 we were locked down for temperature checks. A few inmates had concerning temperatures which caused you to remove them from the Housing Unit 2A. Since then, more inmates have been removed due to covid. When are the remaining inmates going to be tested? My roommate was removed for covid, and my neighbor. I have been placed on quarantine, and yet still not tested. All of the symptoms show. You have people in here who need medical attention. What is the plan? Why is no action being taken?

Respectfully,

# EXHIBIT 7

Original
Rewrote and mailed copy Institution Mail

BP-A0148                 **INMATE REQUEST TO STAFF** CDFRM
JUNE 10
**U.S. DEPARTMENT OF JUSTICE**                **FEDERAL BUREAU OF PRISONS**

| TO:(Name and Title of Staff Member) | DATE: |
|---|---|
| Dr. Andrew Grasley | 9-5-2021 |
| FROM: | REGISTER NO.: |
| Derek Bluford | 77108-097 |
| WORK ASSIGNMENT: | UNIT: |
| Education | 2A |

SUBJECT: (Briefly state your question or concern and the solution you are requesting.
Continue on back, if necessary.  Your failure to be specific may result in no action being
taken.  If necessary, you will be interviewed in order to successfully respond to your
request.

Dr. Grasley,

   I am certain that I have Covid-19. I can not taste my food, smell, and I have been having shortness of breathe and night sweats. I believe that I am "high-risk" as I have several heart conditions. Can you please see me and have me tested? I need help. The medical staff have not responded nor has my housing unit staff. I keep getting blown off. Can you please help me.

Respectfully
D—B

(Do not write below this line)

DISPOSITION:

| Signature Staff Member | Date |
|---|---|
|  |  |

Record Copy - File; Copy - Inmate

PDF                          Prescribed by P5511

This form replaces BP-148.070 dated Oct 86
and BP-S148.070 APR 94

FILE IN SECTION 6 UNLESS APPROPRIATE FOR PRIVACY FOLDER    **SECTION 6**

# EXHIBIT 8

Original kept / Inmate and copy sent Institution mail

BP-A0148
JUNE 10

**INMATE REQUEST TO STAFF** CDFRM

**U.S. DEPARTMENT OF JUSTICE**                    **FEDERAL BUREAU OF PRISONS**

| TO:(Name and Title of Staff Member) Mr. Hendrix / Warden | DATE: 9-1-2021 |
|---|---|
| FROM: Derek Bluford | REGISTER NO.: 77108-097 |
| WORK ASSIGNMENT: Education | UNIT: 2A |

SUBJECT: (Briefly state your question or concern and the solution you are requesting.
Continue on back, if necessary.  Your failure to be specific may result in no action being
taken.  If necessary, you will be interviewed in order to successfully respond to your
request.

Mr. Hendrix,

I wanted to raise a sensitive matter to you, regarding your staff. I attempted to file a complaint regarding the BOP Covid-19 policies not being followed and was threatened in return by my Counselor, Mr. Cray. He informed me that there would be hell to pay if I attempted to file the complaint again or through other means. Staff are knowingly and recklessly increasing our risk of exposure to Covid by not wearing mask in the housing unit, mixing quarantine inmates with nonequarantined inmates, and allowing inmates to mingle with 2B housing inmates. Covid is here. I am "high risk" due to my heart condition and would like to be moved and tested please. I am already not feeling well.

Respectfully
D.B.

(Do not write below this line)

---

DISPOSITION:

| Signature Staff Member | Date |
|---|---|

Record Copy - File; Copy - Inmate

PDF                              Prescribed by P5511

This form replaces BP-148.070 dated Oct 86
and BP-S148.070 APR 94

FILE IN SECTION 6 UNLESS APPROPRIATE FOR Privacy FOLDER          **SECTION 6**

Original kept

BP-A148.055
SEP 98
INMATE REQUEST TO STAFF

U.S. DEPARTMENT OF JUSTICE
FEDERAL BUREAU OF PRISONS

| TO:(Name and Title of Staff Member) Medical | DATE: 9-8-2021 |
|---|---|
| FROM: Derek Bluford | REGISTER NO.: 77108-097 |
| WORK ASSIGNMENT: Education | UNIT: 2A |

SUBJECT: (Briefly state your question or concern and the solution you are requesting. Continue on back, if necessary. Your failure to be specific may result in no action being taken. If necessary, you will be interviewed in order to successfully respond to your request.

Hello,

I believe that I have Covid. You guys removed some inmates yesterday for testing positive in our unit. I am having shortness of breath and I can not really taste or smell. Can I please be tested. I have heart issues and would like to avoid any serious risk. My roommate seems to be sick as well.

Respectfully
Derek Bluford

(Do not write below this line)

DISPOSITION:

| Signature Staff Member | Date |
|---|---|
| | |

Record Copy - File; Copy - Inmate
(This form may be replicated via WP)

This form replaces BP-148.070 dated Oct 86
and BP-S148.070 APR 94

FILE IN SECTION 6 UNLESS APPROPRIATE FOR PRIVACY FOLDER

SECTION 6

BP-A0148
JUNE 10
U.S. DEPARTMENT OF JUSTICE

**INMATE REQUEST TO STAFF** CDFRM

FEDERAL BUREAU OF PRISONS

| TO:(Name and Title of Staff Member) Unit 2 (Mr. Cray & Mrs. Ayala) | DATE: 9-8-2021 |
|---|---|
| FROM: Derek Bluford | REGISTER NO.: 77108-097 |
| WORK ASSIGNMENT: Education | UNIT: 2A |

SUBJECT: (Briefly state your question or concern and the solution you are requesting. Continue on back, if necessary. Your failure to be specific may result in no action being taken. If necessary, you will be interviewed in order to successfully respond to your request.

Mr. Cray / Mrs. Ayala,

I have covid-19 I believe. I need to be tested. I have heart issues and am high risk. Im not trying to upset you or get a write up, but I need help. There are numerous inmates in here who are also showing signs of covid. Im having shortness of breathe, loss of taste/smell, fever and night sweats. What is the plan to help us? We need medical help.

Respectfully
Derek Bluford

(Do not write below this line)

DISPOSITION:

| Signature Staff Member | Date |
|---|---|
| | |

Record Copy - File; Copy - Inmate

PDF                          Prescribed by P5511

This form replaces BP-148.070 dated Oct 86
and BP-S148.070 APR 94

FILE IN SECTION 6 UNLESS APPROPRIATE FOR Privacy Folder      **SECTION 6**

TRULINCS  77108097 - BLUFORD, DEREK - Unit: SHE-C-L

--------------------------------------------------------------------------------------------

FROM: 77108097 BLUFORD, DEREK
TO: Health Services
SUBJECT: ***Request to Staff*** BLUFORD, DEREK, Reg# 77108097, SHE-B-L
DATE: 09/11/2021 05:37 PM

To: Medical
Inmate Work Assignment: N/A

To Whom It May Concern,

I wanted to reach out and address my concern. Last week on the 9/7/2021 we were locked down for temperature checks. A few inmates had concerning temperatures which caused you to remove them from the Housing Unit 2A. Since then, more inmates have been removed due to covid. When are the remaining inmates going to be tested? My roommate was removed for covid, and my neighbor. I have been placed on quarantine, and yet still not tested. All of the symptoms show. You have people in here who need medical attention. What is the plan? Why is no action being taken?

Respectfully,

TRULINCS 77108097 - BLUFORD, DEREK - Unit: SHE-B-R

----------------------------------------------------------------------------------------------------

FROM: 77108097 BLUFORD, DEREK
TO: Unit 2
SUBJECT: ***Request to Staff*** BLUFORD, DEREK, Reg# 77108097, SHE-B-L
DATE: 09/12/2021 05:27 PM

To:
Inmate Work Assignment: N/A

Hello,

On 9/7 we were locked down for temperature checks. Several inmates were removed for covid concerns and placed in the gym. This continued for two more days. Finally, my roommate was removed for Covid. Since then, no one has been tested in here and inmates continue to get sick. Most complain of loss of taste/smell, fever, and shortness of breath. Why are we not being tested. I have been placed on quaratine, yet, the sign says "I am not showing signs of illness" which is false. What is going on?

Respectfully,

# EXHIBIT 9

**FCI Sheridan, Updated March 2020**

# Quarantine: To separate a person from others, preventing the introduction of illness into a population. The separated person is NOT showing signs of illness. This is a PREVENTIVE measure.

## HOW TO PROTECT OUR INMATES, AND YOURSELF:

1.) PPE (Personal Protective Equipment) is <u>required</u>.

2.) Use the SAME surgical mask for all the quarantine cells unless you come into significant body contact with the inmate.

3.) Physical distance from others AND handwashing are THE BEST ways to prevent the introduction and spread of illness.

4.) If talking to the inmate through the door, don't do anything differently. Communicate this way as much as possible! Use <u>physical distance</u> to separate yourself from the inmate.

5.) If opening the trap, or the door: <u>Wear a mask and gloves!</u> Always change your gloves and sanitize or wash when moving on to the next cell.

6.) If touching the inmate, then wear a disposable gown. This should rarely happen.

7.) Only new inmates are being quarantined. Don't do anything different with our current inmates.

8.) Ask a question of Health Services before you act!

# EXHIBIT 10

## Bureau of Prisons
## Health Services
## Clinical Encounter

| | | | |
|---|---|---|---|
| Inmate Name:  BLUFORD, DEREK | | | Reg #:  77108-097 |
| Date of Birth:   03/23/1987 | Sex:    M    Race:  BLACK | | Facility:  SHE |
| Encounter Date:  09/13/2021 19:29 | Provider:  Farrell, Joanna NP | | Unit:    B03 |

Emergency - Respiratory encounter performed at Housing Unit.

**SUBJECTIVE:**

COMPLAINT  1         Provider:  Farrell, Joanna NP

Chief Complaint:   PULMONARY/RESPIRATORY

Subjective:     34 year old male presented to health services at cell front for respiratory emergency. After
unit officer called medical stating patient had breathing issues, he was tested positive for
COVID-19 with rapid swab. Patient stated that he has been feeling sick for a week, unable to
eat. He has been able to drink some water. Endorses feeling chills and having non-
productive coughing, along with body aches. Also stated he has PVCs. Patient was being
transferred from bed to wheelchair by EMT and this NP. He fell on his knees, stated he was
peeing himself. After getting him to the wheelchair, he started to slide down, unable to pick
himself up. 2A unit officer and compound officers were called for assistance. Medical was
also called for ambulance. After getting him on the slide wheelchair, officers transferred
patient to stretcher and patient was taken to medical. Vitals signs were taken, clothes were
taken off since patient was having respiratory issues, non re-breather was applied. IV was
started on L antecubital region. Ambulance was called. When they arrived, they stated
patient was going to Salem Health hospital. Patient unable to have full conversations but able
to nod and speak short sentences.

Pain:           Not Applicable

**OBJECTIVE:**

**Temperature:**

| Date | Time | Fahrenheit | Celsius | Location | Provider |
|---|---|---|---|---|---|
| 09/13/2021 | 19:38 SHE | 97.5 | 36.4 | Forehead | Farrell, Joanna NP |

**Pulse:**

| Date | Time | Rate Per Minute | Location | Rhythm | Provider |
|---|---|---|---|---|---|
| 09/13/2021 | 19:38 SHE | 113 | Via Machine | | Farrell, Joanna NP |

**Blood Pressure:**

| Date | Time | Value | Location | Position | Cuff Size | Provider |
|---|---|---|---|---|---|---|
| 09/13/2021 | 19:38 SHE | 131/56 | | | | Farrell, Joanna NP |

**SaO2:**

| Date | Time | Value(%) | Air | Provider |
|---|---|---|---|---|
| 09/13/2021 | 19:38 SHE | 96 | | Farrell, Joanna NP |

**Exam:**

**General**

**Affect**

Yes: Cooperative

**Appearance**

Yes: Appears Distressed, Lethargic, Stuporous, Dyspneic, Pale, Diaphoretic, Acutely Ill

No: Alert and Oriented x 3

**Pulmonary**

**Observation/Inspection**

| Inmate Name: | BLUFORD, DEREK | | | Reg #: | 77108-097 |
|---|---|---|---|---|---|

Inmate Name:  BLUFORD, DEREK
Date of Birth:  03/23/1987
Encounter Date: 09/13/2021 19:29

Sex:    M    Race:  BLACK
Provider:  Farrell, Joanna NP

Reg #:  77108-097
Facility:  SHE
Unit:    B03

Yes: Respiratory Distress, Tachypnea, Nasal Flaring

### Cardiovascular

#### Observation

Yes: Tachycardia, Irregular Rhythm, Cardiopulmonary Distress

#### Auscultation

Yes: Normal S1 and S2
No: Regular Rate and Rhythm (RRR)

## Exam comments

General:  Shivering.  Able to respond appropriately and react to stimuli (flinched when 18 G needle inserted for IV), Speaking less over time but still able to respond with head nods.

Respiratory:  40 respirations, Shallow breathing, mostly through abdomen.  Drooling noted.

GU:  Urine clear yellow, unable to control bladder.  No foul smell noted.

Cardiovascular:  Heart rate irregular, tachycardia.  Pulses 2+ in bilateral carotid and radial pulses.

Musculoskeletal:  No strength in all extremities.  Unable to sit upright.

## ASSESSMENT:

Confirmed case COVID-19, U07.1 - Current

## PLAN:

## New Consultation Requests:

| Consultation/Procedure | Target Date | Scheduled Target Date | Priority | Translator | Language |
|---|---|---|---|---|---|
| Emergency Room | 09/13/2021 | 09/13/2021 | Urgent | No | |

    Subtype:

        Emergency Room

    Reason for Request:

        Respiratory distress. Drooling, only able to speak short sentences.  Unable to walk.  COVID-19 positive.

Schedule:

| Activity | Date Scheduled | Scheduled Provider |
|---|---|---|
| Sick Call/Triage | 09/20/2021 00:00 | MLP 01 |

Follow-up after trip to hospital

## Disposition:

Follow-up in 1 Week

## Other:

-Follow-up in 1 week
-IV 18 G started on L antecubital.  NS 0.9% started
-Transport to Salem health hospital
-Non re-breather started at 8 L/min
-Unable to swallow at this time.

## Patient Education Topics:

| Date Initiated | Format | Handout/Topic | Provider | Outcome |
|---|---|---|---|---|
| 09/13/2021 | Counseling | Access to Care | Farrell, Joanna | No Participation |

| Inmate Name: BLUFORD, DEREK | Reg #: 77108-097 |
| Date of Birth: 03/23/1987 | Sex: M Race: BLACK | Facility: SHE |
| Encounter Date: 09/13/2021 19:29 | Provider: Farrell, Joanna NP | Unit: B03 |

| Date Initiated  Format | Handout/Topic | Provider | Outcome |
|---|---|---|---|

**Copay Required:** No     **Cosign Required:** No

**Telephone/Verbal Order:** No

Completed by Farrell, Joanna NP on 09/13/2021 19:54

# EXHIBIT 11

**Bureau of Prisons**
## Health Services
## Health Problems

| Reg #: 77108-097 | | Inmate Name: BLUFORD, DEREK | | | | |

| Description | Axis | Code Type | Code | Diag. Date | Status | Status Date |
|---|---|---|---|---|---|---|
| **Current** | | | | | | |
| Unspecified disorder of eye and adnexa | | | | | | |
| 11/04/2021 18:51 EST  Farrell, Joanna NP | | ICD-10 | H579 | 11/04/2021 | Current | |
| Pain in unspecified limb | | | | | | |
| 11/04/2021 18:51 EST  Farrell, Joanna NP | | ICD-10 | M79609 | 11/04/2021 | Current | |
| R thigh and bilateral knees | | | | | | |
| Shortness of breath | | | | | | |
| 11/04/2021 18:51 EST  Farrell, Joanna NP | | ICD-10 | R0602 | 11/04/2021 | Current | |
| Nausea | | | | | | |
| 11/04/2021 19:08 EST  Farrell, Joanna NP | | ICD-10 | R110 | 11/04/2021 | Current | |
| Encounter for general adult medical exam without abnormal findings | | | | | | |
| 06/04/2021 14:16 EST  Donoho, K. NP-C | | ICD-10 | Z0000 | 06/04/2021 | Current | |
| Personal history of COVID-19 | | | | | | |
| 10/04/2021 14:23 EST  Behrens, Kristina QIIC RN | | ICD-10 | Z8616 | 10/04/2021 | Current | |
| **Resolved** | | | | | | |
| Confirmed case COVID-19 | | | | | | |
| 10/04/2021 14:23 EST  Behrens, Kristina QIIC RN | | ICD-10 | U07.1 | 09/13/2021 | Resolved | 10/04/2021 |
| 09/13/2021 22:47 EST  Farrell, Joanna NP | | ICD-10 | U07.1 | 09/13/2021 | Current | |
| Quarantine - asymptomatic person in quarantine | | | | | | |
| 06/11/2021 14:01 EST  Zaragoza, Mariana QIIC RN | | ICD-10 | Z0489-q | 05/24/2021 | Resolved | 06/11/2021 |
| 06/01/2021 11:33 EST  Huston, Amanda HSA/RN | | ICD-10 | Z0489-q | 05/24/2021 | Current | |

**Total: 8**

# EXHIBIT 11A

# Federal Bureau Of Prisons' Medical Care Falls Short Of Its Own Policy

**Walter Pavlo** Contributor ⊙

*I write and consult on federal criminal law and criminal justice.*



🗐 0                                                                 Apr 19, 2022, 11:41am EDT

Listen to article   7 minutes



At some Bureau of Prison facilities, inmate prescriptions are not being filled because of a lack of proper staffing. [-] GETTY IMAGES

Cookie Preferences

The Federal Bureau of Prisons (BOP) has numerous policies and program statements, all meant to set a standard for operations in an agency responsible for the care of 160,000 prisoners. Among them is a program statement for medical care of prisoners entitled Patient Care. The overall goal of the program is stated as being, *"Health care will be delivered to inmates in accordance with proven standards of care without compromising public safety concerns inherent to the agency's overall mission."* However, those standards are being compromised as a result of staffing shortages that the agency has faced for years now.

The BOP's prisoner population peaked at over 215,000 around the same time that the BOP updated its Patient Care Program in June 2014. Today, there are 155,000 prisoners, 60,000 fewer than in 2014, yet the BOP's budget has increased over the same period of time. One cost driver is healthcare of prisoners.

When the BOP updated its Patient Care program statement, it had one lofty goal of creating something called Primary Care Provider Team (PCPT). According to the statement, a PCPT is a core group of health care providers and support staff whose function is to provide direct patient care. It was designed to improve health care services by *"enhancing continuity of care and promoting preventive health care measures."* The BOP believed that it would function in the same manner as a medical office in a community setting, only it would be inside a prison. On paper, every inmate would be assigned to a medical team of health care providers and support staff who are responsible for managing the inmate's health care needs. The statement went on with a lofty prediction that PCPT, *"...when fully implemented, "sick call" will be eliminated."* Presumably this would be the case because a group of medical professionals would proactively manage and treat prisoners. Fast forward to the reality

Cookie Preferences

of today, nearly 8 years after PCPT, the BOP is struggling to care for prisoners in its care.

Be assured, "sick call" is still very much part of medical care inside of federal prisons where prisoners stand in line asking for medical attention for anything from fever, to chest pain, to aching limbs from an injury. Not much has changed. One of the conditions cited in the program statement to make the program a success is that *"Appropriate levels of support staff must be achieved when implementing PCPT."* That is a problem in today's BOP.

MORE FROM FORBES ADVISOR

### Best Travel Insurance Companies

By **Amy Danise** Editor

### Best Covid-19 Travel Insurance Plans

By **Amy Danise** Editor

PCPT guidelines were provided for each institution so that for a day shift PCPT staffing pattern for 1,000 general population inmates will have; 1 physician, 3 mid-level practitioners, 1 registered nurse, 1 or 2 licensed practical nurses and/or medical assistants, 2 health information technicians, and a medical clerical staff person. On paper, it is a team of professionals all assigned to take care of a contingent of prisoners.

In March 2022, the Department of Justice Office of the Inspector General (OIG) issued a report on audits of three BOP contracts awarded to the University of Massachusetts Medical School (UMass) between 2012 and 2014 to provide comprehensive medical services at a few of its medical centers. The contracts totaled more than $304 million. Beyond the cited shortfalls in care noted by

Cookie Preferences

OIG, the report also provided insight into challenges facing the BOP's medical care of prisoners. The report's conclusions were:

*"Although the BOP told us that it did not identify any significant problems with UMass's performance related to the timely delivery of inmate healthcare and quality of care, we found that BOP did not have a reliable, consistent process in place to evaluate either the timeliness of inmate healthcare or the quality of that care."*

*"Further, we found that the BOP faced challenges in transporting inmates to off-site appointments which resulted in a frequent need to reschedule appointments that could delay an inmate's healthcare. In addition, the BOP did not have systems in place to track and monitor the causes for rescheduling appointments, including whether the reason for a cancellation was a BOP issue or one that was out of its control, such as the physician cancelling the appointment.*

*"BOP also did not have a process in place to monitor how long an inmate waited to receive care after a cancelled appointment. Because the BOP did not have systems to measure or track any of these issues, we believe it is difficult for the BOP to determine whether inmates are receiving care within the required community standard."*

A report by OIG is one thing, but how is it playing out on the front lines of providing care in prisons?

A senior medical person at an institution (name and institution withheld) frustrated with the lack of action by the Warden, sent OIG an account of what is happening at one federal prison with over 1,500 inmates. One institution has been without a pharmacist for most of 2022 due to being out on medical leave. The result

Cookie Preferences

according to the submission to OIG is that *"We now have several psychiatric patients decompensating daily. We also have many diabetics, hypertensives, cardiomyopathy and HIV inmates that have run out of medications and have no way of refilling them until they, as well as emergent issues, or are lucky enough to communicate the need to executive staff, or custody staff who communicate it to Medical. We repeatedly are responding to attorney, and family member inquiries about inmates who have not received medication. This, of course takes time away from patient care for the TWO BOP staff members who can resolve the issues, myself and the Nurse Practitioner. ... There are currently OVER 750 unfilled prescriptions."*

I spoke with Charles Jones, Union President of AGFE Local 4036, who works at FCI Marianna in Florida, *"The BOP till hasn't implemented PCPT teams as outlined in policy at Marianna or anywhere from my understanding. This was suppose to be used to give inmates an experience similar to outside world."*

Jones told me that the same issues faced in 2014 have been exacerbated today. *"Currently we are still down positions in medical and this doesn't include the additional positions of 1 nurse and 1 doctor position that we have still not gained back from the 2016 staffing cuts. We had several medical staff leave once hired due to the lack of staff in the department and the expectation for those staff to do all the work all while being questioned about overtime. Those shortages put a lot of normal heath procedures for inmates on backlog. This has caused significant issues of scheduling many outside medical trips each day which is carried out by correctional services."* Jones' observations are similar to the findings of OIG's reports regarding cancelled appointments.

Cookie Preferences

Aaron Mcglothin, Union President at FCI Mendota (California) said in an interview about whether his facility could pass PCPT, "*I know our facility definitely does not meet that criteria. We have over 1,300 inmates and we would not pass that type of inspection but then again the only inspections that happen at our facilities are by agency representatives who cover for management.*"

The staff member at one institution who submitted the plea for help to OIG ended with this ominous note [all CAPS were part of the original submission], "*THIS IS UNACCEPTABLE, DANGEROUS. Literally a powder keg awaiting an explosion.*"
*Follow me on Twitter or LinkedIn. Check out my website or some of my other work here.*

 **Walter Pavlo**

[ Follow ]

I founded Prisonology, an expert network firm of retired Bureau of Prisons professionals, to work with defendants and criminal defense lawyers on federal prison issues. In... **Read More**

Editorial Standards                                    Reprints & Permissions

ADVERTISEMENT

## Join Our Conversation

One Community. Many Voices. Create a free account to share your thoughts. Read our community guidelines here

Commenting as **Guest**    🔔   Log in  Sign up

Be the first to comment...

Powered by 🔷 OpenWeb        Terms | Privacy | Feedback

Cookie Preferences

# EXHIBIT 12

# DECLARATION OF CYRUS ZAL

I, Cyrus Zal, declare as follows:

I am a licensed attorney in California. I have represented Derek Bluford on numerous matters. After December 2021 to when Derek Bluford was moved from FCI Sheridan to FCI Phoenix, I made many calls to FCI Sheridan to request setting up an attorney-client confidential call with Derek Bluford. All of my calls and messages went unanswered, with the exception of one return phone call by Mr. Cray on a Sunday, when my law office is closed.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: November 14, 2022

_____
Cyrus Zal, Attorney-at-Law

# EXHIBIT 13

# Bureau of Prisons
## Health Services
## Clinical Encounter - Administrative Note

| | | | | | |
|---|---|---|---|---|---|
| Inmate Name: | BLUFORD, DEREK | | | Reg #: | 77108-097 |
| Date of Birth: | 03/23/1987 | Sex: | M    Race:BLACK | Facility: | SHE |
| Note Date: | 03/14/2022 09:34 | Provider: | Mehr, Christi HIT | Unit: | Z03 |

Admin Note - Scheduling Note encounter performed at Health Services.
**Administrative Notes:**

ADMINISTRATIVE NOTE   **1**           Provider:   Mehr, Christi HIT

Missed Neurology appointment scheduled for 03/14/2022 @ 0915. Staff were not hired in time to escort trip out. Will reschedule.

**Copay Required:** No          **Cosign Required:** No
**Telephone/Verbal Order:** No

Completed by Mehr, Christi HIT on 03/14/2022 09:35

# EXHIBIT 14

# Bureau of Prisons
## Health Services
## Health Problems

Reg #:  77108-097                        Inmate Name:  BLUFORD, DEREK

| Description | Axis | Code Type | Code | Diag. Date | Status | Status Date |
|---|---|---|---|---|---|---|

### Current

**Major depressive disorder, recurrent**

| 03/17/2023 16:01 EST  Scott, K. NP-C | | ICD-10 | F339 | 03/17/2023 | Current | |
|---|---|---|---|---|---|---|

**Anxiety disorder**

| 12/27/2023 16:21 EST  Watson, William (MAT) MD | | ICD-10 | F419 | 2022 | Current | |
|---|---|---|---|---|---|---|

**Disorder of eyelid**

| 12/27/2023 15:35 EST  Watson, William (MAT) MD | | ICD-10 | H029 | 05/01/2023 | Current | |
|---|---|---|---|---|---|---|
| Stye vs Internal hordeolum OS lids | | | | | | |
| 05/01/2023 11:00 EST  Hutchins, T OD | | ICD-10 | H029 | 05/01/2023 | Current | |
| Internal hordeolum, LUL | | | | | | |

**Astigmatism**

| 05/01/2023 11:00 EST  Hutchins, T OD | | ICD-10 | H52209 | 05/01/2023 | Current | |
|---|---|---|---|---|---|---|

**Unspecified disorder of eye and adnexa**

| 11/04/2021 18:51 EST  Farrell, Joanna NP | | ICD-10 | H579 | 11/04/2021 | Current | |
|---|---|---|---|---|---|---|

**Essential (primary) hypertension**

| 12/27/2023 16:10 EST  Watson, William (MAT) MD | | ICD-10 | I10 | 12/27/2023 | Current | |
|---|---|---|---|---|---|---|
| AHA Stage 1; per cardiology goal 130/80 or less | | | | | | |
| 12/27/2023 15:54 EST  Watson, William (MAT) MD | | ICD-10 | I10 | 12/27/2023 | Current | |
| AHA Stage 1 | | | | | | |

**Unspecified hemorrhoids**

| 01/25/2023 16:52 EST  Winston, Brian DO | | ICD-10 | K649 | 01/25/2023 | Current | |
|---|---|---|---|---|---|---|

**Polyosteoarthritis, unspecified**

| 12/27/2023 15:53 EST  Watson, William (MAT) MD | | ICD-10 | M159 | 04/06/2023 | Current | |
|---|---|---|---|---|---|---|
| C-spine, mild OA changes. Mod. NFS Lf C3-C4-C5 | | | | | | |

**Cervical disc disorder, unsp, unspecified cervical region**

| 12/27/2023 15:53 EST  Watson, William (MAT) MD | | ICD-10 | M5090 | 04/06/2023 | Current | |
|---|---|---|---|---|---|---|
| mild DDD | | | | | | |

**Unspecified disorder of synovium and tendon, multiple sites**

| 12/27/2023 15:45 EST  Watson, William (MAT) MD | | ICD-10 | M6799 | 12/27/2023 | Current | |
|---|---|---|---|---|---|---|
| Rg #1 & Lf #5; see ultrasound report | | | | | | |

Reg #: 77108-097                    Inmate Name:  BLUFORD, DEREK

| Description | Axis | Code Type | Code | Diag. Date | Status | Status Date |
|---|---|---|---|---|---|---|
| Disorder of kidney and ureter, unspecified | | | | | | |
| 12/27/2023 15:53 EST  Watson, William (MAT) MD | | ICD-10 | N289 | 04/06/2023 | Current | |
| single cyst on Rg reported on MRI L spine | | | | | | |
| Localized swelling, mass and lump, upper limb | | | | | | |
| 05/19/2023 16:37 EST  Scott, K. NP-C | | ICD-10 | R2230 | 05/19/2023 | Current | |
| R Thumb | | | | | | |
| Dizziness and giddiness | | | | | | |
| 12/27/2023 15:40 EST  Watson, William (MAT) MD | | ICD-10 | R42 | 2021 | Current | |
| while at Salem Hospital | | | | | | |
| Prediabetes | | | | | | |
| 12/27/2023 16:01 EST  Watson, William (MAT) MD | | ICD-10 | R7303 | 12/27/2023 | Current | |
| 5.9% | | | | | | |
| Post COVID-19 condition, unspecified | | | | | | |
| 12/27/2023 15:39 EST  Watson, William (MAT) MD | | ICD-10 | U09.9 | 12/09/2021 | Current | |
| predominantly LLE weakened, plateaued by history | | | | | | |
| 12/09/2021 15:18 EST  Grasley, Andrew (MAT) M.D./CD | | ICD-10 | U09.9 | 12/09/2021 | Current | |
| Personal history of COVID-19 | | | | | | |
| 12/27/2023 15:37 EST  Watson, William (MAT) MD | | ICD-10 | Z8616 | 09/13/2021 | Current | |
| Salem Hospital | | | | | | |
| 10/04/2021 14:23 EST  Behrens, Kristina QIIC RN | | ICD-10 | Z8616 | 10/04/2021 | Current | |
| | | | | | | |
| Other ill-defined heart diseases | | | | | | |
| 12/27/2023 15:39 EST  Watson, William (MAT) MD | | ICD-10 | I5189 | 06/16/2023 | Remission | 12/27/2023 |
| palpitation | | | | | | |
| 06/16/2023 15:45 EST  Winston, Brian DO | | ICD-10 | I5189 | 06/16/2023 | Current | |
| palpitation | | | | | | |
| Other ill-defined heart diseases | | | | | | |
| 12/27/2023 15:39 EST  Watson, William (MAT) MD | | ICD-10 | I5189 | 06/16/2023 | Remission | 12/27/2023 |
| palpitation | | | | | | |
| 06/16/2023 15:45 EST  Winston, Brian DO | | ICD-10 | I5189 | 06/16/2023 | Current | |
| palpitation | | | | | | |

Unspecified osteoarthritis, unspecified site

# EXHIBIT 15

**verizon✓**

PO BOX 489
NEWARK, NJ 07101-0489

✱ See page 7 &8
for calls to
FCI Sheridan

KEYLINE
Il.l...l.l.ll....ll.ll....l.l..ll..ll.l.l..ll..l

SARAH MORELL
102 MAINSAIL CT
FOLSOM, CA 95630-2339

### Pay your bill online, fast and easy

For convenience and peace of mind you
can pay your bill online or enroll in Auto
Pay and Paper-free Billing. Visit
go.vzw.com/paybill



$875.99

$402.88

Jan       Feb

Your February bill is $473.11 higher
than last month's. You can see a full
breakdown of all this month's charges
on go.vzw.com/mybill.

# Your February bill is $

Your Feb bill of $          is due on Feb 28, 2022. The total includes: past due amount of
$          and a late fee of $5.00.

| | |
|---|---|
| Unpaid balance | $ |
| Account charges | $364.63 |
| **Sarah Morell**<br>415-264-7796 | -$2.60 |
| **Sarah Morell**<br>415-271-5664 | -$2.60 |
| **Sarah Morell**<br>916-599-5086 | $69.86 |
| **Sarah Morell**<br>916-805-3156 | -$2.60 |
| **Sarah Morell**<br>916-805-6149 | $23.21 |
| **Sarah Morell**<br>916-836-6049 | $23.21 |

### Good to know

### Check your online bill for all surcharges, taxes and gov fees

The total amount due for this month
includes surcharges of **$7.86** and
taxes and gov fees of **$1.71**. For an
itemized list of taxes, fees and
surcharges visit go.vzw.com/mybill.

**Due Feb 28, 2022:** $473.11

## Unpaid balance from last bill

| | |
|---|---|
| Previous balance (through Jan 8) | $ |
| No payment received | $0.00 |
| **Total unpaid balance** | $ |

**verizon**

## Changes this month

| | Jan | Feb | Change |
|---|---|---|---|
| Unpaid balance | $0.00 | $402.88 | ↑ $402.88 |
| Account Charges | $172.99 | $364.63 | ↑ $191.64 |
| **SARAH MORELL**<br>415.264.7796 - Cancelled | $70.88 | -$2.60 | ↓ $73.48 |
| **SARAH MORELL**<br>415.271.5664 - Cancelled | $20.48 | -$2.60 | ↓ $23.08 |
| **SARAH MORELL**<br>916.599.5086 | $69.62 | $69.86 | ↑ $0.24 |
| **SARAH MORELL**<br>916.805.3156 - Cancelled | $22.97 | -$2.60 | ↓ $25.57 |
| **SARAH MORELL**<br>916.805.6149 | $22.97 | $23.21 | ↑ $0.24 |
| **SARAH MORELL**<br>916.836.6049 | $22.97 | $23.21 | ↑ $0.24 |
| **Change total** | | | ↑ $473.11 |

## Understand your bill

**Understand "Changes this month"**

These changes are why your amount due is different than last month. For example, if you changed your plan or added a line, you'll see partial-month charges reflected in this table. The table will not display if you have no changes.

**verizon**✓    Billing period Jan 9, 2022 to Feb 8, 2022 | Account # 471831075-00001 | Invoice # 9461311464

---

## Account Charges                                                    $364.63

Save $10/month when you enroll in Auto Pay (using bank account or debit card) and paper-free billing, as long as you remain on The new Verizon Plan Unlimited plan. Enroll using the My Verizon app, or at vzw.com/myverizon.

You'll be charged a late fee when you don't pay your bill on time. The amount is the greater of $5 or 1.5% of the unpaid balance, or as allowed by law in the state of your billing address.

### One-time charges and credits                                     $196.64

| | |
|---|---|
| Late Fee for Amount Due January 31 | $5.00 |
| Device Payment Buyout Charge (Payments 21 - 24) (Agreement 1162614713) | $191.64 |

### Monthly charges and credits                                      $110.00

| | |
|---|---|
| The new Verizon Plan Unlimited (Feb 9 - Mar 8)<br>Shared Unlimited Talk, Text and Data | $110.00 |

### Add-ons                                                          $57.99

| | |
|---|---|
| VZ Mobile Protect Multi-Dvc  (Feb 9 - Mar 8) | $50.00 |
| Disney+ Monthly  (Jan 12 - Feb 11) | $7.99 |

---

## Sarah Morell                                                      -$2.60

415-264-7796

IPHONE 11 PRO
Cancelled

### One-time charges and credits                                     -$2.58

| | |
|---|---|
| Smartphone line access - partial-month refund (Feb 5 - Feb 8) | -$2.58 |

### Surcharges                                                       -$0.01

| | |
|---|---|
| Fed Universal Service Charge | -$0.01 |

### Taxes and gov fees                                               -$0.01

| | |
|---|---|
| Lifeline Surcharge - CA | -$0.01 |

---

## Sarah Morell                                                      -$2.60

415-271-5664

IPAD PRO 11 IN
Cancelled

### One-time charges and credits                                     -$2.58

| | |
|---|---|
| Tablet line access - partial-month refund (Feb 5 - Feb 8) | -$2.58 |

### Surcharges                                                       -$0.01

| | |
|---|---|
| Fed Universal Service Charge | -$0.01 |

### Taxes and gov fees                                               -$0.01

| | |
|---|---|
| Lifeline Surcharge - CA | -$0.01 |

**verizon√**  Billing period Jan 9, 2022 to Feb 8, 2022  |  Account # 471831075-00001  |  Invoice # 9461311464

## Sarah Morell
916-599-5086
iPhone 13 Pro

**$69.86**

"Add Ons" are features, content, and apps that we provide to you directly or through our relationships with certain content, app, and business partners. They are Verizon charges. For questions about these charges, visit http://m.vzw.com/m/block.

| Monthly charges and credits | $56.66 |
|---|---|
| Smartphone Line Access (Feb 9 - Mar 8) | $20.00 |
| Device payment 5 of 30 ($1,099.99/30mo) | $36.66 |
| $916.50 remaining after this month (Agreement 2002647371) | |

| Add-ons | $9.99 |
|---|---|
| Verizon Smart Family Premium - (Feb 9 - Mar 8) | $9.99 |

| Surcharges | $2.63 |
|---|---|
| Fed Universal Service Charge | $0.52 |
| Regulatory Charge | $0.16 |
| Administrative Charge | $1.95 |

| Taxes and gov fees | $0.58 |
|---|---|
| CA State 911 Surcharge | $0.30 |
| CA Teleconnect Fund Surchg | $0.02 |
| CA State High Cost Fund (A) | $0.02 |
| Lifeline Surcharge - CA | $0.15 |
| CA Advanced Srvcs Fund (CASF) | $0.03 |
| CA State PUC Fee | $0.02 |
| CA Relay Srvc/Comm Device Fund | $0.04 |

## Sarah Morell
916-805-3156
GOOGLE PIXEL 3A
Cancelled

**-$2.60**

| One-time charges and credits | -$2.58 |
|---|---|
| Smartphone line access - partial-month refund (Feb 5 - Feb 8) | -$2.58 |

| Surcharges | -$0.01 |
|---|---|
| Fed Universal Service Charge | -$0.01 |

| Taxes and gov fees | -$0.01 |
|---|---|

4

**verizon**✓     Billing period Jan 9, 2022 to Feb 8, 2022 | **Account #** 471831075-00001 | **Invoice #** 9461311464

| Lifeline Surcharge - CA | -$0.01 |
|---|---|

## Sarah Morell                                                      $23.21

916-805-6149
IPHONE 12 MINI

| **Monthly charges and credits** | **$20.00** |
|---|---|
| Smartphone Line Access (Feb 9 - Mar 8) | $20.00 |
| Device payment 9 of 24 ($699.99/24mo) | $29.16 |
| $437.40 remaining after this month (Agreement 1999409307) | |
| Device Promotional Credit 9 of 24 | -$29.16 |

| **Surcharges** | **$2.63** |
|---|---|
| Fed Universal Service Charge | $0.52 |
| Regulatory Charge | $0.16 |
| Administrative Charge | $1.95 |

| **Taxes and gov fees** | **$0.58** |
|---|---|
| CA State 911 Surcharge | $0.30 |
| CA Teleconnect Fund Surchg | $0.02 |
| CA State High Cost Fund (A) | $0.02 |
| Lifeline Surcharge - CA | $0.15 |
| CA Advanced Srvcs Fund (CASF) | $0.03 |
| CA State PUC Fee | $0.02 |
| CA Relay Srvc/Comm Device Fund | $0.04 |

## Sarah Morell                                                      $23.21

916-836-6049
IPHONE SE 2020

| **Monthly charges and credits** | **$20.00** |
|---|---|
| Smartphone Line Access (Feb 9 - Mar 8) | $20.00 |
| Device payment 11 of 24 ($399.99/24mo) | $16.66 |
| $216.58 remaining after this month (Agreement 1998024384) | |
| Device Promotional Credit 11 of 24 | -$16.66 |

| **Surcharges** | **$2.63** |
|---|---|

**verizon**  Billing period Jan 9, 2022 to Feb 8, 2022 | Account # 471831075-00001 | Invoice # 9461311464

| | |
|---|---|
| Fed Universal Service Charge | $0.52 |
| Regulatory Charge | $0.16 |
| Administrative Charge | $1.95 |

| **Taxes and gov fees** | **$0.58** |
|---|---|
| CA State 911 Surcharge | $0.30 |
| CA Teleconnect Fund Surchg | $0.02 |
| CA State High Cost Fund (A) | $0.02 |
| Lifeline Surcharge - CA | $0.15 |
| CA Advanced Srvcs Fund (CASF) | $0.03 |
| CA State PUC Fee | $0.02 |
| CA Relay Srvc/Comm Device Fund | $0.04 |

| **Your bill this month** | **$473.11** |
|---|---|

**verizon√**  Billing period Jan 9, 2022 to Feb 8, 2022 | Account # 471831075-00001 | Invoice # 946131146²

# Sarah Morell
**916.599.5086**
**iPhone 13 Pro**

## Talk activity

| Date | Time | Number | Origination | Destination | Min. | Airtime Charges | LD/Other Charges | Total |
|------|------|--------|-------------|-------------|------|-----------------|------------------|-------|
| Jan 9 | 11:33 AM | 202.499.3650 | Folsom, CA | Incoming, CL | 7 | -- | -- | -- |
| Jan 9 | 6:14 PM | 202.499.3650 | Folsom, CA | Incoming, CL | 12 | -- | -- | -- |
| Jan 10 | 7:49 AM | 916.258.2751 | Folsom, CA | Incoming, CL | 1 | -- | -- | -- |
| Jan 10 | 8:04 AM | 916.667.0600 | Folsom, CA | Elk Grove, CA | 3 | -- | -- | -- |
| Jan 10 | 8:20 AM | 916.534.1599 | Folsom, CA | Incoming, CL | 7 | -- | -- | -- |
| Jan 10 | 8:38 AM | 916.294.9135 | Folsom, CA | Folsom, CA | 6 | -- | -- | -- |
| Jan 10 | 11:15 AM | 202.499.3650 | Folsom, CA | Incoming, CL | 16 | -- | -- | -- |
| Jan 10 | 12:02 PM | 916.667.0600 | Folsom, CA | Incoming, CL | 2 | -- | -- | -- |
| Jan 10 | 4:56 PM | 202.499.3650 | Folsom, CA | Incoming, CL | 3 | -- | -- | -- |
| Jan 11 | 10:14 AM | 916.294.9135 | Folsom, CA | Folsom, CA | 7 | -- | -- | -- |
| Jan 11 | 10:32 AM | 202.499.3650 | Folsom, CA | Incoming, CL | 7 | -- | -- | -- |
| Jan 11 | 5:29 PM | 202.499.3650 | Folsom, CA | Incoming, CL | 3 | -- | -- | -- |
| Jan 12 | 11:23 AM | 202.499.3650 | Folsom, CA | Incoming, CL | 3 | -- | -- | -- |
| Jan 12 | 1:04 PM | 916.983.5862 | Folsom, CA | Folsom, CA | 4 | -- | -- | -- |
| Jan 12 | 1:17 PM | 202.499.3650 | Folsom, CA | Incoming, CL | 3 | -- | -- | -- |
| Jan 12 | 4:04 PM | 916.983.5862 | Folsom, CA | Folsom, CA | 2 | -- | -- | -- |
| Jan 13 | 11:51 AM | 916.836.6049 | Folsom, CA | Incoming, CL | 3 | -- | -- | -- |
| Jan 13 | 12:02 PM | 916.836.6049 | Folsom, CA | Incoming, CL | 1 | -- | -- | -- |
| Jan 13 | 12:49 PM | 866.858.2493 | Folsom, CA | Toll-Free, CL | 9 | -- | -- | -- |
| Jan 13 | 2:10 PM | 202.499.3650 | Folsom, CA | Incoming, CL | 7 | -- | -- | -- |
| Jan 13 | 2:31 PM | 916.294.9135 | Folsom, CA | Incoming, CL | 3 | -- | -- | -- |
| Jan 14 | 3:35 PM | 866.858.2493 | Folsom, CA | Toll-Free, CL | 1 | -- | -- | -- |
| Jan 14 | 3:36 PM | 866.858.2493 | Folsom, CA | Toll-Free, CL | 10 | -- | -- | -- |
| Jan 14 | 3:54 PM | 866.858.2493 | Folsom, CA | Toll-Free, CL | 13 | -- | -- | -- |
| Jan 14 | 4:52 PM | 916.836.6049 | Folsom, CA | Incoming, CL | 3 | -- | -- | -- |
| Jan 16 | 7:28 PM | 916.836.6049 | Folsom, CA | Incoming, CL | 1 | -- | -- | -- |
| Jan 16 | 9:07 PM | 916.836.6049 | Folsom, CA | Incoming, CL | 1 | -- | -- | -- |
| Jan 17 | 1:26 PM | 202.499.3650 | Folsom, CA | Incoming, CL | 9 | -- | -- | -- |
| Jan 17 | 3:43 PM | 916.723.3088 | Folsom, CA | Incoming, CL | 2 | -- | -- | -- |
| Jan 17 | 4:28 PM | 916.836.6049 | Folsom, CA | Incoming, CL | 1 | -- | -- | -- |
| Jan 17 | 6:17 PM | 916.836.6049 | Folsom, CA | Incoming, CL | 2 | -- | -- | -- |
| Jan 17 | 7:33 PM | 202.499.3650 | Folsom, CA | Incoming, CL | 12 | -- | -- | -- |
| Jan 18 | 9:17 AM | 916.294.9135 | Folsom, CA | Folsom, CA | 5 | -- | -- | -- |
| Jan 18 | 11:40 AM | 209.662.3795 | Folsom, CA | Incoming, CL | 1 | -- | -- | -- |
| Jan 18 | 12:04 PM | 209.662.3795 | Folsom, CA | Incoming, CL | 1 | -- | -- | -- |
| Jan 18 | 12:10 PM | 202.499.3650 | Folsom, CA | Incoming, CL | 6 | -- | -- | -- |
| Jan 18 | 12:22 PM | 209.662.3795 | Folsom, CA | Incoming, CL | 1 | -- | -- | -- |
| Jan 18 | 12:40 PM | 209.662.3795 | Folsom, CA | Incoming, CL | 2 | -- | -- | -- |
| Jan 19 | 12:10 PM | 202.499.3650 | Folsom, CA | Incoming, CL | 8 | -- | -- | -- |
| Jan 19 | 5:00 PM | 916.836.6049 | Folsom, CA | Incoming, CL | 1 | -- | -- | -- |
| Jan 20 | 2:19 PM | 202.499.3650 | Folsom, CA | Incoming, CL | 3 | -- | -- | -- |
| Jan 21 | 2:42 PM | 916.836.6049 | Folsom, CA | Folsom, CA | 1 | -- | -- | -- |
| Jan 21 | 2:51 PM | 916.836.6049 | Folsom, CA | Incoming, CL | 1 | -- | -- | -- |
| Jan 22 | 10:31 AM | 503.843.4442 | Folsom, CA | Sheridan, OR | 3 | -- | -- | -- |

7

**verizon**√    **Billing period** Jan 9, 2022 to Feb 8, 2022 | **Account #** 471831075-00001 | **Invoice #** 946131146-

# Sarah Morell
## 916.599.5086
**iPhone 13 Pro**

## Talk activity (cont.)

| Date | Time | Number | Origination | Destination | Min. | Airtime Charges | LD/Other Charges | Total |
|------|------|--------|-------------|-------------|------|-----------------|------------------|-------|
| Jan 22 | 10:35 AM | 800.464.4000 | Folsom, CA | Toll-Free, CL | 13 | -- | -- | -- |
| Jan 22 | 12:50 PM | 800.284.3233 | Folsom, CA | Toll-Free, CL | 1 | -- | -- | -- |
| Jan 22 | 2:06 PM | 916.836.6049 | Folsom, CA | Incoming, CL | 2 | -- | -- | -- |
| Jan 22 | 2:20 PM | 916.836.6049 | Folsom, CA | Incoming, CL | 1 | -- | -- | -- |
| Jan 22 | 4:14 PM | 800.777.0133 | Folsom, CA | Toll-Free, CL | 1 | -- | -- | -- |
| Jan 22 | 9:06 PM | 916.836.6049 | Folsom, CA | Folsom, CA | 1 | -- | -- | -- |
| Jan 23 | 10:23 AM | 916.292.9596 | Folsom, CA | Folsom, CA | 1 | -- | -- | -- |
| Jan 23 | 10:29 AM | 916.983.9966 | Folsom, CA | Folsom, CA | 2 | -- | -- | -- |
| Jan 23 | 2:34 PM | 916.836.6049 | Folsom, CA | Incoming, CL | 2 | -- | -- | -- |
| Jan 23 | 2:42 PM | 916.836.6049 | Folsom, CA | Incoming, CL | 1 | -- | -- | -- |
| Jan 24 | 9:15 AM | 916.817.5200 | Lincoln, CA | Incoming, CL | 1 | -- | -- | -- |
| Jan 24 | 9:17 AM | 916.817.5200 | Lincoln, CA | Incoming, CL | 1 | -- | -- | -- |
| Jan 24 | 12:09 PM | 916.408.0447 | Lincoln, CA | Lincoln, CA | 2 | -- | -- | -- |
| Jan 24 | 2:53 PM | 916.836.6049 | Lincoln, CA | Incoming, CL | 2 | -- | -- | -- |
| Jan 25 | 12:04 PM | 202.499.3650 | Lincoln, CA | Incoming. CL | 7 | -- | -- | -- |
| Jan 25 | 12:55 PM | 209.662.3795 | Lincoln, CA | Incoming, CL | 1 | -- | -- | -- |
| Jan 25 | 1:22 PM | 209.662.3795 | Lincoln, CA | Incoming, CL | 1 | -- | -- | -- |
| Jan 26 | 7:46 AM | 800.284.3233 | Folsom, CA | Toll-Free, CL | 9 | -- | -- | -- |
| Jan 26 | 5:27 PM | 916.836.6049 | Granite BA, CA | Incoming, CL | 1 | -- | -- | -- |
| Jan 27 | 11:07 AM | 916.243.0986 | Lincoln, CA | Incoming, CL | 3 | -- | -- | -- |
| Jan 27 | 11:58 AM | 916.408.0447 | Lincoln, CA | Lincoln, CA | 2 | -- | -- | -- |
| Jan 27 | 3:28 PM | 916.516.2904 | Lincoln, CA | Incoming, CL | 1 | -- | -- | -- |
| Jan 27 | 3:34 PM | 916.836.6049 | Lincoln, CA | Incoming, CL | 3 | -- | -- | -- |
| Jan 27 | 3:37 PM | 916.836.6049 | Lincoln, CA | Incoming, CL | 1 | -- | -- | -- |
| Jan 28 | 3:35 PM | 916.836.6049 | Lincoln, CA | Incoming, CL | 5 | -- | -- | -- |
| Jan 28 | 5:01 PM | 916.220.4315 | Lincoln, CA | Folsom, CA | 2 | -- | -- | -- |
| Jan 28 | 5:40 PM | 916.836.6049 | Citrus Hei, CA | Folsom, CA | 1 | -- | -- | -- |
| Jan 28 | 9:35 PM | 916.836.6049 | Roseville, CA | Incoming, CL | 2 | -- | -- | -- |
| Jan 29 | 9:00 AM | 503.843.4442 | Folsom, CA | Sheridan, OR | 7 | -- | -- | -- |
| Jan 29 | 4:19 PM | 530.470.3748 | Folsom, CA | Nevadacity, CA | 1 | -- | -- | -- |
| Jan 29 | 4:31 PM | 530.470.3748 | Folsom, CA | Incoming, CL | 12 | -- | -- | -- |
| Jan 30 | 2:03 PM | 916.836.6049 | Folsom, CA | Incoming, CL | 1 | -- | -- | -- |
| Jan 30 | 8:24 PM | 916.836.6049 | Folsom, CA | Incoming, CL | 2 | -- | -- | -- |
| Jan 31 | 5:26 PM | 916.836.6049 | Granite BA, CA | Incoming, CL | 5 | -- | -- | -- |
| Feb 1 | 3:03 PM | 916.836.6049 | Lincoln, CA | Incoming, CL | 3 | -- | -- | -- |
| Feb 1 | 5:23 PM | 916.836.6049 | Granite BA, CA | Incoming, CL | 1 | -- | -- | -- |
| Feb 1 | 5:31 PM | 916.836.6049 | Orangevale, CA | Incoming, CL | 2 | -- | -- | -- |
| Feb 1 | 6:33 PM | 916.836.6049 | Folsom, CA | Incoming, CL | 2 | -- | -- | -- |
| Feb 2 | 2:41 PM | 916.836.6049 | Lincoln, CA | Incoming, CL | 4 | -- | -- | -- |
| Feb 2 | 5:20 PM | 916.836.6049 | Loomis, CA | Incoming, CL | 7 | -- | -- | -- |

8

**verizon**√    Billing period Jan 9, 2022 to Feb 8, 2022 | Account # 471831075-00001 | Invoice # 9461311464

# Sarah Morell

**916.599.5086**
**iPhone 13 Pro**

## Talk activity (cont.)

| Date | Time | Number | Origination | Destination | Min. | Airtime Charges | LD/Other Charges | Total |
|------|------|--------|-------------|-------------|------|-----------------|------------------|-------|
| Feb 3 | 10:52 AM | 916.985.3576 | Lincoln, CA | Incoming, CL | 1 | -- | -- | -- |
| Feb 3 | 4:08 PM | 916.836.6049 | Lincoln, CA | Incoming, CL | 2 | -- | -- | -- |
| Feb 3 | 4:31 PM | 916.836.6049 | Lincoln, CA | Incoming, CL | 1 | -- | -- | -- |
| Feb 4 | 10:27 AM | 916.457.7710 | Lincoln, CA | Sacramento, CA | 1 | -- | -- | -- |
| Feb 4 | 10:30 AM | 916.457.7710 | Lincoln, CA | Sacramento, CA | 2 | -- | -- | -- |
| Feb 4 | 10:36 AM | 916.457.7710 | Lincoln, CA | Incoming, CL | 7 | -- | -- | -- |
| Feb 4 | 3:29 PM | 916.836.6049 | Lincoln, CA | Incoming, CL | 1 | -- | -- | -- |
| Feb 4 | 10:20 PM | 916.836.6049 | Folsom, CA | Folsom, CA | 1 | -- | -- | -- |
| Feb 5 | 12:21 PM | 707.515.8619 | Folsom, CA | Incoming, CL | 6 | -- | -- | -- |
| Feb 5 | 7:12 PM | 916.836.6049 | Beale Afb, CA | Incoming, CL | 1 | -- | -- | -- |
| Feb 7 | 2:57 PM | 916.836.6049 | Lincoln, CA | Folsom, CA | 2 | -- | -- | -- |
| Feb 7 | 2:57 PM | 916.836.6049 | Lincoln, CA | Incoming, CL | 2 | -- | -- | -- |
| Feb 7 | 9:51 PM | 916.212.5325 | Folsom, CA | Sacramento, CA | 26 | -- | -- | -- |
| Feb 8 | 4:11 PM | 916.836.6049 | Loomis, CA | Incoming, CL | 2 | -- | -- | -- |

# Sarah Morell

**916.805.6149**
**IPHONE 12 MINI**

## Talk activity

| Date | Time | Number | Origination | Destination | Min. | Airtime Charges | LD/Other Charges | Total |
|------|------|--------|-------------|-------------|------|-----------------|------------------|-------|
| Jan 9 | 12:03 PM | 530.306.3304 | Folsom, CA | Incoming, CL | 2 | -- | -- | -- |

9

# EXHIBIT 16

BP-A0308
JAN 17

## ADMINISTRATIVE DETENTION ORDER

**U.S. DEPARTMENT OF JUSTICE
FEDERAL BUREAU OF PRISONS**

SHERIDAN FCI
Institution

Date/Time: 01-25-2022 15:27

TO:  Special Housing Unit Officer

FROM: CERONE, LIEUTENANT _____ , (Name/Title)

SUBJECT : Placement of _____ BLUFORD, DEREK _____ , Reg. No. ___ 77108-097 ___ , in Administrative Detention

_____(a)  Is pending an investigation for a violation of Bureau regulations;

__✓___(b)  Is pending an SIS investigation.

_____(c)  Is pending investigation or trial for a criminal act;

_____(d)  Is to be admitted to Administrative Detention

_____(1)  Since the inmate has requested admission for protection;

I hereby request placement in Administrative Detention for my own protection.

Inmate Signature/Register No.: _____

Staff Witness Printed Name Signature: _____

_____(2)  Since a serious threat exists to individual's safety as perceived by staff, although person has not requested admission; referral of the necessary information will be forwarded for an appropriate hearing by the SRO.

_____(e)  Is pending transfer or is in holdover status during transfer.

_____(f)  Is pending classification; or

_____(g)  Is terminating confinement in Disciplinary Segregation and has been ordered into Administrative Detention by the Warden's designee.

It is this Correctional Supervisor's decision based on all the circumstances that the above named inmate's continued presence in the general population poses a serious threat to life, property, self, staff, other inmates, or to the security or orderly running of the institution because*
_____
THREAT ASSESSMENT
_____

Therefore, the above named inmate is to be placed in Administrative Detention until further notice. The inmate received a copy of this Order on

(date / time) _____

Staff Witness Signature/Printed Name_____ Date _____

Supervisor 24 hour review of placement: Signature/Printed name_____

* In the case of DHO action, reference to that order is sufficient. In other cases, the Correctional supervisor will make an independent review and decision, which is documented here.

Record Copy - Inmate Concerned (not necessary if placement is a result of holdover status); Copy - Captain; Copy - Unit Manager; Copy - Operation Supervisor - Administrative Detention Unit; Copy – Psychology; Copy - Central File

PDF                              Prescribed by P5270          (Replaces BP-A0308 of JAN 88.)

# EXHIBIT 17

4 SH - INTAKE 4

BP-A0383
AUG 11

**INMATE PERSONAL PROPERTY RECORD** CDFRM

**U.S. DEPARTMENT OF JUSTICE**                                    **FEDERAL BUREAU OF PRISON**

| Institution: FCI Sheridan | 1. Name: Bluford | |
|---|---|---|
| 2. Register No. 77108-097 | 3. Unit: 2B | 4. Date & Time of Inventory: 1/25/2022  4 PM |

5. Purpose of Inventory (Check one that applies): Date and Time of Action: _____

a. ___ Admission    b. ___ Hospital    c. ___ Writ    d. ___ Transfer    e. X Detention

f. ___ Release    g. ___ Incoming Package    h. ___ Other (specify) _____

6. Disposition (Disp.)
D-Donated    M-Mail    S-Storage
K-Keep in Possession
C-Contraband (Attach BP-S102)

7. Type of Property:

a. Personally Owned Items

| Article | Disp. | Article | Disp | Article | Disp. | Article | Disp |
|---|---|---|---|---|---|---|---|
| Address Book | | Plastic spoon, cup | | **b Hygiene, etc** | | **d. Food** | |
| Batteries | | Playing Cards | | Aspirin | | Bean | |
| Belt | | Purse | | Body Soap | | Cake | |
| Billfold | | Radio (w/earplug) | | Cotton Swabs | | Candy | |
| Books, Reading | | Religious Medal | | Deodorant | | Chips | |
| hard ___ soft ___ | | Shirt/Blouse | | Dental Floss | | Coffeemate | |
| Books, Religious | S | Shoes | 1 | Dentures Power | | Cold drink mix, soda | |
| hard ___ Soft 2 | | Shoes, shower | | Hair Oil | | Cough Drops | |
| Boot | | Shoes, Slippers | | Petroleum Jelly | | Fish Packs | |
| Brassiere | | Shorts | 1 | Menthol Rub | | Fruit | |
| Cap, Hat | | Skirt | | Razor | | Honey, Hi-protein | |
| Coat | | Slip | | Shampoo | | Instant Coffee/Instant Chocolate | |
| Comb | | Socks | 1 | Shaving Lotion | | Mayonnaise | |
| Combination Lock | | Socks, Athletic | | Skin Lotion | | Oatmeal | |
| Dress | | Stamps | | Soap Dish | | Pepperoni | |
| Eyeglass Case | | Stockings | | Toothbrush | | Noodles | |
| Eyeglasses | | Sunglasses | | Toothbrush Holder | | Rice | |
| Gloves | | Sweat pants | | Toothpaste | | Sausage | |
| Hairbrush/Pick | | T-Shirt | | Tweezers | | Spices | |
| Handkerchief | | Sweat Shirt | | | | Tea | |
| Headphones | | Thermal Bottoms | | | | Vitamins | |
| Laundry Jacket | | Thermal Top | | | | | |
| Laundry Detergent | | Underwear | | **c. Hobby craft** | | | |
| Legal Materials | | Watch/Watchband | 1 | | | | |
| Letters | | | | # Article | Disp. | **e. Miscellaneous (List any damaged** | |
| Magazines | | | | | | property and from where it was received, | |
| Mirror | | | | | | e.g. U.S. Marshal) | |
| Nail Clippers | | | | | | | |
| Pen/Ballpoint | | | | | | | |
| Pencils | | | | | | | |
| Personal Papers | | | | | | | |
| Photo Album | | | | | | | |
| Photo | | | | | | | |
| Plastic Bowl Plastic Spoon, cup | | | | | | | |

8. Items Alleged by Inmate to Have Value Over $100.00

Description of Property                                                    Value Alleged by Inmate

No individual item over $100.00

9. Article(s) listed as "Mail" (M) Are to be forwarded to (Name and Address of Consignee):

10. Claim Release: a. The receiving officer, as soon after receipt of the property as possible, will review the inventory with the inmate to verify it's accuracy. Property that is stored, kept in possession of the inmate, mailed out of the institution, or donated is to be marked in the appropriate section of this inventory form. The receiving officer certifies receipt, review and disposition of the property by signing below. The inmate by signing below certifies the accuracy of the inventory, except as noted on the form, relinquishing of all claim to articles listed as donated, receipt of all allow able items, and receipt of a copy of the inventory. When the inmate claims a discrepancy in the inventory, the receiving officer shall attempt to resolve the discrepancy. If the inmate states that there is missing or damaged property, this information should be noted under COMMENTS.

COMMENTS:

Printed Name/Signature of Receiving Officer: E. Vanclave    Date: 1/25/22    Time: 4:00PM

I have today reviewed the property returned to me.
Signature of Inmate ___    Register # 77108-097    Date 1/25/22    Time 4:30PM

# EXHIBIT 18



 Gmail

**Sarah Bluford <sarahmbluford@gmail.com>**

## You sent $200.00 to AARON
1 message

**Bank of America** <onlinebanking@ealerts.bankofamerica.com>
Reply-To: Bank of America <reply-fe8d1773706d067872-29_HTML-405549258-73720-12920299@ealerts.bankofamerica.com>
To: sarahmbluford@gmail.com

Tue, Jan 18, 2022 at 9:54 AM

BANK OF AMERICA



# You sent $200.00 to AARON

## sent from account ending in 5200 to 443.929.6106

Confirmation: glfrv1roz

If you didn't make this transaction, please contact us

## BANK OF AMERICA | Zelle

*Zelle* and the *Zelle* related marks are wholly owned by Early Warning Services, LLC, and are used herein under license. Bank of America and the Bank of America logo are registered trademarks of Bank of America Corporation

We'll never ask for your personal information such as SSN or ATM PIN in email messages. If you get an email that looks suspicious or you are not the intended recipient of this email, don't click on any links. Instead, forward to abuse@bankofamerica.com then delete it.

Please don't reply to this automatically generated service email.

Privacy Notice          Equal Housing Lender 🏠

Bank of America, N.A. Member FDIC

© 2022 Bank of America Corporation

# EXHIBIT 19



| BP-A0288 | **INCIDENT REPORT** |
|---|---|

Dept. of Justice / Federal Bureau of Prisons

### Part I - Incident Report

| 1. Institution: **SHERIDAN FCI** | | Incident Report Number: **3631930** | |
|---|---|---|---|
| 2. Inmate's Name<br>**BLUFORD, DEREK** | 3. Register Number<br>**77108-097** | 4. Date of Incident<br>**04-11-2022** | 5. Time<br>**1100 hrs** |
| 6. Place of Incident<br>**Special Housing Unit FCI Sheridan** | 7. Assignment<br>**SHU UNASSG** | 8. Unit<br>**UNIT 2** | |
| 9. Incident<br>**313 -- LYING OR FALSIFYING STATEMENT.** | | 10. Prohibited Act Code(s)<br>**313** | |

11. Description Of Incident
(Date: **05-21-2022**    Time:  **0730 hrs**    staff became aware of incident)

On May 21, 2022, I became aware SIS Case SHE-22-0073 closed. During the course of the investigation Inmate Bluford Derek Reg. No. 77108-097, made false statements and allegations to me. During the investigation no evidence could be found to support any of inmate Bluford s allegations of being assaulted, or extorted. Evidence found shows that inmate Bluford s allegations are fictitious. Inmate Bluford s written statement alleges that he was assaulted by inmate Carter and he was being extorted by inmates Lillard, Carter, and Wells. Inmate Bluford s written statement also alleges that he was forced to send money to Aaron Mitchel, and that he spoke to a Lieutenant Turner at the metal shack. All of the allegations were proven to be false. TRUVIEW money sent report shows inmate Bluford has sent no money to Arron Mitchel or any inmate personal contacts housed in the Federal Bureau of Prisons. The statement that he (inmate Bluford) talked to Lieutenant Turner is false due to the fact there are no Lieutenants at FCI Sheridan by the name of Turner. Inmate Bluford stated during an interview that he cooperated in his case. A review of inmate Bluford s PSI found that inmate Bluford did not cooperate and he provided that FBI with fabricated evidence, which included text messages, and audio recordings, in an attempt to influence the investigation.

| 12. Typed Name/Signature of Reporting Employee<br>**David Prock Jr.** | | 13. Date And Time<br>**05-21-2022 0740 hrs** | |
|---|---|---|---|
| 14. Incident Report Delivered to Above Inmate By<br>(Type Name/Signature) | | 15. Date Report<br>Delivered<br>5-21-22 | 16. Time Report<br>Delivered<br>1310 |

The Government Paperwork Elimination Act (GPEA) of 1998 authorized Federal Agencies the use of electronic forms, electronic filing, and electronic signatures to conduct office business.

Prescribed by P5270                                Replaces BP-S288.052

# EXHIBIT 20

BP-A0148
JUNE 10

**U.S. DEPARTMENT OF**

INMATE REQUEST TO STAFF  CDFRM

**FEDERAL BUREAU OF PRISONS**

| TO: (Name and Title of Staff Member) Lt. Cerone | DATE: 6-14-2022 |
|---|---|
| FROM: Derek Biuford | REGISTER NO. : 77108-097 |
| WORK ASSIGNMENT: n/a | UNIT: SHU-308 |

SUBJECT: (Briefly state your question or concern and the solution you are requesting. Continue on back, if necessary. Your failure to be specific may result in no action being taken. If necessary, you will be interviewed in order to successfully respond to your request.

Lt. Cerone;

   I went to your office on 1-25-2022 after receiving an extortion letter from an inmate. I gave/turned it over and was immediately sent to the SHU. Do you remember the letter? Lt. Prosh says that I didn't have or bring a letter to you or Correctional Counselor A. Bodriguez that day before going to the SHU.

(Do not write below this line)

DISPOSITION:

BLUFORD,

YES I DO RECALL YOU COMING TO THE LT.'S OFFICE WITH A LETTER/DOCUMENTS, BUT UNFORTUNATELY I DON'T RECALL THE EXACT CONTEXT OF WHAT WAS WRITTEN.
— LT. CERONE

| Signature Staff Member LT. CERONE | Date 6-16-2022 |
|---|---|

Record Copy - File; Copy - Inmate

PDF                                     Prescribed by P5511

This form replaces BP-148.070 dated Oct 86 and BP-3148.070 APR 94

FILE IN SECTION 6 UNLESS APPROPRIATE FOR PRIVACY FOLDER

**SECTION 6**

# EXHIBIT 21

BP-A0148
JUNE 10

**INMATE REQUEST TO STAFF** CDFRM

**U.S. DEPARTMENT OF JUSTICE**                    **FEDERAL BUREAU OF PRISONS**

| TO:(Name and Title of Staff Member) | DATE: |
|---|---|
| ~~Derek Bluford~~ Lt. Taylor | 8-6-2022 |
| FROM: Derek Bluford | REGISTER NO.: 77108-097 |
| WORK ASSIGNMENT: n/a | UNIT: SHU-308 |

SUBJECT: (Briefly state your question or concern and the solution you are requesting.
Continue on back, if necessary.  Your failure to be specific may result in no action being
taken.  If necessary, you will be interviewed in order to successfully respond to your
request.

Lt. Taylor,

Can you confirm that you called me to the lieutenants office in January around/between Jan 20-25th 2022] after getting a call. My wife was worried about me being extorted and the stress it was causing me. Do you remember this?

(Do not write below this line)

DISPOSITION:

Yes, / Lietenant K. Taylor did call inmate Bluford up to the Lietenants office sometime during those dates to discuss his mental welfare after his wife called in several times as she was worried about him.

K. Taylor (Lietenant)

| Signature Staff Member | Date |
|---|---|
| | |

Record Copy – File; Copy – Inmate

PDF                              Prescribed by P5511

This form replaces BP-148.070 dated Oct 86
and BP-S148.070 APR 94

FILE IN SECTION 6 UNLESS APPROPRIATE FOR Privacy Folder          **SECTION 6**

# EXHIBIT 22

| FD-1040a | FEDERAL BUREAU OF INVESTIGATION |
|---|---|
| | SOURCE OPENING COMMUNICATION |

**Name**                                    **Relationship**

*No data provided.*

**If a Federal Prosecuting Office (FPO) is participating in the conduct of the investigation     Yes
utilizing the CHS, has the FPO attorney been notified?**

**FPO Attorney:**           AUSA ▮▮▮▮▮▮

**Date:**                   04/11/2019

**Do you intend to use electronic communication with the CHS (email, text, VOIP, etc)     Yes
domestically?**

*Use of electronic communication is discouraged because these methods are easily intercepted and can compromise
the CHS.*

*Use of social networking sites (including but not limited to Facebook, LinkedIn, and Twitter) for communication with
the CHS is PROHIBITED.*

---

### IDENTIFYING DATA

**CHS Name:**              Bluford, Derek
**Date of Birth:**         ▮▮▮▮ 1987
**CHS Age:**               32

**Identifying Numbers**

**Identifying Number Type      Number**

Social Security Number        ▮▮▮▮▮▮▮

**Alias Information**

**Alias Name**
*No data provided.*

**Alias Date of Birth**
*No data provided.*

**Alias Social Security Number**
*No data provided.*

**Place of Birth:**        Fairfield California UNITED STATES
**Citizenship Country:**

**Residence(s)**

| From | To | Address |
|---|---|---|
| | Present | ▮▮▮▮▮▮ |
| | | Folsom, California ▮▮▮▮ UNITED STATES |

**Personal Contact Number(s)**

| FD-1040a | Page 2 of 6 | FEDERAL BUREAU OF INVESTIGATION |
|---|---|---|

**UNCLASSIFIED**

| FD-1040a | **FEDERAL BUREAU OF INVESTIGATION** |
|---|---|
|  | SOURCE OPENING COMMUNICATION |

| **Phone Number** | **Number** | **Phone Type** |
|---|---|---|
| Domestic | ████████ | Cell |

**Email Address**

*No data provided.*

**Occupation(s)**

| **Employer** | **Address** | **Phone Number** | **Employment Date** |
|---|---|---|---|
| WeWorks | ████████ | | 05/01/2019 to Present |
| | Berkeley , California UNITED STATES | | |

**Job Title:** Community Manager

**Nature of job, if known:**

Government App Solutions                                                        to

**Job Title:** Director of Business Development

**Nature of job, if known:**

**Characteristics**

**Sex:** Male

**Height:** (Feet) (Inches)

**Weight (lbs):**

**Hair Color:**                                                **Eye Color:**

**Race:**

**Identifying Marks (scars, marks, and tattoos):**

**Is a photograph maintained in the file?**                                        Yes

---

**ACCESS/MOTIVATION**

**How does the CHS have access to the information?**
CHS has direct access to the target of the investigation.

**Identify and explain all likely motivations (revenge, monetary compensation, patriotism/ideology, immigration benefits, etc.) for providing information, including whether the CHS has a plea agreement with, or is seeking consideration from, any prosecutor's office. List any benefits, and their terms, given a CHS by the FPO or any other law enforcement agency (if known after exercising reasonable efforts).**
CHS was indicted in 2018 as the result of a fraud investigation by IRS. CHS is cooperating to received a reduced sentence.

---

**REPORTING AND INTELLIGENCE PROGRAMS**

**Primary Reporting Program**

| FD-1040a | Page 3 of 6 | FEDERAL BUREAU OF INVESTIGATION |
|---|---|---|

**UNCLASSIFIED**

| FD-1040a | FEDERAL BUREAU OF INVESTIGATION |
|---|---|
| | SOURCE OPENING COMMUNICATION |

| Case Classification | HQ Division | Program | Subprogram |
|---|---|---|---|
| ███████████ | Criminal Investigative Division | ███████████ | ███████████ |

**Secondary Reporting Program**

| Case Classification | HQ Division | Program | Subprogram |
|---|---|---|---|

*No data provided.*

**Substantive Case File Number**

███████████

---

## CHS ASSESSMENT

| | |
|---|---|
| **Does the CHS have a criminal history?** | Yes |

> **Provide brief summary of criminal history:**
>
> CHS criminal history is attached. CHS has multiple arrest convictions including  ███████████

*Results of record checks: Record checks (NCIC, ELSUR, Sentinel, and confidential indices) must be completed.*

*Positive record checks: If the individual is wanted for outstanding criminal charges, see fugitive related questions below.*

| | |
|---|---|
| **Is the CHS reasonably believed to be the subject or target of a pending criminal investigation?** | Yes |

> **DOJ's CHSC or the Assigned FPO Attorney's Name:** AUSA ███████████
>
> **Date Notified:** 04/11/2019

| | |
|---|---|
| **Is the investigation being conducted by the FBI?** | No |

> **Who is conducting the investigation?**
>
> Internal Revenue Services

| | |
|---|---|
| **Was the CHS the subject of a previous FBI investigation?** | No |
| **Has the CHS previously testified?** | No |
| **Is the CHS expected to testify?** | Yes |

> **Provide details:**
>
> CHS is cooperating and willing to testify.

| | |
|---|---|
| **Is the CHS a federal probationer, parolee, or supervised releasee?** | No |

> **Will the conditions of probation, parole, or supervised releasee be violated?**
>
> **If an FPO is participating in the investigation utilizing the CHS, has the FPO attorney been notified?**

| | |
|---|---|
| **Is the CHS a federal prisoner (to include being in the custody of the USMS or the BOP, or is under BOP supervision, BOP detention, BOP halfway house, or BOP electronic monitoring)?** | No |
| **Is the CHS a state or local prisoner, probationer, parolee, or supervised releasee?** | No |

---

| FD-1040a | Page 4 of 6 | FEDERAL BUREAU OF INVESTIGATION |
|---|---|---|

**UNCLASSIFIED**

| FD-1040a | **FEDERAL BUREAU OF INVESTIGATION** |
|---|---|
| | SOURCE OPENING COMMUNICATION |

| | |
|---|---|
| Is the CHS a fugitive or does the CHS have an outstanding warrant? | No |
| Has the CHS been the subject of foreign legal proceedings (i.e. arrested, cited, or detained for any reason)? | No |
| Is the CHS an employee of the Federal Bureau of Prisons (BOP)? | No |
| Is the CHS an employee of the Department of Energy (DOE)? | No |
| Is the CHS an employee of the Department of Defense (DOD)? | No |
| Is the CHS a sworn law enforcement officer? | No |
| Is the CHS a minor? | No |
|     If the minor is not emancipated, has parental consent been obtained? | |
|     Document the justification for the use of this individual absent of parental consent: | |
|     Name of person residing with: | |
|     Relationship: | |
| Is the CHS going to establish, operate, own, control, or act as administrator of any Internet Communication Media? | No |
| Is the CHS a counselor, employee of, or patient in a substance abuse program? | No |
| Is the CHS an elected or appointed government official? | No |
| Is the CHS a military member to include uniformed active duty or active duty reserve member, or member of a state National Guard Unit, which has been activated into the Federal Service? | No |
|     Is the CHS a uniformed inactive duty military member? | No |
|     Is the CHS a civilian employee of a DOD entity? | No |
|     Will the CHS be reporting on matters related to their employment? | No |
| Is the CHS a former FBI employee? | No |
| Is the CHS the spouse/significant other of an FBI employee? | No |
| Is the CHS a part of the White House staff? | No |
| Is a Department of State (DOS) "No Foreign Policy Objection" (NFPO) authorization required for the CHS? | No |
| Is the CHS a current or former participant in the Witness Security Program (WSP) ? | No |
| Is the CHS an employee of a financial institution? | No |
| Is the CHS an employee of an educational institution? | No |
| Is this a National Source Recruitment-in-Place (NSRP) CHS? | |
| **Special Approval CHSs** | |
| Does the CHS report primarily on criminal matters, as opposed to International Terrorism and National Security matters? | Yes |
|     Does the CHS have FPO oversight? | Yes |
|     FPO Name:       AUSA ▮▮▮▮▮ | |
| Does the CHS fall into one of the following Special Approval categories: Senior Leadership, High-Level Union Officials, High-Level Government Officials, Attorneys, Physicians, Clergy, or Employees of the Media? | No |

**ADDITIONAL COMMENTS**

| FD-1040a | Page 5 of 6 | FEDERAL BUREAU OF INVESTIGATION |
|---|---|---|

**UNCLASSIFIED**

**UNCLASSIFIED**

| FD-1040a | **FEDERAL BUREAU OF INVESTIGATION**<br>SOURCE OPENING COMMUNICATION |
|----------|-------------------------------------------------------------------|

**SIGNATURE**

Submitted By                     Fri, 31 May 2019 13:30:07 -0700

First Level Approved By                              Fri, 31 May 2019 17:12:23 -0700

**UNCLASSIFIED**

# EXHIBIT 23

Lisa Hay, OSB #980628
Federal Public Defender
101 S.W. Main Street, Suite 1700
Portland, Oregon 97204
Tel:    (503) 326-2123
Fax:    (503) 326-5524
lisa_hay@fd.org

Attorney for Petitioner

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

| | |
|---|---|
| JOHN PHILIP STIRLING, | Case No. 3:20-cv-00712-SB |
| Petitioner, | PETITIONERS' STATUS REPORT OF OCTOBER 8, 2021 |
| v. | |
| DEWAYNE HENDRIX, Warden, FCI Sheridan, | |
| Respondent. | |

This status report is submitted to update the Court with the petitioners' view of conditions

witnessed during the court-ordered inspection of the Sheridan FCI, which occurred on Friday,

September 17, 2021. The report is supported by three Exhibits: Exhibit 1 – Report of FPD Chief

Investigator William Teesdale on Conditions Witnessed at FCI Sheridan[1] and Exhibit 2 – Fourth

Declaration of Investigator Courtney Withycombe, regarding statements from inmates at Sheridan.

---

[1] Because the BOP did not consent to public disclosure of many of the photographs in the report, the photographs in the report are redacted, and a full version is filed under seal with the Court. One photo approved for publication is included below.

PAGE 1.   PETITIONERS' STATUS REPORT OF OCTOBER 8, 2021

Last, in light of the Court's direction to continue working with the Respondent in order to address individual medical issues, Exhibit 3 provides recent correspondence describing urgent medical issues at Sheridan and the BOP's response, denying assistance.

In summary, the inspection corroborated the dismal conditions described by inmates at Sheridan that are resulting in widespread distress and harm. In particular, Sheridan lacks an adequate plan to care for those who are ill with COVID-19, resulting in either the overcrowded, unsafe detention of ill inmates in a gymnasium, or the locking of ill inmates into cells where they may spend up to 60 hours straight without medical attention. Further, the effect of Sheridan's general response to the coronavirus pandemic – which is to lock inmates into their cells for extended periods to prevent transmission – was sickeningly, hauntingly evident. Hallway after hallway of locked doors; empty outside areas; closed programming spaces; inmates calling out through the crack at the seam of their door, begging for a shower, or for medical care, or just to be let out. It is hard to capture in writing either the fear and desperation that permeated the inmate encounters, or the contrasting equanimity of the staff, who seemed inured to the suffering going on around them.

Petitioners intend to submit discovery requests to the Respondents as soon as possible, but no later than October 29, 2021. The government did not provide an anticipated response date. The briefing schedule should be set after the government's response to the discovery requests, and after any evidentiary hearing if needed.

**COVID OUTBREAK**

As shown in the graph below, Sheridan is experiencing its worst COVID-19 outbreak to date. According to information provided by the government in this lawsuit, two inmates were hospitalized last month with COVID-19, and at least 102 inmates were ill with COVID-19.



The government's most recent information from October 1, 2021, indicates that the number of ill inmates has decreased to 61, which still exceeds the peak number of sick inmates in the prior three outbreaks.

**COVID ISOLATION MEASURES**

As detailed in the Teesdale Report (Ex. 1), Sheridan has isolated inmates who are ill with COVID-19 by placing them into locked cells, in the SHU, in unit J3 of the FDC, or in a gymnasium at the FCI. The photograph below shows the gymnasium with COVID-19 patients in mid-September, just prior to the inspection:

PAGE 3.   PETITIONERS' STATUS REPORT OF OCTOBER 8, 2021



*FCI Sheridan Gym Prior to Inspection, Government Discovery USA000011 – Blur added.*

As accurately described in many inmate messages, the inspection revealed that the gymnasium was not equipped to house the 60 sick inmates who were placed there. There were only two toilets and one shower (a converted mop closet) for this large number of people. The bathroom facilities were not easily accessible for those having difficulty walking. Further, the only reliably available drinking water was from the single sink in the bathroom, which was also used for handwashing. When the inspection team was present, two large, empty Gatorade water containers sat outside the gymnasium. Staff explained that these were ordinarily full of water and available for the inmates in the gymnasium. There were no cups visible. Inmates later stated that the water was not replenished, and that these containers had appeared right before the inspection.

PAGE 4. PETITIONERS' STATUS REPORT OF OCTOBER 8, 2021

Because medical staff are not on-site over the weekend, inmates who are ill with COVID-19 are not medically monitored for the over 60 hours between 5 p.m. on Fridays and approximately 7 a.m. on Mondays when weekday staff return.

**LACK OF ACCESS TO MEDICAL CARE**

As documented in the Teesdale Report (Ex. 1) and the Withycombe Declaration (Ex. 2), inmates reported significant difficulties in obtaining needed medical care. The inspection revealed that Sheridan FCI appeared well-equipped with medical equipment, pharmaceutical supplies, and a dental procedures room, but inmates did not have access to these services. As the government pleadings indicate, in order to access medical care, inmates must submit a written request to the staff, and those requests are gathered up just 4 times per week ("Staff collect Inmate Request to Staff Forms at the lunch mainline on the following days: Monday, Tuesday, Thursday, and Friday.") (ECF 77, p. 2). Inmates report that they receive no responses to their many requests, and that urgent medical conditions go untreated. The BOP declined to respond to requests submitted by counsel on behalf of inmates (Ex. 3).

Several inmates approached or called out to the inspection team to describe untreated medical issues, as documented in the Teesdale Report. Because neither staff nor inmates could be interviewed during the inspection, the lack of access questions could not be answered through the tour. Discovery requests will be aimed at identifying the access issues. As detailed in the Withycombe Declaration, however, dozens upon dozens of inmates complain of an inhumane level of medical neglect.

**COVID PREVENTION MEASURES**

The primary methods to prevent a worsening pandemic at Sheridan appear to be vaccinations for inmates and staff, testing for COVID-19 at unknown intervals, and locking

PAGE 5.  PETITIONERS' STATUS REPORT OF OCTOBER 8, 2021

inmates in their cells for entire days or stretches of days. The government's most recent reports indicate that as of October 1, Sheridan had administered 1,227 vaccinations to inmates. The population as of October 1 was 1,553 inmates. Because some of the inmates who received vaccinations have since left Sheridan, the vaccination rate is likely lower than the 79% these figures would indicate. As of October 1, 2021, 197 staff had been vaccinated. In April, responses to discovery the government reported 317 staff at Sheridan, which would indicate a vaccination rate of 62%.

As described in Exhibits 1 and 2, the lockdown measures seen in effect at Sheridan during the inspection allowed inmates out of their cells only 15 minutes per day. Inmates were visibly distraught and traumatized by the degree of restriction they were experiencing. Slightly less harsh periods of lockdown have been in effect ever since April of 2020, when two weeks of complete lockdown were ordered, followed by periods of up to four hours out of cells. The Report of Dr. Grassian (ECF 72-2) describes the adverse effects that such conditions of confinement have for the inmates.

**CONCLUSION**

The inspection of Sheridan FCI corroborated inmate accounts of inhumane conditions. After receiving additional discovery, petitioners intend to supplement their request for habeas corpus relief.

Respectfully submitted on October 8, 2021.

/s/ Lisa Hay
Lisa Hay
Attorney for Petitioners

# EXHIBIT 24

Lisa Hay, OSB #980628
Federal Public Defender
101 S.W. Main Street, Suite 1700
Portland, Oregon 97204
Tel:    (503) 326-2123
Fax:    (503) 326-5524
lisa_hay@fd.org

Attorney for Petitioners

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **JOHN PHILIP STIRLING,** | Case No. 3:20-cv-00712-SB |
| **Petitioner,** | EMERGENCY MOTION FOR APPOINTMENT OF A SPECIAL MASTER TO ADDRESS ALLEGATIONS OF RETALIATORY ACTION AGAINST SHERIDAN RESIDENTS AND FOR A TEMPORARY RESTRAINING ORDER BARRING RETALIATORY ADVERSE ACTIONS AND PRESERVING EVIDENCE |
| v. | |
| **DEWAYNE HENDRIX, Warden, FCI Sheridan,** | |
| **Respondent.** | |

The petitioners, through counsel, respectfully move this Court for an emergency order appointing a special master empowered to gather facts, including by taking protected statements from residents of FCI Sheridan and reviewing government writings, and to provide the Court with recommendations addressing 1) whether adverse actions are being taken by BOP employees against complaining residents of FCI Sheridan and, 2) if so, what potential orders should be entered

PAGE 1.   EMERGENCY MOTION FOR APPOINTMENT OF A SPECIAL MASTER AND RELATED
        ORDERS

governmental interest involved.'" *Barrett v. Belleque*, 544 F.3d 1060, 1062 (9th Cir. 2008) (quoting *Procunier v. Martinez*, 416 U.S. 396, 413-414 (1974)). Prisoners have a "constitutional right to petition the government for the redress of grievances[.]" *Turner*, 482 U.S. at 84; *accord Blaisdell v. Frappiea*, 729 F.3d 1237, 1243 (9th Cir. 2013). Further, the right of witnesses "to be protected against lawless violence does not depend upon any of the amendments to the constitution, but arises out of the creation and establishment by the constitution itself of a national government, paramount and supreme within its sphere of action." *In re Quarles*, 158 U.S. 532, 536 (1895).

The "reality and substance of any of a prisoner's rights are only as strong as his ability to seek relief from the courts or otherwise to petition the government for redress." *Bradley v. Hall*, 64 F.3d 1276 (9th Cir. 1995), *overruled on other grounds by Shaw v. Murphy*, 532 U.S. 223, 230 n.2 (2001). Activities that hinder an "honest, unabashed airing of a grievance" burden that right. *Id.* The petitioners and supporting witnesses who have provided the Court information in the course of seeking legal redress for government wrongdoing should receive strong protection under due process and First Amendment principles. *Witherow v. Paff*, 52 F.3d 264, 265 (9th Cir. 1995) (citing *Thornburgh v. Abbott*, 490 U.S. 401, 407 (1989)).

The declaration provides alarming evidence that a contingent of BOP employees were brought to FCI Sheridan from out of the District and have taken it upon themselves to inflict summary punishment against FCI residents in retaliation for complaints about conditions and the lawsuits. For example, in a very short period of time, the Federal Public Defender has received remarkably similar reports of retaliatory violence against the person and property of FCI Sheridan residents:

PAGE 3.   EMERGENCY MOTION FOR APPOINTMENT OF A SPECIAL MASTER AND RELATED
          ORDERS

stretcher, I was probably 75 feet away and I could see blood dripping from the stretcher. They removed several other inmates in handcuffs, those who "bucked" (i.e. stood up for themselves in any way, asked for respect, "talked back"). One inmate, [name redacted], told them "get the f#/$k off of me", and I watched, helplessly through my window, as the 5 police picked him up, 4 feet in the air, and slammed him into the ground. I heard the smack as he hit the ground over all the bustle in the unit. I watched the cops get on top of him, and saw their arms cocking back as they punched him over and over and over. They realized that they wanted to beat him worse than they already had. So they took him into the shower by the ice-room and beat him, I could hear his screams from across the unit.

- The last 2 weeks they have been doing a institutional shake down with a specials team from people from other prisons. These same guys have shook down every unit. They aren't wearing any face coverings potentially continuing the spread of Covid-19. This specials team has also been randomly harassing inmates to provoke into assault.

- as of Monday the 25 of july guards entered fci sherdan and began to strip search our rooms and take our personal property,we were fed sack lunches for 3 days no hot meals, and our linen was taken away numerous inmates were assaulted by these gaurds and as of today i have gone 3 days with no linen i have had to sleep in my sweats an jacket to keep warm.

- They had a shake down yesterday and throw all my personal property away, I lost over 400 dollars worth of my property.

- I WOULD LIKE TO INFORM YOU THAT F.C.I SHERIDAN HAD THIS BIG SERCH OF THE UNITS,YARD ECT.THEY CAME THROUGH AND TOOK ALOT OF EVERYONES PERSONAL PROPERTY AND THROUG IT OUT.I LOST EVERYTHING MISS HAY.ALL MY LEAGAL WORK,PERSONAL PICTUERS,RADIO.THEY JUST DESTOED MY CELL AND MIXED ALL OF OUR STUFF TOGETHER,MY CELL MATE.THROUGH US UP ON THE WALL.

- not feeling well they threw out all my meds in the raid and everyone lost so much stuff, thye threw away my books and most of my commisary and personal items...its terrible whats goin on

- The level of disregard and the dehumanization that these officers in FCI Sheridan imposes on me and I am sure other inmates is becoming overwhelming! And yet we are left to sit and wonder what is next! I never been so depressed in my life and I feel this trauma caused here will forever leave a scar on me!

PAGE 5.  EMERGENCY MOTION FOR APPOINTMENT OF A SPECIAL MASTER AND RELATED ORDERS

in the context of prison litigation to resolve disputed factual conflicts and to gather information relevant to resolving legal issues. *See, e.g., Brown v. Plata.* 563 U.S. 493, 514-16 (2011) (noting decades of fact-gathering work by special master); *Plata v. Schwarzenegger,* 603 F.3d 1088, 1095 (9th Cir. 2010) (noting "role of special master" is envisaged by Rule 53); *United States v. Carter,* 429 F. Supp. 3d 788, 868 (D. Kan. 2019) (appointing special master to investigate facts concerning scope of intercepted attorney-client communications in order to protect Sixth Amendment rights of prisoners), *order vacated in part on other grounds,* 2020 WL 430739 (D. Kan. Jan. 28, 2020). Because the Prison Litigation Reform Act (PLRA) does not apply to habeas proceedings, the restrictions on special masters in that statute, by definition. do not apply to this case. 18 U.S.C. § 3626(f), (g) (defining use of special masters in any "civil action with respect to prison conditions" which do not "include habeas corpus proceedings challenging the fact or duration of confinement in prison").

Magistrate Judges maybe appointed as special masters. Fed.R.Civ.P 53(h). Appointment of a federal magistrate judge as a master in this case may be appropriate in light of the immediate need to gather facts. The special master should be authorized to conduct interviews with FCI Sheridan residents pursuant to an order explicitly protecting them from BOP adverse actions, and to gather BOP writings related to the recent allegations by prisoners, including any writing, physical or electronic, that relates to the recent deployment of out-of-District correctional personnel and any reference to litigation, grievances, and any other form of complaint regarding conditions at FCI Sheridan.

**Temporary Restraining Order.** In deciding whether to grant a temporary restraining order, the courts "look to substantially the same factors that apply to a court's decision on whether

First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal." *Id.* at 567-68. The collected statements of FCI residents easily meet each of these conditions for establishing a prima facie case of unlawful retaliation.

## C.    The Scope Of The Temporary Restraining Order Should Include Protection Against Retaliation As Well As Preservation Of Evidence For The Special Master's Use.

The most urgent need for a temporary restraining order is to address and to forestall any further actions that contribute to the appearance and reality of retaliation for FCI Sheridan residents' exercise of First Amendment rights. The entry of an order narrowly framed to adverse actions resulting from protected conduct will both 1) provide FCI Sheridan residents assurance that the Court monitors litigation to ensure it can go forward without retaliation, and 2) deter any government actors who would otherwise be willing to express disapproval of litigation and complaints through violence to persons and property.

The temporary restraining order should also preserve evidence. Although parties are under a duty to preserve all evidence they know is "potentially relevant to the litigation," *Leon v. IDX Sys. Corp.*, 464 F.3d 951, 959 (9th Cir. 2006), the very nature of the claims here raise concerns that relevant evidence will not be faithfully preserved. Any memoranda, directives, instructions, and other writings, including communications among BOP personnel regarding retaliation for the lawsuit or for raising claims, may be easily lost, especially if these are in the form of text messages. *See, e.g.,* The Washington Post, *Secret Service Erased Texts From Jan. 5 and 6, 2021, Official Says* (July 15, 2022), available at https://www.washingtonpost.com/national-security/2022/07/14/secret-service-texts-erased (last accessed July 31, 2022 at 9:29 a.m.). To the extent BOP staff possess bags of confiscated property from residents, those may be destroyed if no preservation order is issued. The petitioners therefore move for an order preserving evidence

PAGE 9.   EMERGENCY MOTION FOR APPOINTMENT OF A SPECIAL MASTER AND RELATED
          ORDERS

regarding their conditions of confinement. The Court should also enter a temporary restraining order barring BOP employees from engaging in adverse actions against FCI Sheridan residents for exercise of First Amendment rights to make complaints, to act as witnesses, and to access the courts, and should further order the preservation of evidence relating to this matter.

Respectfully submitted on July 31, 2022.


/s/ Lisa Hay
Lisa Hay
Attorney for Petitioners

PAGE 11. EMERGENCY MOTION FOR APPOINTMENT OF A SPECIAL MASTER AND RELATED
ORDERS

# EXHIBIT 25

Derek Bluford, 77108-097
Federal Correctional Institution
P.O. Box 5000
Sheridan, or 97378



Sarah Bluford
102 main sail court
Felsom, CA 95630

95630-233902

Case 3:22-cv-00811-SI    Document 49    Filed 06/10/24    Page 250 of 281

Derek Bluford, 77108-097
Federal Correctional Institution
P.O. Box 5000
Sheridan, or 97378

PORTLAND OR 972
28 FEB 2022 PM 3 L

Sarah Bluford
102 main sail court
Felsom, CA 95630

Hi, Love,                                                                    2-25-2022

So we found out that you can send 5,000 max threw western union. they said you can use more then one form to send money. So you can do five 5,000 and then again the following day. I really need you to send this money as soon as possible. I would like for this to be over with.

He is expecting his money to be on there By the 13th of this month. I have already told him that it will not be a problem and it will be there. You have all of his information that you need. I do not need him putting this into court. that will mess up my chances of going to a low and being closer to you and the girls. Please my Love do this right away, so it can be done and over with.

Dont forget to txt his wife to let her know that the money have been sent to his account. his name again is Deandre Johnston, he is willing to work it out this way instead of Cwit and me getting more time. His number again is 7014-084. Do it all threw western union because it would be easier and done right away. If you have to do it all in portions of 5's that's fine, at longs it's getting done, because he been checking his account every day. Again I'm Sorry about this my Love and Soon you Send the money, this will be over with it.

Please do not tell dad about this, I dont want him or anyone stressing about this, because I'm already stress out. remember do not bring this up over the phone or any other letters. I will be calling you and the girls tommorow night. I miss you all very much.

Hi Love,                                                                                    2-24-2022

    I have to explain something to you that am very ashame of. I took some money from another client and forgot about this issue, because of the situation I was dealing with in court. He gave me 150,000 and now he is here with me in SHU. He is trying to file a claim for a lawsuit. If he does this, I will be charged again and they will added more years to my already sentance now. I have spoken with the guy and we both argeed that if I can get him half on his account within the next two weeks, he will settle for that and will not push for a lawsuit. He want the 75,000 wire to him threw western union, money order or you can call the prison to see if they will accept a check. I do not know the max you can send threw western union, But if you have to do it in portions of 25's or 10's that will be fine as well. my love I need you to send the money as soon as you read this. this is very serious and a urgent matter. I can not go into details about this in these letters. I will discuss this more when I get to ~~camp~~ low. I already told him that the money is on the way, my love please take care of this as soon as possible. I have been very stress out about this. Do not bring this up over the phone or any other letters. His name is Deandre Johnston. He would like it to be threw western union, so it can be done right away and over with. I have also told him due to the amount, it will take about a week to get it all on there. His number is 17014-059 he also said to txt his wife 701-561-2523 and let her know that the money have been placed on his account or a check have been sent to him. thank you my love and again I'm very sorry about this. please send the money this week.

                                                I Love you, My Love

# EXHIBIT 26



**46 NATOMA ST    FOLSOM, CA 95630    916-355-7230**
**INFORMATION REPORT**

Case
FPD22-775

| OFFENSES | |
|---|---|

**F/M  Offenses**
Information    Informational Only

| | |
|---|---|
| **Date Occurred** 02/28/22-02/28/22 | **Time Occurred** 1850 | **Incident #** 2202280118 |
| **Date Reported** 02/28/2022 | **Time Reported** 1850 | |
| **Related Cases** | | |
| **Date Printed** 03/04/2022 | **Time Printed** 10:53:07 | **Printed By** 3213 |
| **Latitude** 38.685750 | **Longitude** -121.139620 | |

| Location 102 Mainsail Ct, Folsom, CA 95630 | Beat 2 | Area 2 | Disposition Information Only | Dispo Date 02/28/2022 |
|---|---|---|---|---|

| Location Type House (includes driveway) | Location of Entry | Method of Entry | Point of Entry | Alarm System | Means of Attack (Robbery) |
|---|---|---|---|---|---|

| Reporting Party Bluford, Sarah Marie | Drivers License D8681430 CA | Cell Phone | Email | | | |
|---|---|---|---|---|---|---|

| Residence Address 102 Mainsail Ct, Folsom, CA 95610 | Notified of Victim Rights | Residence Phone 916-599-5086 | DOB 09/05/1988 | Age 33 | Sex F | Race |
|---|---|---|---|---|---|---|

| Business Name and Address | Business Phone | Height 5`5" | Wt 115 | Hair BRO | Eyes |
|---|---|---|---|---|---|

| Assistance Rendered/Victim Disposition | Transporting Agency | Means of Attack (Assaults) |
|---|---|---|

| Description of Injuries | Other Information |
|---|---|

| Other Involved Bluford, Derek Lavon | Drivers License ███████ | Cell Phone | Email | | | |
|---|---|---|---|---|---|---|

| Residence Address ████████████ | Residence Phone ████████ | DOB 03/23/1987 | Age 34 | Sex M | Race B |
|---|---|---|---|---|---|

| Business Name and Address | Business Phone | Height 5`6" | Wt 165 | Hair | Eyes |
|---|---|---|---|---|---|

| Suspect Name | Action Taken | Charges | | | |
|---|---|---|---|---|---|

| Residence Address | Residence Phone | DOB | Age | Sex | Race |
|---|---|---|---|---|---|

| Business Name and Address | Business Phone | Height | Wt | Hair | Eyes |
|---|---|---|---|---|---|

| Identifying Features | Cell Phone | Drivers License | Arrest Number |
|---|---|---|---|

| Aliases | CII |
|---|---|

| VEHICLES | |
|---|---|

| Status | Vehicle Make and Model | License/State | VIN |
|---|---|---|---|

| OFFICERS | |
|---|---|

| Prepared By 185 - Lasater, Jon | Date 02/28/2022 | Assisted By | Approved By 219 - Grueneberg, Mike | Date 03/03/2022 |
|---|---|---|---|---|

| Routed To | Date | Routed To | Date | Notes |
|---|---|---|---|---|

# CONTROLLED DOCUMENT - DO NOT DUPLICATE

| | FOLSOM POLICE DEPARTMENT | Page 2 |
|---|---|---|
| | 46 NATOMA ST    FOLSOM, CA 95630    916-355-7230 | FPD22-775 |
| | NARRATIVE | |

**SUMMARY:**

On 02/28/2022 at approximately 1850 hours I responded to 102 Mainsail Court for a report of a possible extortion attempt. I contacted the reporting party, Sarah Bluford, at her residence. She related the following to me in summary:

*'my husband is currently incarcerated at the Federal Prison in Sheridan, Oregon. Last month he got involved in some type of incident involving other people trying to extort money from him. He was locked in Solitary confinement and is not allowed phone calls. I received a letter that was labeled from him, but when I read it, I could immediately tell that it was not from him. The hand writing is not the same and there our grammatical and spelling errors. In this letter, the person pretending to be Derek said I needed to send a check for $75,000 dollars or else he will face additional time in prison. I am just wanting documentation, because I am going to follow up with the Bureau of Prisons and the Inspector General's Office'.*

*END OF STATEMENT.*

R/P-Bluford provided me with a photocopy of an original letter from her husband, and a copy of the fake letter. I could tell the difference in the handwriting, as well as a noticeable difference in the verbiage and grammar.

I provided R/P-Bluford with a case number and told her to contact me if she received any further correspondence.

**RECOMMENDATIONS:**

This report was taken for information only.

| Prepared By: | | Date: | Approved By: | | Date: |
|---|---|---|---|---|---|
| 185 | LASATER, JON | 03/02/2022 | 219 | GRUENEBERG, MIKE | 03/03/2022 |

**CONTROLLED DOCUMENT - DO NOT DUPLICATE**

# EXHIBIT 27

| ![seal] BP-A0288 | **INCIDENT REPORT** | |
|---|---|---|
| | Dept. of Justice / Federal Bureau of Prisons | |

| Inmate's Name | Register Number | Incident Report Number |
|---|---|---|
| **BLUFORD, DEREK** | **77108-097** | **3631930** |

### Part II - Committee Action

17. Comments of Inmate to Committee Regarding Above Incident

**Inmate Bluford statement="I was being threatened and forced to send money to another inmate. Check the cameras, I was assaulted by Carter and Wells. I did not remember the Lieutenant's name. I did cooperate with the government. I am contesting the dates within policy of when investigation started and when I was notified of my incident report."**

18. A. It is the finding of the committee that you:

   **X** Committed the Prohibited Act as charged.

   — Did not commit a Prohibited Act.

   — Committed Prohibited Act Code(s)

B. _ The Committee is referring the Charge(s) to the DHO for further Hearing.

C. **X** The Committee advised the inmate of its finding and of the right to file an appeal within 20 calendar days.

19. Committee Decision is based on Specific Evidence as Follows:

**Based on greater weight of evidence of staff not finding any evidence of allegations made by Inmate Bluford, UDC supports code 313 lying or falsifying statement.**

20. Committee action and/or recommendation if referred to DHO (Contingent upon DHO finding inmate committed prohibited act)

**Loss of email for 60 days**
**Start: 05-24-2022**

21. Date And Time Of Action  **05-23-2022 1315 hrs**  (The UDC Chairman's signature certifies who sat on the UDC and that the completed report accurately reflects the UDC proceedings.)

**B. Cray**

**B Sponsler**

| Chairman (Typed Name/Signature) | Member (Typed Name) | Member (Typed Name) |
|---|---|---|

The Government Paperwork Elimination Act (GPEA) of 1998 authorized Federal Agencies the use of electronic forms, electronic filing, and electronic signatures to conduct office business.

# EXHIBIT 28

**Stuart Grassian, M.D.**
401 Beacon Street
Chestnut Hill, MA 02467
(617) 244-3315; fax (617) 244-2792
stgrassian@gmail.com

## Declaration:

## Psychiatric Report in *United States of America v. John Philip Stirling,*
## U.S. Dist. Ct., Oregon, No. 3:19-cr-001590MO

My name is Stuart Grassian, M.D.   I am a Board-certified psychiatrist, licensed to practice medicine in the Commonwealth of Massachusetts and was on the teaching faculty of the Harvard Medical School for over 25 years. As described in detail in the Qualifications section of this Declaration, I have significant experience in evaluating the psychiatric effects of stringent conditions of confinement.  In addition, during the past year I have learned about conditions of confinement that have occurred in prisons  during the COVID-19 pandemic in the United States and Canada. In the present litigation, I was asked to prepare a report concerning the psychiatric effects of lockdown confinement during the COVID-19 pandemic at the Federal Prison Complex at Sheridan, Oregon.

### 1.  Qualifications.

My C.V. is attached hereto as Exhibit A to this Report. I have been actively engaged as a psychiatric clinician continually since 1974, when I began my psychiatric residency at Beth Israel Hospital – Harvard Medical School.

1

During the course of my professional career, I have had extensive experience in evaluating inmates who were experiencing, or had in the past experienced, stringent conditions of confinement, such as conditions that have traditionally been termed as "solitary confinement". In 1983, I published an article in the American Journal of Psychiatry (AJP) describing a particular psychiatric syndrome associated with solitary confinement. The article also noted that this syndrome had been previously described in the psychiatric literature. This article[1] is attached hereto as Exhibit B to this declaration, and is incorporated herein.

My observations and conclusions generally regarding the psychiatric effects of such confinement have been cited in a number of federal court decisions in the United States, for example: *Davenport v. DeRobertis*, 844 F.2d 1310 (7th Cir. 1988), *Coleman v. Wilson*, 912 F. Supp. 1282 (E.D. Cal., 1995), *affirmed sub nom Brown v. Plata* (2011), 131 S. Ct. 1910), *Madrid v. Gomez*, 889 F. Supp. 1146 (N.D. Cal. 1995), and in several United States Supreme Court decisions, including in an opinion of Justice Kennedy in *Davis v Ayala*, (2015) 135 S. Ct. 2187, and a statement of Justice Sotomayor in *Apodaca v. Raemisch*, (2018). 586 U.S. ____. My opinions have also been cited in a number of federal court decisions in Canada, for example: *British Columbia Civil Liberties Association and John Howard Society vs. Attorney General of Canada,* (2018) , B.C.J. No.53, BCSC 67; *Brazeau v. Attorney General of Canada,* (2019) ONSC 1888; *Reddock v. Attorney General of Canada (2019)* ONSC 5053.

---

[1] *Psychopathological Effects of Solitary Confinement.* Am. J. Psychiatry, 140:1450-1454, 1983.

2

I prepared a written declaration for *Madrid* describing the medical literature and historical experience concerning the psychiatric effects of restricted and isolated conditions of confinement as well as of other conditions of restricted environmental and social stimulation, and subsequently compiled the general (non-institution, non-inmate specific) portions of that declaration into an article entitled *Psychiatric Effects of Solitary Confinement*, 22 Wash. U. Journal of Law & Policy (2006) (attached hereto as Exhibit C and incorporated herein). This article describes the extensive body of literature, including clinical and experimental literature, regarding the effects of decreased environmental and social stimulation in a variety of medical and non-medical situations, as well as in relation to the effects of segregated confinement on prisoners.[2]

---

[2] I have given lectures and seminars regarding these issues. They include, but are not limited to, lectures at Harvard Medical School-Beth Israel Hospital, Boston, at meetings of the Nova Scotia, Virginia and New York State Bar Associations, The Office of Military Commissions of the U.S. Department of Defense (regarding Guantanamo detainees), The Federal Capital Defenders Habeas Unit, The John Jay College of Criminal Justice, and the American Correctional Association, as well as invited testimony before state legislative hearings in New York, Massachusetts and Maine.

I have been retained as an expert in class-action investigations and lawsuits regarding these issues in Massachusetts (2), New Jersey, New York (3), California (2), Kentucky, Michigan, Ohio (2), Pennsylvania, Texas and Florida, as well as individual cases in other states, including Alabama, Arizona, California, Connecticut, Delaware, Florida, Georgia, Kansas, Kentucky, Illinois, Louisiana, Maine, Massachusetts, Mississippi, Nevada, New Mexico, New York, North Carolina, Nova Scotia, Oregon, Pennsylvania, Tennessee, Texas, Vermont, Virginia, the State of Washington, Washington D.C. and Wisconsin. I have been retained and consulted by a variety of public advocacy groups, including The Legal Aid Society of New York, Prisoner's Legal Services of New York, the Center for Constitutional Rights, The Massachusetts Correctional Legal Services, The Massachusetts Civil Liberties Union, the National Prison Project of the American Civil Liberties Union, the Department of Corrections of the State of Florida, and various religious organizations. I have also been appointed to the Advisory Committee of the New York State Commission on Quality of Care & Advocacy for Persons with Disabilities.

Since the tragic events of September 11, 2001, I have also been consulted regarding the confinement of a number of individuals who were deemed to be "enemy combatants" and/or were either charged with or convicted of conspiring against the United States. These include individuals who were confined in Guantánamo, in the Navy Brig in Charleston, S.C., in the Federal ADX prison in Florence, Colorado and in the SeaTac facility in Seattle, Washington, as well as in federal detention centers in New York City and Miami, Florida.

During the past year, I have learned about the effects of the COVID-19 pandemic on prison conditions in the United States, including through my involvement in the Advisory Committee of the New York State Justice Commission for People with Disabilities, and in Canada through my involvement in *Lloyd v. Attorney General of Canada,* Supreme Ct. of BC, No. VA-207500, a class-action suit regarding COVID-19 conditions in the federal prisons in Canada.

## 2. Sources of Information.

- •. Declarations of Courtney Withycombe dated June 30 and December 8, 2020.
- •. Descriptions written by each inmate who joined the lawsuit as of June 7, 2021
- • February 8, 2021 oral argument transcript regarding John Stirling..
- •. Interview with John Stirling dated October 28, 2020.
- •. Medical records of Tracy Nichols.
- •. Interview with Tracy Nichols, 11/24/2020.
- •. Respondents' Responses to Petitioner's Requests for Admission.
- •. Respondents' Responses to Petitioner's Second Set of Interrogatories.
- •. Interview with Timothy Rourke. 10/28/2020.
- •. Interview with Jacob McNeil March 30, 2021.
- •. Letter from Mr. McNeil to Lisa Hay, October 31, 2020, regarding his health.
- •. Letter to Court of Dr. Melissa Chubbuck dated August 26, 2020 regarding Mr. McNeil's health.
- •. McNeil's medical records.

## 3. Conditions of Confinement at Sheridan Facilities During the Pandemic.

The interviews I conducted and the documents which I reviewed indicate that since the onset of the COVID-19 pandemic in March of 2020, inmates in the Sheridan facilities have been in varying lockdown conditions multiple times, sometimes for extended periods

4

of time. These originally were ordered as part of the Bureau of Prisons' response to the pandemic, and have apparently then continued as the BOP response, or been precipitated by an inmate or staff member testing positive for the COVID virus. At other times, staff shortages apparently played a role.

Although most of the information I obtained concerned the situation in 2020, in her June 2021 opinion granting Timothy Rourke compassionate release from Sheridan FDC, Federal Court Judge Court Ann Aiken noted that the prison had recently had yet another outbreak of COVID-19, and thus presumably yet another lockdown was in process. Lockdowns were unpredictable, adding to an atmosphere of chronic tension and uncertainty.

The conditions described in Sheridan during lockdown resembled those of solitary confinement.[3] In the sections that follow, I will note the similarities and differences.

**Out of cell time:**

During lockdowns, inmates were housed in their cell for virtually the entire day, with very little opportunity for exercise or outdoor recreation. There are varying accounts of the amount of out-of-cell time allowed, presumably for the most part reflecting different policies in different parts of the prison, and differences over time. In their responses to interrogatories, the Bureau of Prisons stated that during lockdown most inmates were allowed out of their cell 4 hours a day, while a minority were out only 2 hours a day.

---

[3] The term "solitary confinement" has in many settings been changed to e.g. "administrative segregation", "special housing unit", and so forth. The conditions, however, are basically the same.

5

There was at least one inmate report of being allowed out of his cell for four hours a day, at least for some period of time, but in general the inmates informed that their lockup was generally far more severe. In the most severe conditions, inmates have been locked up in their cell either 24 hours a day for many days in a row, or with extremely limited opportunity for outdoor exercise or recreation. The experience of other inmates was variable. There were reports of 1.5 hours a day out of the cell during Monday through Friday, and 24 hour lockup during weekends. Other reports were of only 1.5 hours out of cell every two days. Others of being allowed out of cell two hours a day.

Inmates reported that much of this out of cell activity took place indoors, in a dayroom that was too crowded to allow for proper social distancing, and that for the first four months of the pandemic, there was no opportunity at all to be outside, in the fresh air. Then towards end of summer, outdoor recreation was allowed for about two hours once a week. Outdoor recreational opportunities have been severely curtailed since the beginning of the pandemic; basically the inmates are reduced to walking in circles in the outdoor yard.

In solitary confinement settings, most typically the inmate would be allowed out of his cell for 1-2 hours a day, and access to outdoor exercise is typical, though not universal. In one respect, the opportunity for social interaction among inmates are better at Sheridan lockdown than generally prevail in conditions of solitary confinement. At Sheridan, a group of inmates has recreation time jointly, and thus are free to converse with each other during that time, with the proviso, though, that the crowding and fear of contagion

6

undoubtedly inhibits such social intercourse. In solitary, most typically inmates are housed individually in "cages" surrounded by heavy chain link fencing; however, typically an inmate can converse with inmate in other cages, and especially, of course, with an inmate in an adjacent cage. Thus, in this regard, the conditions in Sheridan lockdown are comparable, and in some respects harsher than typically seen in solitary confinement, while in one respect possibly less harsh than conditions in solitary.

### Contact with family and friends.

Inmates reported that their ability to use the phone was either eliminated or severely limited. An inmate related that when a family member called to inquire about a loved one, the family member who called was only told that the inmate was alive, no further information was provided. All personal visits were cancelled until approximately October 2020, at which point non-contact social visits were allowed only on weekends.

In this respect, lockdown in Sheridan has been harsher than typical conditions in solitary, in which both access to social phone calls and non-contact visits are allowed.

### Hygiene

Inmates stated that during lockdown periods there was grossly inadequate provision of hygiene products, such as cleaning materials, soap and toilet paper. (One inmate described having to use his own dirty laundry as toilet paper because no toilet paper was supplied for a month. Another stated that he was told to use a rag because there was no toilet paper.) Inmates reported instances of garbage being uncollected and food trays not being picked up, so that food residues rotted in the cell, creating foul odors. One inmate

7

stated that meal trays were not picked up for six days, by which time there were maggots living inside the Styrofoam tray.

Inmates complained of not being provided clean laundry for up to two weeks at a time. One inmate who shared his cell with a cellmate reported that they were provided only a small amount of soap and one toothbrush to be shared between the two cellmates. In solitary confinement settings, such lack of hygienic supplies and laundry is extremely rare.

**Food.**

There were multiple descriptions of inadequate and poor quality food being provided. There were many reports that almost all meals consisted basically of baloney sandwiches, along with milk and a piece of fruit or chips. Other inmates said that eventually they did receive one or more hot meals, some of which arrived cold or only partially cooked. There was no opportunity for commissary purchases. Some reports stated that food was served in the cell, passed through the slot in the cell door.

There were several reports that special diets – including diabetic diets - were not provided. One inmate with diabetes reported he was served cake for breakfast and fruit in a sugary syrup.

In solitary confinement, food is almost always eaten in the cell, but at least lunch and supper could be expected to be hot meals. Medically necessary diets are virtually always provided. Commissary availability in solitary is variable.

8

instead he was placed in isolation. He reported that while he was there, staff sometimes forgot to check on him or feed him, and he was given no soap.

• As noted above, several diabetic inmates complained that they were not provided with a proper diabetic diet – even given cake and other sugary products in their meal trays. Moreover, blood sugars that were supposed to be obtained prior to the inmate eating breakfast were not obtained in a timely fashion, so there was no way to know the inmate's fasting blood sugar. Insulin doses were similarly provided haphazardly and not at the proper times. At a Court Hearing, Dr. Jill Ginsburg testified that based on her review of an inmate's records, a morning insulin dose might not be administered until noon or 2pm, and then the evening dose as early as 3pm, a situation that would create chaotic and dangerous fluctuations in blood sugar level.

•. One inmate had undergone surgery for a Dupuytrens contracture at a local hospital and subsequently developed a severe and very painful hand abcess, leaking pus for months. The condition apparently worsened after a second operative procedure by a physician untrained in surgery. This individual also had evidence of coronary artery disease, but there was no treatment or follow-up. He also diagnosed with hepatitis-C with liver scarring, but received no treatment for it at Sheridan. Eventually, a Court Hearing resulted in this inmate receiving compassionate release.

•. Another inmate with a urinary tract disorder was left in quarantine without any urologic follow-up. His pain was so severe that he removed the catheter himself and had to be shown how to use a self-catheter. Self-catheterization with the rigid catheter provided was described as "extraordinarily painful". He eventually developed a urinary tract infection from the multiple catheterizations. This individual also had difficulty with

11

sleep and was ordered sleep medication, but the sleep medication was given him at 3pm, far earlier than a reasonable time for sleep. This inmate too had a Court Hearing that resulted in his receiving compassionate release.

### Conditions Unique to the Pandemic:

#### 1. Quarantine

When an inmate arrived at the facility, he would be placed in quarantine for 30 days, sometimes, as noted above, sharing a cell with two others. One inmate reported that upon arrival at the facility and confined in quarantine, he was initially given only a blanket and sheets. He was allowed no personal property, nor access to a phone. He stated that he was confined in his cell 24 hours a day for the first 10 days before he was finally allowed out of his cell. Inmates also reported that on occasion, staff failed to bring them meals. One inmate related that he learned that staff did not like going back there to the quarantine unit, and often failed to provide needed services.

Inmates in quarantine apparently were let out of their cell only once every three days, at night, for only 30 minutes. One inmate explained that the quarantine unit housed both COVID positive and COVID negative inmates, yet when the inmates in quarantine were allowed out of their cells, all the inmates on that unit – both COVID positive and negative inmates – were out together in a dayroom crowded enough that it was not possible to maintain social distance.

12

Inmates reported being afraid of letting medical staff know if they had any medical problems, out of fear that even symptoms of a mild cold could result in the inmate being sent to quarantine, where he would be even further isolated and exposed to risk.

## 2. Safety, Risk of Contagion.

Inmates reported that many staff resisted wearing masks, and that after about the first six weeks, they generally either failed to wear a mask, or when told they had to, they simply wore them around their neck, providing no protection for the mouth and nose.

There were reports that the quarantine area itself did not provide real protection from contagion. Inmates reported that staff would walk through the quarantine area and then come onto other units without wearing masks or gloves, or they would be wearing gloves but then not change them when they left the quarantine unit. Moreover, inmates reported that the ventilation system was such that the air from the quarantine unit came directly into the dayroom of a non-quarantined unit.

Inmates reported that they were provided one paper mask but then had to use that same mask for several months, even having to jury rig a repair when the string broke off from the mask.

Meanwhile, busses were continually coming in to the facility with new inmates from other facilities.

13

### 4. Opinions Regarding Effects of Conditions at Sheridan: The Psychiatric Effects of Solitary Confinement.

As stated above, the conditions of lockdown at Sheridan are basically those of solitary confinement, conditions involving severe restriction of environmental and social stimulation. It has long been known that such conditions have a profoundly deleterious effect on mental functioning; this issue has, for example, been a major concern for many groups of patients including, for example, patients in intensive care units, spinal patients immobilized by the need for prolonged traction, and patients with impairment of their sensory apparatus (such as eye-patched or hearing impaired patients). This issue has also been a very significant concern in military situations and in exploration - polar and submarine expeditions, and in preparations for space travel.

In regard to segregated confinement, the United States was actually the world leader in introducing prolonged incarceration - and solitary confinement - as a means of dealing with criminal behavior; the "penitentiary system" began in the United States in the early 19th century, a product of a spirit of great social optimism over the possibility of rehabilitation of individuals with socially deviant behavior. This system, originally embodied as the "Philadelphia System," involved almost an exclusive reliance upon segregated confinement as a means of incarceration, and also became the predominant mode of incarceration - both for post conviction and also for pretrial detainees - in the several European prison systems emulating the American model at the time.

The results were catastrophic. The incidence of mental disturbances among prisoners so detained, and the severity of such disturbances, was so great that the system fell into disfavor and was ultimately abandoned. During this process, a major body of clinical literature developed which documented the psychiatric disturbances created by such stringent conditions of confinement. The paradigmatic disturbance was an agitated confusional state which, in more severe cases, had the characteristics of a florid delirium, characterized by severe confusional, paranoid, and hallucinatory features, and also by intense agitation and random, impulsive violence – whether directed at others or self-directed.

The psychiatric harm caused by solitary confinement became exceedingly apparent. Indeed, by 1890, in In re Medley, the United States Supreme Court explicitly recognized the massive psychiatric harm caused by solitary confinement: "This matter of solitary confinement is not ... a mere unimportant regulation as to the safe-keeping of the prisoner .... [E]xperience [with the penitentiary system of solitary confinement] demonstrated that there were serious objections to it. A considerable number of the prisoners fell, after even a short confinement, into a semi-fatuous condition, from which it was next to impossible to arouse them, and others became violently insane; others still, committed suicide; while those who stood the ordeal better were not generally reformed, and in most cases did not recover sufficient mental activity to be of any subsequent service to the community."

15

Concerns about the profound psychiatric effects of such conditions of isolated confinement continued into the twentieth century, both in the medical literature and in the news. The alarm raised about the "brainwashing" of political prisoners of the Soviet Union, Communist China, and especially of American prisoners of war during the Korean War, gave rise to a major body of medical and scientific literature concerning the effects of sensory deprivation and social isolation, including a substantial body of experimental research, especially at Harvard and McGill Universities, that was funded by the United States government and the Canadian Department of Defense.

The medical literature, as well as my own experience and observations, has demonstrated conclusively that, deprived of a sufficient level of environmental and social stimulation, individuals will soon become incapable of maintaining an adequate state of alertness and attention to the environment. Indeed, even a few days of solitary confinement will predictably shift the electroencephalogram (EEG) pattern towards an abnormal pattern characteristic of stupor and delirium. In addition, the lack of access to natural sunlight contributes to a significant disruption of the sleep-wake cycle.

As described in my American Journal of Psychiatry (AJP) article, solitary confinement (as well as other conditions of restricted environmental stimulation) produces a particular psychiatric syndrome:

16

### 4.1. Impairments in Thinking, Concentration and Memory.

After even a relatively brief period of time in such a situation, an individual will begin to descend into a mental torpor - a "fog" - in which alertness, attention and concentration all become impaired. These impairments can become severe enough to result in massive confusion and disorientation. The AJP article described symptoms developing in less than 15 days of solitary confinement, yet of the 14 cases described in the AJP article, eight reported these symptoms. And of these eight, four developed overt confusional states with subsequent partial amnesia for events during the episode. For example: "I went to a standstill psychologically once – lapse of memory." "I didn't talk for 15 days. I couldn't hear clearly." "You can't see – you're blind – block everything out – disoriented, awareness is very bad.... I think I was drooling – a complete standstill."

And even those less severely affected will still experience difficulties with thinking, concentration and memory. For example, an inmate describes trying to read a book, but being unable to concentrate for more than a few minutes, or reading a page and then having no idea what he just read, or he describes not being able to remember what he just ate, or even whether he just ate, and so forth.

### 4.2. Perceptual Disturbances.

#### •. Hyper-responsivity to External Stimulation.

Over time, the restriction of environmental stimulation in solitary confinement causes the individual to become increasingly incapable of processing external stimuli. In

17

such a setting, individuals becomes "hyper-responsive" to even ordinary levels of stimulation; for example, a sudden noise or the flashing of a light jars the individual from his stupor, and becomes intensely unpleasant. Over time, the very absence of stimulation causes whatever stimulation is available to become noxious and irritating. Instances of this include: "You get sensitive to noise – the plumbing system. Someone in the tier above me pushes the button on the faucet, the water rushes through the pipes – it's too loud, gets on your nerves. I can't stand it – I start to holler. Are they doing it on purpose?" "Everything gets exaggerated. After a while, you can't stand it. Meals – I used to eat everything they served. Now I can't stand the smells – the meat – the only thing I can stand to eat is the bread." "What really freaks me out is when a bee gets into the cell – such a small thing."

- **Perceptual Distortions, Illusions and Hallucinations.**

It is well-known that situations of restricted environmental stimulation cause hallucinations. Indeed, commercially produced "sensory deprivation tanks" have been rented by individuals who want to have a "psychedelic experience" without ingesting psychedelics[4]. But when such experiences occur unbidden – and especially in a context where the individual does not feel safe and trusting - they can be terrifying. For example: "I hear sounds – guards saying, 'They're going to cut it [his nerve-damaged leg] off.' I'm not sure. Did they say it, or is it my imagination?" "I overhear the guards talking. Did they say that? Yes? No? It gets confusing. I tried to check it out with [the prisoner in the adjoining cell]; sometimes he hears something and I don't. I know one of us is crazy, but which one? Am I losing my mind?" "There's a guard in my cell; he's holding a noose."

---

[4] A class that includes LSD, mescaline and psilocybin among others.

18

Hallucinations are not the only perceptual aberration experienced by individuals in solitary confinement or other conditions of restricted environmental stimulation. There are distortions and illusions. For example: "The cells walls start wavering." "Melting, everything in the cell starts moving; everything gets darker, you feel you are losing your vision." "They come by [for breakfast] with four trays; the first has big pancakes – I think I'm going to get them. Then someone comes up and gives me tiny ones – they get real small, like silver dollars." "[S]eems like they're doing things behind your back – can't quite see them. Did someone just hit me? I dwell on it for hours."

### 4.3. Affective Disturbances – Depression and Anxiety.

Individuals in solitary confinement often become seriously depressed, even to the point of suicide. Indeed, statistical studies have shown that up to 50% of all prison suicides occur among the relatively small percent of inmates (about 7%) who are housed in solitary confinement.

In addition, inmates in solitary confinement often develop serious anxiety disorders, including acute panic attacks characterized by tachycardia, diaphoresis, shortness of breath, panic, tremulousness, and dread of impending death. For example: "Shortness of breath a lot. My heart pumps real fast. I feel like I don't get enough oxygen. Get frantic." "I start to feel dizzy. I can't breathe." "I start to dwell on things – too many roaches – get scared one might get into my ear. I start to feel hot – extreme heat – then I

19

can barely breathe. I start sweating, heart races, can't sit still, shaking, get a headache – real bad."

### 4.4. Disturbances of Thought Content.

#### •. Obsessive Ruminations.

An adequate state of responsiveness to the environment requires both the ability to focus attention and the ability to shift attention. The impairment of alertness and concentration in solitary confinement leads to two related abnormalities. The inability to focus attention is experienced as the mental "fog" described above (§2.1).

The inability to shift attention results in a kind of "tunnel vision" in which the individual's attention becomes obsessively stuck - almost always on something intensely unpleasant - and in which he cannot stop thinking about that matter; instead, he becomes obsessively – maddeningly - fixated upon it. Individuals in isolated confinement easily become preoccupied with some thought, some perceived slight or irritation (for example, the meal he received was cold), or some sound (for example, the dripping of a faucet),or some bodily sensation which over time grows into an all-consuming, terrifying preoccupation that he has a dread disease.

#### •. Paranoia, Delusions.

In the context of a fearful situation, and with so little to keep the individual anchored to reality, it is not surprising that many inmates in solitary develop paranoid thoughts, and some develop formed delusional beliefs. For example: "I sometimes get paranoid – think they meant something else. Like a remark about Italians. Dwell on it for hours. Get frantic. Like when they push the buttons on the sink. Think they did it just to annoy me." "I

20

suspected they're putting drugs in my cell. The reverend, the priest – even you – you're all in the Scared Straight program. Drive them crazy."

### 4.5. Problems with Impulse Control.

Inmates in solitary confinement have increasing difficulty maintaining impulse control. Chaotic, often violent and often self-destructive behaviors are one of the most serious management problems experienced by staff working with inmates in solitary confinement. For example: "I snap off the handle over absolutely nothing. Have torn up mail and pictures, throw things around. Try to control it. Know it only hurts myself. " "I cut my wrists – cut myself many times when in isolation. Now it seems crazy. But every time I did it, I wasn't thinking – lost control – cut myself without knowing what I was doing."

### 5.  Conclusion:  Inmates Confined in Conditions Such as Those in Lockdown at Sheridan will Inevitably Suffer Harm.

Solitary confinement – being isolated and in a condition of restricted stimulation and occupation – is intrinsically painful for anyone so confined.  The mental fog is exhausting – mentally and physically draining.  As described above, in such a situation, the individual becomes increasingly unable to tolerate ordinary levels of stimulation – noises, lights, smells – all become noxious and jarring.  If the individual attempts to focus attention - reading, watching television, or doing anything else that requires a level of attention and concentration - becomes increasingly difficult and frustrating. For example, individuals I interviewed spoke of trying to read a book or magazine article, but could not concentrate well enough and kept forgetting what they just read.

21

Along with this mental fog, there is its converse – the inability to shift attention will cause the individual to be unable to distract himself from negative thoughts. These troubling thoughts become obsessional in nature, and in a situation like the one which is the focus of this litigation, it is inevitable that those thoughts will focus upon fear, and upon helplessness and anger – fear of disease, and both fear and anger at the thought that those responsible for their safety do not care what happens to them. Individuals whom I interviewed spoke of their inability to stop thinking about their helplessness and their fear of getting sick – either from COVID, or from their own underlying medical conditions - Inmates spoke of staff refusing to get medical care when an inmate was having a medical episode, and staff threatening to send the inmate to "the Hole" if he continued to complain, e.g. about his need for medical attention or his fear of getting sick because staff were not wearing masks. The helplessness itself is humiliating and demoralizing, leaving the individual with an impaired sense of self-worth and personal agency. Inmates I interviewed spoke of feeling like hurting themselves while locked in their cell.

Constant tension, anxiety, and fear are inevitable, and were reported by several inmates with whom I spoke. Inmates spoke of having panic attacks and claustrophobia while locked in their cell. And coupled with those feelings, there is the lack of physical exercise – which combined together to render restful sleep increasingly elusive for some inmates. In my experience, it is especially difficult for inmates to tolerate solitary-like conditions when they do not how long they will be forced to endure those conditions. As a result, individuals in administrative segregation – a solitary confinement classification on

22

indeterminate duration – suffer an additional stress  than do individuals in disciplinary solitary, since the latter is indeed of determinate duration.

## CONCLUSION

Because the conditions of lockdown at Sheridan share characteristics of solitary confinement, including severe restriction of environmental and social stimulation, and based on the written statements of inmates in their petitions and the statements made to me during inmate interviews, I conclude to a reasonable degree of medical certainty that these conditions at Sheridan are having a severely deleterious effect on the population.   The longer the conditions continue, the worse the likely effect on the mental and physical health of inmates.  My recommendation is that steps be taken  immediately to (1) alleviate uncertainty among the inmates by providing frequent, clear, and truthful information; (2) improve medical responsiveness; (3) increase social interaction and contact with family members; and (4) make every attempt to increase COVID safety in the institution, so as to allow some programming and  more time out of cells and on the yard or in the day room. I expect that significant damage has already been done to the physical and mental health of inmates from the extended lockdown conditions, and ameliorating these conditions is imperative.

Signed this 5th day of August, 2021

Stuart Grassian, M.D.

23

CERTIFIED MAIL

Derek Bluford, 77108-097
FCI Lompoc 2
3901 Klein Blvd
Lompoc, CA 93436

9589 0710 5270 0417 6242 76

**PRIORITY** ★ MAIL ★

**TRACKED** ★ ★ ★ **INSURED** ★

**UNITED STATES POSTAL SERVICE**

For Domestic and International Use     Label 107R, May 2014



*Retail*

U.S. POSTAGE PAID
PM
LOMPOC, CA 93436
JUN 05, 2024

97204     **$0.00**

R2304W120448-08

RDC 03

⇔77108-097⇔
District Court Of Oregon
1000 SW 3RD AVE
Clerk of The Court
Portland, OR 97204
United States

DELIVERED





FCC LOMPOC 3901 KLEIN BLVD, LOMPOC CA 93436

DATE: 5/31/24

THE FOLLOWING LETTER WAS PROCESSED THROUGH SPECIAL MAILING
PROCEDURES FOR FORWARDING TO YOU. THIS LETTER HAS BEEN
NEITHER OPENED OR INSPECTED. IF THE WRITER RAISES A QUESTION OR
PROBLEM OVER WHICH FACILITY HAS JURISDICTION, YOU MAY WISH TO
RETURN THE MATERIAL FOR FURTHER INFORMATION OR CLARIFICATION,
IF THE WRITER ENCLOSED CORRESPONDENCE FOR FORWARDING TO
ANOTHER ADDRESS, PLEASE RETURN THE ENCLOSED TO THE ABOVE